## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

TAREQ AQEL MOHAMMED AZIZ
      and
AMMAR AQEL MOHAMMED AZIZ,
      by their next friend,
AQEL MUHAMMAD AZIZ,

      and

JOHN DOES 1-60,

on behalf of themselves and others similarly situated,

             *Petitioners*,

               v.

DONALD TRUMP, President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); JOHN KELLY, Secretary of DHS; KEVIN K. MCALEENAN, Acting Commissioner of CBP; WAYNE BIONDI, Customs and Border Protection (CBP) Port Director of the Area Port of Washington Dulles, and EIGHT UNNAMED CBP AGENTS AT DULLES AIRPORT,

             *Respondents*.

Case No. 1:17-cv-116

Date: January 30, 2017

## FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Pursuant to an Executive Order signed by President Donald Trump on January 27, 2016, the U.S. government banned entry into the United States by all non-citizens from seven listed countries, subject to an undefined waiver process. This ban, when first promulgated, included individuals on immigrant visas and returning lawful permanent residents.

2.      The Immigration and Nationality Act provides no way to legally effectuate such a ban against this category of immigrants.  As a result, upon information and belief, Department of Homeland Security officials have been effectuating the ban by bullying these arriving immigrants into "voluntarily" relinquishing their claims to lawful permanent residence into the United States.

3.      On information and belief, respondents (through their agents and employees) lied to immigrants arriving after the Executive Order was signed, falsely telling them that if they did not sign a relinquishment of their legal rights, they would be formally ordered removed from the United States, which would bring legal consequences including a five-year bar for reentry to the United States. Because respondents knew that there was no valid, legal basis to remove these individuals from the United States, these were material, false representations.

4.      Throughout this time, respondents denied arriving immigrants access to legal counsel.

5.      On information and belief, these acts occurred nationwide, including but not limited to Washington-Dulles International Airport. During the first 24 to 48 hours that the ban was in place, Customs & Border Protection reports that it denied entry to at least 109 individuals. Many of these individuals were unlawfully compelled to "voluntarily" renounce their U.S. immigration status.

6.      Petitioners Tareq Aqel Mohammed Aziz (Tareq) and Ammar Aqel Mohammed Aziz (Ammar) are two brothers of Yemeni nationality, who were granted immediate relative immigrant visas (IR2 category) by virtue of their status as immediate relatives of their father, a US citizen.

7.      On the morning of January 28, 2017, they landed in Washington-Dulles International Airport (IAD). This was a moment that they and their father had waited for and dreamed of for many years. But their dream quickly and inexplicably converted into a nightmare: instead of being permitted to transit to their connecting flight, Tareq and Ammar were handcuffed, detained, forced to sign papers that they neither read nor understood, and then placed onto a return flight to Ethiopia just two and a half hours after their landing.

8.      During the brief time Tareq and Ammar were in the United States, employees or agents of respondents coerced Tareq and Ammar to sign U.S. Citizenship and Immigration Services Form I-407, which is entitled "Record of Abandonment of Lawful Permanent Resident Status." The immigrant visas that they had fought so long and hard to obtain were thereupon cancelled – and, to add insult to injury, this was falsely claimed to be a result of their voluntary request. *See* https://www.uscis.gov/i-407 ("Use Form I-407 to let us know that you have decided voluntarily to abandon your status as a lawful permanent resident of the United States. We will then update your records to show that you are no longer an LPR.").

9.      Tareq and Ammar signed these papers because agents or employees of respondents misrepresented that, if they failed to sign them, that they would be ineligible for entry to the United States for a period of at least five years. That representation was not true.

10.     Tareq and Ammar are currently in Addis Ababa Bole International Airport, where they remain in limbo. They do not want to return to Yemen, which is currently in a state of civil

war. They are thus constructively in the custody of the United States. Tareq and Ammar wish to return to the United States, to reside with their father.

