IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| TAREQ AQEL MOHAMMED AZIZ, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-116 |
| | ) | |
| DONALD TRUMP, President of the United States, et al., | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |

# BRIEF IN SUPPORT OF THE
# COMMONWEALTH OF VIRGINIA'S MOTION TO INTERVENE

Mark R. Herring
Attorney General of Virginia

Trevor S. Cox (VSB No. 78396)
Deputy Solicitor General
tcox@oag.state.va.us

Matthew R. McGuire (VSB No. 84194)
Assistant Attorney General
mmcguire@oag.state.va.us

Stuart A. Raphael (VSB No. 30380)
Solicitor General

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
sraphael@oag.state.va.us

*Counsel for Commonwealth of Virginia*

January 31, 2017

On January 27, 2017, President Donald J. Trump signed an Executive Order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "Executive Order"). That order immediately led to the violation of the constitutional and statutory rights of numerous residents of the United States. Because innumerable Virginia residents have been and will continue to be subjected to degrading and unlawful treatment under the Executive Order, the Commonwealth is compelled to intervene in this case. It is well recognized that a State has a quasi-sovereign interest "in assuring that the benefits of the federal system are not denied to its general population."[1] Here, the Commonwealth has an overriding interest in "the well-being of its" lawful permanent residents as well as residents who have been living, working, and attending school under valid visas.[2] Intervention therefore is required so that the Commonwealth can both protect its own sovereign interests and vindicate its residents' civil rights.[3] Because no existing party adequately represents Virginia's fundamental interest in this case and no party will be prejudiced by permitting intervention at this early stage of the litigation, the Commonwealth's motion to intervene should be granted.

## STATEMENT OF FACTS

Respondents have applied the Executive Order to individuals with lawful permanent resident status, to persons with valid student and work visas, and to individuals who would seek asylum in the United States.[4] The Executive Order provides, in pertinent part:

---

[1] *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 608 (1982).

[2] *Id.* at 602.

[3] *See New York v. Town of Wallkill*, No. 01-Civ-0364, 2001 U.S. Dist. LEXIS 13364, at *5 (S.D.N.Y. Mar. 16, 2001) ("Based on this premise, courts of appeals and district courts routinely have permitted states to use the basic law enforcement tool of *parens patriae* litigation to seek remedies for civil rights violations.").

[4] Section 5 of the Executive Order suspends the U.S. Refugee Admissions Program for 120 days, indefinitely bars the admission of Syrian refugees, caps the number of refugees at 50,000 for

1

**Sec. 3. Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern.** (a) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat.

(b) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed for adjudications and a list of countries that do not provide adequate information, within 30 days of the date of this order. The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State and the Director of National Intelligence.

(c) To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals, pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas).

. . .

(g) Notwithstanding a suspension pursuant to subsection (c) of this section or pursuant to a Presidential proclamation described in subsection (e) of this section, the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the

---

2017, and allows for "case-by-case" exceptions such as "when the person is a religious minority in his country of nationality facing religious persecution."

2

>national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked.

Section 3 effectively bans anyone from Iran, Iraq, Syria, Sudan, Libya, Yemen, and Somalia from entering the United States for the next 90 days unless they are U.S. citizens or "foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas." Critically absent from that list are legal permanent residents, as well as persons possessing J-2 visas, H-1B visas, student visas, and visitor visas.

After President Trump signed the Executive Order, numerous individuals legally traveling to the United States were detained in airports worldwide.[5] The named petitioners in this case are two legal permanent residents, Tareq Aqel Mohammed Aziz and Ammar Aqel Mohammed Aziz, who were detained at the Washington-Dulles International Airport when they landed on January 28, 2017.[6] CBP has declined to release information about the number of persons it has detained, but the petition alleges that at least 50 to 60 other legal permanent residents were likewise detained at Dulles.[7] This Court granted a temporary restraining order on January 28, 2017, ordering that "respondents shall permit lawyers access to all legal permanent residents being detained at Dulles" and that "respondents are forbidden from removing petitioners . . . for a period of 7 days."[8] The amended petition filed on January 30, 2017 states that the Petitioners "were handcuffed, detained, forced to sign papers that they neither read nor

---

[5] Liam Stack, *Trump's Executive Order on Immigration: What We Know and What We Don't*, N.Y. Times (Jan. 29, 2017) ("The immigration ban unleashed chaos on the immigration system and in airports in the United States and overseas . . . ."), https://www.nytimes.com/2017/01/29/us/trump-refugee-ban-muslim-executive-order.html.

[6] Pet. for Writ of Habeas Corpus ¶ 1, ECF No. 1.

[7] *Id.* ¶ 2.

[8] Temporary Restraining Order at 1, ECF No. 3.

3

understood, and then placed onto a return flight to Ethiopia just two and a half hours after their landing."[9]  The Respondents also never allowed "arriving immigrants access to legal counsel."[10]

But the full extent of the Executive Order's impact remains unclear. Because the government has not complied fully and transparently with this Court's TRO, the Commonwealth has been hindered in its ability to identify the Virginia residents who have been detained at Dulles, moved to an immigration detention facility, or removed from the country.

