IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| TAREQ AQEL MOHAMMED AZIZ, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-116 |
| | ) | |
| DONALD TRUMP, President of the United States, et al., | ) | |
| | ) | |
| Respondents. | ) | |

**DECLARATION OF CONGRESSMAN DONALD S. BEYER, JR.**

I, Congressman Donald S. Beyer, Jr., declare that the following facts are true to the best of my knowledge, information and belief:

1.  I represent Virginia's 8th congressional district in the U.S. House of Representatives and have served in that position since January 6, 2015.

2.  I previously served as United States Ambassador to Switzerland and Liechtenstein (2009-2013).  In that position I oversaw the consular affairs of the embassy and became familiar with the vetting processes by which the U.S. Department of Homeland Security grants green cards to permanent residents, and by which visa applicants from a Middle Eastern country are subjected to extensive research, often requiring six months to a year to complete.  I also served as Lieutenant Governor of Virginia (1990-1998), and on Virginia's Commonwealth Transportation Board (1987-1990), in which roles I became generally familiar with the operations of Dulles International Airport ("Dulles").

1

3.      I am familiar with the Executive Order signed by President Trump on January 27, 2017, styled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "Executive Order").

4.      I am familiar with the temporary restraining order entered by the Court in this matter on January 28, 2017 (the "TRO"), which I understand requires, in part, that U.S. Customs and Border Protection (CBP) officials permit lawyers access to all legal permanent residents being detained at Dulles.

5.      On January 29, 2017, I visited Dulles in response to reports that CBP officials enforcing the Executive Order were detaining travelers and, contrary to the TRO, were not permitting them access to lawyers. My congressional colleagues Gerry Connolly (VA-11), Jamie Raskin (MD-8), and John Delaney (MD-6) also were present.

6.      I spent more than four hours at Dulles, from about 1 p.m. to 5:30 p.m. During that time, I spoke with numerous families awaiting the arrival of travelers from the seven countries affected by the Executive Order. In some cases, the traveler had arrived at Dulles but had been detained for questioning upon arrival; in others, the traveler had been prevented from boarding U.S.-bound planes in other countries. The families I met were anxious, grief-stricken, and confused.

7.      I was moved by these interactions with families to try to uncover information about the status of detained travelers. Among other things, I investigated whether any of the many attorneys present to provide legal services had been granted access to detained travelers. Attorney after attorney complained to me that CBP would not allow them access to the holding rooms where travelers may have been detained. To my knowledge, not a single attorney was

permitted access to any detained traveler. My congressional colleagues and I were also denied access to detainees.

8.      Alarmed by this situation, my colleagues and I personally attempted to speak with CBP staff. We were denied access to CBP staff by Dulles police, who, while polite, informed us that they were under orders not to allow anyone to make contact with CBP. We asked the deputy police chief to request that CBP officials come to the concourse to speak with us, or allow us to come to their office, to get assurances that they would comply with the TRO. CBP did not respond to our requests.

9.      As a result of these experiences, I concluded (and characterized to others) that CBP's continued enforcement of the Executive Order amounted to a constitutional crisis: four members of Congress asked CBP officials to enforce a federal court order, and we were all turned away.

10.      Notwithstanding CBP's lack of responsiveness, we did what we could to assist affected families. In one instance, we learned of a detained traveler from Sudan, a permanent U.S. resident who holds a Ph.D. and works in northern Virginia. She had been detained on arrival, her green card and passport had been taken from her by CBP, and she had not been permitted access to counsel. Only after I intervened, along with four immigration attorneys and a highlighted copy of the TRO, did CBP release her. The deputy police chief who was our intermediary with CBP explained that CBP had decided to release her and so no lawyer was necessary.

11.      I remain concerned about the continued enforcement of the Executive Order and its impact on members of my congressional district. To take just one example, I am aware that the Sudanese mother of a constituent who is in a coma was recently granted a visa to visit him in

3

an intensive care unit in a Washington, D.C. hospital.  Following issuance of the Executive

Order, she was prevented from boarding her plane in Dubai to make that trip.  I anticipate

learning of other similarly distressing stories affecting constituents.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is

true and correct.

Executed on January 31 , 2017.

DONALD S. BEYER, JR.

District of Columbia: SS
Subscribed and Sworn to before me
this 31 day of January , 2017

Kathleen M.A. Hayes, Notary Public, D.C.
My commission expires June 14, 2020

KATHLEEN M.A. HAYES
NOTARY PUBLIC
MY COMMISSION EXPIRES
6/14/2020
DISTRICT OF COLUMBIA

4