# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | |
|---|---|
| TAREQ AQEL MOHAMMED AZIZ, et al., <br><br> Petitioners, <br><br> v. <br><br> DONALD TRUMP, President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOM AND BORDER PROTECTION; JOHN KELLY, Secretary of DHS; KEVIN K. MCALEENAN, Acting Commissioner of CBP; and WAYNE BIONDI, Customs and Border Protection (CBP) Port Director of the Area Port of Washington, Dulles. <br><br> Respondents. | Civil Action No. 1:17-cv-00116 |

## BRIEF IN SUPPORT OF OSMAN NASRELDIN AND SAHAR KAMAL AHMED FADUL'S MOTION TO INTERVENE

On January 27, 2017, President Donald J. Trump signed an Executive Order, Protecting the Nation from Foreign Terrorist Entry into the United States (the "Executive Order"). The implementation of the Executive Order immediately led to the violation of the constitutional and statutory rights of numerous individuals, including Osman Nasreldin and Sahar Kamal Ahmed Fadul (collectively, the "Intervenors"). More specifically, on or about January 28, 2017, while traveling from Sudan to the United States on a valid K-1 visa, Ms. Fadul was detained at the Washington-Dulles International Airport, coerced into surrendering her visa, and summarily returned to Addis Ababa, Ethiopia, without so much as the opportunity to contact her fiancé, Mr. Nasreldin, a United States citizen and resident of Colorado.

Because the Intervenors have suffered a cognizable harm at the hands of the Executive Branch through the operation of the Executive Order, and because this case will determine both (1) the legality of the Executive Order itself, and (2) whether other individuals affected by the Executive Order can raise claims under the United States Constitution and various federal statutes, this Court should allow Mr. Nasreldin and Ms. Fadul to intervene as a matter of right in this case under Fed. R. Civ. P. 24(a), or, in the alternative, grant permissive intervention under Fed. R. Civ. P. 24(b).

## PROCEDURAL HISTORY

The respondents in this case have used the Executive Order to prevent individuals with lawful permanent resident status, as well as individuals with lawfully-issued visas, from entering the United States. The Executive Order states, in pertinent part:

> Sec. 3. Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern. (a) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat.
>
> (b) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed for adjudications and a list of countries that do not provide adequate information, within 30 days of the date of this order. The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State and the Director of National Intelligence.
>
> (c) To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals, pursuant to section 212(f) of the INA, 8 U.S.C. § 1182(f), I hereby proclaim that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section

> 217(a)(12) of the INA, 8 U.S.C. §1187(a)(12), would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas).
>
> ….
>
> (g) Notwithstanding a suspension pursuant to subsection (c) of this section or pursuant to a Presidential proclamation described in subsection (e) of this section, the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked.

After the Executive Order was signed, numerous individuals traveling to the United States on valid visas were detained in airports worldwide. The named petitioner-plaintiffs in this case, for example, were detained at the Washington-Dulles International Airport ("Washington-Dulles") upon their arrival on January 28, 2017. *See* Pet. for Writ of Habeas Corpus and Compl. for Declaratory and Injunctive Relief at ¶1, ECF No. 1.

That same day, the petitioners filed their writ of habeas corpus and complaint in this Court. *See id*. The petitioner-plaintiffs alleged that the Executive Order, and the implementation thereof, violated the First and Fifth Amendment to the United States Constitution, the Immigration and Nationality Act, the Administrative Procedure Act, and the Religious Freedom Restoration Act. *Id*., at ¶36-59. The petitioner-plaintiffs sought a writ of habeas corpus requiring the release of travelers purportedly detained at Washington-Dulles, an injunction commanding the respondents to refrain from detaining any travelers on the basis of the Executive Order, and a declaratory judgment regarding the validity of the Executive Order. *Id*. at 14. Also on January 28, 2017, the petitioners filed their *Emergency Application for a Temporary Restraining Order*, ECF No. 2, requesting, *inter alia*, an order forbidding the respondents in this case from removing the petitioner-plaintiffs from the United States for a period of 7 days. Later

3

that evening, the Court issued a *Temporary Restraining Order* ("TRO") ordering that respondents permit lawyers access to all "legal permanent residents being detained at Dulles International Airport," and forbidding the respondents from "removing petitioners–lawful permanent residents at Dulles International Airport–for a period of 7 days . . . ." TRO at 1, ECF No. 3.[1] On January 30, 2017, the petitioner-plaintiffs filed their *First Amended Petition for Writ of Habeas Corpus and Class Complaint for Declaratory and Injunctive Relief* ("Amended Petition"), wherein the petitioner-plaintiffs informed the court that at least two members of the proposed class, named petitioners Tareq Aqel Mohammed Aziz and Ammar Aqel Mohammed Aziz, had been coerced into signing U.S. Citizenship and Immigration Services Form I-407, "Record of Abandonment of Lawful Permanent Resident Status." First Amended Pet. for Writ of Habeas Corpus and Class Compl. for Declaratory and Injunctive Relief, at ¶8, ECF No. 7. The *Amended Petition* then alleged that agents of the Executive Branch had forced the two named petitioners to board a flight to Addis Ababa Bole International Airport, where the petitioners remain. *Id.* at ¶10.

