IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| TAREQ AQEL MOHAMMED AZIZ, et al., <br> Petitioners, <br><br> COMMONWEALTH OF VIRGINIA, <br> Intervenor, <br><br> v. <br><br> DONALD TRUMP, President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOM AND BORDER PROTECTION; JOHN KELLY, Secretary of DHS; KEVIN K. MCALEENAN, Acting Commissioner of CBP; and WAYNE BIONDI, Customs and Border Protection (CBP) Port Director of the Area Port of Washington, Dulles. <br><br> Respondents. | Civil Action No. 1:17-cv-116 |

## DECLARATION OF EDWARD J. GRASS, ESQ.

I, Edward J. Grass, declare that the following facts are true and correct:

1. Exhibit 1 is the declaration I prepared on January 30, 2017, for use in the case *Darweesh v. Trump*, pending in the Eastern District of New York. The contents of that declaration are true and correct.

2. As detailed at greater length in Exhibit 1, I was personally present as a pro bono attorney at Dulles International Airport in the International Arrival area (near baggage claim) from approximately 4:30 p.m. on Saturday, January 28, 2017, until approximately 12:30 a.m. on Sunday, January 29, 2017. I was so situated that I would have been able to observe if any of the many pro bono attorneys who had gathered with me had been allowed access to the arriving international passengers being held in custody by Customs and Border Protection (CBP).

1

3. As reflected in paragraph 37 of Exhibit 1, the Vice President and Airport Manager at Dulles, Brian Leuck, told me at 10:44 p.m. that he had personally handed a copy of this Court's temporary restraining order ("TRO" or "Brinkema Order") to "Wayne Bond . . . .," whom I understood to be Wayne Biondi, the CBP Port Director of the Area Port of Washington at Dulles.

4. Mr. Leuck cut himself off and then said that he personally "handed" a copy of the Brinkema Order to the "CBP 'duty officer,'" behind the doors marked "No Entry," and that he "was told by CBP they will not comply to allow any access."

5. At no time did I observe any of the many attorneys gathered with me being granted access to any of the persons being held by CBP in custody, despite our repeated insistence that it was required by the TRO.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 2, 2017

_____
Edward J. Grass, Esq.

|   |   |
|---|---|
| HAMEED KHALID DARWEESH and HAIDER SAMEER ABDULKHALEQ ALSHAWI, *on behalf of themselves and others similarly situated*, <br><br> Petitioners, <br><br> v. <br><br> DONALD J. TRUMP, *President of the United States*; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); JOHN KELLY, *Secretary of DHS*; KEVIN K. MCALEENAN, *Acting Commissioner of CBP*; JAMES T. MADDED, *New York Field Director, CBP*, <br><br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DECLARATION OF EDWARD J. GRASS, ESQ.

I, Edward J. Grass, upon my personal knowledge, declare under threat of perjury as follows:

1. My name is Edward J. Grass, a retired Hunton & Williams LLP, litigation partner, residing in Burke, VA, with a current business address of 9501 Burke Road #10784, Burke VA 22015, egrass@me.com, 202-256-2471 cell, and an active attorney license issued by the Commonwealth of Virginia, Bar #48010.

2. This declaration is prepared based on my personal knowledge of attempts by me and fellow attorneys to gain access to individuals detained ("Detainees") by the United States Customs & Border Protection ("CBP") at the Metropolitan Washington Airports Authority Dulles International Airport ("Dulles"), as well as repeated, intentional, and knowing refusals by CBP and Dulles to comply with the "lawyers access" paragraph of the Temporary Restraining Order by The

1
**Exhibit 1--Declaration of Edward J. Grass, Esq.**

Honorable Judge Leonie M. Brinkema in *Tareq Aziz et al., v. Trump, et al.*, No 1:17-cv-116 (EDVA, Jan. 28, 2017) ("Brinkema Order").

3. I depose and state the following under oath based on my personal knowledge and recollection, to the best of my knowledge, information and belief, under the pains and penalties of perjury, and subject to my additional obligation of candor and honesty as an officer of the court.

**EVENTS AT DULLES LEADING TO THE ATTORNEY ACCESS DENIAL AND ACCESS MOTION**

4. On or about 4:30 pm on Saturday January 28, 2017, I arrived at Dulles International Airport, Gate 1, International Arrivals (near baggage claim) to provide legal services *pro bono* to any Detainees and/or their families to avoid irreparable harm from deprivation of liberty through detention and loss of due process rights, including through CBP's new and ongoing deportation activities after the related Executive Order by President Donald J. Trump.

5. Several dozen other lawyers advised me that they were present for similar purposes, and such lawyers, including me, coordinated a variety of efforts to efficiently benefit the Detainees.

6. Starting at approximately 5:00 pm, I personally observed and confirmed with several individual uniformed Officers of the Metropolitan Washington Airports Authority Police Department ("Dulles Police") that they were legally responsible for and in fact in charge of security in that Gate 1 baggage area and were barring entry on behalf of CBP to areas behind several doors marked "No Entry" where Detainees were being held at that time.

