IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| TAREQ AQEL MOHAMMED AZIZ, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| THE COMMONWEALTH OF VIRGINIA, | ) | |
| | ) | |
| Intervenor-Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-116 |
| | ) | |
| DONALD TRUMP, President of the United States, et al., | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |

**BRIEF IN SUPPORT OF
THE COMMONWEALTH OF VIRGINIA'S
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

Mark R. Herring
Attorney General of Virginia

Trevor S. Cox (VSB No. 78396)
Deputy Solicitor General
tcox@oag.state.va.us

Matthew R. McGuire (VSB No. 84194)
Assistant Attorney General
mmcguire@oag.state.va.us

Stuart A. Raphael (VSB No. 30380)
Solicitor General

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
sraphael@oag.state.va.us

*Counsel for Commonwealth of Virginia*

February 2, 2017

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS..................................................................................................ii

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 1

STANDARD OF REVIEW ......................................................................................... 5

ARGUMENT ............................................................................................................... 5

I.      The Commonwealth is likely to prevail on the merits.........................................5

        A.      The detention, summary removal, and travel ban imposed on lawful
                permanent residents and visa holders violate their due process rights. ..................6

                1.      Lawful permanent residents have a property interest in their status
                        that is protected by the Fifth Amendment.................................................... 6

                2.      Visa holders likewise have a property interest in their status that is
                        protected by the Fifth Amendment. ............................................................ 8

                3.      The Executive Order also impairs the fundamental liberty interests of
                        lawful permanent residents and visa holders. ........................................... 10

                4.      The Executive Order affords no process to individuals detained
                        under the Order. ....................................................................................... 12

        B.      The Executive Order was motived by animus towards Muslims and
                therefore violates the Establishment Clause and the Equal Protection
                aspects of the Due Process Clause. ......................................................................16

II.     The Commonwealth, its residents, and its public universities are suffering
        ongoing irreparable harm.................................................................................21

III.    The balance of equities weighs in favor of granting the injunction..................22

IV.     The public interest strongly favors the injunction. ..........................................23

CONCLUSION............................................................................................................ 23

CERTIFICATE OF SERVICE .................................................................................... 25

## INTRODUCTION

The Commonwealth of Virginia respectfully requests that this Court enter a preliminary injunction barring Respondents from enforcing Section 3(c) of last week's Executive Order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "Executive Order").  Section 3(c) violates the Due Process Clause of the Fifth Amendment as well as the Establishment Clause of the First Amendment.  Absent preliminary injunctive relief, irreparable harm will continue to afflict numerous Virginia residents who hail from the seven majority-Muslim countries in question, and to whom the Federal Government (the "Government"), after thorough vetting, has already granted lawful-permanent-resident ("LPR" or "green card") status or valid student or work visas (and accompanying spousal/family visas). The balance of equities weighs decidedly in favor of a preliminary injunction because the Virginia residents to whom the ban now applies have *already* been thoroughly vetted by the United States as a condition of earning their green cards or visa status, and any security concern the Government might have as to particular Virginia residents may be addressed on an individualized basis under existing law.  The public interest additionally favors granting the preliminary injunction to protect the constitutional rights of Virginia's lawful immigrant and nonimmigrant residents, as well as to mitigate the major disruption that Section 3(c) is causing to Virginia's colleges and universities.

## STATEMENT OF FACTS

Respondents have applied the Executive Order to individuals with lawful permanent resident status, to persons with valid student and work visas, and to individuals who would seek asylum in the United States.[1]  Section 3(c) of the Executive Order provides, in pertinent part:

---

[1] In addition, § 5 of the January 27 Executive Order suspends the U.S. Refugee Admissions Program for 120 days, indefinitely bars the admission of Syrian refugees, caps the number of

> (c) To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals, pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas).[2]

Section 3(c) effectively bans anyone from Iran, Iraq, Syria, Sudan, Libya, Yemen, and Somalia from entering the United States for the next 90 days unless they are U.S. citizens or "foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas."  Section 3(c) thus bars, from those countries, lawful permanent residents and persons possessing valid visas entitling them to reside in the United States, such as work and student visas (e.g., B-1, H-1B, L-1, O, F-1, F-2, J-1), and their family members traveling on authorized visas (e.g., B-2, J-2, F-2).

Many of the relevant facts were laid out in the Commonwealth's brief in support of its motion to intervene (ECF No. 15) and its show-cause motion (ECF No. 19).  Filed in support of this brief is a declaration from W. Taylor Reveley, III, President of the College of William & Mary and the Chair of Virginia's Council of Presidents.  We previously filed a declaration by Congressman Donald S. Beyer, Jr., who represents Virginia's 8th congressional district in the United States House of Representatives.  (ECF No. 20.)

---

refugees at 50,000 for 2017, and allows for "case-by-case" exceptions such as "when the person is a religious minority in his country of nationality facing religious persecution."

[2] ECF No. 7-1.

