IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| TAREQ AQEL MOHAMMED AZIZ, et al., | ) | |
| | ) | |
| Petitioners/Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:17-cv-116 (LMB/TCB) |
| | ) | |
| DONALD TRUMP, President of the United States, et al., | ) ) | |
| | ) | |
| Respondents/Defendants. | | |

## MEMORANDUM OPINION

On Friday, February 3, 2017, after hearing oral argument, the Court granted a Motion to Intervene by the Commonwealth of Virginia ("the Commonwealth") and a Motion to Intervene by Osman Nasreldin ("Nasreldin") and Sahar Kamal Ahmed Fadul ("Fadul"). This Memorandum Opinion supplements the reasoning articulated in open court.

### I. BACKGROUND

On January 27, 2017, President Donald Trump signed an executive order titled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("the EO"). Section 3 of the EO includes a proclamation "that the immigrant and nonimmigrant entry into the United States of aliens from" Syria, Iraq, Iran, Libya, Sudan, Yemen, and Somalia "would be detrimental to the interests of the United States" and "suspend[s] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order." Pet. Ex. A, [Dkt. 7-1] at 3. Although the EO explicitly excludes "foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United

Nations, and G-1, G-2, G-3, and G-4 visas" from the ban on entry, it does not exclude persons who have been granted lawful permanent residency.[1] Id.

The named petitioners,[2] Tareq Aqel Mohammed Aziz and Ammar Aqel Mohammed Aziz, are Yemeni citizens (and brothers) who were holders of IR2 immigrant visas[3] issued by the U.S. Embassy in Djibouti. They arrived at Dulles on Saturday, January 28, 2017. According to the petition, they were handcuffed upon deplaning and told by Customs and Border Protection ("CBP") agents that they would be sent to Yemen and barred from entry into the United States for five years if they did not sign Form I-407, which is titled "Record of Abandonment of Lawful Permanent Resident Status."[4] Confused and pressured by the representations of the CBP agents, petitioners signed the I-407, after which CBP stamped "Cancelled" over their IR2 visas. Petitioners were then required to purchase return trip tickets to Addis Ababa, Ethiopia, at their own expense.

The Aziz brothers' amended petition alleges seven counts: (1) Fifth Amendment Procedural and Substantive Due Process violations; (2) violations of petitioners' rights to enter the United States under the Immigration and Nationality Act ("INA"); (3) discrimination on the

---

[1] On February 1, 2017, White House Counsel Donald F. McGahn II issued a memorandum stating that "there has been reasonable uncertainty about whether [Section 3 of the EO] appli[ies] to lawful permanent residents of the United States. Accordingly, to remove any confusion, I now clarify that Section 3(c) and 3(e) do not apply to such individuals." [Dkt. 34-1].

[2] The petition also names John Does 1–60 as petitioners, who are "approximately 60 lawful permanent residents of the United States, or immigrant visa holders, all nationals of [the affected countries], who landed at Dulles Airport on January 27 and/or 28, 2017" and who allegedly experienced treatment similar to the named petitioners.

[3] IR2 visas are available to qualifying children and stepchildren of U.S. citizens who do not themselves hold U.S. citizenship. The Aziz brothers were eligible for IR2 visas because their father is a U.S. citizen.

[4] The United States Citizenship and Immigration Services website instructs users to "[u]se Form I-407 to let us know that you have decided to voluntarily abandon your status as a lawful permanent resident of the United States."

2

basis of nationality without sufficient justification in violation of the INA; (4) violations of the Establishment Clause; (5) violations of the Equal Protection Clause; (6) violations of the Administrative Procedure Act ("APA"); and (7) violations of the Religious Freedom Restoration Act.[5]

Intervenor plaintiff Fadul is a Somali citizen and the fiancée of intervenor plaintiff Nasreldin, a United States citizen and resident of Colorado. Fadul held a K-1 visa[6] and was traveling from Addis Ababa, Ethiopia. Like the named petitioners, Fadul was one of the persons at Dulles "stopped by CBP agents, and forced to surrender her visa and accompanying immigration documentation." [Dkt. 26] at 2. Fadul alleges that she was required to sign a form rescinding her visa application without being given an opportunity to consult with a translator or legal counsel and then forced to purchase a return ticket on the first available flight to Addis Ababa.

