1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

TAREQ AQEL MOHAMMED          .     Civil Action No. 1:17CV116
AZIZ, et al.,                .
                             .
              Petitioners,   .
                             .
     vs.                     .     Alexandria, Virginia
                             .     February 3, 2017
DONALD TRUMP, President of   .     10:00 a.m.
the United States, et al.,   .
                             .
              Respondents.   .
                             .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PETITIONERS:          SIMON SANDOVAL-MOSHENBERG, ESQ.
                              Legal Aid Justice Center
                              6066 Leesburg Pike, Suite 520
                              Falls Church, VA 22041
                                and
                              PAUL W. HUGHES, ESQ.
                              Mayer Brown LLP
                              1999 K Street, N.W.
                              Washington, D.C. 20006


FOR THE RESPONDENTS:          EREZ R. REUVENI
                              Senior Litigation Counsel
                              United States Department of
                              Justice
                              Civil Division, Office of
                              Immigration Litigation
                              P.O. Box 868
                              Ben Franklin Station
                              Washington, D.C. 20044

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1 - 54)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   APPEARANCES:  (Cont'd.)

 2   FOR THE RESPONDENTS:          DENNIS C. BARGHAAN, JR., AUSA
                                   United States Attorney's Office
 3                                 2100 Jamieson Avenue
                                   Alexandria, VA 22314
 4

 5   FOR INTERVENOR PLAINTIFF      MARK R. HERRING, Attorney General
     COMMONWEALTH OF VIRGINIA:     STUART A. RAPHAEL
 6                                 Solicitor General
                                   Office of the Attorney General
 7                                 202 North 9th Street
                                   Richmond, VA 23219
 8

 9   FOR INTERVENOR PLAINTIFFS     TIMOTHY J. HEAPHY, ESQ.
        OSMAN NASRELDIN AND        Hunton & Williams LLP
10      SAHAR KAMAL AHMED FADUL:   2200 Pennsylvania Avenue, N.W.
                                   Washington, D.C. 20037
11

12   OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                                   U.S. District Court, Fifth Floor
13                                 401 Courthouse Square
                                   Alexandria, VA 22314
14                                 (703)299-8595

