# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

|  |  |
|---|---|
| TAREQ AQEL MOHAMMED AZIZ, et al., | ) |
| Petitioners, | ) |
| v. | ) Civil Action No.: 1:17-cv-116-LMB-TCB |
| DONALD TRUMP, President of the United States, et al., | ) |
| Respondents. | ) |

**BRIEF OF *AMICI CURIAE* MUSLIM ADVOCATES, AMERICAN MUSLIM HEALTH PROFESSIONALS, COUNCIL FOR THE ADVANCEMENT OF AMERICAN MUSLIM PROFESSIONALS, ISLAMIC MEDICAL ASSOCIATION OF NORTH AMERICA, MUPPIES, INC., NATIONAL ARAB AMERICAN MEDICAL ASSOCIATION, and NETWORK OF ARAB-AMERICAN PROFESSIONALS <u>IN SUPPORT OF INTERVENOR-PETITONER</u>**

ARNOLD & PORTER KAYE SCHOLER LLP

    /s/
Michael Kientzle (VSB 85487)
Daniel A. Cantor
   (Pro hac vice motion to be filed)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
michael.kientzle@apks.com
daniel.cantor@apks.com

*Attorneys for Amici Curiae*

February 8, 2017

MUSLIM ADVOCATES

Farhana Khera
Aziz Huq
Brenda Abdelall
Madihha Ahussain
Johnathan Smith
Junaid Sulahry
Muslim Advocates
P.O. Box 71080
Oakland, CA 94612
Telephone: (415) 692-1484

*Of Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

Table of Authorities ........................................................................................................................ iii
INTRODUCTION ...........................................................................................................................5
INTEREST OF THE AMICI CURIAE ............................................................................................5
ARGUMENT ...................................................................................................................................9
I.    The President's Executive Orders on Immigration Are Subject to Important Constitutional Limitations .................................................................................................9
    A.    The Executive Order Is Not Immune From Judicial Review ........................................9
    B.    The Court Is Not Prohibited From Reviewing The Executive Branch's Motives ......................................................................................................................11
II.    The Purpose and Effect of the Executive Order Is Animus Toward Muslims .....................13
    A.    The Executive Order Is Animated By Overt Animus Toward Muslims .....................13
    B.    The Executive Order Disproportionately Injures Muslims, Including Longtime U.S. Residents ............................................................................................15
CONCLUSION ...............................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Cardenas v. United States*,
   826 F.3d 1164 (9th Cir. 2016) ...........................................................................................10

*Chae Chan Ping v. United States*,
   130 U.S. 581 (1889) ............................................................................................................10

*Church of Lukumi Babalu v. Hialeah*,
   508 U.S. 520 (1993) ............................................................................................................12

*Equity in Athletics, Inc. v. Dep't of Educ.*,
   639 F.3d 91 (4th Cir. 2011) ................................................................................................12

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893) ............................................................................................................10

*Hamdan v. Rumsfeld,*
   548 U.S. 557 (2006) ............................................................................................................12

*INS v. Chadha*,
   462 U.S. 919 (1983) ..............................................................................................................9

*INS v. Pangilinan*,
   486 U.S. 875 (1988) ............................................................................................................12

*Kerry v. Din*,
   135 S. Ct. 2128 (2015) .................................................................................................10, 13

*Korematsu v. United States*,
   323 U.S. 214 (1944) ............................................................................................................10

*Locke v. Davey*,
   540 U.S. 712 (2004) ............................................................................................................12

*McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*,
   545 U.S. 844 (2005) ............................................................................................................11

*Nguyen v. INS*,
   533 U.S. 53 (2001) ................................................................................................................9

*Sante Fe Indep. Sch. Dist. v. Doe*,
   530 U.S. 290 (2000) ............................................................................................................11

*United States v. O'Brien*,
   391 U.S. 367 (1968) ............................................................................................................11

*United States v. Windsor*,
   133 S. Ct. 2675 (2013) ........................................................................................................12

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ..............................................................................................................9

**Other Authorities**

Donald Trump on Orlando Shooting, FACTCHECK.ORG (June 14, 2016),
    http://www.factcheck.org/2016/06/donald-trump-on-orlando-shooting/ ................................14

Exec. Order No. 13,769, 82 FR 8977 (2017) ............................................................................1, 8

Kambiz Ghanea Bassiri, A History of Islam in America: From the New World to
    the New World Order (Cambridge 2010) ................................................................................16

## INTRODUCTION

Plaintiffs' Motion for Declaratory and Injunctive Relief against the implementation of Section 3(c) of President Donald J. Trump's executive order of January 27, 2017, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "Executive Order") should be granted. The Executive Order is unconstitutional on a number of grounds, most strikingly because its evident purpose and effect is animus toward Muslims.