11.    What happened to Tareq and Ammar is illustrative of what happened to dozens—if not hundreds—of LPRs and immigrant visa holders throughout the country on January 27 and 28, 2017. In these circumstances described above, any relinquishment of rights via a form I-407 was not voluntary, knowing, or freely given. Instead, it was the direct product of respondents' agents' misrepresentations as to what would occur if these individuals refused to sign. On information and belief, similarly-situated individuals who did not sign I-407s were ultimately admitted into the United States—thus demonstrating the falsity of the representations of respondents' agents.

## JURISDICTION AND VENUE

12.    Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331, 1361, 2241, 2243, and the Habeas Corpus Suspension Clause of the U.S. Constitution. This court has further remedial authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

13.    Venue properly lies within the Eastern District of Virginia, Alexandria Division because a substantial part of the events or omissions giving rise to this action occurred in the District. 28 U.S.C. § 1391(b).

14.    No petition for habeas corpus has previously been filed in any court to review petitioners' cases.

## PARTIES

15.    Petitioner Tareq Aqel Mohammed Aziz is a 21-year-old citizen and national of Yemen. He was granted an immigrant visa (IR2 category) by the US Embassy in Djibouti, by virtue of being an immediate relative of a US citizen. He is a Muslim.

16.     Petitioner Ammar Aqel Mohammed Aziz, is a 19-year-old citizen and national of Yemen. He was granted an immigrant visa (IR2 category) by the US Embassy in Djibouti, by virtue of being an immediate relative of a US citizen. He is a Muslim.

17.     Aqel Muhammad Aziz is a US citizen. He is a resident of Flint, Michigan. He is a Muslim.

18.     Petitioners JOHN DOES 1-60 are approximately 60 lawful permanent residents of the United States, or immigrant visa holders, all nationals of Syria, Libya, Iran, Iraq, Somalia, Yemen or Sudan, who landed at Dulles Airport on January 27 and/or 28, 2017. Upon information and belief, some of these John Does were, like Tareq and Ammar, unlawfully forced to withdraw their applications for admission by means of being compelled into signing I-407 forms against their will and without their knowledge or consent, and placed on planes headed to foreign countries.[1]

19.     The U.S. Department of Homeland Security ("DHS") is a cabinet department of the United States federal government with the primary mission of securing the United States.

20.     U.S. Customs and Border Protection ("CBP") is an agency within DHS with the primary mission of detecting and preventing the unlawful entry of persons and goods into the United States.

21.     Respondent John Kelly is the Secretary of DHS. Secretary Kelly has immediate or constructive custody of Petitioners and other members of the proposed class. He is sued in his official capacity.

---

[1] Petitioners anticipate seeking leave to file amended pleadings as further John Does are identified.

22.     Respondent Kevin K. McAleenan is the Acting Commissioner of CBP. Acting Commissioner McAleenan has immediate or constructive custody of petitioners and other members of the proposed class. He is sued in his official capacity.

23.     Respondent Wayne Biondi is the Customs and Border Protection (CBP) Port Director of the Area Port of Washington Dulles, which has immediate or constructive custody of petitioners. He is sued in his official capacity.

24.     Respondent Donald Trump is the President of the United States. He is sued in his official capacity.

25.     Respondents Eight Unnamed CBP Agents at Dulles Airport are employees of CBP, acting at all times in their official capacity and under the direct and specific orders of Messrs. Kelly, McAleenan, and Trump. They are sued in their official capacity.

## STATEMENT OF FACTS

### President Trump's January 27, 2017 Executive Order

26.     On January 20, 2017, Donald Trump was inaugurated as the forty-fifth President of the United States. Throughout his campaign, he made repeated and specific promises to enact a "Muslim ban" once elected.

27.     One week later, on January 27, at about 4:30pm, President Trump signed an executive order entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States," which is attached hereto as Exhibit A and is hereinafter referred to as the "EO."

28.     Citing the threat of terrorism committed by foreign nationals, the EO directs a variety of changes to the manner and extent to which non-citizens may seek and obtain admission to the United States, particularly (although not exclusively) as refugees.