Additionally, Virginia public universities and their administration, faculty, students, and families are being harmed by the Executive Order.  For example, Virginia Tech obtains H-1B visas for faculty members and has a number of employees on such visas.  After the January 27 Executive Order, employees from those countries can no longer enter (or exit) the United States. Virginia Commonwealth University has approximately 100 to 150 students who will be unable to reenter the United States to continue their education (or, alternatively, leave to visit their families).[11]  Students who are unable to perform their course of study because they are denied entry to the United States will cease paying tuition, causing fiscal harm to Virginia's colleges and universities.  Faculty members and other educational personnel who are lawful permanent residents or visa holders but covered by the Executive Order are likewise unable to reenter or exit the United States, interfering with their employment relations and disrupting the operation of Virginia's colleges and universities.  Faculty members at several Virginia universities likely will be forced to forfeit their grant moneys if they are unable to travel.

In sum, there are countless residents of the Commonwealth—people who live in Virginia,

---

[9] Am. Pet. ¶ 7.

[10] *Id.* ¶ 4.  Respondents claimed on January 31, 2017 that they had complied with this Court's order.

[11] VCU also has a campus based in Qatar.  The university's educational programs rely on students and faculty from Qatar being able to travel to Richmond, Virginia.

who work in Virginia, or who attend school in Virginia—whose lives and livelihoods have been and will be irreparably disrupted by the January 27 Executive Order.

## ARGUMENT

I. **The Commonwealth satisfies the requirements to intervene as a matter of right under Rule 24(a).**

Federal Rule of Civil Procedure 24(a) provides that "the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Would-be intervenors must show: "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation."[12] The Commonwealth satisfies each requirement.[13]

First, the Commonwealth has a substantial legal interest in this case. Virginia has a quasi-sovereign interest as *parens patriae* "in the health and well-being—both physical and economic—of its residents in general."[14] Here, the unconstitutional January 27 Executive Order irreparably harms residents of the Commonwealth who have been or will be denied access to their homes, their jobs, their families, and their education. Virginia has an independent interest in protecting its public universities from the academic disruption and fiscal impacts caused when students on academic visas are unable to continue their education (and stop paying their tuition), and when faculty and other personnel holding work visas or permanent-residence status cannot

---

[12] *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th Cir. 1991).

[13] The Commonwealth's motion plainly is timely under Rule 24(a), having been filed within 3 days of the initial petition.

[14] *Alfred L. Snapp & Son*, 458 U.S. at 607.

enter or leave the country.

Second, the Commonwealth's ability to protect its critical interests will be impaired if intervention is denied. While Petitioners have identified various constitutional issues with respect to those persons who are being detained without counsel at Dulles Airport, the problems with the January 27 Executive Order extend beyond Dulles. In the process of resolving the urgent, emerging issues at Dulles, the Court also will be considering the constitutional infirmities of the January 27 Executive Order. Doing so without affording the Commonwealth the opportunity to litigate additional reasons why the January 27 Executive Order should be enjoined would prejudice Virginia in a later case.

Third, the Commonwealth easily satisfies the "minimal" requirement that its interests are inadequately represented by existing parties to the case.[15] Petitioners are rightly focused on the individuals illegally removed from the United States, or detained at Dulles, including those who have been denied access to counsel in violation of the TRO. The Commonwealth too desires that those individuals' constitutional rights be respected. In addition to those individuals, the Commonwealth also seeks relief on behalf of all residents of the Commonwealth whose lives have been thrown into turmoil by the January 27 Executive Order.

## II. Alternatively, the Court should permit the Commonwealth to intervene under Rule 24(b).

Under Rule 24(b), "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." "[T]he movant must satisfy three requirements: (1) the motion is timely; (2) the existence of a shared question of law

---

[15] *Teague*, 931 F.2d at 262 (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). *See also JLS, Inc. v. Pub. Servs. Comm'n of W. Va.*, 321 F. App'x 286, 290 (4th Cir 2009) ("[W]hen a governmental agency's interests appear aligned with those of a particular private group at a particular moment in time, 'the government's position is defined by the public interest, [not simply] the interests of a particular group of citizens.'") (citation omitted).

6

or fact in common with the main action; and (3) no undue delay or prejudice to the existing parties will result from the intervention."[16] "[L]iberal intervention is desirable to dispose of as much of a controversy 'involving as many apparently concerned persons as is compatible with efficiency and due process.'"[17] "The principal consideration . . . is 'whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.'"[18]

As previously explained, the Commonwealth's motion to intervene has been timely filed and addresses the same legal question (whether the January 27 Executive Order is constitutional) and involves similar facts (the status of individuals who have the legal right to be in the United States but are being denied admission or detained). The Commonwealth's motion to intervene comes on the second business day after plaintiffs' petition was filed. Consequently, no party will be prejudiced nor will the case be delayed.

## CONCLUSION

For the reasons stated, the Commonwealth's motion to intervene as a plaintiff should be granted.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA,

By:  /s/
Stuart A. Raphael (VSB No. 30380)
Solicitor General

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219

---

[16] *United States v. North Carolina*, No. 1:16CV425, 2016 U.S. Dist. LEXIS 174103, at *9 (M.D.N.C. Dec. 16, 2016).

[17] *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986).

[18] *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978).

                    (804) 786-7240 – Telephone
                    (804) 371-0200 – Facsimile
                    sraphael@oag.state.va.us

Mark R. Herring
Attorney General of Virginia

Trevor S. Cox (VSB No. 78396)
Deputy Solicitor General
tcox@oag.state.va.us

Matthew R. McGuire (VSB No. 84194)
Assistant Attorney General
mmcguire@oag.state.va.us

*Counsel for Commonwealth of Virginia*

## CERTIFICATE OF SERVICE

    I hereby certify that on January 31, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the counsel of record for Petitioners and Respondents.

                    By:   /s/
                          Stuart A. Raphael