On January 31, 2017, the Commonwealth of Virginia filed its *Motion to Intervene*, ECF No. 14. The Commonwealth moved to intervene based on its significant interest in protecting residents from the "ongoing unlawful enforcement" of the Executive Order. Mot. to Intervene at 1, ECF No. 14. A hearing on the motion is set for February 3, 2017.

---

[1] Since this Court issued its TRO, federal district courts in a number of jurisdictions have issued similar orders, recognizing that petitioners affected by the Executive Order have a sufficient likelihood of success on the merits of their claims. *See, e.g.*, Order Granting Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction, *Mohammed v. United States,* No. 2:17-cv-00786-AB-PLA (C.D. Ca. Jan. 31, 2017), ECF No. 7; Temporary Restraining Order, *Tootkaboni v. Trump,* No. 1:17-cv-10154 (D. Ma. Jan. 29, 2017), ECF No. 6; Decision and Order, *Darweesh, v. Trump,* No. 1:17-cv-00480 (E.D.N.Y. Jan. 28, 2017), ECF No. 8; Order Granting Emergency Stay of Removal, *John Doe 1 v. Trump,* No. 2:17-cv-00126 (W.D. Wa. Jan. 28, 2017), ECF No. 5.

## STATEMENT OF FACTS

Like the petitioner-plaintiffs in this case, the proposed Intervenors, Mr. Nasreldin and Ms. Fadul, have had their lives turned upside down by the Executive Order.[2] Mr. Nasreldin is a United States citizen, whose father, born in the Sudan, was granted asylum by the United States in 1999. In 2011, Mr. Nasreldin traveled to the Sudan to visit relatives. During his trip, he met Ms. Fadul, who works as a microbiologist. Over the next three years, while Mr. Nasreldin worked and attended classes, he maintained contact with Ms. Fadul and made two additional trips to the Sudan to see her. In 2014, Mr. Nasreldin and Ms. Fadul were engaged to be married. The couple made plans for Ms. Fadul to join Mr. Nasreldin in the United States after he completed his studies and began work as a dental hygienist. Meanwhile, Ms. Fadul began the process of applying for a K-1 fiancé visa.

On or about October of 2016, after multiple interviews with Department of State personnel at the United States embassy in Khartoum, repeated document submissions, and an extensive vetting process, Ms. Fadul was granted a K-1 visa, and provided with a sealed packet by the Khartoum embassy containing her immigration records. On or about January 1, 2017, Mr. Nasreldin purchased a plane ticket for Ms. Fadul to travel from the Sudan to the United States via Ethiopian Airlines, departing from Addis Ababa Bole International Airport on or about January 27, 2017. When she arrived at Bole International Airport, Ms. Fadul presented her visa to Ethiopian officials, and was permitted to board her flight to Washington-Dulles.

---

[2] All facts contained herein were gathered during an initial conversation with Mr. Nasreldin on February 1, 2017. Additional facts may be forthcoming as more details emerge about the procedures used by the respondents to administer the Executive Order. At this juncture, undersigned counsel must rely upon the facts as set forth by Mr. Nasreldin, and will inform the Court promptly of any additional pertinent facts.

On or about January 28, 2017, Ms. Fadul's flight arrived at Washington-Dulles. The United States embassy had had instructed Ms. Fadul to present her visa and sealed packet of documents to United States Customs and Border Protection (CBP) agents upon her arrival. After her admission into the United States, Ms. Fadul was to board a flight from Washington-Dulles to Denver International Airport, where she would be reunited with Mr. Nasreldin.