7. I observed and personally confirmed with the Dulles Police that they were being supported by, but had superior jurisdiction to, several uniformed officers from the Loudoun County Sheriff's Office ("Loudoun Sheriff").

8. At approximately 5:45 pm, I suggested that a group of lawyers present start work on emergency efforts to seek an order from the United States District Court for the Eastern District of

2
**Exhibit 1--Declaration of Edward J. Grass, Esq.**

Virginia compelling lawyers access to the Detainees to prevent immediate and ongoing prejudice to them from waivers or deportations that they could not consider or challenge without legal help.

9. At approximately 6:05 pm, I spoke with Shahin Fallah, Esq., who advised me that he was there to assist individuals with an arriving family member.

10. Mr. Fallah and I learned that an Iranian Detainee had been permitted to leave the detention area and Dulles, and Mr. Fallah spoke with her.

11. I and other attorneys expressed alarm at the released Detainee's reports of CBP demands for information and the apparent likelihood of ongoing waivers of rights and deportations in violation of Detainee rights.

12. The Detainees were reportedly kept in open groups that were not sequestered or otherwise isolated from contact, meaning, in part, that additional lawyer contact should not be an issue for CBP.

13. At, 6:11 pm, I emailed Simon Y. Sandoval-Moshenberg, Legal Director of the Legal Aid Justice Center ("Mr. Moshenberg"), with the proposed lawyers access effort, and he subsequently retained Mayer Brown LLP to draft relevant legal paperwork (the "Access Motion").

14. From approximately 6:11 pm to 8 pm, I personally worked at Dulles Airport to help coordinate the production of affidavits and other materials in support of the Access Motion.

15. A working group on matters related to the Access Motion included the efforts of attorney Alfred Robinson, Esq. ("Mr. Robinson"), who had a client who already had landed and was a Detainee or would be shortly based on the client's origin and visa status.

16. As part of this Access Motion project, from approximately 7:30 pm to 7:53 pm, I again tested and again was refused access for me, Mr. Fallah, Mr. Robinson, or any other attorney present to reach the Detainees on threat of being arrested.

17. At approximately 7:50 pm, I asked one Loudoun Sherriff's Deputy Officer Purdue for access for me or any other attorneys into the Detainee area to observe it silently and/or assist anyone who might want representation.

18. Officer Purdue politely declined and advised that she would forcibly prevent me from doing so if I attempted to enter, and I would be arrested.

19. At approximately, 8:05 pm, I met and spoke with Metropolitan Washington Airports Authority Police Deputy Chief Damsky ("DC Damsky") who, cordially and professionally, confirmed that I or any other attorney attempting access on any basis would be arrested immediately by him or his Officers.

20. At the same time, I asked DC Damsky to put me in touch with a representative of the CBP to ask them to agree to access.

21. DC Damsky advised me that he would be glad to do so, but that CBP had ignored his attempts at contact throughout the day and had abandoned their normal positions behind the doors marked "No Entry."

22. DC Damsky advised me that he had been "trying to get CBP officers to give me [i.e. DC Damsky] guidance and I cannot reach them."

23. DC Damsky also advised me that he had had no contact with any CBP personnel "for hours", but would find me and let me know if he did have CBP contact in the future that evening.

24. DC Damsky never advised me that he reached anyone with CBP nor put anyone with CBP in touch with me, though I followed up with DC Damsky several times on this topic and he advised that he remained unable to reach anyone with CBP.

**CPB AND DULLES REFUSAL TO COMPLY WITH THE BRINKEMA ORDER**

25. After the Brinkema Order was entered, but before I received a copy, at approximately 9:30 pm, I spoke to DC Damsky to give him a "heads up" that the lawyers access

4
**Exhibit 1--Declaration of Edward J. Grass, Esq.**

requirement appearing in the Brinkema Order had been entered and that I hoped and expected to coordinate with him and CBP for that access to help make the process run smoothly.

26. Shortly thereafter, I met and spoke with Interim Vice President and Airport Manager for Dulles International Brian Leuck ("Mr. Leuk"), who advised that he was the person in charge and responsible with Mr. Damsky for coordinating with CBP for access if such an order arrived and CBP directed him to comply.

27. During this discussion, Mr. Leuck advised me that he personally had all electronic keypad access codes to gain entry to the CBP area where the Detainees were located, and that he had personally used them earlier that evening and personally saw the Detainees.

28. During a similar time period, the working group selected an initial team of 8 attorneys with clients and immigration experience to be ready to enter once the Brinkema Order arrived.

29. At 9:56 pm, I received an electronic copy of the Brinkema Order.

30. I immediately walked the Brinkema Order to Mr. Leuck, who read it on my phone.

31. Mr. Leuck advised that he would not grant access unless and until CBP ordered him to do so.

32. I asked him what if any basis he had to decline the Brinkema Order in favor of CBP instructions, and he said that he had none other than that he would follow their instructions.

33. Soon thereafter, I showed the Brinkema Order to DC Damsky, and had a virtually identical conversation to that with Mr. Leuck, including that DC Damsky would not comply with the Brinkema Order unless and until CBP instructed him to do so.