In his declaration, President Reveley describes the disruption that § 3(c) has caused to students and faculty at Virginia's colleges and universities, including the plight of students who have left the country and now cannot return, and students who are here now but cannot leave because they will not be readmitted.[3] He describes the disruption to those schools' operations as a result of § 3(c)'s restrictions on faculty members who reside in Virginia with LPR or work visas but who come from the seven majority-Muslim countries at issue.[4] He also discusses the injury to Virginia's economy that will be suffered as a result of restricting access by foreign students, describing the financial advantage "that foreign students bring to our local and State economies, not just during their periods of study but after graduation."[5]

In his declaration, Congressman Beyer details his experience at Washington-Dulles International Airport ("Dulles") on January 29, 2017 and the chaos that resulted from the sudden announcement and immediate implementation of the Executive Order.[6] Congressman Beyer describes how, despite the Temporary Restraining Order (the "TRO") issued by this Court the previous evening (ECF No. 3), "[a]ttorney after attorney complained . . . that [Respondents] would not allow them access to the holding rooms where travelers may have been detained," and that "to [his] knowledge, not a single attorney was permitted access to any detained traveler."[7] Based on Respondents' conduct, Congressman Beyer "concluded (and characterized to others) that [Respondents'] continued enforcement of the Executive Order amounted to a constitutional crisis: four members of Congress asked [Respondents] to enforce a federal court order, and we

---

[3] Reveley Decl. ¶¶ 5-7.

[4] *Id*. ¶¶ 8-12.

[5] *Id*. ¶ 13.

[6] Beyer Decl. ¶¶ 5-9 (ECF No. 20).

[7] *Id*. ¶ 7.

were all turned away."[8]

That already strong evidence that Respondent Customs & Border Protection (CBP) willfully disobeyed this Court's TRO on attorney-access was amplified by information counsel just learned today from Edward Grass, a pro bono attorney who was present at the International Arrival area at Dulles last Saturday night.  (ECF No. 30.)  His first-hand account shows that Respondent Biondi, the CBP Port Director at Dulles, had physical possession of the TRO by no later than 10:44 p.m. and communicated through Brian Leuck (the Vice President and Airport Manager at Dulles) that CBP "will not comply to allow any access."[9]

The Commonwealth has attempted unsuccessfully to discover the full adverse impact of § 3(c) on Virginia residents but has been hampered by the Government's refusal to cooperate and apparent disobedience of the TRO.  Last Sunday, the Attorney General of Virginia sent a letter to CBP seeking the identities of Virginia residents with green cards or student or work visas who were removed from the United States.  (ECF No. 19-1.)  The Government has not responded.  In addition, Respondents' apparent refusal to permit detainees access to counsel, as required by the Court's TRO, has restricted the flow of important information to the Commonwealth.  (We addressed that problem in the brief in support of our show-cause motion, ECF No. 19.)

Even without the benefit of full information from the Government, it is clear that § 3(c) is inflicting irreparable harm right now on Virginia residents.  In addition to the disruption to specific students and faculty members we currently know about (on the fourth business day after the Executive Order was issued), reports arrive daily of others whose lives have been thrown into turmoil.  As President Reveley put it: "Daily we discover ways, large and small, in which the

---

[8] *Id*. ¶ 9.

[9] Grass Decl. ¶ 4 & Ex. 1 ¶ 37 (ECF No. 30).

Executive Order is disrupting our operations."[10]  Congressman Beyer also describes one affected Virginia resident: "a constituent who is in a coma" with a "Sudanese mother . . . [who] was recently granted a visa to visit him in intensive care" but "was prevented from boarding her plane in Dubai to make that trip."[11]

## STANDARD OF REVIEW

To obtain a preliminary injunction, the Commonwealth must show that it (1) "is likely to succeed on the merits," (2) "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [its] favor," and (4) "that an injunction is in the public interest."[12]  The court's decision to grant a preliminary injunction is reviewed for an abuse of discretion.[13]

## ARGUMENT

**I.      The Commonwealth is likely to prevail on the merits.**

Petitioners have pleaded a number of reasons why the Executive Order is invalid.[14]  In addition, the Commonwealth has filed a Complaint in Intervention (ECF No. 22) that includes most of those theories but focuses particularly on the irreparable injury that § 3(c) is inflicting on the Commonwealth, its public colleges and universities, and its residents (many of whom, of course, travel through Dulles).

In light of the exigencies giving rise to this motion, however, we focus here on perhaps the two clearest reasons why § 3(c) is illegal: it violates the Due Process Clause of the Fifth

---

[10] Reveley Decl. ¶ 16.

[11] Beyer Decl. ¶ 11 (ECF No. 20).

[12] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[13] *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 192 (4th Cir. 2013) (citing *Doran v. Salem Inn., Inc.*, 422 U.S. 922, 934 (1975)).

[14] Am. Pet. ¶¶ 72-104 (ECF No. 7).

Amendment (Count I) and the Establishment Clause of the First Amendment (Count II).

### A.    The detention, summary removal, and travel ban imposed on lawful permanent residents and visa holders violate their due process rights.

The Executive Order violates the due process rights of the hundreds of Virginia residents who are lawful permanent residents and visa holders from Iraq, Iran, Syria, Libya, Yemen, Somalia, and Sudan.  Many of the individuals who are being excluded, or who will be excluded upon their return if they leave the United States, are long-term Virginia residents.  They include university professors, students, business owners, employees of business owners, and their family members.  The ban imposed by § 3(c) of the Executive Order, as amply demonstrated by the events over the weekend of January 28, arbitrarily strips these individuals of their legal right to be in the United States, denying any process whatsoever.[15]  The Fifth Amendment demands more.  "There are literally millions of aliens within the jurisdiction of the United States.  The Fifth Amendment . . . protects *every one* of these persons from deprivation of life, liberty, or property without due process of law."[16]

### 1.    Lawful permanent residents have a property interest in their status that is protected by the Fifth Amendment.

It is beyond debate that lawful permanent residents have a property interest protected by the Due Process Clause.[17]  In *Landon v. Plasencia*, the Supreme Court held that lawful permanent residents have due process rights even if they have been absent and are in the process

---

[15] *See* Am. Pet. ¶¶ 2-9 (ECF No. 7).  *See also* Beyer Decl. ¶ 11 (ECF No. 20).