The Commonwealth of Virginia has moved to intervene under Rule 24 of the Federal Rules of Civil Procedure. The Commonwealth asserts a variety of connections to this litigation. First, it asserts a general parens patriae interest in the well-being of its citizens and residents, and a more particular interest in ensuring that such persons are not discriminatorily denied the benefits of federal law. Second, it argues that the government has "not complied fully and transparently" with the Temporary Restraining Order entered by this Court on January 28, 2017, directing that defendants "permit lawyers access to all legal permanent residents being detained at Dulles," meaning that the Commonwealth "has been hindered in its ability to identify the

---

[5] The Commonwealth's intervenor complaint includes each of these counts except for those alleging substantive due process, nationality discrimination in violation of the INA, and violations of the APA. Nasreldin and Fadul have not yet filed an intervenor complaint.

[6] A K-1 visa is available to a person who is engaged to marry a United States citizen.

Virginia residents who have been" detained or removed. Mot. to Intervene Memo. ("MTI"), [Dkt. 15] at 4. Third, the Commonwealth argues that its "public universities and their administration, faculty, students, and families are being harmed by the Executive Order" because several such persons are being prevented from returning to the United States or traveling from it by the EO. Id. These hindrances have the effect of "interfering with . . . employment relations and disrupting" operations. Id. Additionally, the Commonwealth alleges that certain faculty members "likely will be forced to forfeit their grant moneys" if they are unable to travel. Id.

## II. DISCUSSION

### A. Intervention

Federal Rule of Civil Procedure 24(a)(2) requires a court to permit intervention by a party who "claims an interest relating to the . . . subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The Fourth Circuit has articulated a three-part test for Rule 24(a)(2) intervention, requiring a movant to show: "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." Teague v. Bakker, 931 F.2d 259, 260–61 (4th Cir. 1991).

Even when a party may not intervene as of right, a court may permit intervention when the party "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(b). The Fourth Circuit favors "liberal intervention . . . to dispose of as much of a controversy" as possible. Feller v. Brock, 802 F.2d 722, 729 (4th Cir. 1986). When permissive intervention is being invoked, the key question is whether the existing parties would be prejudiced by allowing the intervention. Alt v. U.S. Envtl. Prot. Agency, 758 F.3d

588, 591 (4th Cir. 2014). This concern that is usually minimal early in the litigation process, id., and is not a barrier in this case as the only petitioners do not oppose the interventions and the defendants cannot show prejudice.

Nasreldin and Fadul satisfy the standards for intervention as of right. They have an interest in the subject matter of the litigation because they allege nearly identical treatment as the named petitioners, and protection of their interest may be impaired by the action because an adjudication in the defendants' favor might deprive them of an opportunity to present additional arguments in support of their position. Their interest is not adequately represented by the existing parties because an adjudication in favor of the Aziz brothers would not necessarily resolve the matter of Fadul's entry into the United States.[7] They have also met the standard for permissive intervention because they share many questions of law and fact with the original petitioners. Indeed, the only obvious factual distinction is that Fadul held a K-1 visa rather than an IR2 visa. Moreover, there is no significant danger that the original parties will be prejudiced by permitting them to join, particularly as less than a week had passed since the original petition was filed when Nasreldin and Fadul moved to intervene.

The Commonwealth also satisfies the requirements for intervention as of right. As the standing analysis below outlines in greater detail, the Commonwealth has an interest in the subject matter of the litigation both as parens patriae and as the proprietor of numerous public universities. Its interests are not adequately represented by the existing parties because they are broader, covering a greater class of affected persons than merely holders of IR2 or K-1 visas.

---

[7] The inadequacy of the Aziz brothers to represent either of the intervenors is highlighted by their agreement to reach a settlement with the government. The government has represented that it has made a similar offer to Nasreldin and Fadul, but until the offer has been accepted and implemented it does not moot their case. Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 666 (2016) (holding that "an unaccepted settlement offer has no force").