15

16

17

18

19

20

21

22

23

24

25
```

1                      P R O C E E D I N G S

2              THE CLERK:  Civil Action 17-116, Tareq Aqel Mohammed

3    Aziz, et al., v. Donald Trump, President of the United States,

4    et al.  Will counsel please note their appearances for the

5    record.

6              MR. RAPHAEL:  Good morning, Your Honor.  Stuart

7    Raphael from the Commonwealth of Virginia.

8              THE COURT:  Good morning.

9              MR. HERRING:  Good morning, Your Honor.  Mark

10   Herring.

11             THE COURT:  Good morning.

12             MR. HEAPHY:  Good morning, Your Honor.  I'm Jim

13   Heaphy at Hunton & Williams.  I'm here for Osman Nasreldin and

14   Sahar Fadul.

15             THE COURT:  Good morning.

16             MR. HEAPHY:  Good morning.

17             MR. SANDOVAL-MOSHENBERG:  Good morning, Your Honor.

18   Simon Sandoval-Moshenberg, Legal Aid Justice Center, appearing

19   pro bono for the Aziz petitioners; and with me is Paul Hughes

20   with the Mayer Brown law firm, who has been admitted pro hac

21   vice.

22             THE COURT:  Good morning, counsel.  We almost ran out

23   of seats for you-all, didn't we?

24             MR. BARGHAAN:  And good morning, Your Honor.

25   Assistant United States Attorney Dennis Barghaan on behalf of

4

1    the respondents.  With me today is Erez Reuveni from the Office

2    of Immigration Litigation at the Department of Justice, the

3    Civil Division, and he will be arguing the cause on behalf of

4    the respondents this morning.

5              THE COURT:  Don't you want to do that, Mr. Barghaan?

6              MR. BARGHAAN:  Can I plead the fifth?

7                        (Laughter.)

8              THE COURT:  You realize you'll be quoted on that one,

9    I'm sure.  All right.

10             Well, I'm glad everybody is smiling this morning

11   because I hope we can resolve what's before us today in a good

12   and amicable and civil fashion.  All right, we have several

13   motions before us, and I want to address the first one, which

14   is the motion to hold in abeyance.  It's my understanding that

15   in terms of the two Aziz plaintiffs, they have worked out their

16   dispute with the United States.  Is that correct?

17             MR. REUVENI:  That is correct, Your Honor.

18             THE COURT:  All right.  Could you -- how close is

19   that resolution to being finalized?

20             MR. REUVENI:  So we have a signed settlement document

21   that both parties have countersigned.  It is not finally

22   executed; that will take several days.  There are certain

23   conditions in the settlement that need to be -- need to occur

24   before the settlement is finally executed, at which point

25   our -- the terms of the settlement will lead to dismissal of

1    the Aziz brothers' claims.

2              THE COURT:  But as you know, there were other, I

3    believe, 60 John Does also named in that complaint --

4              MR. REUVENI:  Yes.

5              THE COURT:  -- so that there are other claims that

6    still are potentially unresolved.

7              MR. REUVENI:  I don't want to speak on behalf of

8    plaintiffs' counsel, but there is language in there that the

9    government believes addresses those claims as well.  It just

10   leads -- it would lead to a dismissal without prejudice, and if

11   those claims are picked up again, if individuals are identified

12   that can raise those claims, they'd be free to bring them

13   before the Court.

14             THE COURT:  All right.  Well, that, I think, then is

15   a segue into the motion from the commonwealth to intervene in

16   this case.  Mr. Raphael?

17             MR. RAPHAEL:  Your Honor, if I may, I think

18   Mr. Heaphy has a motion to intervene.  It would make sense for

19   sequencing purposes for him to -- for the Court to address

20   that.  I think he's going to be very brief.

21             THE COURT:  All right, that's fine.

22             MR. HEAPHY:  Thank you, Your Honor.  Your Honor, good

23   morning again.  I'm Tim Heaphy, and I'm here representing the

24   proposed intervenors Osman Nasreldin and Sahar Fadul.

25             We have filed a motion to intervene in this matter

1   because our clients are in a very same position as the

2   petitioner-plaintiffs, the Aziz brothers.  Very briefly, Your

3   Honor, our clients are an American citizen, Mr. Nasreldin, and

4   his Somali fiancee, Ms. Fadul.  She was on the very same flight

5   with the Aziz brothers from Ethiopia to Dulles Airport on

6   Friday, January 28.

7          She was detained at the airport, asked to sign a

8   paper, we believe, withdrawing her K-1 visa, which she had been

9   lawfully issued by the embassy in Sudan, and when she did sign

10  that document, despite the fact that she doesn't speak English

11  and did not understand it, she was immediately returned to

12  Ethiopia, and it is on that basis that we have filed the motion

13  to intervene and seek the Court's leave to help us reverse that

14  action and get her admitted on that lawfully issued K-1 visa.

15         THE COURT:  So she's within those 60 John Does that

16  were part of the original case.

17         MR. HEAPHY:  I believe so, Your Honor, but again --

18         THE COURT:  Well, if she was at Dulles Airport --

19         MR. HEAPHY:  She was.

20         THE COURT:  -- she was among those.

21         MR. HEAPHY:  She was.  I think she was actually on

22  the same flight, Your Honor, yes.  But again, we also represent

23  her American citizen husband, who is a resident of Colorado.

24         Now, we have also been offered a proposed resolution

25  by the United States.  I think it is exactly the same

1    resolution that is offered the Aziz brothers, and that

2    essentially would be to return Ms. Fadul to the United States

3    on that originally executed K-1 visa, and we are inclined to

4    work with the United States to have that occur, but we do not

5    believe that the litigation should be held in abeyance.

6          Our preference is for Your Honor to grant our motion

7    to intervene because there are common questions of law and fact

8    at issue with our clients and the Aziz brothers, but until our

9    client is returned to the United States pursuant to that

10   agreement, this is a very live controversy.

11         THE COURT:  All right.

12         MR. HEAPHY:  As a matter of fact, we actually asked

13   the Court to set a deadline by which we would file a

14   substantive complaint, and if Ms. Fadul has been returned,

15   obviously, that would moot that, and we would withdraw for --

16   or seek to dismiss our case, but we believe, Your Honor, it's a

17   very live controversy, and unless and until Ms. Fadul is

18   returned to this country pursuant to this negotiated settlement

19   that we are attempting to work out with the government.

20         We don't have a signed document.  We have had

21   discussions, but essentially, it would be to return our client

22   to the United States, which would then moot her substantive

23   claims.

24         THE COURT:  Thank you.

25         MR. HEAPHY:  So, Your Honor, again, we would just

1   move to formally intervene, and hopefully, the Court will grant

2   our motion.

3           THE COURT:  All right.

4           MR. REUVENI:  Good morning again, Your Honor.  This

5   can be very short.  We have an agreement in principle.

6   However, in case that doesn't come together, which I don't have

7   any reason to believe it should, there are very similar terms

8   that, as her counsel indicated, if that does not follow

9   through, intervention would not be appropriate in this case.

10          The individual who we are seeking to bring back

11  pursuant to this settlement we have in principle is not an

12  unlawful permanent resident is and not an immigrant visa

13  holder.

14          THE COURT:  But she is somebody who went through a

15  carefully vetted review process, correct, before she got the

16  authorization to come here?

17          MR. REUVENI:  That's absolutely correct.

18          THE COURT:  That's absolutely correct, all right.

19          MR. REUVENI:  She is a -- well, actually, sorry, let

20  me clarify.

21          THE COURT:  All right.

22          MR. REUVENI:  There are different levels.

23          THE COURT:  I'm fully aware of that.

24          MR. REUVENI:  A K-1 visa is a nonimmigrant visa that

25  fiancees can use to come to the United States and within 90

1    days get married once they arrive here.  It is not the same

2    level of rigorous review that may occur in the context of

3    refugees or in other sorts of review scenarios.

4          And the issues that would arise if this case -- and

5    we're not saying they can't bring their case.  They can

6    certainly bring their case.  It's just not the same nexus of

7    facts or events.  It's not the same type of visa.  It's not the

8    same type of legal issues.  It's not the same sort of due

9    process rights that may be in play.

10         It would unnecessarily complicate this case and

11   essentially set up, if this case moves forward, which we very

12   much hope it does not at least not respect to the Aziz brothers

13   and with respect to the additional individual who wishes to

14   intervene, but it would set up two separate tracks before Your

15   Honor of a nonimmigrant track, an immigrant visa track, and a

16   lawful permanent resident track, so you'd have three separate

17   sets of legal issues.

18         THE COURT:  Well, I don't know why it should.  If, in

19   fact, the proper way of looking at this case is to simply draw

20   a line in the sand and say that any visas or other

21   authorizations to come into the United States that had gone

22   through the then existing appropriate processes before the

23   executive order went into effect should be implemented, and --

24   so that anybody, whether they're a refugee or they've got a K-1

25   visa or they've got a -- or they're a lawful permanent

1   resident, if that paperwork had gone through, they've been

2   properly vetted through the processes that we've had in place

3   up to this point, why should they not get the benefit of that?