Amici are business, education, finance, healthcare, legal, science, technology, and other professional members of the American Muslim community directly harmed and stigmatized by the Executive Order. Given the propriety of judicial review in this case, and the irremediable harms to American citizens, residents, and visa holders from the Executive Order, Amici urge this Court to grant the Plaintiffs' Motion for Declaratory and Injunctive Relief.

## INTEREST OF THE AMICI CURIAE

This amici curiae brief is submitted on behalf of the Amici described below in support of intervenor-petitioner the Commonwealth of Virginia. Amici are business, education, finance, healthcare, legal, science, technology, and other professional members of the American Muslim community directly harmed and stigmatized by the Executive Order.

**Muslim Advocates**, a national legal advocacy and educational organization formed in 2005, works on the frontlines of civil rights to guarantee freedom and justice for Americans of all faiths. Muslim Advocates advances these objectives through litigation and other legal advocacy, policy engagement, and civic education. Muslim Advocates also serves as a legal resource for the American Muslim community, promoting the full and meaningful participation of Muslims in American public life. The issues at stake in this case directly relate to Muslim Advocates' work fighting institutional discrimination against the American Muslim community.

**American Muslim Health Professionals** ("AMHP") works to improve the health of all Americans. AMHP has three areas of focus: (1) health promotion and education; (2) professional development; and (3) state and national advocacy on public health issues. AMHP has been a leader in expanding healthcare coverage through state liaisons and its "Connecting Americans to Coverage" campaign. Its leadership has been at the forefront of raising awareness about bullying, identity development, and other mental health issues impacting the most vulnerable segments of society – our children and youth. AMHP has also spearheaded many social just initiatives including "EnabledMuslim," an online platform that provides spiritual and social support for individuals and families impacted by disability.

**Council for the Advancement of Muslim Professionals** ("CAMP") is an association of mid- to senior-level Muslim professionals, which works to facilitate and inspire the development of Muslim Professionals across the United States. CAMP currently has a membership base of approximately 7,500 professionals and has a physical presence in Chicago, New Jersey, New York, Philadelphia, and Washington D.C. Founded in 1994 in Chicago as a face-to-face networking organization, CAMP has grown to become a multi-city professional association, which empowers Muslim professionals to advance and excel, not only in their careers, but also in their broader community and philanthropic efforts.

The **Islamic Medical Association of North America** ("IMANA") was founded in 1967 and represents the largest network of American Muslim physicians, dentists, and allied healthcare professionals in North America. IMANA provides professional networking opportunities for healthcare practitioners; acts as a medical ethics resource for educational institutions, medical professionals and medical students, residents and fellows; and provides continuing medical education. IMANA has active medical relief programs and emergency relief efforts to respond to disasters and facilitates the transfer of medical knowledge around the world.

The mission of IMANA is to provide humanitarian aid and medical relief worldwide and to be an advocate of compassionate, sustainable and quality healthcare policies. Its objectives are to connect and assist Muslim physicians, dentists and allied health professionals in North America with orientation, adjustment, finding appropriate training and job opportunities. IMANA wishes to continue to promote and facilitate medical education, research, publications and improve global healthcare delivery by encouraging American-Muslim diplomacy, through medical relief work and other charitable activities.

**Muppies, Inc.,** also known as Muslim Urban Professionals ("Muppies"), is a nonprofit, charitable organization dedicated to empowering and advancing Muslim business professionals to be leaders in their careers and communities. Its mission is to create a global community of diverse individuals who will support, challenge, and inspire one another by providing a platform for networking, mentorship, and career development. Muppies members are leaders in the fields of finance, consulting, technology, venture capital, healthcare, entrepreneurship and social enterprise. As a condition of acceptance to the organization, members must demonstrate dedication to the development and advancement of themselves and their communities, in addition to outstanding professional achievement. Muppies members contribute to the fabric of the U.S. economy in diverse ways, such as driving innovation, creating new opportunities for employment, and promoting excellence through diversity and inclusion.