29.     Most relevant to the instant action is Section 3(c) of the EO, in which President Trump proclaims "that the <u>immigrant and</u> nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to the interests of the United States," and that he is therefore "suspend[ing] entry into the United States, as <u>immigrants and</u> nonimmigrants, of such persons for 90 days from the date of this order," with narrow exceptions not relevant here. (Emphasis added.)

30.     There are seven countries that fit the criteria in 8 U.S.C. § 1187(a)(12): Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen. According to the terms of the EO, therefore, the "entry into the United States" of non-citizens from those countries is "suspended" from 90 days from the date of the EO.

31.     Consistent with its terms, the EO was at first applied to all noncitizens from the listed countries, regardless of immigration status. Only on the afternoon of January 29, 2016, did Respondent Kelly publish a memorandum stating that the EO would henceforth generally not be applied to returning lawful permanent residents (LPRs).  However, a DHS Fact Sheet clarified that this exception did not apply to first-time entrants on immigrant visas. *See* Exh. C at p.2 ("Importantly, however, lawful permanent residents of the United States <u>traveling on a valid I-551</u> will be allowed to board U.S. bound aircraft and will be assessed for exceptions at arrival ports of entry, as appropriate." (Emphasis added.)).  As of the date of filing this pleading, the EO is still being applied to bar the entry of first-time entrants on immigrant visas.

**Tareq and Ammar**

32.     After performing standard administrative processing and security check procedures, the federal government deemed both Tareq and Ammar to be admissible to the United States as immigrants.

33.     Both individuals were therefore issued valid U.S. immigrant visas, category IR2, by the U.S. Embassy in Djibouti. In order to obtain these visas, they passed rigorous background checks, and the Embassy determined they were not inadmissible for any reason under law. They obtained these visas by virtue of their status as immediate relatives of their father, who is a US citizen. (Neither they nor their father committed fraud or material misrepresentations at any point during the visa process.)

34.     Excited that they would finally be reunited as a family, Tareq and Ammar then traveled from Djibouti to Addis Ababa, Ethiopia, from where they departed on a flight to Washington-Dulles International Airport ("IAD"). The flight departed Ethiopia about two hours before President Trump signed and promulgated the EO. The flight made a stop in Dublin, Ireland, and then landed at IAD at around 8:00am on Saturday, January 28. While in the air, they had no idea that the EO even existed.

35.     Tareq and Ammar intended to be admitted into and enter the United States on their valid IR2 visas, whereupon they would become lawful permanent residents (LPRs), and then continue on to Michigan where their father was awaiting them.

36.     Upon deplaning, officers or agents of respondents handcuffed Tareq and Ammar.

37.     Officers or agents of respondents fingerprinted and photographed them. Officers or agents of respondents also seized Tareq and Ammar's immigration paperwork, including a packet of documents necessary to obtain entry into the United States in LPR status. That material was never returned to Tareq and Ammar.

38.     Tareq and Ammar were forced to wait for approximately an hour until employees or agents of respondents returned. Tareq overheard that his visa had been canceled.

39.     An employee or agent of respondents presented the brothers with documents to sign. Tareq stated that he did not understand the documents. The employees or agents stated that "our country will discuss this problem with your country." Upon information and belief, these officers or agents compelled Tareq and Ammar to sign U.S. Citizenship and Immigration Services Form I-407, which is entitled "Record of Abandonment of Lawful Permanent Resident Status." *See* https://www.uscis.gov/i-407.

40.     Tareq and Ammar were at the time shocked and bewildered. They did not understand the documents presented to them. They were not informed of the legal consequences of those documents. They were not offered the opportunity to consult with legal counsel.

41.     An employee or agent of respondents falsely informed Tareq and Ammar that, if they did not sign the documents, they would be sent to Yemen and that they would be barred from returning to the United States for five years.

42.     It therefore appears that an employee or agent of respondents represented to Tareq and Ammar that, if they declined to sign an I-407, they would be officially removed from the United States and thus subject to an entrance bar of five years. This statement was highly material in these circumstances and it was plainly false. Respondents possessed no legal right to remove Tareq and Ammar from the United States.