Unfortunately, these plans were permanently disrupted by the Executive Order. Upon her arrival at Washington-Dulles, Ms. Fadul was detained by CBP agents, who confiscated her visa and immigration documents and transported her to a holding room, where she was told to wait along with numerous other travelers. She had no access to a telephone and was never given the opportunity to contact her fiancé. Notably, Ms. Fadul does not speak English, and no interpreters were provided for the detainees. Eventually, after watching numerous other travelers called to individual meetings with CBP, Ms. Fadul was given the opportunity to speak with an agent. The CBP agent informed Ms. Fadul that her visa had been cancelled, and demanded that she sign a "form" waiving any rights to enter the United States.[3] CBP did not provide Ms. Fadul with the opportunity to carefully read the form, or provide a translation of the form. With no knowledge of English, no understanding of the United States legal system, and no awareness of her right to request a removal proceeding, Ms. Fadul believed she had no choice but to sign the form. She was then informed that she would be returned to Addis Ababa immediately by Ethiopian Airlines, and she was placed on a flight that same night. She was also informed that her passport would be held by the airline until she was able to reimburse the airline for the cost of the flight. When Ms. Fadul asked if she could at least contact Mr. Nasreldin to inform him of

---

[3] To date, the undersigned counsel has been unable to determine what immigration form, if any, is used to memorialize the withdrawal of a valid K-1 visa.

her predicament, CBP agents denied her request, and indicated that Mr. Nasreldin would eventually be informed of her whereabouts.[4]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 24 sets forth two methods for intervention in a civil proceeding in federal court. Rule 24(a), "Intervention of Right", states, in pertinent part, that a federal district court is to permit "anyone" to intervene who "claims an interest relating to the … transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a).[5] In the Fourth Circuit, a party seeking intervention as of right must show "first, an interest sufficient to merit intervention; second, that without intervention, its interests may be impaired, and third, that the present litigants do not adequately represent its interests." *Cooper Techs., Co. v. Dudas*, 247 F.R.D. 510, 514 (E.D. Va. 2007)(quoting *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976)).

Alternatively, the Court may permit intervention where a movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). However, "[i]n exercising its discretion, the court must consider whether the intervention will

---

[4] Fortunately, fellow passengers on Ms. Fadul's return flight to Addis Ababa showed more courtesy, allowing Ms. Fadul to borrow a cellular telephone and contact Mr. Nasreldin. Mr. Nasreldin spent the majority of the next twenty-four hours attempting to arrange payment for Ms. Fadul's return ticket with Ethiopian Airlines.

[5] Rule 24(a) also requires that a motion to intervene be "timely." Fed. R. Civ. P. 24(a). In *Gould v. Alleco, Inc.*, 883 F.2d 281,(4th Cir. 1989) the Fourth Circuit held that when determining if a motion to intervene was timely, district courts should "look at how far the suit has progressed, the prejudice which delay might cause other parties, and the reason for the tardiness in moving to intervene." *Gould*, 883 F.2d at 286. Each of these factors weigh in favor of intervention in this case. The suit is less than a week old, and petitioner-plaintiffs and Intervenor-Commonwealth of Virginia have consented to intervention. Moreover, the case is still in the pleading stage, and the Fourth Circuit has held that a motion to intervene is clearly timely if made before initial pleadings between the original parties. *See Scardelli v. Debarr*, 265 F.3d 195, 203 (4th Cir. 2001).

7

unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

## ARGUMENT

### A.  THE INTERVENORS HAVE A SUFFICIENT PROTECTABLE INTEREST TO SUPPORT INTERVENTION OF RIGHT

Like the petitioner-plaintiffs in this case, the Intervenors were stripped of their rights under the First and Fifth Amendments to the United States Constitution, as well as various federal statutes, including the Immigration and Nationality Act, 8 U.S.C. §§1101, *et. seq.*, the Administrative Procedure Act, 5 U.S.C. §§500, *et. seq.*, and the Religious Freedom Restoration Act, 42 U.S.C. §§2000bb, *et. seq.*  The Intervenors intend to raise these claims, and potentially other claims, against the respondents if intervention is granted.  The Intervenors therefore have a strong protectable interest in the outcome of this civil action, sufficient to support intervention of right.  Courts in the Eastern District of Virginia have held that for an interest to be "protectable," it must "bear a close relationship to the dispute between the existing litigants and therefore must be direct, rather than remote or contingent."  *Dairy Maid Dairy, Inc. v. United States*, 147 F.R.D. 109 (E.D. Va. 1993).  Here, there is a direct relationship between the injury alleged by the petitioner-plaintiffs and the Intervenors.  Like the named petitioner-plaintiffs, Ms. Fadul traveled to the United States on a valid visa, and she and Mr. Nasreldin were deprived of their constitutional and statutory rights by virtue of the Executive Order.  Furthermore, the petitioner-plaintiffs assert very broad claims against the United States, claims that necessarily implicate the rights of the Intervenors. This is exactly the type of "direct" relationship contemplated by Rule 24 and the relevant Fourth Circuit precedent.  *See, e.g.*, *United States v. Virginia*, 282 F.R.D. 403, 405 (E.D. Va. 2012)  (finding that intervention of right was appropriate where "… the

8

Complaint contains a very broad request for relief that directly implicates the rights and interest of the Petitioners.")