34. At the same time, DC Damsky advised that he still had not and still could not reach anyone at CBP for guidance on anything.

35. At 10:28 pm, I emailed Mr. Moshenberg the following:

5
**Exhibit 1--Declaration of Edward J. Grass, Esq.**

> I personally showed the Dulles Airport Manager Brian Luke [sic] and his Deputy Chief Damsky the VA access order. They acknowledged it to me, refused to accept a paper copy and are refusing access 'on CBP orders.' Luke [sic] said CBP has seen the va order but no CBP personnel will speak with us.
>
> Edward J Grass, Esq.
> VA Bar 48010
>
> Sent from my IPhone

36. At 10:30 pm, I emailed Mr. Moshenberg the following confirmation that Mr. Leuck had the Brinkema Order in hand, could comply with it, would not comply with it, and that he was aware of the risk of contempt:

> Showed this email to Mr. Luke [sic] who confirmed accuracy and now has a paper copy of the Va order from his attorneys. (I saw him holding the copy).
>
> Mr. Luke [sic] also confirmed that he has the door codes that would enable us to get to and see the LRP Individuals in compliance with Judge Brinkema but he will not use them per CBP orders to him.
>
> I warned him that this might be seen as actionable contempt of court to side with CBP orders over Judge Brinkema. He said "so be it".
>
> Sent from my IPhone
>
> On Jan 28, 2017, at 10:28 PM, Edward Grass <egrass@mac.com> wrote:
>
> I personally showed the Dulles Airport Manager Brian Luke [sic] and his Deputy Chief Damsky the VA access order. They acknowledged it to me, refused to accept a paper copy and are refusing access 'on CBP orders.' Luke [sic] said CBP has seen the va order but no CBP personnel will speak with us.
>
> Edward J Grass, Esq.
> VA Bar 48010
>
> Sent from my IPhone

37. At 10:44 pm, Mr. Leuck began to state to me that he had handed a copy of the Brinkema Order to "Wayne Bond...", who I understood to be Wayne Bondi, Port Director of the Area Port of Washington Dulles, U.S. Customs & Border Protection. Mr. Leuck cut himself off and then said that he personally "handed" a copy of the Brinkema Order to the "CPB 'duty officer'" behind the doors marked "No Entry" and "was told by CBP they will not comply to allow any access."

38. During this same conversation, I again asked why Mr. Leuck would not comply with the access codes in his possession to follow the Brinkema Order, and he responded that he would follow CBP's instructions over the order.

39. During another conversation, moments later, Mr. Leuck advised me that CBP told him they were at that time "going through the waiver process with everybody [Detainees] still inside". Mr. Leuck told me he had no idea what this entailed, what process or standards were being used, and whether irreparable harm or prejudice might result.

40. I explained that this was one reason exactly why the attorneys sought and obtained the Brinkema Order and why he and CBP needed to comply, but Mr. Leuck again rejected compliance. I explained to Mr. Leuck "the importance of them having counsel per the Judge's order so that their rights are not lost and that due process is followed" for every Detainee, not just arbitrarily selected individuals.

41. In fact, two elderly Iranian Detainees, a husband and wife in their late 80s or older, were allowed through and to leave the airport while other Detainees, for unknowable reasons, were not similarly cleared or allowed lawyers to access them.

42. Mr. Leuck then spoke to the released Iranian Detainees' granddaughter in front of me who thanked him, and then Mr. Leuck spoke with me directly to confirm that Mr. Leuck had personally interceded with CBP on the released Detainees' behalf to "get them out" because of their precarious health and because CBP reportedly had discarded their medications. I asked Mr. Leuck if he could or would do the same to help others be released on any basis, and he declined to answer.

43. Several times, until approximately 11:45 pm, I politely reminded Mr. Leuck that he did not have the option to refuse a federal court order in favor of CBP instructions, but he repeatedly declined compliance.

44. I also spoke with DC Damsky to advise him during the same time frame of his own obligation to comply, and he politely declined, saying he would follow CBP instructions.

45. Shortly before midnight Senator Cory Booker arrived at Dulles, and I observed as he walked with a copy of the Brinkema Order to speak with Dulles representatives.

46. Around midnight, I observed as Senator Booker spoke to the assembled crowd.

47. After the speech, I personally spoke with Senator Booker, who confirmed that he had spoken with Dulles representatives who refused access in a way similar to the refusal I and other attorneys had faced earlier.

48. Mr. Leuck advised me that all Detainees had been or would shortly likely be released that evening, which Mr. Booker similarly stated publicly he had been told.

49. Before I left Dulles, Mr. Robinson advised me that he had still not been provided the access to his Detainee client required by the Brinkema Order and did not know where she was or would be held the remainder of the evening.

50. At approximately 12:30 am, on January 29, 2017, I left Dulles.

FURTHER AFFIANT SAYETH NAUGHT.

BY: Edward J. Grass, Esq.
VA Bar # 48010
9501 Burke Road #10784
Burke, VA 22015
egrass@me.com
202-256-2471 cell

Dated: January 30, 2017