[16] *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (emphasis added).

[17] *Landon v. Plasencia*, 459 U.S. 21, 32-34 (1982) ("[T]he United States has conceded that [a lawful permanent resident] has a right to due process . . . .").

of returning to the United States.[18]   *Landon* explains that, if the government seeks to eliminate a person's status, each person's claim must be assessed at "a fair hearing" on its own merits.[19] Although due process claims will be stronger for residents who previously have "gain[ed] admission to our country and beg[an] to develop the ties that go with permanent residence,"[20] every lawful permanent resident has a legally protected interest in that status.

The Court further explained that the ties and reliance interests that lawful permanent residents form with their communities are a "weighty" component in the due process analysis.[21] The Court specifically pointed to the person's "right 'to stay and live and work in this land of freedom'" and "the right to rejoin her immediate family."[22]   Given these important interests, "the courts must evaluate the particular circumstances [of the individual] and determine what procedures would satisfy the minimum requirements of due process on the re-entry of a permanent resident alien."[23]   As shown below, § 3(c) deprives Virginia residents of those property and liberty interests without any process at all, simply because they have come to the United States from one of the seven majority-Muslim countries at issue.

---

[18] *Id.* at 33 ("[T]he returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him." (citing *Rosenberg v. Fleuti*, 374 U.S. 449, 460 (1963))).

[19] *Id.* at 32-33.

[20] *Id.*

[21] *Id.* at 34.

[22] *Id.* (citing *Bridges v. Wilson*, 326 U.S. 135, 154 (1945), and *Moore v. City of East Cleveland*, 431 U.S. 494, 499, 503-04 (1977)).

[23] *Id.* at 35.

### 2.   Visa holders likewise have a property interest in their status that is protected by the Fifth Amendment.

Visa holders likewise have property interests protected by the Due Process Clause.[24]  To be sure, courts have not often grappled with whether a property interest is created when a person has successfully negotiated the lengthy visa application process and in fact been awarded a visa, immigrated to the United States, and participated as a member of American society.  But the Supreme Court has instructed that property interests "may take many forms," and that the protection attaches as "a safeguard of the security interests that a person has already acquired in specific benefits."[25]  "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined."[26]

In that light, visa holders' claim to a property interest is similar to that of lawful permanent residents.  Like lawful permanent residents, visa holders have routinely relied on and built their lives around a legal status accorded them by the United States.[27]  Those extensive reliance interests demonstrate that visa holders have a "legitimate claim of entitlement to," as opposed to "a unilateral expectation of," their visa status.[28]  Although various courts have found that visa *applicants* do not have a property interest protected by the Due Process Clause,[29] those cases are all inapplicable here.  This case involves *current Virginia residents* who live, work, and

---

[24] *Ibrahim v. Dep't of Homeland Sec.*, 62 F. Supp. 3d 909, 920 (N.D. Cal. 2014) ("A visa is permission for an alien, also known as a foreign national, to approach the borders of the United States and ask to enter.").

[25] *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972).

[26] *Id.*

[27] *See, e.g.*, Univ. of Va., Curry Sch. Of Educ., *Faiza Jamil Works to Support Teachers, Becomes U.S. Citizen* (May 14, 2013) (describing how Faiza Jamil started as a student from Kuwait at an American university before eventually becoming a nationalized citizen), https://goo.gl/KjZSSF.

[28] *Roth*, 408 U.S. at 577.

[29] *See, e.g.*, *Kerry v. Din*, 135 S. Ct. 2128, 2133 (2015) (no due process right for an individual whose visa application was denied).

attend school in Virginia under lawfully issued visas.  These individuals plainly have a

constitutionally protected property and liberty interest in not having their approved visa

arbitrarily revoked based on their national origin.

What is more, the duration and extensiveness of the visa application process further

shows that individuals have a property interest in their visa once it is granted.  In *Ibrahim v.*

*Department of Homeland Security*, the court summarized the extensive vetting that is part of that

cumbersome process:

> *First*, the alien applies for a visa by submitting a visa application to
> a consular officer.  The consular officer then evaluates whether the
> individual is eligible for a visa and what type of visa he or she may
> be eligible to receive.  *Second*, the applicant makes an appointment
> for a visa interview with a consular officer at the United States
> embassy or a consulate abroad.  Consular officers are employees of
> the Department of State who are authorized to adjudicate visa
> applications overseas.  *Third*, an interview is conducted.  *Fourth*,
> after the interview, the consular officer grants or denies the
> application.[30]

Congressman Beyer became personally familiar with the vetting process for visa applicants

based on his service as the United States ambassador to Switzerland from 2009-2013.[31]  He

explains that "visa applicants from a Middle Eastern country are subjected to extensive research,

often requiring six months to a year to complete."[32]

As the Supreme Court recently observed, "[b]efore issuing a visa, the consular office

must *ensure* the alien is *not inadmissible* under any provision of the INA."[33]  The award of such

a visa after complying with that drawn-out vetting process entitles the recipient to present

himself for entry to the United States, and surely "secure[s] certain benefits and . . . support[s]

---

[30] 62 F. Supp. 3d at 920.