For the same reason, the Commonwealth's interests are not adequately represented by the existing parties, because resolution of their claims might leave some of the Commonwealth's grievances unaddressed. Moreover, the Commonwealth satisfies the requirements for permissive intervention. Although the Commonwealth's legal claims do not overlap completely with petitioners', at least five of the counts in the Commonwealth's complaint are largely identical to the claims in the original petition. Moreover, DHS and CBP's actions in response to the EO form the common factual basis for both petitioners' and the Commonwealth's claims, and because the request was filed within 72 hours of the original petition having been filed there is no danger that defendants' ability to respond will be prejudiced. Accordingly, the Commonwealth has cleared the procedural bar for intervention as well. The real question is whether the Commonwealth has standing to pursue an action against the federal defendants.

### B. The Commonwealth's Standing

The burden to prove standing is on the party invoking federal jurisdiction. Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 198 (2000). Although standing must eventually be proven by the same standard of proof as the substantive claims alleged, "[g]eneral allegations of injury may suffice at the pleading stage." Id.

The Commonwealth asserts parens patriae standing to ensure the well-being of its residents and their access to the benefits of the federal system, as well as proprietary standing to vindicate its own interests. MTI at 1. The defendants argue that states are prohibited from bringing a parens patriae action against the federal government[8] and that the Commonwealth's proprietary injuries are too tenuous to support standing.

---

[8] The defendants have been sued in their official capacity, meaning that this civil action is in effect against the federal government. Kentucky v. Graham, 473 U.S. 159, 165 (1985).

1. Parens Patriae Standing

"Parens patriae means literally 'parent of the country.'" Alfred L. Snapp & Son., Inc. v. Puerto Rico, 458 U.S. 592, 600 (1982) ("Snapp"). American courts have long recognized that states, as parens patriae, have a peculiar "set of interests . . . in the well-being of [their] populace." Id. at 602. These interests are often referred to as "quasi-sovereign interests," and although that concept "does not lend itself to a simple or exact definition," it includes an interest in "securing residents from the harmful effects of discrimination." Id. at 601, 609. If a state's quasi-sovereign interests are threatened, the state has standing under Article III to bring an action in federal court to vindicate them. Id. at 601.

Defendants have argued that an early Supreme Court case, Massachusetts v. Mellon, 262 U.S. 447 (1923), created a "prohibition against states suing the United States on behalf of their citizens." Virginia v. Sebelius, 656 F.3d 253, 269 (4th Cir. 2011). But it is a mischaracterization of Mellon (and Virginia) to speak of a "prohibition" without further qualification. Importantly, both cases addressed a state's challenge to congressional, rather than executive, action. In Mellon, Massachusetts sought to enjoin appropriations under a federal statute called the Maternity Act, arguing that the statute was an unconstitutional exercise of federal power. The Supreme Court held that "a state, as parens patriae, may [not] institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. . . . [I]t is no part of its duty or power to enforce [its citizens'] rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae[.]" Mellon, 262 U.S. at 485–86. The Court cautioned that it did not "go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress," id. at 485, and specifically observed that it

7

was "not now speaking of the merely ministerial duties of officials," id. at 488. The Court explained that the separation of powers concerns were less significant in that context because "the [judicial] power exercised is that of ascertaining and declaring the law applicable to the controversy. It amounts to little more than the negative power to disregard an unconstitutional enactment, which otherwise would stand in the way of the enforcement of a legal right." Id. The Fourth Circuit's opinion in Virginia, in which the Commonwealth challenged the constitutionality of the Affordable Care Act's mandate requiring individuals to purchase health insurance, reflected this distinction between congressional and executive action, observing that the federalism concerns underlying the rule in Mellon applied "[w]hen a state brings a suit seeking to protect individuals from a federal statute[.]" (emphasis added). Neither Mellon nor Virginia confronted, or purported to address, whether a state would have standing to challenge executive actions.