4          Going forward is another question because the

5   executive order has changed that situation, but I'm looking

6   right now and I think most of the -- all of the issues in this

7   case right now are focused essentially on that, that people who

8   have already gotten the permission to be in this country or to

9   come to this country, why should that not be honored?

10          MR. REUVENI:  Before I answer that, just one global

11  response to that.  I don't know that the issues that the

12  commonwealth wishes to raise, but we'll talk about that later,

13  fall into that category, but with respect to the Aziz

14  plaintiffs and with respect to the individual with the K-1

15  visa, yes, our understanding is they all arrived here over the

16  weekend, which is why the United States government is looking

17  to resolve those particular issues.

18          If I may perhaps just suggest this as a course

19  forward with respect to the motion to intervene, we do have an

20  agreement in principle.  At this point, we're simply

21  wordsmithing.  There's no principle terms that are in

22  disagreement at this point between the parties.

23          Perhaps we table the motion to intervene for a short

24  period of time, allow us to reach a settlement, and we may not

25  even need to deal with these issues, but we can do that on a

1   short turnaround, if you don't object to that, of course, and

2   we don't have to address this on the legal matter -- on the

3   legal merits.

4          MR. HEAPHY:   If I may, Your Honor, I do object to

5   that.  We need to be intervened in this case.

6          THE COURT:   You want a stake in this litigation just

7   in case.

8          MR. HEAPHY:   We need to be in the case.  We see it

9   exactly as Your Honor just articulated in your question.  This

10  is a matter of whether or not people with lawful visas vetted

11  carefully by the United States government were wrongly and

12  unconstitutionally denied access.  That's the situation

13  involving our client with the K-1 visa and those with the

14  immigrant visas.

15         There may be subtle factual distinctions that would

16  be relevant, but the common issues of law and fact in our view

17  compel intervention.  We need to be a party in this case,

18  frankly, for leverage to enforce whatever settlement may ensue,

19  and we don't have a settlement until Ms. Fadul sets foot back

20  in the United States, and that has not happened yet.

21         THE COURT:   I understand.  Well, first of all, I want

22  to commend -- I want to commend the government for working so

23  quickly in trying to resolve these cases.  That's great.  And I

24  don't want to do anything that's going to interfere with that,

25  but I do agree with Mr. Heaphy that, number one, I think that

1   his clients have alleged sufficient common facts and issues of

2   law that are already included in the amended papers that have

3   been filed in the original case to justify the Court's exercise

4   of its discretion and to allow them to intervene, so the motion

5   is granted, all right?

6           MR. REUVENI:  Your Honor, I understand the order, but

7   I just want to verify something for the record.

8           THE COURT:  Yeah.

9           MR. REUVENI:  I mean, we'll work this out going

10  forward, of course.

11          It is the government's understanding that

12  Mr. Heaphy's client is not in either of the two classes before

13  you in the current -- in the current state of this case.  A

14  nonimmigrant visa is very different than an immigrant visa.

15  Very different equities attach.  Very different processes

16  occur.

17          THE COURT:  Yes, and --

18          MR. REUVENI:  Putting that aside --

19          THE COURT:  Right.

20          MR. REUVENI:  Putting that aside, going forward if we

21  need to, we'll elaborate on that.

22          THE COURT:  Thank you.

23          All right, Mr. Raphael?

24          MR. RAPHAEL:  Thank you, Your Honor.  I stood up

25  before because the permissive intervention and intervention of

1    right issues that you were just talking about are obviously at

2    issue in our case with our motion as well.  So we do have a

3    motion to intervene.  We filed that on Tuesday.  On Wednesday,

4    we filed a proposed complaint in intervention.

5            And I think it's important to start from the

6    standpoint that at this stage of the proceeding, there are now

7    two parties in the case that are in that have, that clearly

8    have standing, and the law is clear, as I believe the

9    government cited in its papers, that you only need one

10   plaintiff to have standing in order for the Court to be able to

11   exercise its Article III jurisdiction.

12           So I'm going to get to in a second why it's

13   absolutely clear that Virginia has standing because of direct

14   injuries to Virginia, but the government argued last night in

15   their brief that we don't have standing, and given that there

16   are now several parties who are plaintiffs in the case, the

17   Aziz brothers and Mr. Heaphy's clients, standing is just not a

18   question.

19           And the case I would cite for that is *Rumsfeld v.*

20   *Forum for Academic and Institution Rights*.  It's 547 U.S. 47,

21   at -- pinpoint is 52, note 2, from 2006, where the Court said

22   the presence of one party with standing is sufficient to

23   satisfy Article III's case or controversy requirement.

24           So the government's principal objection to our motion

25   to intervene is that we don't have standing.  It's just not an

1    issue given the current posture of the case.

2          They also suggest that the case is somehow mooted now

3    because they're working out a deal to whisk these other

4    plaintiffs back in exchange for their promising to dismiss

5    their cases once they get back to U.S. soil.  That's just not

6    accurate as far as the law goes.

7          We cited to the Court *CVLR v. Wynne* in the papers we

8    filed last night.  That's 792 F.3d 469, 475.  And I have a copy

9    of that.  If it would help the Court, I have a copy of that.

10         THE COURT:  It's all right.

11         MR. RAPHAEL:  Okay.  Two sentences that appear at

12   page 475 of that, of that opinion, the first one is that most

13   courts -- this is in footnote 2 -- "Most courts that have

14   considered situations similar to Tosco" -- which was a Tenth

15   Circuit case -- "agree that when the motion to intervene is not

16   filed until after the underlying case is fully resolved, that

17   motion is moot."

18         The underlying case here is obviously not fully

19   resolved.  The Aziz brothers and Mr. Heaphy's clients are in

20   the case, and it's not fully resolved, but more importantly, I

21   think this is sort of the -- the important language is further

22   down the page.  The Fourth Circuit said, "To the contrary, the

23   case was live when Appellants moved to intervene, and remained

24   so when the district court denied the motion . . .."

25         So if the intervention motion is filed when the case

1   is a live controversy, that is all that is needed, even if the

2   underlying case later becomes moot.  So you measure this as of

3   the time the motion to intervene was filed, and that was filed

4   on Tuesday, when this was absolutely a live controversy, and

5   still is.

6          Now, I'm going to address standing.  We don't need to

7   because we've got existing parties that have it, but I want the

8   Court to be comfortable that we absolutely have direct injury

9   here.  To have standing, you need an injury that's caused by

10  the conduct at issue and that would be redressed by the relief

11  that you're seeking, and we satisfy all three of those

12  requirements.

13         And I point out, by the way, that the federal court

14  in Massachusetts just yesterday in the *Louhghalam v. Trump*

15  case, docket 17-10154, granted Massachusetts' motion to

16  intervene in a case that has a very similar posture, and I

17  actually brought a copy of that order, which I'd be

18  delighted --

19         THE COURT:  We've also seen that.

20         MR. RAPHAEL:  Okay.  Very good.

21         So what is the direct injury here?  You know, in the

22  Massachusetts case, Massachusetts was arguing for a much sort

23  of broader notion of standing, to just protect citizens, you

24  know, allowing refugees to come to the state.

25         We're not, we're not challenging the refugee

1    provision in this case.  We're here based on direct injury to

2    Virginia, and it's laid out in Taylor Reveley's declaration,

3    which we filed yesterday.  That's ECF 32.

4            In the commonwealth, in our 14 colleges and

5    universities, not to mention our community colleges, there are

6    more than 350 students alone at VCU, Virginia Tech, George

7    Mason, UVA, and William & Mary, 350 students who come from

8    these banned countries.  There are numerous others at other

9    schools.  We haven't been able to tally them all up yet, but

10   that's a lot of students coming to our public schools.

11           We know at this point based on Mr. Reveley's

12   declaration, and this is paragraph 5, there are dozens of

13   employees and faculty who have work visas or LPR status who

14   come from these banned countries.

15           We know of at least two students who are trapped and

16   cannot get back to the United States.  One of them is an

17   Iranian doctoral candidate who needs to come back to have his

18   examination for his dissertation, and he was planning to come

19   with his wife.  They've been issued visas, and then they were

20   cancelled.  They can't get here.  And they need to do that this

21   semester.

22           And then we know of a young lady who is a student at

23   George Mason University who's from Libya.  Her visa was

24   cancelled when she was in Turkey, and she's stuck in Turkey.

25           Now, to the government's credit, they've been working

1    with us to try to get the information needed so they can free

2    her to come back, and that's one reason why we were willing to

3    set the TRO -- the preliminary injunction hearing for next

4    Friday rather than for, for this Friday, but I think that