The **National Arab American Medical Association** ("NAAMA") is the largest international organization of Arab American health care providers, trainees and medical students based in North America. Since its founding, twenty-seven chapters have been established in the United States and Canada. In 1990, NAAMA was created to support international medical assistance projects, educational exchanges, scholarships, research grants, and emergency medical aid in areas of conflict. Members of the association include well-trained clinicians, high ranking

7

university professors, leaders of several medical societies, and scientists involved in cutting edge research and innovation. In the United States, the foundation supports professional and educational activities aimed at Arab American health education and disease prevention in cooperation with community-based organizations. Members have also donated their time and money to help the relief efforts following Hurricanes Katrina and Rita. Internationally, the foundation sponsors projects, focusing on the Arab world. It has sponsored humanitarian projects in Iraq in the wake of the Iraq War. Currently, volunteers from the association conduct periodic missions to countries surrounding Syria to provide humanitarian medical care and establish eye care and dental clinics to benefit local populations and refugees.

**Network of Arab-American Professionals** ("NAAP") is a professional organization grounded in the notion that all Arabs in America need to connect to advance the community. Through collective contribution to strengthen our individual and community standing, NAAP provides a channel for Arab-Americans to realize their passions and pursue their interests through community involvement. NAAP promotes professional networking and social interaction among Arab-American and Arab professionals in the United States and abroad; educates both the Arab-American and non-Arab communities about Arab culture, identity, and concerns; advances the Arab-American community by empowering, protecting and promoting its political causes and interests in the United States and abroad within all levels of society; supports the Arab student movement in the United States; and serves society through volunteerism and community service efforts.

## ARGUMENT

I. **THE PRESIDENT'S EXECUTIVE ORDERS ON IMMIGRATION ARE SUBJECT TO IMPORTANT CONSTITUTIONAL LIMITATIONS**

### A. The Executive Order Is Not Immune From Judicial Review

In support of its broadly sweeping immigration ban, the Government has repeatedly invoked a supposed "plenary power" of the Government's political branches to exclude particular groups from entering the United States. *See, e.g.*, Brief of Government at 15, Washington v. Donald Trump, et al., No. 2:17-cv-00141-JLR (W.D. Wash. Feb. 2, 2017), ECF No. 50 (citing *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016)). However, any such attempt to shield the Executive Order from meaningful judicial review fails for several reasons.

*First*, the Supreme Court's recent cases have clarified that the political branches' power over immigration matters is not immune from judicial review. *See Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (holding that so-called "'plenary power' to create immigration law . . . is subject to important constitutional limitations" in the treatment of aliens). To the contrary, the political branches must use "a constitutionally permissible means of implementing" the relevant policy. *INS v. Chadha*, 462 U.S. 919, 941–942 (1983) (invalidating enforcement action against alien plaintiff on the basis of a structural constitutional limit on governmental power akin to the Establishment Clause).

The operation of constitutional constraints on the executive and legislative branches' power with respect to regulating immigration is embodied in a number of important recent cases. These cases involve both U.S. citizens and aliens; and both individual antidiscrimination claims and structural constitutional limits on the government's power. For example, in *Zadvydas v. Davis*, the Supreme Court ruled in favor of an alien who had already been found removable, citing Procedural Due Process concerns. 533 U.S. 678, 693 (2001). In *Nguyen v. INS*, 533 U.S.

53, 58 (2001), the Court adjudicated a noncitizen's Equal Protection challenges to gender classifications in the statutory frameworks regulating claims of derivative citizenship. The *Nguyen* Court carefully reviewed the "important governmental interest[s]" furthered by the gender classification. *Id.* at 64.