43.     In light of this significant pressure exerted by employees or agents of respondents, Tareq and Ammar felt that they had no choice other than to sign the documents. They were fearful that if they did not sign the documents, that they would be indefinitely detained or that they would be barred from entering the United States for a lengthy period of time. Tareq and Ammar did not understand any of the consequences of signing the documents.

44.     Tareq and Ammar were not permitted to keep copies of the documents that they were compelled and coerced into signing. No copies of those documents have been provided.

45.     CBP agents then stamped "Cancelled" over Tareq and Ammar's IR2 immigrant visas.

46.     Subsequently, attorneys for the respondents have suggested that Tareq and Ammar "voluntarily" relinquished their rights as immigrant visa holders. Tareq and Ammar deny that their conduct in signing any documents at Dulles airport was voluntary. They made neither a free choice nor an informed choice.

47.     The reason that CBP agents compelled Tareq and Ammar to sign I-407 documents, is that, because the brothers were not subject to expedited removal, nor inadmissible, there was no other legal mechanism to bar Tareq and Ammar from entering the United States and becoming lawful permanent residents thereof. *See generally* 8 U.S.C. § 1225(b). Yet, they were under specific orders from respondents to bar admission of individuals in Tareq and Ammar's situation. Accordingly, respondents' agents engaged in this illegal scheme.

48.     Tareq and Ammar were then compelled to purchase tickets—at their own expense—on the next flight to Addis Ababa, Ethiopia.

49.     Tareq and Ammar departed Dulles on an Ethiopian Airlines flight on the morning of Saturday, January 28, about two and a half hours after landing at Dulles Airport.

50.     Since arriving in Ethiopia, Tareq and Ammar have been in limbo at the Addis Ababa Bole International Airport. Their passports have been confiscated by Ethiopian Airlines authorities.

51.     Tareq and Ammar do not wish to return to Yemen, which is currently in a state of civil war.  They wish to return to the United States, to live with their father in Flint, Michigan, pursuant to the immigrant visa properly granted by the U.S. government.

**John Does 1-60.**

52.     Petitioners John Does 1-60 are approximately 50-60 returning lawful permanent residents, or individuals traveling on valid immigrant visas entitling them to be admitted into the United States in lawful permanent resident status. Most of these were individuals returning from trips abroad, all of whom are nationals of one of the following seven countries: Lybia, Iraq, Iran, Yemen, Syria, Sudan, Somalia. All were held for some time, during January 27 or 28, 2017, in the international arrivals area of Dulles Airport.

53.     Upon information and belief, many of petitioner John Does 1-60 were, like Tareq and Ammar, forced to withdraw their applications for admission to the United States by means of being compelled against their will and without knowledge or consent to sign forms I-407, and then placed on planes headed to foreign destinations. *See, e.g.*, http://jezebel.com/woman-and-her-2-children-held-at-dulles-airport-for-20-1791762183 (describing how a Somali woman entering the United States on an immigrant visa together with her U.S.-citizen children "was pressured to sign papers and told that her visa had been canceled. When she refused to sign, asking to wait until her husband arrived, immigration officers threatened that she would not be permitted to return to the United States. She was then told to sign her children's paperwork so that they could accompany her back to Africa. . . . 'They handcuffed her, even when she went to the bathroom[.]'").

54.     Discovery will reveal the full identifies of these individuals. Counsel is meanwhile working diligently to uncover the identities of John Does 1-60.

**Petitioners' claim to lawful admission to the United States as immigrants**

55.     No grounds of inadmissibility under the Immigration and Nationality Act applies to either Tareq or Ammar, nor are they subject to expedited removal for any reason, nor is there any reason under Title 8 of U.S. Code or Title 8 of the Code of Federal Regulations to bar them from entering the United States as immigrants and thereby lawful permanent residents.

56.     Congress has provided that immigrants in petitioners' situation are entitled to enter the United States, and that if the government disagrees, it must institute regular removal proceedings before an immigration judge. 8 U.S.C. § 1225(b). The only exceptions to that rule (for example, criminals, stowaways, fraud, or individuals arriving without valid documentation) do not apply here.