The Fourth Circuit also requires consideration of whether the rights of the Intervenors are likely to be impaired if intervention is denied. *See Virginia v. Westinghouse Elec. Corp.*, 542 F.2d at 216. In this case, that standard is easily satisfied. The petitioner-plaintiffs have moved for a declaration regarding the constitutionality of the Executive Order and also asserted numerous claims arising under the Constitution and federal statutes. Were the Court to adjudicate these issues against the petitioner-plaintiffs without considering the claims of the Intervenors, it is beyond dispute that the Intervenors would face nearly insurmountable obstacles in obtaining relief.

Finally, the interest of the Intervenors is not adequately represented by the current petitioner-plaintiffs. The Supreme Court has held that the "inadequacy" requirement of Rule 24(a) is not a rigorous one, and can be satisfied if the party seeking intervention "shows that representation of his interest 'may be' inadequate …" *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *see also Teague v. Bakker*, 931 F.2d 259, 262 (4th Cir. 1991) (citing *Trbovich* for the proposition that a moving party's burden in showing a lack of adequate representation should be "treated as minimal.") While the Intervenors were also ensnared in the net of the recent Executive Order, their specific factual situation differs from that of the petitioner-plaintiffs, in that Ms. Falud was traveling on a K-1 visa. "In determining whether an interest is adequately represented, 'The easiest case is that in which the [intervenor] has an interest that … is not represented at all. An interest that is not represented is surely not adequately represented and intervention must be allowed." *Jerez v. Republic of Cuba*, No. 1:09mc38 (GBL), 2010 WL 629846, at *3 (E.D. Va. Feb. 16, 2010) (Lee, J.) (quoting 7C

9

CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §1909 (3d ed., rev. 2009).) Here, while the petitioner-plaintiffs share many attributes with the Intervenors, the petitioner-plaintiffs cannot possibly adequately represent the Intervenors, because the petitioner-plaintiffs were entangled in the Executive Order while traveling on a different type of visa. The court should therefore find that intervention of right is appropriate under Rule 24(a).

### B. IN THE ALTERNATIVE, THE COURT SHOULD PERMIT INTERVENTION UNDER RULE 24(b)

Assuming *arguendo* that the Court declines to grant intervention of right under Rule 24(a), the Court should nonetheless permit intervention under Rule 24(b). As an initial matter, there is clearly a common question of law and fact. Both the petitioner-plaintiffs and the Intervenors contest the validity of the Executive Order and assert that the Executive Order and the methods by which it was implemented violated their rights under the Constitution and various federal statutes. The resolution of these issues will necessary affect both the petitioner-parties and the Intervenors. While Rule 24(b)(3) also requires the Court to consider whether permitting intervention will "unduly delay or prejudice the adjudication of the original parties' rights," no such delay or prejudice will occur if the Court permits intervention in this case. The case is still in the pleading stages, and therefore any prejudice to the existing parties will be minimal. *See Liberty Mutual Fire Ins. Co. v. Lumber Liquidators, Inc.*, 314 F.R.D. 180, 187 (E.D. Va. 2016) (finding that permissive intervention would not prejudice the original parties because the case "[was] still in the initial pleadings stage.") Furthermore, as stated *supra*, both the petitioner-plaintiffs and the Intervenor-Commonwealth of Virginia have consented to intervention by Mr. Nasreldin and Ms. Fadul. Therefore, if the Court finds that intervention of

right is inappropriate under Rule 24(a), the Court should still allow permissive intervention under Rule 24(b).

## CONCLUSION

For the foregoing reasons, this Court should permit Mr. Nasreldin and Ms. Fadul to intervene in this case. The Intervenors clearly satisfy the test for intervention of right under Rule 24(a); their motion is timely, they have a protectable interest at stake in the litigation, their rights are likely to be impaired absent intervention, and the existing parties do not adequately represent their interests. If the Court finds that the Intervenors do not satisfy the standard for intervention of right, the Court should nonetheless permit intervention under Rule 24(b); the Intervenors share numerous common questions of law or fact with the petitioner-plaintiffs, and intervention will not prejudice the existing parties in any material way.

Respectfully submitted,

Dated: February 2, 2017

    /s/
Timothy J. Heaphy
VA Bar. No. 68912
Hunton & Williams LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
P: (202) 778-2239
F: (202) 828-3760
theaphy@hunton.com
*Counsel for Intervenors*

**CERTIFICATE OF SERVICE**

I hereby certify that on the February 2, 2017, I electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

                                                  /s/
                                            Timothy J. Heaphy
                                            VA Bar. No. 68912
                                            Hunton & Williams LLP
                                            2200 Pennsylvania Ave., NW
                                            Washington, DC 20037
                                            P: (202) 778-2239
                                            F: (202) 828-3760
                                            theaphy@hunton.com
                                            *Counsel for Intervenors*