[31] Beyer Decl. ¶ 2 (ECF No. 20).

[32] *Id*.

[33] *Kerry*, 135 S. Ct. at 2131 (emphasis added).

claims of entitlement to those benefits."[34]

Congress has recognized as much, affording persons arriving at the border but deemed inadmissible the right to specific, extensive hearing procedures under 8 U.S.C. § 1229a.[35] They cannot be summarily sent away. Section 3 cuts the legs out of those procedural-due-process protections, however. It bars valid visa holders from now boarding a plane to the United States and intimidates Virginia residents who come from those majority-Muslim countries by telling them that the Government will not readmit them if they leave this country.

### 3. The Executive Order also impairs the fundamental liberty interests of lawful permanent residents and visa holders.

The Executive Order also infringes on other protected liberty interests enjoyed by lawful permanent residents and visa holders. The Supreme Court has made clear that due process "is a flexible concept that varies with the particular situation."[36] Courts apply the *Mathews v.*

---

[34] *Roth*, 408 U.S. at 577. Like with lawful permanent residents, the scope of process due to these individuals will depend on a variety of factors such as the length of their continuous residency in the United States under a valid visa, the presence of their family, and whether they have lawful employment.

[35] 8 U.S.C. § 1229a(a)(3) ("Unless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States . . . ."). *See Clark v. Suarez Martinez*, 543 U.S. 371, 373 (2005) ("An alien arriving in the United States must be inspected by an immigration official, and, unless he is found 'clearly and beyond a doubt entitled to be admitted,' *must generally undergo removal proceedings to determine admissibility*.") (emphasis added) (citations omitted). To the extent Respondents claim that 8 C.F.R. § 235.3(b)(i) would provide sufficient process, that is flatly inconsistent with the statutory provisions cited by that regulation and with the Fifth Amendment. *See* 8 C.F.R. § 235.3(b)(i) (applying expedited removal to "aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the" INA). *See also* 8 U.S.C. § 1182(a)(6)(C) ("Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."), § 1182(a)(6)(7) (stating, in relevant part, that an alien is inadmissible if they are "not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter").

[36] *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

*Eldridge* balancing test to determine what the Constitution requires in a particular case:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[37]

"Due process provides heightened protection against governmental interference when certain fundamental rights and liberty interests are involved."[38] Most relevant here are the right to travel, the right to pursue an occupation, and the right to acquire knowledge.[39]

With respect to the right to travel,[40] the court in *Ibrahim* found that the Government had violated the due process rights of an individual who had been admitted to the United States on a student visa but who was later "denied a visa to return to the United States" because she had been erroneously placed on the no-fly list.[41] The court concluded that the government's actions infringed directly on her right to travel.[42] Like the no-fly list in *Ibrahim*, the Executive Order severely restricts the freedom of LPRs and visa holders to travel—as they were permitted to do under their valid visas until the Executive Order issued last week.

Moreover, lawful permanent residents and visa holders have extensive reliance interests premised on the knowledge that their visas will continue to be recognized and not arbitrarily canceled. President Reveley describes how university professors' careers are tied to their research and grants at their universities and how students commit to a course of study on the

---

[37] 424 U.S. 319, 335 (1976).

[38] *Ibrahim*, 62 F. Supp. 3d at 928 (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

[39] *Id. See also Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

[40] *Kent v. Dulles*, 357 U.S. 116, 125 (1957).

[41] 62 F. Supp. 3d at 911, 927-28.

[42] *Id.*

assumption that their student visas will not be arbitrarily revoked.[43]  Thus, in addition to the right

to travel, the arbitrary deprivation of a person's legal status implicates the right to pursue

employment and education.[44]  Because § 3(c) directly infringes those rights and reliance

interests, the Due Process Clause applies.

### 4.    The Executive Order affords no process to individuals detained under the Order.

Section 3(c) provides no process at all to the Virginia residents whose green cards and

visas were effectively canceled by last Friday's surprise order.  Petitioners claim that CBP has

coerced or attempted to coerce arriving air passengers to relinquish their legal right to enter the

United States without affording them an individualized hearing or access to counsel as ordered

by this Court.[45]  Intervenors Nasreldin and Fadul complain that they suffered the same

mistreatment by CBP at Dulles.  Fadul, a Sudanese national, was traveling on a K-1 visa to meet

her fiancé, an American citizen.  But when she arrived at Dulles, her travel documents and

telephone were seized; she was not allowed to call her fiancé or anyone else; she was coerced

into signing documents waiving her visa rights; she was deported to Addis Ababa later that

evening; and, adding insult to injury, the airline kept her passport to coerce her into paying for

the return flight.[46]

The undersigned counsel for Virginia do not know how many Virginia residents were

removed from the United States before the TRO was entered, or whether Respondents ceased

---

[43] *See* Reveley Decl. ¶¶ 6, 8, 11-12.

[44] *See Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 238-39 (1957) ("A state cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment."); *Meyer*, 262 U.S. at 399.

[45] *See* Am. Pet. ¶¶ 2-9 (ECF No. 7).