Moreover, as many courts have observed, reading Mellon as a complete ban on parens patriae actions by states against the federal government would contradict Massachusetts v. EPA, 549 U.S. 497 (2007). In that case, Massachusetts attacked the Environmental Protection Agency's ("EPA") decision not to regulate carbon dioxide, arguing that the EPA's stated reasons for the decision were inconsistent with the relevant federal statute. Id. at 505. Relying in part on Mellon, the EPA argued that Massachusetts lacked standing. The Court disagreed, holding that Massachusetts was not only permitted to challenge the EPA's failure to act but that it was "entitled to special solicitude" in the standing analysis because (1) Congress had created a cause of action for challenging the decision not to engage in rulemaking and (2) Massachusetts had a stake in protecting its "quasi-sovereign interests." Id. at 520. The Court specifically rejected the argument, advanced by the Chief Justice in dissent, that Mellon amounted to a ban, observing

that "Mellon itself disavowed any such broad reading[.]" Id. at 520 n.17. Courts have subsequently acknowledged that Massachusetts v. EPA cannot be reconciled with the broad reading of Mellon as a ban on parens patriae actions against the federal government. Ariz. State Legis. v. Ariz. Ind. Redistricting Comm'n, 135 S. Ct. 2652, 2664 n.10 (2015); Wash. Utils. and Transp. Comm'n v. Fed. Commc'ns Comm'n, 513 F.2d 1142, 1153 (9th Cir. 1975) ("Wash. Utils."); Challenge v. Moniz, __ F. Supp. 3d ___, 2016 WL 6902416, at *3 (E.D. Wash. Nov. 3, 2016).[9]

As the Mellon Court observed, its rationale for barring parens patriae challenges to federal statutes has less force when "ministerial," or executive, action is challenged. See Mellon, 262 U.S. at 488. In such situations, a court is on more familiar terrain, determining whether the executive branch has lawfully discharged the authority allocated to it, rather than opining on more delicate questions of federal supremacy. Id. This is precisely the kind of claim raised in a constitutional challenge to an executive act, which argues that the executive's action is contrary to other, superior federal law. Similarly, to the extent that a state argues that executive action is inconsistent with a federal statute, the state "seeks to vindicate the congressional will by preventing what it asserts to be a violation of that statute by the administrative agency charged with its enforcement." Wash. Utils., 513 F.2d at 1153. Accordingly, a state is not be barred by the Mellon doctrine from a parens patriae challenge to executive action when the state has

---

[9] For these reasons, the statement from the final footnote in Snapp that "[a] State does not have standing as parens patriae to bring an action against the Federal Government" cannot be taken as controlling. 458 U.S. at 609 n.16. That statement was dictum in 1982 when it was made, because Snapp involved private defendants, and has since been undermined by the Court's holding in Massachusetts v. EPA.

grounds to argue that the executive action is contrary to federal statutory or constitutional law. Id.[10]

Having concluded that the Commonwealth is not categorically barred from maintaining a parens patriae action against the federal defendants, the next question is whether the other requirements of a parens patriae action have been satisified. The first requirement is that the state have a legitimate quasi-sovereign interest in the litigation. In addition to its interest in "securing residents from the harmful effects of discrimination," those interests include "the health and well-being—both physical and economic—of [the state's] residents in general" and "ensuring that the State and its residents are not excluded from the benefits that . . . flow from participation in the federal system." Snapp, 458 U.S. at 607–609. The second requirement is that the challenged action have a sufficiently "substantial" effect on the state's residents, rather than a narrow and definable class. Id. at 609. When determining whether the effect is substantial, the court must consider persons who are both directly and indirectly affected. Id. For example, in Snapp, although only 787 Puerto Rican workers were allegedly denied the benefit of federal labor law, the Court held that the indirect impact of discrimination was nevertheless substantial, given the Court's "experience with the political, social, and moral damage of discrimination[.]" Id.