5    demonstrates the irreparable harm and injury to Virginia's

6    interests that the executive order is causing right now.

7              There are other harms that are laid out in

8    Mr. Reveley's declaration.  For example, a number of scholars

9    have cancelled their travel plans to international conferences.

10   They're afraid to leave the country because they won't be able

11   to get back, and those include some Iranian-born faculty and

12   students.  That's paragraph 7 of Mr. Reveley's declaration.

13             We have examples of visiting scholars who've

14   cancelled their plans to come here.  There are five people in

15   that category, paragraph 9 of Mr. Reveley's declaration.

16             There are a number of students who have now withdrawn

17   their applications to come to our schools.  We're aware of two

18   Sudanese applicants and a handful of Iranian engineering

19   students who, who have withdrawn their applications.  That's

20   lost opportunity and lost -- and if you have to put it in

21   monetary terms, obviously, this is much bigger than that, but

22   if you have to put it in monetary terms, that's lost revenue to

23   the commonwealth.

24             All of those direct injuries are plainly caused by

25   the executive order, and they will plainly be redressed by the

1    injunction that we're seeking.  We absolutely have standing.

2         Now, the primary group we're here to protect are the

3    students and faculty at our universities and colleges, but we

4    are also here to protect Virginia residents who are here on LPR

5    or work or student visas even if they're not going to our

6    schools, and we have standing for that, too, because they are

7    taxpayers.

8         Under IRS Publication 519, at page 3 to 4, the IRS

9    rules provide that green card holders and others who have been

10   substantially present in the U.S. are considered U.S. residents

11   for tax purposes, and Virginia follows that rule.  It's on our

12   Web site under the residency status page at the Department of

13   Taxation Web site.  It says, "If you are a resident or a

14   nonresident alien required to file a federal income tax return,

15   and you meet the definition of a Virginia resident, part-year

16   resident or nonresident and other filing requirements, you must

17   file a Virginia return, unless exempted from the requirement by

18   federal treaty."

19        So they're taxpayers, and if they can't be here, we

20   lose that tax revenue.  And that kind of trivializes what's

21   really important here, but that's plainly a pecuniary interest

22   that the commonwealth has.

23        And if you need case law to back that up, I've got

24   two suggestions.  Number one, *Corr v. MWAA*.  That was the

25   Dulles Toll Road case which Judge Trenga decided; and, you

1    know, when I represented MWAA on that case, I argued that the

2    toll payers didn't have standing because a zillion people pay

3    tolls, and that it's not adequate to restrict who the

4    plaintiffs could be, and I persuaded him I was right, but the

5    Fourth Circuit reversed in that case.

6         The Fourth Circuit held -- and this is at 740 F.3d

7    295 (2014) -- the Fourth Circuit held that paying like a $2

8    toll was enough to give them standing to complain that MWAA was

9    unconstitutional, and the Fourth Circuit let that case go

10   forward.  And so if paying $2 is enough for standing, certainly

11   everything that the commonwealth is losing here is enough for

12   standing.

13        And one other case I'd cite is *Texas v. United*

14   *States*, the Fifth Circuit case from 2015, 787 F.3d 733.  You

15   know, Texas challenged President Obama's DAPA policy, and their

16   basis for standing was that because the federal government

17   deemed these people from other countries to be lawfully

18   present, Texas had to spend $131 on each of them in order to

19   issue them a license or some kind of identifying paper, and

20   that was enough for standing in Texas.

21        So given that low bar, we amply meet it here.  We

22   clearly have standing, but again, we don't need it because

23   there are two parties in the case who have it.

24        Now, we have sought both permissive standing --

25   permissive intervention and as of right intervention, and I

1    think I'm going to flip it and take permissive first because

2    it's really, frankly, the easiest way for the Court to decide

3    it.  It's totally in your discretion to do it, and this is

4    where I was going to stand up for Mr. Heaphy's client, because

5    I think it's easy to think of his motion to intervene in a very

6    narrow way like we're just dealing with his two clients.

7         This is a much bigger issue, and I think there's a

8    very good chance that you're going to be seeing a lot more

9    motions to intervene, and that's why it's important to

10   understand what permissive intervention is all about.

11        There are three elements.  The first one, 24(b)(1),

12   has to be timely.  We're here in two days after the original

13   complaint was filed.  That is clearly timely.

14        Number two, it has to involve a claim or defense that

15   share with the main action a common question of fact or law.

16   That's 24(b)(1)(B).  We only need one of those elements.

17        Both of those elements are satisfied here.  There's a

18   common legal claim that the executive order is

19   unconstitutional.  We've pleaded the same theories as the

20   underlying complaint.  There are also common facts arising from

21   the events this past weekend at Dulles.  So for both of those

22   reasons, you clearly have permissive standing under element 2.

23        And there's a third one.  The third element is

24   prejudice to the parties.  This is 24(b)(3).  It says:  "In

25   exercising its discretion, the court must consider whether the

1    intervention will unduly delay or prejudice the adjudication of

2    the original parties' rights."

3           Well, there's plainly no prejudice to adjudicating

4    the Aziz brothers' rights.  In fact, they consent to our

5    intervention.  They're happy for us to be in this case.  So no

6    prejudice to their rights.

7           Is there any prejudice to the government's rights?

8    Obviously not.  Forcing the government to have to adjudicate

9    the constitutionality of the executive order sooner than they

10   would like to does not prejudice their rights.  You're not

11   entitled to do a delay for delay's sake.  So permissive

12   intervention is plainly established.

13          We cited a case at page 7 of our brief on this, ECF

14   No. 15, footnote 17, I want to bring to the Court's attention:

15   *Feller v. Brock*.  It's 802 F.2d 722, 729 (4th Cir. 1986), and

16   it really captures the purpose of permissive standing --

17   permissive intervention.

18          The court said:  ". . . [L]iberal intervention is

19   desirable" -- desirable -- "to dispose of as much of a

20   controversy 'involving as many apparently concerned persons as

21   is compatible with efficiency and due process.'"  That was

22   tailor -- in other words, permissive intervention is

23   tailor-designed for exactly this kind of controversy, because

24   when it gets out that what the government is really doing is

25   anybody who comes forward to sue them will be allowed back in

1    the United States, there are a lot of people who are going to

2    want to come forward to take that deal, and you shouldn't make

3    them file a new lawsuit to do that.  That's exactly what

4    permissive intervention is for.

5           Let me turn to intervention of right.  The federal

6    court in Massachusetts, I know Your Honor is familiar with

7    that, granted Massachusetts' intervention of right as opposed

8    to discretion.  It granted it as of right.  Similar elements.

9    It has to be timely.  We are, two days.  You have to show that

10   the intervenor shares -- claims an interest relating to the

11   property or transaction that's the subject of the action and is

12   so situated that disposing of the action may as a practical

13   matter impair or impede the movant's ability to protect its

14   interest unless existing parties adequately represent that

15   interest.

16          I have articulated Virginia's substantial interest.

17   I think that's clearly satisfied.  Virginia's interests will be

18   adversely affected were this executive order upheld, and as a

19   sovereign entity, we are plainly not represented by the Aziz

20   brothers or by Mr. Heaphy's clients, so all of those elements

21   are satisfied.

22          Now, you've heard the government say, well, the

23   claims by these plaintiffs and by Virginia are kind of

24   different claims so they shouldn't be in this case.  That is

25   not the test for intervention.  In the *CVLR* case, you had

1    different plaintiffs who were injured differently by the

2    defendants' common racketeering scheme.

3           Of course they were different claims.  The issue is

4    is there a common claim of law or a common claim of fact, and

5    you plainly have that here.

6           Practicality is also a critical aspect of the

7    decision whether to allow intervention, and the Ninth Circuit

8    said in *Citizens for Balanced Use*, 648 F.3d 893, 897:  "In

9    addition to mandating broad construction" -- and they're

10   talking about intervention of right -- "our review is guided

11   primarily by practical considerations, not technical

12   distractions."

13          Again, you should be using this vehicle to address

14   this controversy in a broader way than simply focusing on a

15   specific plaintiff's claim.

16          THE COURT:  All right, thank you, Mr. Raphael.

17          Let me hear, Mr. Reuveni -- is that how you pronounce

18   your name?

19          MR. REUVENI:  Yes, Your Honor.

20          THE COURT:  All right.  Mr. Reuveni, do you know --

21   first of all, since you are senior litigation counsel, are you

22   overseeing this litigation as a whole, or are you just

23   addressing it in this court?

24          MR. REUVENI:  At the moment, I'm just addressing it

25   in this court, but we are, we are, as you know --

24

```
 1                THE COURT:  You're litigating all over the country.
 2                MR. REUVENI:  We're litigating everywhere right now.
 3                THE COURT:  Okay.  So I would assume down the road,
 4     there's going to be some uniform approach to this case -- these
 5     cases.
 6                MR. REUVENI:  I would clearly hope so.  It would
 7     allow me to sleep more.
 8                THE COURT:  All right.  Do you have any sense at this
 9     point as to how many people have been affected by this, that
10     is, how many people to whom -- from these seven countries, how
11     many people had gotten some kind of visa or authorization to
12     enter the United States?  Any idea?  Are we talking thousands,
13     tens of thousands, hundreds of thousands, or you don't know?
14                MR. REUVENI:  Well, I think it's important to
15     distinguish two things here in answering this question.  There
16     are the group of people that made their plans, had their visas,
17     and attempted to come over right after the order was signed or
18     may have already been in the air.  Let's call that the events
19     of the weekend, January 27th to the 29th.  It's a very small
20     number.  I don't have the exact figures.  It's in the ballpark
21     of between 100 and 200 people.  It's a very small --
22                THE COURT:  Nationwide, not just coming to Dulles.
23                MR. REUVENI:  Don't hold me to that, but let me make
24     sure that's correct as to Dulles versus nationwide, and I can
25     get that to you very quickly afterwards, but that's a much
```

1   smaller number than the folks that are abroad and can't come

2   here currently because their visas have been revoked, and so

3   the government has submitted in two separate lawsuits, the one

4   in Massachusetts and the one in New York, a notice -- we didn't

5   submit it here because we didn't believe it was relevant to the

6   specific facts at issue in this case, because it involved

7   immigrant visas and lawful permanent resident visas that had

8   come over over the weekend.  Visas have been revoked.  Over

9   100,000 visas have been revoked.  That's the scope of this

10  thing.  Those were revoked on Friday at 6:30 p.m.

11         That is not this lawsuit.  It is not the lawsuit

12  Virginia wishes to bring, and it is not the lawsuit the

13  plaintiffs -- the named plaintiffs that are already in the case

14  wish to bring, and it is certainly not the lawsuit that the

15  intervenor who you've granted leave to participate, the K-1

16  visa, wishes to bring.  Those two individuals and others

17  similarly situated, at least in this case, we are attempting to

18  bring them back and resolve those claims.

19         The individuals abroad who did not get on a plane

20  before any of this happened and are now trying to come into the

21  United States, a very different case, and the government at

22  this time is defending those cases.

23         THE COURT:  But what's the logical difference?

24         MR. REUVENI:  The logical difference is they are

25  folks that made plans and had sort of just call it a reliance

1    interest.  While we were implementing this thing, our clients

2    were implementing the order, and it was a very chaotic 48 hours

3    for all of us, those folks seem to be the ones that have the

4    better argument from the government's perspective as to

5    something not completely perfect from the government's view

6    happened.

7            Those folks that are abroad right now and their visas

8    have been revoked, that's a totally different case, and if we

9    are given the opportunity, if that issue arises in this case

10   and it's certainly already arisen in the Massachusetts case and

11   potentially in the Washington case that the attorney general of

12   Washington is bringing, we would argue, the government would

13   argue that that visa revocation is a non-reviewable

14   discretionary decision committed to the executive discretion.

15   That's by statute, 8 U.S.C. 1201 and 8 U.S.C. 1155, but

16   obviously, we're getting ahead of ourselves here.  That's not

17   this case, but that's why we would think that will be a very

18   different lawsuit.

19           So to the extent Your Honor is contemplating that as

20   being part of what you have before you right now, there are no

21   claims to that effect in this case, no plaintiffs in this case

22   with those types of claims.  Virginia, I don't believe -- I've

23   seen the complaint that they filed last night or was it two

24   days ago, they don't raise those claims.  That would be a very

25   different lawsuit, and there's already other cases addressing

1    that issue -- or where that issue is raised.

2            As to this case, as to the commonwealth and the

3    motion for intervention, I think it's absolutely fundamental

4    that they demonstrate standing if they want to participate in

5    this case or any case.  If they were to file their own lawsuit,

6    they would have to have standing.  If you grant them

7    intervention, they would still need to have standing because

8    when the Aziz plaintiffs and when the K-1 visa plaintiff, their

9    matters are resolved, there's no one left with standing, and

10   standing has to exist at every step of the lawsuit -- at its

11   commencement, at the motion for preliminary injunction stage,

12   at the motion to dismiss stage, and so on all the way up on

13   appeal.  So if they don't have standing, they can't get in this

14   case.  They can't bring any case.

15           So this is a pivotal issue to address, and it may not

16   be this venue in which it should be addressed.  It should be in

17   their own case, with their own issues, with their own

18   plaintiffs or individuals they've identified through

19   declarations.

20           The issues here are not at all interrelated with the

21   issues I believe the commonwealth is attempting to bring before

22   Your Honor.  The LPR issue that they raise, it's a moot point

23   now.  We've all seen at this point, I think, the White House

24   guidance on that, and we submitted it with our papers last

25   night on the opposition --

1         THE COURT:  But, you know, there's case law that just

2    because there has been a response to alleged illegal activity

3    doesn't get the parties totally off the hook.

4         MR. REUVENI:  That's certainly true.  I'm familiar

5    with that, Your Honor, but I would say in this case involving

6    the things that happened at Dulles, not a single lawful

7    permanent resident was turned around.  They've all been

8    admitted into the United States.  They're all in the United

9    States presently.

10        Not a single individual was turned around, so there

11   is no live controversy as to any lawful permanent resident,

12   including the Doe plaintiffs -- or the unnamed Doe plaintiffs.

13   They've all been admitted.  We've confirmed that with our

14   client.  Not a single lawful permanent resident arriving in

15   Dulles before your order came in and after you had entered Your

16   Honor's order, they've not been turned around.  They have been

17   admitted.  They're here in the United States.

18        And going forward, lawful permanent residents who

19   wish to come to the United States, the executive order is not

20   being applied to them.  They are coming in.  They're getting

21   into the United States.

22        So the lawful permanent resident issue from the

23   government's view in this case is a moot point.  There are no

24   lawful permanent residents' interests at stake in this case any

25   longer, and so to the extent the commonwealth wishes to

1    piggyback on those interests to get into this case, that would

2    be inappropriate because those claims are moot, and there's no

3    live controversy as to any lawful permanent resident.

4          I do want to talk for a minute about the case that

5    the commonwealth raised with you a number of times concerning

6    its presentation, the *CVLR* case.  So that's a very different

7    case.  I've had an opportunity to see it as well as the

8    commonwealth.  That is a case where a party moved to intervene,

9    and that motion was denied while the case was live.  They

10   appealed the denial of the motion to intervene after the case

11   was resolved by the actual named parties.

12         The Court of Appeals said it could exercise its

13   appellate jurisdiction to address the issue of whether that was

14   an erroneous denial of the motion to intervene, and I think

15   it's important, the commonwealth left this part out when it was

16   reading various language to you, that case cites an earlier

17   case from the Fourth Circuit, *Atkins v. State Board*, 418 F.2d

18   at 876, that's a 1969 case:  ". . . [A] court may treat

19   intervention as a separate action" only when "the intervenor

20   has an independent basis for jurisdiction."

21         So it's arguable whether that case has any bearing

22   here at all.  The cases that are more relevant are those cases

23   cited in the federal government's brief at pages 3 through 4.

24   I'm referring to the Eleventh Circuit, the Tenth Circuit, the

25   Seventh Circuit, and the Ninth Circuit, all of which hold --

1   and the Ninth Circuit en banc at that -- the intervenor has to

2   have standing throughout the litigation.  They can't piggyback

3   on standing, particularly where, as here, the actual parties to

4   the case, including the other intervenor who is now in the

5   case, want to resolve the case and move on.

6          We will meet Virginia in court; I have no doubt about

7   that.  The question is simply is this case, with very different

8   issues of the actual named plaintiffs, the place to do that.

9          As I mentioned, we are defending these cases

10  nationwide.  We're not trying to run and hide from Virginia.

11  We know we're going to be defending this in Virginia and

12  elsewhere.  The question simply is whether it should be here in

13  this case.

14         As to the standing itself in this case, from what we

15  know now, Virginia seems to raise two theories as to standing.

16  They wish to sue on behalf of their citizens generally, but

17  that's a settled issue.  The Supreme Court settled that in the

18  1920s in the *Mellon* case, and *Massachusetts v. E.P.A.* case in

19  2007 similarly revisited the issue and made clear *Mellon* is

20  still good law.

21         The fact that the federal government 's action causes

22  a general tax burden on your citizens does not provide you

23  parens -- and I'm going to mispronounce this; I'm terrible at

24  latin -- parens patriae jurisdiction or standing.  That just

25  doesn't -- that is a nonstarter in the government's view, and

1    we have that in our papers and cases, and we're happy to give

2    you more on that if you'd like.

3            The other, the other injury they raise is the impact

4    to their public universities, and again, I think here it's

5    important to realize what is really being challenged:  Federal

6    action in the federal space which is committed entirely to the

7    federal government under the separation of powers on the

8    state-federal system we have.  So it is the federal government

9    that actually would have this general welfare of the citizenry

10   jurisdiction or standing to speak on behalf of individuals

11   affected by federal law, not Virginia.

12           And I can refer you specifically to cases addressing

13   this very issue.  We have them in our papers.  One,

14   *Pennsylvania v. Kleppe* (D.C. Cir. 1976), 533 F.2d 668, or if

15   it's easier, I'll just refer you to the pages in the brief

16   where that --

17           THE COURT:  That's all right.  We've read it.

18           MR. REUVENI:  Okay.  Very good.  I didn't -- I have

19   no doubt you -- the -- so as to the actual individuals,

20   Virginia speaks in generalities, and that's really not what

21   standing requires.  We need specific -- for there to be Article

22   III jurisdiction, there needs to be specific articulated injury

23   as to specific individuals, not the commonwealth writ large.

24           Their papers refer to individuals, generally

25   professors or students, and again, these are individuals who

1    are not similarly situated to the individuals that are

2    currently in this case.  F-1 visas and J-1 visas, which would

3    refer to students coming to the commonwealth's universities,

4    those are nonimmigrant visas, and this is the issue I alluded

5    to earlier.  This is a very different claim, very different

6    issues, very different legal defense the government would make

7    and different arguments that plaintiffs or the commonwealth

8    would make if that issue was in this case.

9         As to some of the other issues, the commonwealth

10   raised an establishment clause violation as a basis for

11   standing in this case.  I'd just like to refer the Court to the

12   Ninth Circuit's decision on this very issue.  It's called the

13   *Catholic League for Religious and Civil Rights v. City of San*

14   *Francisco*, 624 F.3d 1050.  This one is not in our papers.

15   States cannot allege injury based on religious stigma or

16   spiritual or psychological harm derived from federal action or

17   state action based on -- or impacting religion in some way.

18        The commonwealth doesn't really address that in their

19   papers, but that's another impediment to jurisdiction going

20   forward.

21        Intervention as of right and permissive intervention,

22   their papers as to as of right are premised on the same

23   jurisdictional theory that they cannot rely on.  That's the

24   general welfare of the citizenry.  So I won't spend too much

25   time on that.

1          Permissive joinder, again, this case is winding down.

2    Well, at least the government believes as to the named

3    plaintiffs, it is winding down.  Let me be clear on that.  As

4    to also the intervenor you just granted intervention to, that

5    we can resolve very quickly.

6          And it is, it is our position that it is in the

7    interests of the United States to resolve these where it is

8    appropriate, and the commonwealth's papers suggest that we're

9    just trying to get out of a lawsuit.  That's -- we're being

10   sued right now in ten different courts.  We're going to be sued

11   tomorrow in 20 different courts.  That's just not the case.

12   We're defending these cases.  We're not playing games with the

13   courts.  It's just a matter of whether these particular

14   plaintiffs and the issues in this case are the appropriate

15   vehicle for the commonwealth to come into court and have its

16   day in court, particularly where they at this time so far as

17   the government is concerned don't have standing to raise those

18   claims.

19         If you have any more questions on that, that's enough

20   for me.

21         THE COURT:  All right.  Well, the issue has been very

22   thoroughly briefed and argued.  We've had, obviously,

23   relatively short periods of time for both counsel and the Court

24   to look at all this, but I am satisfied at this point that the

25   commonwealth has made a sufficient argument to establish that

1   it does have standing to enter into this lawsuit both under

2   permissive and as of right principles of intervention, and at

3   this point, I'm granting the motion and therefore will allow

4   the commonwealth to enter into this litigation.

5          There have been no objections from either the

6   original plaintiffs or from the new intervenor, and I therefore

7   find that it is not inappropriate to allow the commonwealth in

8   the case.

9          Now, part of the commonwealth's papers, however, and

10  I'm not actually going to hear a lot of argument on this today,

11  the commonwealth has included a motion for an order to show

12  cause, and I'm not going to grant that motion at this time, in

13  part because I am encouraged by the attitude of the government

14  that they're trying to resolve these cases, and I don't want to

15  stir up the waters unnecessarily.

16         This Court has always taken the position in any type

17  of civil litigation that the most successful litigation is that

18  which can be amicably and appropriately settled, and,

19  Mr. Barghaan, I know you and your office have a great deal of

20  experience with that, and I know the Department of Justice does

21  as well.

22         I have to tell you I've been on this bench a long

23  time.  I was the judge that handled the September 11 case.  I

24  have never had so much public outpouring as I have seen in this

25  case.  It is amazing.  I have spoken to some of the other

1    judges in the country who have these cases, and their

2    experience has been the same.  This order touched something in

3    the United States that I've never seen before.  People are

4    really upset.

5         Now, there is no question the president of the United

6    States has almost, almost unfettered discretion in matters of

7    international relations and in protecting the borders.  There's

8    no question about that.  But it's not unfettered.  There are

9    limits.

10        And this case, this order went into -- was issued so

11   quickly, it's quite clear that there were not all the -- not

12   all the thought went into it that should have gone into it.  As

13   a result, there has been chaos.  I mean, the example being how

14   the, for lawful permanent residents, they were captured in this

15   order, and now the government has recognized that was a

16   mistake, and they have backed off of that.

17        But it is a real problem, it seems to me, when the

18   government has gone through the vetting process, has authorized

19   individuals to come to this country, and then without any kind,

20   from what we can tell, of significant fact-finding or any kind

21   of actual hard evidence that there is a need to rescind those

22   decisions, to revoke them.

23        Human beings have relied upon those decisions that

24   were made by hard-working government authorities.  Families

25   have expected family members to be reunited with them.

1    Universities have expected students or faculty to be able to

2    come back.  It has obviously thrown hundreds of thousands of

3    people into states of great discomfort, and it's something that

4    the government should think very carefully about how you want

5    to resolve all of these cases globally.

6           Again, I commend you for having taken the steps

7    you've taken so far, but I don't think it's far enough, and I

8    would hope that you would give serious thought to thinking more

9    broadly about how you want to address these issues.

10          In any case, we have this case scheduled for next

11   Friday for a hearing on a more permanent situation.  At this

12   point, all I'm going to do, and I'll have some orders that

13   we'll issue at some point today, the injunction, the temporary

14   restraining order which we issued last Saturday was only for

15   seven days.  That's how it was presented to the Court.  I want

16   to leave that injunction in place, and I'm going to expand it

17   slightly, but only slightly, and you'll get it later today, but

18   it will be in place until next Friday.

19          I want to make sure that there is no slippage, and

20   that is, that lawful permanent residents clearly are allowed to

21   come back in.  I understand the government has agreed to do

22   that.  I want to make sure that it is done, so I want to

23   definitely keep that within the language of the injunction, and

24   at this point, that would be maintaining the status quo.

25          Plus, I am concerned about the representations in the

1    commonwealth's papers that although the order had clearly said

2    that people who are being held at Dulles should have the

3    opportunity to have access to counsel, that that was not being

4    done.  Now, I understand from the government's papers that

5    there was some telephone arrangement that was set up.  I don't

6    want to get into the details of that today other than to say

7    that the agents need to be careful at the airport not to

8    violate a court order because there are sanctions that can

9    result from that.

10           I'm not unsympathetic with the poor Customs and

11   Border Patrol officials at the airport Saturday and Sunday.  It

12   was chaotic for everybody, and I'm certainly not going to find

13   that the people at the low level, who were just following

14   orders, that was too confusing a time to find that any of them

15   would have been in contempt.

16           Whether or not any of the people who are more in

17   control should have acted differently, I'm not in a position at

18   this point to address, and frankly, I don't think it furthers

19   the goal of trying to get these issues resolved by pushing for

20   contempt citations at this point.

21           It does appear as though the government is now

22   working diligently to resolve many of the ills involved, maybe

23   not all but many of the ills involved in the original case, and

24   that gives the Court some optimism in this respect, all right?

25   So unless there's anything else, I think I've resolved all the

1    issues.

2          Mr. Raphael?

3          MR. RAPHAEL:  Yes, Your Honor, thank you.  Just a

4    couple minor points.  Just to be clear, we weren't seeking to

5    hold the government in contempt.  We were seeking to have them

6    account for what they've done.

7          When Your Honor expands slightly the language of the

8    TRO, I would ask that you make clear that the requirement to

9    permit access to lawyers means in person access.  The paragraph

10   7, I think it was, of the motion for a TRO made it clear that

11   there were lawyers waiting there to see these people.  There

12   was nothing preventing them from seeing them if they were

13   allowed.  They were all -- the people were gathered together.

14         And the government has apparently taken the position

15   that it didn't require in person access.  So I think you need

16   to clarify that or -- they say maybe, maybe telephone access

17   was okay.  We don't have any records --

18         THE COURT:  They indicated -- and again, I wasn't

19   there; I don't know what was going on -- that the folks were

20   being held in the secondary inspection locations, and I don't

21   think counsel are permitted into the secondary area.  That's

22   the problem.

23         And so -- but access can be -- I mean, prisoners all

24   the time have adequate access to counsel via telephone.

25         MR. RAPHAEL:  Right.  And my point is that we don't

1  have any records to show that, in fact, people were being

2  granted access, that the named plaintiffs and the intervenors

3  say that their phones were taken away.  Mr. Heaphy's client

4  wasn't allowed to call her fiance.

5         Maybe that was before the TRO issued, but I think

6  that there is something very troubling about the fact that

7  there were so many lawyers there waiting to help, and not a

8  single one of them got to talk with any of the detainees.  So I

9  would just ask the Court to make it clear that CBP must provide

10  access to lawyers who are on hand, willing and waiting to help,

11  or it's going to be unfair to these people.

12         THE COURT:  All right.  Let me hear the government's

13  response to that.  I'm sorry, was there another thing?

14         MR. RAPHAEL:  Yeah, I had a couple more points.  Part

15  of the problem -- part of the consequence of the lawyers not

16  having access is there was a restriction on the flow of public

17  information.  We know very little about what was going on

18  there.  The fact that lawyers weren't involved means the

19  lawyers couldn't tell us what was going on there.

20         As you know, the attorney general sent a letter to

21  the government on last Sunday with these concerns and asking

22  for the names of Virginia residents who have been removed from

23  the country or blocked from entering, and so I would ask the

24  Court today to require the government to tell the commonwealth

25  of Virginia which Virginia residents have been denied entry or

1    have been removed from the country, and I would ask for the

2    name, the Virginia address, the foreign residence address, the

3    type of visa, a phone number where we can get in touch with

4    these Virginia residents, and an e-mail address if they have

5    it.

6           I would ask for that both retrospectively, anybody

7    whose visas were cancelled, and prospectively, any Virginia

8    resident whose visa is cancelled going forward, and the same

9    for people removed.  If somebody's been removed from the

10   country, we'd like to know which Virginia residents were

11   removed both retrospectively and prospectively.  I don't think

12   that's asking for a lot.

13          And I want to say one thing about the government's

14   good faith.  I am, I am pleased that they are willing to whisk

15   people back when they come to our attention.  They're not going

16   to come to our attention if we don't have this list because,

17   you know, please stand forward if you're not here, right?  It's

18   hard to know who's affected.  So I think that list is really

19   important.

20          And I don't, I don't want to be overly critical of

21   the government on this, but I think it's important to point out

22   that there appears to be some strategic maneuvering here not by

23   counsel but by counsel's client.  So whenever one of these

24   folks comes forward and files a lawsuit and intervenes, they

25   are immediately presented with a deal that drop your case and

1    I'll bring your person back and dismiss your case with

2    prejudice, which is exactly why you need a vehicle like this

3    case, where you allow permissive intervention, but there's

4    something very troubling about the way this is playing out.

5         These people were excluded based on national origin

6    on the theory that they were a security risk, but if they can

7    file a lawsuit, you get right back unless you are a security

8    risk.  So I'm very -- we're very troubled by that.

9         MR. HEAPHY:  Your Honor, before the government goes,

10   can I just add one thing?

11        THE COURT:  Yes.

12        MR. HEAPHY:  Thank you.  It's on the scope of your

13   order on counsel, Your Honor.  My client now has a lawyer, and

14   that's me, and arguably, we would be protected by the temporary

15   restraining order in terms of access to counsel, and I just

16   want to be clear that I understand the Court's order correctly.

17   It applies to lawyers' access to all legal permanent residents

18   being detained at Dulles International Airport.

19        When it's extended, Your Honor, I would assume that

20   that allows me to have access to Ms. Fadul despite the fact

21   that she's in this K-1 status, not yet a lawful permanent

22   resident, that the Legal Aid Justice Center and Mayer Brown

23   also have access to their clients upon their return.

24        My understanding is that the government, through its

25   good faith efforts to resolve the case, are going to make

1  efforts to reinstate my client's visa, but when she arrives,

2  we'd very much like to be there and facilitate her processing

3  through CBP so that there is no confusion, that the order is

4  enforced.

5          THE COURT:  Well, before this order went into effect,

6  what was the arrangement for access to counsel at Dulles

7  Airport?

8          MR. HEAPHY:  I don't know, Your Honor.

9          THE COURT:  All right.

10          MR. SANDOVAL-MOSHENBERG:  If I may address that?

11          THE COURT:  All right, Mr. Sandoval-Moshenberg.

12          MR. SANDOVAL-MOSHENBERG:  Thank you, Your Honor.  My

13  practice, although I've been practicing immigration for

14  eight-and-a-half years, does not generally involve consular

15  processing, bringing people into the country, but I can tell

16  you that it is not the case that lawyers are never allowed to

17  speak with clients when those clients are taken, for example,

18  into credible fear interviews, for example.  So it is -- it

19  would certainly not be the first time, you know, in the history

20  of Dulles Airport that attorneys are allowed back into the CBP

21  area.

22          THE COURT:  All right.

23          All right?

24          MR. REUVENI:  Maybe I can go now?

25          THE COURT:  Yeah.

 1            MR. REUVENI:  Thank you.  Let me take these in

 2    reverse order, Your Honor, because there are a number of things

 3    here, and it looks like we are going to argue some aspect of

 4    the commonwealth's motion, even though we weren't going to, but

 5    now we are.

 6            You hit on this point earlier, and this is a line, I

 7    think, that CBP would have to draw, and this is just, lawyers

 8    do not get into secondary inspection unless that becomes a

 9    custodial interrogation or a criminal investigation occurs and

10    a right to counsel attaches.

11            The INA is very clear on this, and I want to speak to

12    the Aziz attorney's point.  Credible fear hearings, those are

13    an adjudicatory proceeding that you actually have by regulation

14    entitlement to counsel.  You're not in secondary when that

15    happens.  A credible fear hearing does not occur in secondary

16    with CBP.  A credible fear hearing occurs in front of the

17    United States Citizenship and Immigration Service.  Totally

18    different entity, not part of this lawsuit at least at this

19    time.

20            I am not aware of, no party has cited any case in

21    which any individual, including citizens returning to the

22    United States who would just go through normal secondary

23    process, have a lawyer in secondary.  I don't think it's really

24    hard to imagine what sort of operational problems that may

25    present at the border, but more so in terms of trying to move

1   forward with this litigation and just getting past this weekend

2   and addressing the real issues, that's the sort of thing that

3   the government would probably have to look at very closely if

4   the order was expanding to that.

5           Actually, I will say this:  The counsel, pro bono

6   counsel, we are not aware of anyone after Your Court -- Your

7   Honor's order was implemented who -- of anyone asking for

8   counsel who was a lawful permanent resident once they received

9   this document, because they were getting waived through very

10  quickly -- why would you want to talk to a lawyer if you're

11  getting admitted to the United States? -- which suggests things

12  were working fine once your order was operationalized.

13          So there's really -- the government would strongly

14  oppose, and this is really the only issue we're left -- we're

15  opposing here, expanding the order to apply to individuals who

16  are in secondary.  That's not the law, and the INA doesn't

17  provide for it, and there's no constitutional right to that for

18  anyone, let alone arriving aliens who have never been admitted

19  to the United States before and have no ties or connection to

20  this country.

21          As to the commonwealth's request for a list, that

22  seems way beyond the scope of the TRO you entered, which had to

23  do with access to counsel, and the commonwealth never mentioned

24  this to us when we in good faith were discussing bringing back

25  these potentially one or two individuals they mentioned.

1          I want to -- since I mention that, I take issue with

2    the fact on behalf of the federal government that the

3    commonwealth is suggesting we're mooting cases out

4    strategically.  Everyone in this courtroom knows very well we

5    have dozens of these across the country.  Some of them we are

6    litigating; some of them we're not.

7          As to the events that happened on the weekend, those

8    seem like cases we're looking to resolve because that is an

9    entirely different scenario than people now trying to come to

10   the United States with a revoked visa.  Those we're defending.

11   Those at this time we're continuing to defend.  There's no

12   strategic mooting of cases out occurring here from the

13   government's view.

14         Back to the list, I mean, we would oppose that.  We

15   don't see any reason for it right now, and frankly, it would

16   complicate moving forward with trying to resolve some of these

17   cases if we have to dig in and look for names, and I don't see

18   its relevance right now.  I don't see its helpfulness to where

19   we are in this case right now, and at the very least, we would

20   request, Your Honor, an opportunity to provide a brief opposing

21   that.

22         THE COURT:  Well, again, how many people do you think

23   as best you can tell were removed from Dulles over the weekend?

24         MR. REUVENI:  So now that we're talking about not

25   just lawful permanent residents --

1          THE COURT:  The whole --

2          MR. REUVENI:  Everyone --

3          THE COURT:  Yeah.

4          MR. REUVENI:  -- trying to come into Virginia, I

5   don't know the answer because the answer I had before I came to

6   court today was limited to lawful permanent residents, which

7   was zero people removed over the weekend.

8          So I don't have the answer as to nonimmigrants, and I

9   don't have the answer as to individuals who had immigrant visas

10  but had not yet been admitted to the United States so had not

11  yet been lawful permanent residents.

12         THE COURT:  And among -- I'm sorry, among the people

13  who were removed on Saturday and/or Sunday, did that include

14  refugees?  If you know.  If you don't know, I mean,

15  obviously -- yeah.

16         MR. REUVENI:  No, I'd be speculating.  I'd like to

17  say no, but I'm speculating.

18         THE COURT:  All right.

19         MR. REUVENI:  So I'll just go with I don't know right

20  now.

21         THE COURT:  Okay.

22         MR. REUVENI:  If need be, if necessary, I can find

23  out, but what I do know, not a single lawful permanent resident

24  even before your order was entered, between the time the

25  executive order was signed and your TRO was -- CBP received

1  notice of it, and thereafter, no lawful permanent residents

2  were removed.  The government -- every single one has been

3  admitted to the United States that I'm aware of, and those that

4  would now proceed to continue to try to come to Dulles and get

5  on a plane, the way that they're supposed to be working is they

6  get on a plane, they arrive at Dulles, they don't otherwise

7  have some reason under the INA during the secondary inspection,

8  if they get through secondary, to be denied entry, they're

9  admitted to the United States.

10         THE COURT:  Are lawful permanent residents normally,

11 normally required to go through secondary?

12         MR. REUVENI:  No one is required to go through

13 secondary if they're a lawful permanent resident, but everyone

14 including citizens can be asked to go through secondary.

15         THE COURT:  Right.  All right, so there has never

16 been an established practice in the past that all LPRs must go

17 through secondary?

18         MR. REUVENI:  I'm not aware of one.

19         THE COURT:  And is that what's happening now?  That

20 is, those LPRs who are being permitted, permitted back in the

21 country from those particular countries, are they all required

22 to go through secondary?

23         MR. REUVENI:  Well, no.  To be clear, we're talking

24 about two different points in time.  So we're talking about the

25 weekend, and yes, at that time, lawful permanent residents were

1    going through secondary and then getting this waiver process

2    that the executive order anticipates and outlines, and they

3    were getting waived through pretty quickly, 15 to 30 minutes

4    after, by Sunday is my understanding.

5            Going forward, no.  We have the White House guidance

6    that we attached to our intervention.  The way that our --

7    opposition to intervention.  The way that is being

8    operationalized, they are not, they are not going through

9    secondary.

10           If there is an independent reason other than the

11   executive order, as it would have been before the order was

12   signed on Friday, to go to secondary, they're going to

13   secondary, as everybody else would if the order didn't exist.

14           THE COURT:  So it's your understanding that lawful

15   permanent residents now are being treated exactly the -- from

16   those seven countries are being treated the same as they would

17   have been treated a year ago.

18           MR. REUVENI:  Correct.  So the guidance and the way

19   that it's being implemented, sections 3(c) and 3(e) of the

20   executive order that would otherwise apply if read that way to

21   lawful permanent residents does not apply to them, so they are

22   to be treated -- are being treated so far as I know as though

23   it was 4:21 Friday.

24           THE COURT:  But you would agree with me that within

25   the four corners of that document, that is not included.  It

1    required the additional statement by counsel to make it clear

2    that they were not included within the executive order.

3            MR. REUVENI:  Well --

4            THE COURT:  I didn't see the word "lawful permanent

5    residents" in there.

6            MR. REUVENI:  No, that is in there.  "I understand

7    that there has been reasonable uncertainty about whether those

8    provisions" -- and I'm reading from the counsel for the

9    president's memorandum, back to the language -- "apply to

10   lawful permanent residents of the United States.  Accordingly,

11   to remove any confusion, I now clarify that Sections 3(c) and

12   3(e) do not apply to such individuals.  Please immediately

13   convey this interpretive guidance to all individuals

14   responsible for the administration and implementation of the

15   Executive Order."

16           So at least in the government's understanding of

17   this, no lawful permanent residents are going to secondary

18   solely on the basis of the executive order.  Again, if there's

19   some independent basis that it preexisted the executive order

20   that's in the INA, yes, they're going to secondary, but other

21   than that, no.  The order does not apply to them so far as the

22   government is concerned.

23           THE COURT:  All right.

24           MR. REUVENI:  Thank you.

25           THE COURT:  Mr. Raphael?

1            MR. RAPHAEL:  Just a couple points.  Just on that

2     last point, section -- as we, as we read the executive order,

3     it does apply to lawful permanent residents.  There is an

4     exemption -- an exception in 5(g), but it requires case-by-case

5     review.

6            And so what's happened here is after the chaos

7     developed, I think the government realized they made a mistake

8     or at least it wasn't turning out as they planned, and the

9     secretary has promulgated this sort of categorical decree that

10    if you're an LPR, you can come in.  I don't, I don't see how

11    that comports with 5(g), which required case-by-case review.

12           But Your Honor touched on it earlier.  Under the

13    voluntary cessation doctrine, they snap their fingers; they

14    change it.  They can snap their fingers back, and unless the

15    wrongful conduct is absolutely certain not to recur, they can't

16    moot the case out by changing their -- by changing what they're

17    doing.

18           On the issue of the list, this is no surprise.  We

19    asked for this list last Sunday.  We might not have gotten in

20    this case if they'd given it to us and we could figure out the

21    full extent of the damage to Virginia residents.

22           We're here seven days after this order was issued,

23    only five business days, and we know of these two students who

24    were stranded that I mentioned earlier, and yeah, we're trying

25    to get them back, but there could be many others, and we can't

1    find them unless we know who they are.  It is not an

2    unreasonable request for the government to tell us which

3    Virginia residents they have not let in or who have been

4    removed, and I think that's very reasonable.

5            And the last thing I might ask, Your Honor, given a

6    showing of cooperation here, if Your Honor might consider

7    appointing a magistrate judge who might facilitate mediation

8    efforts, such as Magistrate Judge Buchanan, who's been

9    extremely successful on these things.

10           THE COURT:  All right.  Well --

11           MR. REUVENI:  Your Honor, just one last point?

12           THE COURT:  Yeah.

13           MR. REUVENI:  I just want to clarify any confusion

14   here.  Paragraph 5(g) that counsel refers to applies to

15   refugees.  Paragraph 3 applies to lawful permanent residents.

16   That's why the White House guidance says nothing about

17   paragraph 5.  Refugees coming here are not lawful permanent

18   residents; they're refugees, different category.  Maybe one day

19   they will become lawful permanent residents, but refugees don't

20   have that status when they arrive in the United States.

21           THE COURT:  All right, thank you.

22           MR. RAPHAEL:  I'm sorry, it's 3(g), not 5(g).  3(g)

23   does apply.  3(g).

24           MR. REUVENI:  You said 5(g).

25           THE COURT:  You had said 5(g).

1            MR. RAPHAEL:  I apologize, it was 3(g).  That calls

2    for case-by-case review.

3            THE COURT:  All right.

4            MR. REUVENI:  On the list, again we would, we would

5    oppose what the commonwealth is proposing, and we think it

6    would change the tenor of this litigation dramatically, but if

7    you would like us to get back to you with a brief on that, we

8    can do so.  We just haven't had enough time to think of that or

9    respond to it.  It just came up today.

10           THE COURT:  All right.

11           MR. REUVENI:  As to the letter, I mean, I would say

12   one last thing; I apologize, Your Honor.  The letter asked us

13   to respond to ongoing litigation.  I think we all understand

14   the position that puts the U.S. government in when we're asked

15   to give information that could affect ongoing litigation.

16           THE COURT:  All right.  Well, we'll take a look at

17   that issue in chambers, but at this point, then I've allowed --

18   granted the motions to intervene.  We're going to extend the

19   temporary restraining order to keep things somewhat in place.

20           The access to counsel issue is a troubling one

21   because I -- my experience having handled many cases at Dulles

22   is that, in fact, the government's position is correct that

23   normally, under normal circumstances, counsel would not have

24   the right to have direct, in person contact with people who are

25   held up in the process there.

53

1                    There are exceptions, and I do believe in one of your

2     sets of papers, there was discussion about reference of people

3     to hotlines or telephone contact with various agencies that

4     provide legal counsel in immigration.  So I'll see what makes

5     sense to me.

6                    I mean, I do think that probably this issue is

7     somewhat less pressing than it was on Saturday because at this

8     point, I don't think folks are coming to the airport who would

9     be covered by this, right?  I mean, are there any more issues

10    of people who have been coming to the airport and being turned

11    around since this weekend?

12                   MR. RAPHAEL:  Well, I mean, LPRs, I guess after the

13    government's change in position, are now allowed in.

14                   THE COURT:  LPRs are coming in, and the problem now

15    is from your standpoint, is that everybody else is basically

16    stopped because the airlines won't let -- they aren't getting

17    the visas.

18                   MR. RAPHAEL:  That's right.

19                   THE COURT:  Yeah.

20                   MR. RAPHAEL:  And Your Honor's TRO applied only to

21    LPRs.

22                   THE COURT:  Correct.

23                   MR. RAPHAEL:  And so I think the counsel issue is

24    still a live issue if they have problems going forward.

25                   THE COURT:  If LPRs have problems.

54

1          MR. RAPHAEL:  Yes, yes.

2          MR. REUVENI:  Yes.  No one is getting turned around

3 at the airport if they're a lawful permanent resident.  If

4 they're not and they don't have a valid visa, practically

5 speaking, they're not getting on a plane to get here, so that

6 can't be an issue unless and until they do.

7          THE COURT:  All right, thank you.

8          All right, I think that resolves everything for

9 today.  We will recess court until 12:00.

10          MR. RAPHAEL:  Thank you.

11                         (Which were all the proceedings had

12                          at this time.)

13

14              CERTIFICATE OF THE REPORTER

15     I certify that the foregoing is a correct transcript of

16 the record of proceedings in the above-entitled matter.

17

18

19          _____ /s/ _____
                        Anneliese J. Thomson
20

21

22

23

24

25