*Second*, as it is commonly applied today, the plenary power doctrine addresses the standard of judicial review of an individual consular officer's discretionary denial of a visa to a specific non-resident alien. *See, e.g.*, *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (applying consular non-reviewability doctrine to discretionary denial of a visa). Practical concerns of administrability may support insulating the large volume of such discretionary, fact-specific consular-level visa decisions from time-consuming judicial review. Such concerns, though, have no application in the context of the States' challenge to the Executive Order. Rather than making a case-specific determination regarding the appropriateness of allowing a specific individual to enter the United States, the Executive Order bars entire populations categorically. It also severely impacts longtime residents of the United States who have already been deemed appropriate to reside in the country. Moreover, as discussed in Part I.B below, even were it applicable, the consular non-reviewability doctrine is not absolute. *See Kerry v. Din*, 135 S. Ct. 2128 (2015).

*Third*, to the extent the plenary power doctrine historically was given a broader scope of application, it is important to recall the ignominious context in which the doctrine originated. In *Fong Yue Ting v. United States*, 149 U.S. 698 (1893), and *Chae Chan Ping v. United States*, 130 U.S. 581 (1889), the Supreme Court upheld the overtly racist Chinese Exclusion Acts.[1] The same sort of animus later led the federal government to intern Japanese-American citizens and aliens on the West Coast, a decision the federal courts did not overturn. *See Korematsu v. United*

---

[1] For example, in *Fong Yue Ting*, the Court upheld a requirement that evidence of residency for aliens of Chinese origin be supported by "one credible *white* witness." 149 U.S. at 729-30.

10

*States*, 323 U.S. 214, 216 (1944) (upholding wartime internment of Japanese-Americans). The Government's invocation of the doctrine in support of the President's "Muslim ban" will no doubt be remembered as synonymous with these infamous historical precedents.

**B. The Court Is Not Prohibited From Reviewing The Executive Branch's Motives**

The Government has contended in other litigation that any inquiry into "motive" would create "substantial separation of powers problems." Brief of Government at 17, Washington v. Donald Trump, No. 17-35105 (9th Cir. Feb. 4, 2017), ECF No. 14 (citing *United States v. O'Brien*, 391 U.S. 367 (1968)). This broad assertion of immunity from motive-based judicial review is erroneous, and would have startling and disruptive consequences if accepted. This is equally true when the Government purports to invoke national security considerations.

Contrary to the Government's position, in reviewing the Executive Order, courts are duty-bound to consider not only the language of the Order but also its "historical context" and the "specific sequence of events leading to [its pronouncement]." *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005). As demonstrated below in Part II.A, such a review can support only one conclusion — that the Executive Order is motivated by animus toward Muslims and the Islamic faith.

The courts' duty to examine the context in which the Executive Order was conceived and implemented flows from the nature of the constitutional and statutory violations that petitioners and intervenor-petitioner, the Commonwealth of Virginia, have alleged. With respect to the Establishment Clause count in the Commonwealth's complaint, the District Court must consider both "historical context" and the "specific sequence of events leading to" issuance of the Executive Order to determine whether it was intended, at least in part, to disfavor one faith over others. *McCreary County, Ky.*, 545 U.S. at 866; *Sante Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (holding that courts have a "duty . . . to distinguish a sham secular purpose from a

11

sincere one"). With respect to Equal Protection, the District Court must similarly address the Plaintiffs' credible allegations and evidence that the Executive Order was intended to discriminate against Muslims. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) ("In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus."). Equal Protection challenges to federal action require judicial consideration of both the "avowed *purpose* and practical effect of the law" to test its constitutionality. *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (emphasis added).

Yet another example is the Free Exercise Clause, which requires a determination of whether "animus toward religion" motivated a state action. *Locke v. Davey*, 540 U.S. 712, 725 (2004). Doing so means that judges must look closely at a measure's "history" and "operation." *Id.* They also look closely at public statements made by the enacting body. *Church of Lukumi Babalu v. Hialeah*, 508 U.S. 520, 541 (1993) (examining "minutes and taped excerpts" of city council meeting that produced challenged ordinance, and finding "significant hostility" toward a religious minority).

Nor does a different rule apply in the immigration or national security contexts. In previous antidiscrimination challenges to executive immigration-related action by noncitizens, the Supreme Court has looked to "the historical record" to determine whether "the actions at issue . . . were motivated by any racial animus." *INS v. Pangilinan*, 486 U.S. 875, 886 (1988). In the national security context, the Court has also insisted on careful judicial scrutiny of the factual justifications for decisions that impinge on basic constitutional rights. *See, e.g., Hamdan v. Rumsfeld*, 548 U.S. 557, 623 (2006) (invalidating military commissions system established by executive order on the ground that "[n]othing in the record before us demonstrates that it would be impracticable to apply court-martial rules in this case" as required by federal statute).

12

Finally, even if the plenary power doctrine were properly invoked here (and it is not), Justice Kennedy's controlling opinion in *Kerry v. Din*, 135 S. Ct. 2128 (2015) directs that courts should "look behind" the government's stated reasons for an immigration decision if the plaintiff "plausibly alleged with sufficient particularity" "an affirmative showing of bad faith." *Din*, 135 S. Ct. at 2131. Such a standard is met here. As demonstrated below, the Executive Order reflects the implementation of a bad faith effort to target Muslims. These allegations are more than plausible in light of the publicly available evidence.

## II. THE PURPOSE AND EFFECT OF THE EXECUTIVE ORDER IS ANIMUS TOWARD MUSLIMS

### A. The Executive Order Is Animated By Overt Animus Toward Muslims

Among the stated purposes of the Executive Order is "to protect Americans . . . [by] ensur[ing] that those admitted to this country do not bear hostile attitudes toward it and its founding principles." Executive Order Section 1. However, statements by the President and his advisors leave no doubt that the unstated premise of the Executive Order is the false proposition that Muslims, by virtue of their religious faith, are more likely than non-Muslims to "bear hostile attitudes toward [the United States] and its founding principles." This unfounded and irrational animus toward all Muslims has permeated the conception, promulgation, and implementation of the Executive Order, as demonstrated by the below chronology of public pronouncements by the President and his advisors.

On November 18, 2015, Mr. Trump claimed that he believed that the United States will have "absolutely no choice" but to close down mosques and pledged that, if he won the presidency, "[Syrian refugees are] going out." Kientzle Decl. Ex. A.

On December 7, 2015, following the terror attack in San Bernardino, California, then-candidate Mr. Trump called for a "complete shutdown of Muslims entering the United States." Kientzle Decl. Ex. B. Mr. Trump justified this call by claiming, without evidence, that "large

segments of the Muslim population" favor Sharia (Islamic law) over U.S. law and violence against Americans. Kientzle Decl. Ex. C.

On December 8, 2015, Mr. Trump defended his proposed "Muslim ban," and falsely accused Muslims of failing to report the San Bernardino plot:[2] "The Muslim community is not reporting what's going on. They should be reporting that their next-door neighbor is making pipe bombs and they've got them all over the place. The mother's in the apartment, other people, his friend was buying him rifles. Nobody was reporting that." Kientzle Decl. Ex. D.

On January 14, 2016, during a Republican Candidate Debate in North Charleston, South Carolina, Mr. Trump answered "No" when asked whether he had heard anything that made him want to rethink his position on banning Muslims from entering the country. Kientzle Decl. Ex. E.

On March 9, 2016, Mr. Trump told CNN's Anderson Cooper that "Islam hates us." Kientzle Decl. Ex. F. Asked whether he made a distinction between Islam and radical Islam, Mr. Trump asserted that, "It's very hard to separate, because you don't know who is who." Kientzle Decl. Ex. F.

On June 13, 2016, in a speech responding to the terror attack in Orlando, Florida, Mr. Trump pledged to suspend immigration from areas of the world where there is a proven history of terrorism against the United States, Europe, or our allies. Kientzle Decl. Ex. G. According to public statements by Mr. Trump's advisor, Rudolph Giuliani, on the day the Executive Order was signed, this new formulation reflected an instruction by Mr. Trump to his advisors to find a way to implement the "Muslim ban" "legally." Kientzle Decl. Ex. H. During

---

[2] Donald Trump on Orlando Shooting, FACTCHECK.ORG (June 14, 2016), http://www.factcheck.org/2016/06/donald-trump-on-orlando-shooting/ ("There is no evidence for Trump's claim that "many people," including neighbors of the San Bernardino shooters, saw "bombs all over the floor" of the apartment, but did not report it to authorities because of concerns about racial profiling.").

the same June 13, 2016 speech, Mr. Trump accused Muslims of "trying to take over our children and convince them how wonderful ISIS is and how wonderful Islam is." Kientzle Decl. Ex. G.

On August 10th, 2016, Mr. Trump's National Security Adviser Michael Flynn called Islam "a cancer" during remarks at an ACT for America event in Dallas, Texas. Kientzle Decl. Ex. I. Mr. Flynn made similar remarks again during the same month at a speech to the Ahavath Torah Congregation in Stoughton, Massachusetts, saying, "This is Islamism, it is a vicious cancer inside the body of 1.7 billion people on this planet and it has to be excised." Kientzle Decl. Ex. J.

At a campaign rally in Canton, Ohio, on September 14, 2016, Mr. Trump, while discussing Syrian refugees, claimed that, "We don't know where these people come from. We don't know if they have love or hate in their heart, and there's no way to tell." Kientzle Decl. Ex. K.

On January 27, 2017, Mr. Trump said that Christian refugees would be given priority in the refugee program. Kientzle Decl. Ex. L. On February 3, 2017, Mr. Trump posted on Twitter "We must keep 'evil' out of our country." Kientzle Decl. Ex. M.

### B. The Executive Order Disproportionately Injures Muslims, Including Longtime U.S. Residents

As American Muslim professionals, Amici can attest to the stigma that has attached to all American Muslims (and those perceived as Muslim in consequence of their ethnicity), unfairly and irrationally, as a result of the Executive Order and the public pronouncements of the President and his advisors in connection therewith.

Contrary to the misperception spread by the "Muslim ban," the presence of Muslims in America is not a threat to American security. Muslims have been a part of America since its founding, when 10–15% of slaves forcibly brought to America were Muslim. Muslims have expended their blood, sweat, and tears building and defending the United States. In fact, today,

15

more than 5,000 Muslims serve in the U.S. military, and many have given their lives in recent wars in defense of US interests.  They also provide necessary healthcare, educate our nation's children, create jobs, and contribute innovation that is an essential driver of our nation's economic growth.  Today, Muslims represent 1% of the US population.  *See generally* Kambiz Ghanea Bassiri, A History of Islam in America: From the New World to the New World Order (Cambridge 2010).

The intentional and false stigmatization of Muslims as potential terrorists — even if supposedly limited to Muslims from the seven majority-Muslim countries expressly included in the Executive Order — will, if not restrained, continue to harm Amici.

## CONCLUSION

For the foregoing reasons, Amici respectfully request that the Court grant Plaintiffs' Motion for Declaratory and Injunctive Relief.

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

/s/
Michael Kientzle (VSB 85487)
Daniel A. Cantor (pro hac vice to be filed)

   Arnold & Porter Kaye Scholer LLP
   601 Massachusetts Ave., NW
   Washington, DC 20001
   Telephone: (202) 942 5000
   Facsimile: (202) 942-5999
   michael.kientzle@apks.com
   daniel.cantor@apks.com

*Attorneys for Amici Curiae*

Farhana Khera
Aziz Huq
Brenda Abdelall
Madihha Ahussain
Johnathan Smith
Junaid Sulahry

   Muslim Advocates
   P.O. Box 71080
   Oakland, CA 94612
   (415) 692-1484

Bethan R. Jones

   Arnold & Porter Kaye Scholer LLP
   601 Massachusetts Ave., NW
   Washington, DC 20001
   (202) 942 5000

Anton Ware

   Arnold & Porter Kaye Scholer LLP
   Three Embarcadero Center
   10th Floor
   San Francisco, CA 94111
   (415) 471 3100

(continued)

                        Andrew D. Bergman

                            Arnold & Porter Kaye Scholer LLP
                            700 Louisiana Street
                            Suite 1600
                            Houston, TX 77002
                            (713) 576 2430

                        *Of Counsel for Amici Curiae*

Date:      February 8, 2017

## **CERTIFICATE OF SERVICE**

I hereby certify that on the February 8, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

ARNOLD & PORTER KAYE SCHOLER LLP

/s/
Michael Kientzle (VSB 84587)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
michael.kientzle@apks.com

*Attorney for Amici Curiae*