57.     The government considers that Tareq and Ammar "withdrew their application for admission" and then voluntarily departed. That is, as a matter of fact, false. The jurisdictional bars of 8 U.S.C. § 1252 therefore do not apply.

**The Court's issuance of a Temporary Restraining Order.**

58.     On January 28, 2017, at approximately 9:30pm ET, this Court granted a TRO. It provided: "a) respondents shall permit lawyers access to all legal permanent residents being detained at Dulles International airport; b) respondents are forbidden from removing petitioners— lawful permanent residents at Dulles International Airport—for a period of 7 days from the issuance of this Order."[2]

---

[2] The government can be expected to argue that Tareq and Ammar were not in fact "lawful permanent residents" as they were never admitted on their immigrant visas. As set forth herein, it makes no material difference to the legal analysis: they were entitled to be admitted; or, failing that, to be placed in regular removal proceedings before an immigration judge.

59.     At the time the TRO issued, unbeknownst to counsel or to their father (or anyone else outside of CBP), respondents had already placed Tareq and Ammar on a plane departing the country, and they were in flight.[3]

60.     At the time the TRO issued, at least some JOHN DOES 1-60 were held in secure areas at Dulles, including in secondary screening.

61.     On the evening of Saturday, January 28, 2017, following the issuance of the Court's TRO, CBP personnel refused to permit any lawyers access to LPRs subject to the new screening provisions established by the Executive Order.

62.     CBP personnel indicated that it would not comply with the order unless it was served via "official channels."

63.     CBP personnel also indicated that the Court's order was limited to LPRs in "detention," but asserted that individuals at Dulles were not in "detention." They claimed that the TRO did not apply because individuals are instead subject to "processing."

64.     Notwithstanding the assertions of CBP personnel, petitioners were not free to leave CBP custody. Additionally, the INS Insp. Field Manual provides, at Section 17.8, that "During an inspection at a port-of-entry, detention begins when the applicant is referred into secondary and waits for processing."

65.     The refusal of respondents' agents to comply with the counsel-access provisions of the TRO are by now well documented. See http://www.thedailybeast.com/articles/

---

[3] Counsel was not aware of this fact because, despite repeated inquiries by telephone and in person, CBP personnel refused to advise counsel as to any facts regarding the brothers' case. Likewise, their father was unaware of this fact because, at no time during their two-and-a-half hours in CBP custody were they allowed to make any telephone calls or otherwise advise anyone in the outside world as to what was happening to them.

[2017/01/29/trump-s-border-patrol-defies-judge-u-s-senator-at-dulles-airport-at-his-first-constitutional-crisis-unfolds.html](2017/01/29/trump-s-border-patrol-defies-judge-u-s-senator-at-dulles-airport-at-his-first-constitutional-crisis-unfolds.html).

66.     U.S. Senator Cory Booker arrived at Dulles airport on the evening of Saturday, January 28, 2017. Respondents' agents continued to refuse compliance. Holding a copy of this Court's TRO, Senator Booker stated that "I am now of the belief that though this was issued by the judicial branch, that it was violated tonight." *Id.*

67.     Senator Booker has submitted affidavit regarding his time at Dulles, attached hereto as Exh. B. In it, he states:

> Prior to my arrival at IAD, a CBP employee who was not present at IAD communicated to my staff member, upon receiving the TRO, that "individuals are not entitled to counsel during immigration processing at a port of arrival." When my staff member challenged their assertion in light of the TRO, they responded that "The lawyers are looking at the order."
>
> Upon arrival, I met with Metropolitan Washington Airports Authority (MWAA) police in an effort to obtain compliance with a Temporary Restraining Order (TRO) from the Eastern District of Virginia (E.D. Va.) and a nationwide stay issued by the Eastern District of New York (E.D.N.Y.). At my request, the TRO was presented by the MWAA police officer to CBP officials on site. I did not speak directly with Customs and Border Protection (CBP) or any other representative of the Department of Homeland Security (DHS).

68.     In the late afternoon of January 29, 2017—approximately 16 hours after the Court issued the TRO—counsel for respondents confirmed that respondents would provide notice of the Court's order to arriving LPRs subject to screenings pursuant to the Executive Order. But respondents refused to permit in-person access to lawyers. Likewise, respondents refused to provide specialized telephone numbers to arriving LPRs, instead providing only generic materials listing the names and phone numbers for 10 different immigration non-profits in the Washington DC metro-area – nine of which respondents knew had no interest in or ability to provide legal

advice to this particular population (and indeed were not even open and available to take calls on a Sunday). *See* https://www.justice.gov/eoir/file-/ProBonoVA/download.

69.     Throughout this time, at all times, more than 25 lawyers were present at Dulles Airport in the international arrivals area, ready and willing to offer free, pro-bono legal services to the JOHN DOES.

70.     Had Tareq, Ammar, and the JOHN DOES been properly advised of their legal rights and the legal consequences of signing an I-407, they would not have done so.

**Representative Allegations**

71.     In addition to Petitioners, there are there are numerous other individuals with legal permanent resident status or who are traveling on valid U.S. immigrant visas who have been or will be either detained and/or coerced into signing a Form I-407. Each of these similarly situated individuals is entitled to bring a petition for a writ of habeas corpus or, in the alternative, a complaint for declaratory and injunctive relief, to prohibit respondents' policy, pattern, and practice of prohibiting class members from entering the United States when they arrive at U.S. borders with valid entry documents and coercing the relinquishment of rights. These similarly situated individuals satisfy the numerosity, typicality, commonality, adequacy of representation requirements established by Fed. R. Civ. P. 23. Petitioners therefore will move this Court for an order certifying a representative class of Petitioners consisting of all individuals with legal permanent resident status or traveling on valid U.S. immigrant visas, who are from Iraq, Syria, Iran, Sudan, Libya, Somalia, and Yemen, legally authorized to enter the United States, and who have been or will be denied entry to the United States on the basis of the January 27, 2017 Executive Order.

**CAUSES OF ACTION**

**COUNT ONE**
**FIFTH AMENDMENT – PROCEDURAL AND SUBSTANTIVE DUE PROCESS**
**DENIAL OF RIGHT TO ENTER UNITED STATES**

72.     Petitioners repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

73.     Respondents have infringed petitioners' procedural and substantive due process rights in multiple respects.

74.     To begin with, petitioners have a due process interest in the statutory rights granted by Congress; that is, "[m]inimum due process rights attach to statutory rights." *Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003) (alteration in original) (quoting *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996)).

75.     U.S. law, including federal statutes and regulations, obligate the United States to allow LPRs and immigrant visa holders admission into the United States, unless those individuals are for some reason inadmissible. In denying petitioners admission to the United States, respondents violated petitioners' procedural and substantive due process rights.

76.     One of the procedural due process rights denied petitioners was access to legal counsel, to their specific and material injury. Respondents prohibited petitioners from conferring with attorneys who were present on the scene and willing to advise and represent them on a *pro bono* basis.

77.     Further, the grant of the immigrant visas to petitioners, such as the IR2 visas to Tareq and Ammar, created an entitlement to the lawful permanent resident status and subsequent provision of a "green card." These entitlements were revoked without due process of law.

78.     Likewise, the conduct of respondents has amounted to an illegal retroactive revocation of the immigration status previously extended by the U.S. government. *See Estrada v. Holder*, 604 F.3d 402, 406 (7th Cir. 2010); *Sharkey v. Quarantillo*, 541 F.3d 75, 86, 93 (2d Cir. 2008); *United States v. Figueroa-Burruel*, No. CR 10-3738-TUC-RCC, 2011 WL 6100288, at *9 (D. Ariz. Oct. 11, 2011), *report and recommendation adopted sub nom. United States v. Burruel*, No. CR 10-3738-TUC-RCC, 2011 WL 6099355 (D. Ariz. Dec. 8, 2011). The retroactive retraction of this status is an unlawful action in violation of due process rights.

79.     The actions of respondents—as well as respondents' employees and agents— coerced or compelled Tareq and Ammar to withdraw their applications for admission against their will. These were neither freely made nor knowing and informed decisions. The conduct of respondents, and their employees and agents, thus violated petitioners' procedural and substantive due process rights.

## COUNT TWO
## THE IMMIGRATION AND NATIONALITY ACT

80.     Petitioners repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

81.     The Immigration and Nationality Act and implementing regulations entitle Tareq, Amar, and John Does 1-50 to enter the United States as immigrants or LPRs.

82.     Respondents' actions in sending Tareq and Ammar to Yemen, and John Does 1-50 to various foreign countries, deprive petitioners of their statutory and regulatory rights.

83.     In particular, because petitioners have valid and/or approved immigrant visas or lawful permanent resident status, denial of admission into the United States violates 8 U.S.C. §§ 1151, 1201, 1225, and accompanying regulations.

## COUNT THREE
## THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C. § 1152

84.     Petitioners repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

85.     Respondents' actions in sending Tareq and Ammar to Yemen, and John Does 1-50 to various foreign countries, also violates 8 U.S.C. § 1152 and accompanying regulations. This statute prohibits discrimination against individuals on the basis of nationality, without sufficient justification.

## COUNT FOUR
## FIRST AMENDMENT – ESTABLISHMENT CLAUSE

86.     Petitioners repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

87.     Tareq, Ammar, and John Does 1-50 were denied entry to the United States or forced to withdraw their applications for admission to the United States and/or abandon their status as lawful permanent residents as a result of the EO.

88.     The EO exhibits hostility to a specific religious faith, Islam, and gives preference to other religious faiths, principally Christianity. The EO therefore violates the Establishment Clause of the First Amendment by not pursuing a course of neutrality with regard to different religious faiths.

## COUNT FIVE
## FIFTH AMENDMENT – EQUAL PROTECTION

89.     Petitioners repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

90.     The EO discriminates against petitioners on the basis of their countries of origin

and religion, without sufficient justification, and therefore violates the equal protection component

of the Due Process Clause of the Fifth Amendment.

91.     Additionally, the EO was substantially motivated by animus toward—and has a

disparate effect on—Muslims, which also violates the equal protection component of the Due

Process Clause of the Fifth Amendment. *Jana-Rock Const., Inc. v. N.Y. State Dep't of Econ. Dev.*,

438 F.3d 195, 204 (2d Cir. 2006); *Hunter v. Underwood*, 471 U.S. 222 (1985).

92.     Respondents have demonstrated an intent to discriminate against petitioners on the

basis of religion through repeated public statements that make clear the EO was designed to

prohibit the entry of Muslims to the United States. *See* Michael D. Shear & Helene Cooper, *Trump

Bars Refugees and Citizens of 7 Muslim Countries,* N.Y. Times (Jan. 27, 2017), ("[President

Trump] ordered that Christians and others from minority religions be granted priority over

Muslims."); Carol Morello, *Trump Signs Order Temporarily Halting Admission of Refugees,

Promises Priority for Christians*, Wash. Post (Jan. 27, 2017).

93.     Applying a general law in a fashion that discriminates on the basis of religion in

this way violates petitioners' rights to equal protection the Fifth Amendment Due Process Clause.

*Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999); *Yick Wo v. Hopkins*, 118 U.S. 356,

373-74 (1886). Petitioners satisfy the Supreme Court's test to determine whether a facially neutral

law—in this case, the EO and federal immigration law—has been applied in a discriminatory

fashion. The Supreme Court requires an individual bringing suit to challenge the application of a

law to bear the burden of demonstrating a "prima facie case of discriminatory purpose." *Vill. of

Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-7 (1977). This test examines the

impact of the official action, whether there has been a clear pattern unexplainable on other grounds

besides discrimination, the historical background of the decision, the specific sequence of events leading up to the challenged decision, and departures from the normal procedural sequence. *Id.*

94.     Here, President Donald Trump and senior staff have made clear that EO will be applied to primarily exclude individuals on the basis of their national origin and being Muslim. *See, e.g.*, sources cited, *supra* ¶ 48, *See, e.g.*, Donald J. Trump, *Donald J. Trump Statement On Preventing Muslim Immigration*, (Dec. 7, 2015), https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration ("Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."); Abby Phillip and Abigail Hauslohner, *Trump on the Future of Proposed Muslim Ban, Registry: 'You know my plans'*, Wash. Post (Dec. 22, 2016). Further, the President has promised that preferential treatment will be given to Christians, unequivocally demonstrating the special preferences and discriminatory impact that the EO has upon Petitioners. *See* sources cited, *supra*.

95.     Thus, Respondents have applied the EO with forbidden animus and discriminatory intent in violation of the equal protection of the Fifth Amendment and violated petitioners' equal protection rights.

## COUNT SIX
## ADMINISTRATIVE PROCEDURE ACT

96.     Petitioners repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

97.     Respondents detained and mistreated petitioners solely pursuant to an executive order issued on January 27 and 28, 2017, which expressly discriminates against Petitioners on the basis of their countries of origin and was substantially motivated by animus toward Muslims..

98.     The EO exhibits hostility to a specific religious faith, Islam, and gives preference to other religious faiths, principally Christianity.

99.     The INA forbids discrimination in issuance of visas based on a person's race, nationality, place of birth, or place of residence. 8 U.S.C. § 1152(a)(1)(A).

100.    The INA and implementing regulations entitle Petitioners to enter the United States as LPRs.

101.    Respondents' actions in detaining and mistreating Petitioners were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of APA § 706(2)(A); contrary to constitutional right, power, privilege, or immunity, in violation of APA § 706(2)(B); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of APA § 706(2)(C); and without observance of procedure required by law, in violation of § 706(2)(D).

## COUNT SEVEN
## RELIGIOUS FREEDOM RESTORATION ACT

102.    Petitioners repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

103.    The EO will have the effect of imposing a special disability on the basis of religious views or religious status, by withdrawing an important immigration benefit principally from Muslims on account of their religion. In doing so, the EO places a substantial burden on petitioners' exercise of religion in a way that is not the least restrictive means of furthering a compelling governmental interest.

104.    Respondents' actions constitute a violation of the Religious Freedom Restoration Act. *See* 42 U.S.C. § 2000bb-1 *et seq.*

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Petitioners pray that this Court grant the following relief:

(1) To the extent that any petitioners remain in custody of respondents, issue a Writ of Habeas Corpus requiring respondents to release petitioners forthwith;

(2) Issue an injunction ordering respondents not to detain any petitioners, including but not limited to the John Doe petitioners, and anyone similarly situated, solely on the basis of the EO, or deny any petitioners admission to the United States solely on the basis of the EO;

(3) Enter a judgment declaring that respondents' detention of petitioners is and will be unauthorized by statute and contrary to law;

(4) Issue an injunction ordering respondents to invalidate the improperly coerced I-407 forms, reinstate the petitioners' immigrant visas and/or LPR status, return the petitioners to Dulles Airport, and admit them into the United States, subject to the laws and regulations existing prior to January 27, 2017;

 (6) Award petitioners their costs and reasonable attorney's fees; and

(7) Grant any other and further relief that this Court may deem fit and proper.

Petitioners/plaintiffs demand a jury trial on all issues and claims so triable.

[Remainder of page intentionally left blank.]

Respectfully submitted,


_____//s//_____          Date: 1/30/2017

Simon Y. Sandoval-Moshenberg (VA 77110)
Mary Bauer (VA 31388)
Rebecca Wolozin (VA 89690)
Elaine Poon (pro hac vice motion forthcoming)
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike #520
Falls Church, VA 22041
(703) 720-5605
simon@justice4all.org
mary@justice4all.org
becky@justice4all.org
elaine@justice4all.org

Andrew J. Pincus (pro hac vice motion forthcoming)
Paul W. Hughes (pro hac vice motion filed)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-2000
apincus@mayerbrown.com
phughes@mayerbrown.com