[46] ECF No. 27 at 6 (PageID# 153).

their removal activities following the TRO.[47]   The Government has failed to answer our request.[48]

So far as has come to counsel's attention, the only written guidance specifying any "process" under § 3(c) is a recent press statement from Secretary Kelly, issued on Sunday night, January 29.[49]   Secretary Kelly decreed that "[i]n applying the provisions of the president's executive order, I hereby deem the entry of lawful permanent residents to be in the national interest."[50]   How many Virginia lawful permanent residents were removed from the United States before the Government changed its mind about their security risk is still unknown.   The Government has not answered the Commonwealth's questions about that.   And the Executive Order itself has not been amended, so it is unclear if Kelly's actions are in derogation of it.

That Sunday Press Release was followed by a televised press conference on Tuesday, January 31.[51]   Respondent McAleenan represented that CBP, in the first 72 hours after the Executive Order, had denied boarding to 721 visa holders in the seven countries, preventing travelers even from presenting themselves for entry to the United States, as they were entitled to do under their visas.[52]   That clearly constitutes insufficient process for returning Virginia

---

[47] Beyer Decl. ¶¶ 7-9 (ECF No. 20).

[48] *See* Letter from Attorney General Mark R. Herring to Secretary John Kelly, et al. (Jan. 29, 2017), ECF No. 19-1.

[49] Statement by Secretary John Kelly on the Entry of Lawful Permanent Residents into the United States (Jan. 29, 2017) [hereinafter Press Release], https://www.dhs.gov/news/2017/01/29/statement-secretary-john-kelly-entry-lawful-permanent-residents-united-states.

[50] *Id*.

[51] *Homeland Security Secretary On Trump's Travel Ban Orders—Full News Conference* (Jan. 31, 2017), https://www.youtube.com/watch?v=pkdF5SSk8aQ.

[52] *Id*. at 5:11.   *See also* Ron Nixon, *721 – not 109 – denied entry to the US under Trump's travel ban*, N.Y. Times (Feb. 1, 2017), https://goo.gl/00Fju7 ("A far larger number of people were affected by President Donald Trump's executive order on refugees than he initially said,

residents.  McAleenan exacerbated the appearance of arbitrariness about whether the Executive

Order applies to LPRs.  He said they are "technically covered," but that DHS "worked quickly

with counsel" to devise the class-based exemption for LPRs as a blanket waiver.[53]

In any case, the Press Release and the Government's flip-flopping shows just how hastily

the order was conceived and how arbitrarily it has been implemented.  Just because the

Government has said that LPRs will be readmitted (or is it only readmitted by "waiver"?),

nothing prevents Respondents from resuming their illegal exclusion of Virginia's green card

holders based on national origin.  Indeed, a press release plainly does not carry the force of

law.[54]  And in this case, the Press Release appears to have been issued only after litigation was

filed in numerous jurisdictions challenging the order's validity.  The rule of law is plainly

undermined when major immigration laws can be changed with the snap of an executive's

fingers, subject to being snapped back on a later date.[55]

The Executive Order plainly provides no individualized process, let alone process that

---

Department of Homeland Security officials acknowledged Tuesday.  Trump posted on Twitter
that only 109 people were detained or denied entry into the United States after his order, but
during a news briefing at the Customs and Border Protection agency's headquarters Tuesday,
officials said that 721 people had been denied boarding for the United States after it began
enforcing the travel ban.").

[53] *Full News Conference*, *supra* note 51, at 22:47-23:41 (statement of Director McAleenan).

[54] *See, e.g.*, *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545-46 (D.C. Cir. 1999) ("The document
(which was not published in the Federal Register) states that it 'is intended solely to provide
information to the public and the regulated community . . . .  We take this to mean only . . . that
the agency is advising the public as to its present enforcement inclinations—not that the
document itself would be given any weight at all in enforcement proceedings.").

[55] We don't know if the Government will claim that its new position on LPRs somehow moots
that part of the case.  It plainly does not.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.
(TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation
of a challenged practice does not deprive a federal court of its power to determine the legality of
the practice.  If it did, the courts would be compelled to leave the defendant . . . free to return to
his old ways.") (citations and quotation marks omitted).

meets the *Mathews v. Eldridge* test.  Considering "the interest at stake for the individual, the risk

of an erroneous deprivation of the interest through the procedures used as well as the probable

value of additional or different procedural safeguards, and the interest of the government in using

the current procedures rather than additional or different procedures,"[56] the one-size-fits-all

blanket exclusions based on national origin cannot pass muster.

With respect to residents currently present in Virginia based on an LPR or visa, or who

present themselves at the border with valid visas predating the Executive Order, those

individuals must be given the opportunity to dispute the characterization that they personally

pose a national security risk (a determination Respondents have made based on national origin).

Those Virginia residents are entitled to an individualized, pre-deprivation hearing.[57]  And for

individuals possessing a valid visa but who have been denied their right to board a plane bound

for the United States, those individuals must be permitted to present themselves at the border and

similarly be afforded a hearing to contest the arbitrary determination that they are a national

security risk.  It would be fundamentally unfair and discriminatory to permit the Respondents to

summarily revoke an individual's legal right to be in the United States for no reason other than

that they were born or naturalized in, or traveled through, a majority-Muslim country.[58]

---

[56] *Landon*, 459 U.S. at 34.

[57] *See Fuentes v. Shevin*, 407 U.S. 67, 82 (1972) ("The right to a prior hearing has long been recognized by this Court under the Fourteenth and Fifth Amendments. . . . [T]he Court has traditionally insisted that, whatever its form, opportunity for that hearing must be provided before the deprivation at issue takes effect.").  *See also Kerry*, 135 S. Ct. at 2144 (Breyer, J., dissenting) ("These procedural protections help to guarantee that government will not make a decision directly affecting an individual arbitrarily but will do so through the reasoned application of a rule of law.").

[58] *See Reno v. Flores*, 507 U.S. 292, 344 n.30 (1993) (Stevens, J., dissenting) (discussing *Korematsu v. United States*, 323 U.S. 214 (1944), and the decision to uphold "the exclusion from particular 'military areas' . . . all persons of Japanese ancestry without a determination as to whether any particular individual actually posed a threat of sabotage or espionage" in connection

**B.    The Executive Order was motived by animus towards Muslims and therefore violates the Establishment Clause and the Equal Protection aspects of the Due Process Clause.**

The Commonwealth is also likely to succeed on its Establishment Clause and Equal Protection challenges because of the overwhelming evidence that the Executive Order resulted from animus towards Muslims.  Whether a governmental action is motivated by hostility towards a particular religious group is a touchstone under both claims.

With respect to the Establishment Clause, the Supreme Court explained in *Larson v. Valente* that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."[59]  "The First Amendment mandates governmental neutrality between religion and religion . . . .  The State may not adopt programs or practices . . . which aid or oppose any religion . . . .  This prohibition is absolute."[60]  Where a "law grant[s] a denominational preference," the Supreme Court "treat[s] the law as suspect and . . . appl[ies] strict scrutiny in adjudging its constitutionality."[61]

Similarly, the Supreme Court has made clear that the Due Process Clause of the Fifth

---

with the detention of juvenile immigrants and noting that "the Court should *proceed with extreme caution* when asked to permit the detention of juveniles when the Government has failed to inquire whether, in any given case, detention actually serves the Government's interest . . . .") (emphasis added).

[59] 456 U.S. 228, 244 (1982).

[60] *Awad v. Ziriax*, 670 F.3d 1111, 1127 (10th Cir. 2012) (quoting *Larson*, 456 U.S. at 246).  *See also Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 728 (1994) (Kennedy, J., concurring) ("[T]he Establishment Clause forbids the government to use religion as a line drawing criterion. In this respect, the Establishment Clause mirrors the Equal Protection Clause. Just as the government may not segregate people on account of their race, so too it may not segregate on the basis of religion.").

[61] *Larson*, 456 U.S. at 246.  *See also Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring) ("Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion.  In making that determination, courts must keep in mind both the fundamental place held by the Establishment Clause in our constitutional scheme and the myriad, subtle ways in which Establishment Clause values may be eroded.").

Amendment has an "equal protection component," and also that noncitizens "com[e] within the ambit of" that Clause.[62]   Under standard Equal Protection jurisprudence, "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."[63]   The blanket assumption—that Virginia residents from the seven majority-Muslim countries pose some sort of terror threat—is an ugly and poisonous form of bigotry that cannot possibly survive strict scrutiny.

But even if the Court were to apply lesser scrutiny in consideration of the Government's plenary control over immigration, the result would be the same.[64]   Where governmental action is principally motivated by animus towards a religious group, the action denies equal protection of the law.[65]   As the Court recently said in *Windsor*, "[t]he Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group."[66]   Just as *Windsor* and *Romer* invalidated laws based on animus towards gay people, even under the rational-basis tests, the religious animus here cannot be justified either.

---

[62] *Harris v. McRae*, 448 U.S. 297, 297 (1980); *Kwai Fun Wong v. United States*, 373 F.3d 952, 974 (9th Cir. 2004).  *See also Jean v. Nelson*, 472 U.S. 846, 874 (1985) (Marshall, J., dissenting) ("[T]he principle that unadmitted aliens have no constitutionally protected rights defies rationality.  Under this view, the Attorney General, for example, could invoke legitimate immigration goals to justify a decision to stop feeding all detained aliens.  He might argue that scarce immigration resources could be better spent by hiring additional agents to patrol our borders than by providing food for detainees. Surely we would not condone mass starvation.").

[63] *Graham v. Richardson*, 403 U.S. 365, 372 (1971).

[64] *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001).

[65] *See, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) ("In determining whether a law is motivated by an improper animus or purpose, '[d]iscriminations of an unusual character' especially require careful consideration.") (citation omitted); *Romer v. Evans*, 517 U.S. 620, 632 (1996) ("[I]ts sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus towards the class it affects; it lacks a rational relationship with legitimate state interests.").

[66] *Windsor*, 133 S. Ct. at 2693.

17

Indeed, the President and his advisers have laid bare that the purpose of the Executive

Order is to ban Muslims and to tilt the balance of immigration to the United States in favor of

Christians.  In 2015, then-candidate Trump issued a statement unequivocally "calling for a total

and complete shutdown of Muslims entering the United States until our country's representatives

can figure out what is going on."[67]  In that statement, Trump revealed his belief that Muslims as

a class are "people that believe only in Jihad, and have no sense of reason or respect for human

life."[68]  And when explaining what the immigration process would look like "for a Muslim non-

citizen attempting to enter the" United States, Trump stated, "'That would be probably—they

would say, are you Muslim?'[69]  When the journalist inquired, "'And if they said yes, they would

not be allowed in the country[?],'" Trump responded "'That's correct.'"[70]

Just last week, after the Executive Order had issued, former New York Mayor Rudy

Giuliani, one of the President's advisers, revealed that the President had asked him to craft a

Muslim ban that would withstand judicial scrutiny.[71]  And at DHS's January 31 press

conference, Secretary Kelly explicitly tied the Executive Order to the President's promise as a

candidate; Kelly explained that he knew the Order was coming and that "[t]his whole approach

---

[67] *Donald Trump proposes "total and complete shutdown of Muslims entering the United States*," http://www.vox.com/2015/12/7/9867900/donald-trump-muslims (last visited Jan. 31, 2017).

[68] *Id.*

[69] *Trump not bothered by comparisons to Hitler*, Politico (Dec. 8, 2015 7:51 a.m.), http://www.politico.com/trump-muslims-shutdown-hitler-comparison.

[70] *Id*.

[71] *Trump asked for a 'Muslim ban,' Giuliani says – and ordered a commission to do it 'legally'*, The Wash. Post (Jan. 29, 2017) ("'So when [Trump] first announced it, he said, 'Muslim ban.' He called me up.  He said, 'Put a commission together.  Show me the right way to do it legally.'"), https://goo.gl/VL155w.

was *part of what then-candidate Trump talked about for a year or two*."[72]  Steve Bannon,

President Trump's Chief Strategist, is publicly credited with developing the Executive Order.[73]

On a radio program in November 2015, when he was the Executive Chairman of Breitbart News,

Bannon questioned why refugees from majority-Muslim countries should be admitted to the

United States, saying that the money spent vetting them would better be spent in this country.[74]

And on the same day the Executive Order issued, President Trump was asked the following

question about the Executive Order's refugee exemption for religious minorities:  "As it relates

to persecuted Christians, do you see them as kind of a priority here?"; he answered "Yes."[75]

        A claim requiring proof of intentional discrimination seldom has a stronger evidentiary

foundation than what we already have here (before discovery has even commenced), because the

evidence in this case comes from the very mouth of the person who promulgated the

discriminatory policy.  Indeed, President Trump just said on January 31 that he keeps his

campaign promises: "I am a man of my word.  I will do as I say."[76]  So as to *then-Candidate*

Trump's promised Muslim ban, there is plainly no reason *not* to take him at his word.  Indeed,

his word is echoed by the words of his senior advisors.  And that is true even if the President and

senior advisors now claim—as they do *post hoc*—that the Executive Order is really not intended

to be a Muslim ban after all.

---

[72] *Full News Conference*, *supra* note 51, at 11:24-42 (statement of Sec. Kelly) (emphasis added).

[73] Frances Stead Sellers & David A. Fahrenthold, *'Why let 'em in?' Understanding Bannon's worldview and the policies that follow*," The Wash. Post (Jan. 31, 2017, at 8:05 p.m.), https://goo.gl/IPIV14.

[74] *Id.*

[75] *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees*, CBN News (Jan. 27, 2017), https://goo.gl/DTUdWo.

[76] Ron Elving, *Gorsuch Pick For Top Court Fulfills Trump Campaign Pledge, Confirms Democrats' Fears*, NPR (Feb. 1, 2017, 3:37 a.m.), https://goo.gl/XOvzqK; President Trump Announces Supreme Court of the United States Nominee, at 33:18, https://goo.gl/DB5Ods.

Apparently recognizing the unconstitutional nature of a ban motivated by animus towards Muslims, then-Acting Attorney General Sally Yates instructed Department of Justice attorneys on Monday night not to defend the Executive Order, believing that "the intent" of the order appeared to "single out people based on religion" and that "'[t]he intent was clear from the face of it.'"[77]  She was promptly fired by the President.[78]

No post-hoc excuse that the Government might now offer can justify what operates as a Muslim ban.  The two purposes listed in the Order are (1) national security, and (2) to reduce "investigative burdens on relevant agencies" during the visa-adjudication review process. Banning all individuals from seven countries from the United States plainly is not narrowly tailored to either purpose.[79]  With respect to national security, there is a "near-absence of terror attacks" perpetrated by lawful permanent residents or visa holders from Iran, Iraq, Syria, Libya, Somalia, Yemen, or Sudan in the United States.[80]  Thus, it is a vast overreach to claim that *all* members of those majority-Muslim countries pose national security risks, let alone *Virginia residents* with strong ties to the Commonwealth.[81]  And with respect to the "investigative burdens on relevant agencies," there is no reason to believe that the number of visa applications

---

[77] *Trump's Talk About Muslims Led Acting Attorney General to Defy Ban*, N.Y. Times (last visited Jan. 31, 2017), https://www.nytimes.com/2017/01/31/us/politics/sally-yates-trump-immigration-ban.html.  *See also* Yates Memo (Jan. 30, 2017), http://documents.latimes.com/message-acting-attorney-general/.

[78] Michael D. Shear, *Trump Fires Acting Attorney General Who Defied Him*, N.Y. Times (Jan. 30, 2017), https://goo.gl/kxLYJo.

[79] State Dep't Memo at 1 ("This ban, which can only be lifted under conditions which will be difficult or impossible for countries to meet, will not achieve its stated aim of to protect the American people from terrorist attacks by foreign nationals admitted to the United States."), https://goo.gl/JCAUdL.

[80] *Id.* at 2.

[81] *See id.* at 5 ("We do not need to place a blanket ban that keeps 220 million people—men, women, and children—from entering the United States to protect our homeland.").

from those seven countries will overwhelm the Executive branch.  No facts have been offered suggesting that an inordinately large number of visa applications come from those countries, or that the individuals responsible for conducting the review are instrumental in reviewing those applications.  Furthermore, the Government's abrupt about-face in applying the Executive Order to LPRs unwittingly admits that the Executive Order was not narrowly tailored at all.

In short, the intent of the Executive Order is to discriminate against persons from Iran, Iraq, Syria, Libya, Somalia, Yemen, and Sudan on the basis that they are more likely than not to be Muslim and more likely to be terrorists.  Because the Executive Order was motivated by animus to a particular religious group, the Order is very likely to be found unconstitutional under the Establishment Clause and under the Equal Protection aspects of the Due Process Clause.

## II.    The Commonwealth, its residents, and its public universities are suffering ongoing irreparable harm.

The Commonwealth, its residents, and its public universities are suffering irreparable harm that can be stanched only by a preliminary injunction.  With respect to the Establishment Clause violation, "[t]he Supreme Court has explained that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"[82]  With respect to the Due Process violation, Virginia residents are suffering ongoing discrimination on account of their national origin that, in light of the Government's sovereign immunity and the incalculable injury to dignity and freedom, cannot be redressed by a money-damages award.[83]

As long as § 3(c) of the Executive Order remains in effect, the Government denies Virginia residents their fundamental due process rights and subjects them to arbitrary detention,

---

[82] *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

[83] *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  *See also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (irreparable harm is harm that cannot be prevented or fully rectified by judgment after trial).

exclusion, and expulsion from the country.  Virginia residents cannot board planes bound for the

United States or leave the country without fear of not being barred from returning.  Some remain

stranded in foreign airports.[84]  Students denied entry or detained cannot attend classes, causing

them to fall behind or abandon their course of study.[85]  Students currently present in the United

States are effectively barred from leaving no matter the circumstances—like going home in the

event of a family member's illness or death—under penalty of being denied reentry.[86]  Many

university faculty members who are unable to travel will be unable to satisfy the obligations of

their grants.[87]  These injuries are happening now and are not fanciful or speculative.[88]

## III.    The balance of equities weighs in favor of granting the injunction.

The balance of equities plainly weighs in favor of granting the injunction.  The Fourth

Circuit has held that "'a state is in no way harmed by issuance of a preliminary injunction which

prevents the state from enforcing restrictions likely to be found unconstitutional.  If anything, the

system is improved by such an injunction.'"[89]  Because the Commonwealth is likely to succeed

in its challenges to the Executive Order, Respondents cannot claim to be harmed by being forced

to stop their unconstitutional actions.

And as should be plain from what we have already said, the notion is indefensible that

enjoining § 3(c) as applied to Virginia residents would somehow threaten the Government's

legitimate security interests.  These green card and visa holders who reside in Virginia have

---

[84] Am. Pet. ¶ 10.

[85] Reveley Decl. ¶¶ 5-6.

[86] Reveley Decl. ¶¶ 7, 14.

[87] Reveley Decl. ¶ 12.

[88] *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (irreparable harm is actual and imminent).

[89] *Centro Tepeyac*, 722 F.3d at 191 (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)).

already been vetted and approved for travel to the United States.  If any particular person poses a security risk, existing law amply allows the Government to take protective action.

## IV.    The public interest strongly favors the injunction.

The public interest further warrants enjoining the Executive Order.  As the Fourth Circuit has made clear, "upholding constitutional rights surely serves the public interest."[90]  And the public interest is further served by not disrupting the lives of students, teachers, workers, and other Virginia residents, pending a trial on the merits.

## CONCLUSION

This is a monumental case involving a monumental abuse of Executive Power.  So it is worth remembering another monumental case, *Plessy v. Ferguson*, that enshrined in American law—for more than a half century—the approval of government-mandated racial segregation.[91]  The majority in *Plessy* reasoned that government-mandated segregation "does not discriminate against either race, but prescribes a rule applicable alike to white and colored citizens."[92]  We admire the first Justice Harlan for putting the lie to that claim:  "Every one knows" what was being justified, he said.[93]  The same is true here.

And what Justice Harlan said next may be even *more* important for Twenty-First Century Americans to remember: "the seeds of race hate" should not be "planted under the sanction of law."[94]

---

[90] *Id.* (citation omitted).

[91] 163 U.S. 537 (1896).

[92] *Id*. at 556-57 (Harlan, J., dissenting).

[93] *Id*.

[94] *Id*. at 560.

In this case, the seeds of hate towards Muslims are "planted under the sanction" of the Executive Order.  Those seeds must be rooted out, as soon as possible, lest they germinate and poison more Americans.  The Executive Order was conceived in bigotry and does not reflect who we are as a people.

* * *

The Court should issue a preliminary injunction in the form attached.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA,


By: _____/s/_____
Stuart A. Raphael (VSB No. 30380)
Solicitor General

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
sraphael@oag.state.va.us

Mark R. Herring
Attorney General of Virginia

Trevor S. Cox (VSB No. 78396)
Deputy Solicitor General
tcox@oag.state.va.us

Matthew R. McGuire (VSB No. 84194)
Assistant Attorney General
mmcguire@oag.state.va.us

*Counsel for Commonwealth of Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2017, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to the counsel of record for Petitioners and Respondents.

By:     /s/
                    Stuart A. Raphael