---

[10] The Court acknowledges that the D.C. Circuit has disagreed with this view. In a 1976 opinion that relied heavily on Mellon, the court held that Pennsylvania lacked standing to sue the Small Business Administration over the classification of a major hurricane as a Class B rather than a Class A disaster. Pennsylvania v. Kleppe, 533 F.2d 668, 670 (D.C. Cir. 1976). The persuasive force of that opinion is diminished by the majority opinion in Massachusetts v. EPA, 549 U.S. at 520; see also Ariz. State Legis., 135 S. Ct. 2652 at n.10, as well as by the D.C. Circuit's recognition that "it was debatable whether the Court in [Mellon] meant to bar all state parens patriae suits against the Federal Government," Kleppe, 533 F.2d at 677.

Here, the Commonwealth has made sufficient allegations to support parens patriae standing. It challenges executive action rather than a congressional statute. In doing so, it seeks to ensure that its residents "are not excluded from the benefits [of] participation in the federal system," Snapp, 458 U.S. at 608, most notably benefits afforded to Virginia residents by the Immigration and Naturalization Act and the federal constitution. Moreover, through its equal protection, First Amendment, and Religious Freedom Restoration Act claims, the Commonwealth seeks to "secur[e] its residents from the harmful effects of discrimination." Id. These are textbook quasi-sovereign interests. In terms of substantiality, the Commonwealth has alleged that at least 300 persons are directly affected by this ban. As for indirect effects, as in Snapp, the stigma of discrimination "carr[ies] a universal sting." Id. at 609 (internal quotation marks and citation omitted). Accordingly, the Commonwealth has sufficient standing under Article III to pursue this action against the federal defendants, at least at the pleading stage.[11]

2. Proprietary Standing

At oral argument, the Commonwealth argued that in addition to having standing under its parens patriae theory, it has also established standing because it has alleged injury to its "nonsovereign . . . proprietary interests." Snapp, 458 U.S. at 601. The Court agrees with this argument.

Like "associations and private parties, a State is bound to have a variety of proprietary interests," and "like other such proprietors it may at times need to pursue those interests in court." Snapp, 458 U.S. at 601–02. In such situations, a state is subject to the same law of

---

[11] As the litigation proceeds, the Court will of course be under an ongoing duty to satisfy itself that the requirements of Article III are met. Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006). Should additional discovery or other developments alter this initial impression, the question of standing may be reassessed.

11

standing as any other party in federal court—that is, it must allege an injury to an interest that is "concrete and particularized" and "actual and imminent" as opposed to merely "conjectural or hypothetical;" that the injury is "fairly traceable to the challenged action of the defendant;" and that it is "likely . . . that the injury will be redressed by a favorable decision[.]" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (internal citations and quotation marks omitted). In this inquiry, the particularity of the injury is of greater importance than its magnitude. See Friends of the Earth, 528 U.S. at 183 (holding that a purely aesthetic injury can confer Article III standing); see also Texas v. United States, 809 F.3d 134, 155 (5th Cir. 2015) (holding that subsidies used to offset the cost of printing additional driver's licenses gave Texas standing to challenge the Deferred Action for Parents of Americans program), aff'd by an equally divided Court, United States v. Texas, 136 S. Ct. 2271 (2016).

Here, the Commonwealth has alleged that the travel ban will disrupt the operations of its public universities, depriving them of some faculty and staff members and potentially requiring other faculty members to forfeit grant money by virtue of their inability to leave the country to fulfill the terms of their grants.[12] This allegation satisfies the requirements of Article III. The injury is pecuniary and particular to the Commonwealth, not shared by the public at large. It is fairly traceable to the challenged EO, because the Commonwealth alleges that the only thing impeding the travel of these faculty and staff members is the EO. And a judicial declaration that the EO is unenforceable would certainly redress the injury by removing that obstacle.

---

[12] The Commonwealth has also alleged that students of its universities are affected by the EO. The Court need not consider whether those allegations would independently confer proprietary standing on the Commonwealth because the allegations related to faculty and staff members are sufficient.

12

Accordingly, even if the Commonwealth did not have standing as <u>parens</u> <u>patriae</u>, it would have traditional proprietary standing to challenge the constitutionality of the EO.

### III. CONCLUSION

For the reasons stated above and in open court, the Motions to Intervene by the Commonwealth and by Nasreldin and Fadul have been GRANTED.

Entered this 3rd day of February, 2017.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge