**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| TAREQ AQEL MOHAMMED AZIZ, <u>et al</u>, | No. 1:17-cv-00116-LMB-TCB |
| Petitioners, | |
| COMMONWEALTH OF VIRGINIA, | **RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO INTERVENOR-PETITIONER COMMONWEALTH OF VIRGINIA'S MOTION FOR PRELIMINARY INJUNCTION** |
| Intervenor-Petitioner | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOMS AND BRODER PROTECTION; JOHN F. KELLY, in his official capacity as Secretary of the Department of Homeland Security; KEVIN K. MCALEENAN, in his official capacity as Acting Commissioner of Customs and Border Protection; and WAYNE BONDI, in his official capacity as Customer and Border Protection Port Director of the Area Port of Washington Dulles, | |
| Respondents. | |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................3

I.      The Immigration and Nationality Act.........................................................................3

II.     Presidential Authority Over Foreign Affairs and National Security ..................................5

III.    The President's Executive Order of January 27, 2017 ....................................................6

IV.     Recent Events.......................................................................................................7

STANDARD OF REVIEW ...................................................................................................9

ARGUMENT .....................................................................................................................9

I.      Virginia Lacks Standing .........................................................................................9

II.     This Court Cannot, and Need Not, Review the President's National Security
        Determinations Underlying the Executive Order ..............................................................14

        A.      Courts lack jurisdiction to review the Executive Branch's decisions concerning
                visa revocation and entry .......................................................................14

        B.      Virginia lacks any cause of action under the INA or to enforce the alleged rights
                of third party aliens ...............................................................................16

III.    Virginia Fails to Demonstrate It Is Likely to Prevail on the Merits ..................................18

        A.      The Order is a Valid Exercise of Congress's Broad Delegation of Authority to the
                President and His Own Constitutional Powers .......................................................18

        B.      Virginia's constitutional challenges are without merit ........................................22

                i.      Fifth Amendment—Due Process  ...........................................................22

                ii.     Establishment Clause and Equal Protection .............................................25

        C.      State Sovereigns Lack a Cause of Action under the RFRA....................................27

IV.     Virginia Fails to Demonstrate Irreparable Harm ...............................................................28

V.      The Balance of Equities and Public Interest Tip Sharply in the Government's Favor......29

VI.     Relief Must be Limited in Scope to Virginia and to Specific Harm Found ....................30

**CONCLUSION** ................................................................................................................**30**

**CERTIFICATE OF SERVICE** ..............................................................................................

# TABLE OF AUTHORITIES

## CASE LAW

*Action NC v. Strach,*
  2016 WL 6304731 (M.D.N.C. Oct. 27, 2016) ...................................................................... 12

*Adams v. Baker,*
  909 F.2d 643 (1st Cir. 1990) ............................................................................................... 24

*Adams v. Freedom Forge Corp.,*
  204 F.3d 475 (3d Cir. 2000) ................................................................................................ 28

*Adams v. Vance,*
  570 F.2d 950 (D.C. Cir. 1978) ................................................................................... 2, 9, 30

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,*
  686 F.3d 965 (9th Cir. 2012) ............................................................................................... 15

*Alabama v. United States,*
  2016 WL 4070146 (N.D. Ala. Aug 31, 2016) ..................................................................... 18

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ...................................................................................................... 17, 18

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
  458 U.S. 592 (1982) ............................................................................................................ 11

*Am. Fed'n of Gov't Emp., AFL-CIO v. Rumsfeld,*
  321 F.3d 139 (D.C. Cir. 2003) ............................................................................................ 17

*Appiah v. U.S. I.N.S.,*
  202 F.3d 704 (4th Cir. 2000) .............................................................................................. 20

*Ariz. Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) ............................................................................................ 13

*Arizona Christian Sch. Tuition Org. v. Win*n,
  563 U.S. 125 (2011) ............................................................................................................ 17

*Arizona v. United States,*
  132 S. Ct. 2492 (2012) ........................................................................................................ 11

*Azizi v. Thornburgh,*
  908 F.2d 1130 (2d Cir. 1990) ............................................................................................. 24

*Burwell v. Hobby Lobby Stores, Inc.*,
  134 S. Ct. 2751 (2014) ............................................................................... 28

*Castro v. United States Dep't of Homeland Sec.*,
  835 F.3d 422 (3d Cir. 2016) ....................................................................... 17

*Comm. for Nuclear Responsibility, Inc. v. Seaborg*,
  463 F.2d 796 (D.C. Cir. 1971) .................................................................... 29

*Connecticut ex rel. Blumenthal v. United States*,
  369 F. Supp. 2d 237 (D. Conn. 2005) ......................................................... 11

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ................................................................................... 14

*Dames & Moore v. Regan*,
  453 U.S. 554 (1982) ................................................................................... 19

*De Avilia v. Civiletti*,
  643 F.2d 471 (7th Cir. 1981) ...................................................................... 24

*Dekoladenu v. Gonzales*,
  459 F.3d 500 (4th Cir. 2006) ...................................................................... 23

*Dep't of Def. v. Meinhold*,
  510 U.S. 939 (1993) ................................................................................... 31

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988) ................................................................................... 14

*Detroit Int'l Bridge Co. v. Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016) .............................................................. 17

*Diomande v. Gonzales*,
  247 Fed. App'x 450 (4th Cir. 2007) ........................................................... 23

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
  952 F.2d 802 (4th Cir. 1991) ...................................................................... 28

*Dorsey v. United States*,
  567 U.S. 260 (2016) ................................................................................... 22

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*,
  485 U.S. 568 (1988) ................................................................................... 22

*F.C.C. v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993) ................................................................................. 26

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
93 F.3d 897 (D.C. Cir. 1996) ................................................................... 13

*Fiallo v. Bell,*
430 U.S. 787 (1977) ................................................................................. 27

*Franklin v. Massachusetts,*
505 U.S. 800 (1992) ................................................................................. 17

*Georgia-Pacific Consumer Prods. LP v. Von Drehle Corp.,*
781 F.3d 710 (4th Cir. 2015) ................................................................... 31

*Haig v. Agee,*
453 U.S. 280 (1981) ................................................................................. 24

*Haitian Refugee Ctr., Inc. v. Baker,*
789 F. Supp. 1552 (S.D. Fla. 1991) ......................................................... 14

*Haitian Refugee Ctr., Inc. v. Baker,*
953 F.2d 1498 (11th Cir. 1992) ............................................................... 19

*Harisiades v. Shaughnessy,*
342 U.S. 580 (1952) ................................................................................... 6

*Heller v. Doe,*
509 U.S. 312 (1993) ................................................................................. 26

*Hobbie v. Unemployment Appeals Comm'n of Fla.,*
480 U.S. 136 (1987) ................................................................................. 25

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ..................................................................................... 15

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.,*
17 F.3d 691 (4th Cir. 1994) ..................................................................... 29

*I.N.S. v. Aguirre-Aguirre,*
526 U.S. 415 (1999) ................................................................................. 14

*Jean v. Nelson,*
727 F.2d 957 (11th Cir. 1984) ........................................................ 5, 20, 27

*Johnson v. Whitehead,*
647 F.3d 120 (4th Cir. 2011) ................................................................... 27

*Kentuckians for Commonwealth v. Rivenburgh*,
   317 F.3d 425 (4th Cir. 2003) ................................................................................. 30

*Kerry v. Din*,
   135 S. Ct. 2128 (2015) ....................................................................................... 15

*Kiyemba v. Obama*,
   555 F.3d 1022 (D.C. Cir. 2009) ....................................................................... 13

*Kleindienst v. Mandel*,
   408 U.S. 762 (1972) ........................................................................................... 15

*Knoetze v. United States*,
   634 F.2d 207 (5th Cir. 1981) ........................................................................... 23

*Landon v. Plasencia*,
   459 U.S. 21 (1982) ....................................................................................... 2, 23

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*,
   104 F.3d 1349 (D.C. Cir. 1997) ....................................................................... 21

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) ........................................................................................... 18

*Louhghalam v. Trump*,
   Civ. No. 17-10154-NMG, 2017 WL 479779 (D. Mass. Feb. 3, 2017) ................. 1, 17, 19, 25

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................... 12

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ............................................................................................. 20

*Mississippi v. Johnson*,
   71 U.S. 475 (1867) ....................................................................................... 16, 17

*Mow Sun Wong v. Campbell*,
   626 F.2d 739 (9th Cir. 1980) ........................................................................... 19

*Munaf v. Geren*,
   553 U.S. 674 (2008) ............................................................................................. 9

*Narenji v. Civiletti*,
   617 F.2d 745 (D.C. Cir. 1979) ......................................................................... 20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
132 S. Ct. 2566, (2012) ............................................................................. 15

*Nat'l Res. Def. Council, Inc. v. Pena*,
972 F. Supp. 9 (D.D.C. 1997) ..................................................................... 29

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................... 29

*Norfolk S. Ry. Co. v. City of Alexandria*,
608 F.3d 150 (4th Cir. 2010) ...................................................................... 23

*Palestine Information Office v. Shultz*,
674 F. Supp. 910 (D.D.C. 1987) ................................................................... 9

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) .................................................................................... 13

*Peterson v. Nat'l Telecommunications & Info. Admin.*,
505 F. Supp. 2d 313 (E.D. Va. 2006) ......................................................... 10

*Premo v. Martin*,
119 F.3d 764 (9th Cir. 1997) ...................................................................... 28

*RadLAX Gateway Hotel v. Amalgamated Bank*,
132 S. Ct. 2065 (2012) ............................................................................... 22

*Raines v. Byrd*,
521 U.S. 811 (1997) .................................................................................... 13

*Rajah v. Mukasey*,
544 F.3d 427 (2d Cir. 2008) ....................................................................... 20

*Ramirez v. Clinton*,
2013 WL 227732 n.2 (E.D. N.C. Jan. 22, 2013) ....................................... 23

*Rasul v. Myers*,
563 F.3d 527 (D.C. Cir. 2009) ................................................................... 28

*Regan v. Wald*,
468 U.S. 222 (1984) .................................................................................... 24

*Romer v. Evans*,
517 U.S. 620 (1996) .................................................................................... 26

*Romero v. Consulate of U.S., Barranquilla, Colombia*,
860 F. Supp. 319 (E.D. Va. 1994) ............................................................. 15

*Rosenberg v. Fleuti,*
374 U.S. 449 (1963) ............................................................................ 22

*State of S.C. v. Katzenbach,*
383 U.S. 301 (1966) ............................................................................ 28

*Saavedra v. Albright,*
197 F.3d 1153 (D.C. Cir. 1999) ................................................. 15, 21

*Sale v. Haitian Ctrs. Council, Inc.,*
509 U.S. 155 (1993) ............................................................................ 19

*Sampson v. Murray,*
415 U.S. 61 (1974) .............................................................................. 29

*Schneider v. Kissinger,*
412 F.3d 190 (D.C. Cir. 2005) ......................................................... 30

*Shaughnessy v. United States ex rel. Mezei,*
345 U.S. 213 (1953) ............................................................................ 23

*Shaw v. Hunt,*
154 F.3d 161 (4th Cir. 1998) ........................................................... 10

*Tepeyac v. Montgomery Cty.,*
722 F.3d 184 (4th Cir. 2013) ........................................................... 29

*Texas Health & Human Servs. Comm'n v. United States,*
193 F. Supp. 3d 733 (N.D. Tex. 2016) ........................................... 18

*Texas v. United States,*
86 F. Supp. 3d 591 (S.D. Tex. 2015) ................................... 12, 13, 17

*Thomasson v. Perry,*
80 F.3d 915 (4th Cir. 1996) ............................................................. 26

*Trauz v. Raich,*
239 U.S. 33 (1915) .............................................................................. 17

*United States ex rel. Knauff v. Shaughnessy,*
338 U.S. 537 (1950) ............................................................... 2, 5, 6, 14

*United States v. Carpio-Leon,*
701 F.3d 974 (4th Cir. 2012) ........................................................... 26

*United States v. Comstock*,
 627 F.3d 513 (4th Cir. 2010) ............................................................................. 9

*United States v. Curtiss-Wright Exp. Corp.*,
 299 U.S. 304 (1936).......................................................................................... 6

*United States v. Lindh*,
 212 F. Supp. 2d 541 (E.D. Va. 2002) ............................................................... 25

*United States v. O'Brien*,
 391 U.S. 367 (1968)......................................................................................... 16

*United States v. Oakland Cannabis Buyers' Coop.*,
 532 U.S. 483 (2001)......................................................................................... 30

*United States v. Peralta-Sanchez*,
 — F.3d —, 2017 U.S. App. LEXIS 2165 (9th Cir. Feb. 7, 2017) ........................ 24

*United States v. Salerno*,
 481 U.S. 739 (1987)..................................................................................... 9, 18

*United States v. Texas*,
 809 F.3d 134 (5th Cir. 2015) ...................................................................... 12, 13

*United States v. Windsor*,
 133 S. Ct. 2675 (2013).................................................................................... 26

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, Inc.,
 454 U.S. 464 (1982)......................................................................................... 25

*Vartelas v. Holder*,
 132 S. Ct. 1479, 1484 (2010)........................................................................... 29

*Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*,
 984 F.2d 113 (4th Cir. 1993) ........................................................................... 29

*Virginia ex rel. Cuccinelli*,
 656 F.3d 253 (4th Cir. 2011) ...................................................................... 11, 17

*Webster v. Doe*,
 486 U.S. 592 (1988).......................................................................................... 14

*Whitmore v. Arkansas*,
 495 U.S. 149 (1990).......................................................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)............................................................................... 2, 9, 28, 29

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ........................................................................... 6

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ............................................................................... 24

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   135 S. Ct. 2076 (2015) ................................................................. 6, 19

## FEDERAL STATUTES

Pub. L. No. 89-732 ................................................................................ 5

Pub. L. No. 105-100 .............................................................................. 5

Pub. L. No. 105-277 .............................................................................. 5

Pub. L. No. 109-13 .............................................................................. 13

Pub. L. No. 114-113 .............................................................................. 4

5 U.S.C. § 702 ..................................................................................... 16

8 U.S.C. § 1101 ..................................................................................... 3

8 U.S.C. § 1101(a)(13) ........................................................................ 23

8 U.S.C. § 1101(a)(13)(A) ..................................................................... 7,

8 U.S.C. § 1101(a)(13)(C) ..................................................................... 7,

8 U.S.C. § 1101(a)(20) ..................................................................... 8, 23

8 U.S.C. § 1151 ................................................................................... 16

8 U.S.C. § 1152(a)(1)(A) ................................................................. 20, 21

8 U.S.C. § 1152(a)(1)(B) ...................................................................... 21

8 U.S.C. § 1157(a)(2) ............................................................................ 5

8 U.S.C. § 1182(f) ......................................................................... *passim*

8 U.S.C. § 1187(a)(12) ............................................................. 4, 5, 7, 27

8 U.S.C. § 1201 ................................................................................................................ 17

8 U.S.C. § 1201(i) ..................................................................................................... *passim*

8 U.S.C. § 1225 ................................................................................................................ 17

8 U.S.C. § 1225(b) ........................................................................................................... 17

8 U.S.C. § 1252 ................................................................................................................ 17

8 U.S.C. § 1254a ................................................................................................................ 5

8 U.S.C. § 1255 .................................................................................................................. 5

42 U.S.C. § 2000bb-1(a) ................................................................................................. 28

## EXCUTIVE ORDER AND PROCLAMATIONS\

Exec. Order No. 12,324 ..................................................................................................... 4

Exec. Order No. 12,807 ..................................................................................................... 4

Exec. Order No. 13,694 ..................................................................................................... 4

Exec. Order No. 13,726 ..................................................................................................... 4

Presidential Proclamation 5517 ........................................................................................ 3

Presidential Proclamation 6958 ........................................................................................ 4

Presidential Proclamation 8342 ........................................................................................ 4

Presidential Proclamation 8693 ........................................................................................ 4

## MISCELLANEOUS

Protecting the Nation from Foreign Terrorist Entry into the United States,
https://www.cbp.gov/border-security/protecting-nation-foreign-terrorist-entry-united-states,

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA

TAREQ AQEL MOHAMMED AZIZ, et al,

                    Petitioners,

COMMONWEALTH OF VIRGINIA,

                    Intervenor-
                    Petitioner

v.

DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOMS AND BRODER PROTECTION; JOHN F. KELLY, in his official capacity as Secretary of the Department of Homeland Security; KEVIN K. MCALEENAN, in his official capacity as Acting Commissioner of Customs and Border Protection; and WAYNE BONDI, in his official capacity as Customer and Border Protection Port Director of the Area Port of Washington Dulles,

                    Respondents.

No. 1:17-cv-00116-LMB-TCB


**RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO INTERVENOR-PETITIONER COMMONWEALTH OF VIRGINIA'S MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

The President of the United States has determined that "[d]eteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter the United States," and that our Nation accordingly must take additional steps "to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism." Executive Order: Protecting the Nation from Foreign Terrorist Entry into the United States (Jan. 27, 2017) (Order) (Exhibit A). Invoking his constitutional authority to control the entry of aliens into this country and congressionally delegated authority to "suspend the entry of * * * any class of aliens" whose entry "would be detrimental to the interests of the United States," 8 U.S.C. § 1182(f), the President has directed a temporary 90-day suspension of entry for individuals from seven countries previously identified as posing a heightened risk of terrorism by Congress or the Executive Branch; a temporary 120-day suspension of the U.S. Refugee Admissions Program; and a suspension of entry of Syrian nationals as refugees until the President determines that measures are in place "to ensure that admission of Syrian refugees is consistent with the national interest." Order §§ 3(c), (5)(a), (c). As another district court recently concluded in a thorough, well-reasoned opinion finding that plaintiffs there were unlikely to show that the Order is not a lawful exercise of the political branches' plenary control over the admission of aliens into the United States. *Louhghalam v. Trump*, 2017 WL 479779 *4-5 (D. Mass. Feb. 3, 2017).

Nevertheless, despite the plain congressional authorization for the President to make determinations regarding national security and the entry of aliens to this country, the Commonwealth of Virginia seeks an injunction prohibiting enforcement of section 3(c) of the Order on the grounds that it violates the due process rights of its residents vis-à-vis the federal Government and is allegedly motivated by animus towards Muslims. Virginia does so despite the

heavy burden it carries to justify the "extraordinary remedy" of interfering with Congress's determination that it is the President, not a court or the political actors of a single state, who makes relevant judgments over national security and foreign affairs. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22, 25-26 (2008).

Virginia's attempts to rewrite federal immigration law conflicts with the basic principle that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative," *Landon v. Plasencia*, 459 U.S. 21, 32 (1982), and that "it is not within the province of any court, unless expressly authorized by law, to review [that] determination," *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). It also contravenes the considered judgment of Congress that the President should have the unreviewable authority to suspend the entry of any class of aliens, and it is raised at the behest of a party that is not itself subject to the Order, lacks Article III standing or any cognizable right under any source of law to challenge the federal Government's denial of entry or visas to third-party aliens, and "deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978). Finally, it seeks an injunction that is vastly overbroad—it would be untethered to Virginia's particular claims; would extend to aliens outside the territory of the United States lacking any substantial ties or connections to this country; and would apply in part nationwide, effectively overriding the judgment of another district court that sustained the Order against parallel challenges. Indeed, Virginia's likelihood of success faces a particularly insurmountable barrier because Virginia is bringing a facial challenge to the Order; but the vast majority of applications of the Order—*e.g.*, to aliens lacking any due process rights with respect to their requests for admission to the United States—are lawful on their face, such that Virginia's facial challenge must fail.

2

Nor can Virginia sustain its other burdens. Virginia's claimed harm is vague, abstract, and illusory, and plainly lacks the concrete immediacy necessary to warrant a preliminary injunction. The balance of equities and the public interest also decisively favor the United States, given Virginia's requested relief would interfere with the President's exercise of plenary power delegated by Congress. As these factors, like the merits, weigh squarely against judicial relief, the Commonwealth's motion should be denied.

## BACKGROUND

### I.   The Immigration and Nationality Act

The Immigration and Nationality Act of 1952 (INA), 8 U.S.C. §§ 1101 *et seq*., as amended, establishes the general framework under which Congress has exercised and delegated its plenary constitutional authority to determine who is permitted to enter and remain in the United States and for what reasons aliens may be admitted to or removed from the United States. *See Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). Among the sweeping authorities Congress has delegated to the President is the discretion to, whenever he "finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate . . . ." 8 U.S.C. § 1182(f). Numerous Presidents have invoked this authority to suspend or impose restrictions on the entry of certain aliens or classes of aliens, including classifications based on nationality.[1] *See*

---

[1] "The President's sweeping proclamation power thus provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [inadmissibility] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd mem*., 484 U.S. 1 (1987). For example, in 1986, President Reagan (through Presidential Proclamation 5517) invoked section 1182(f) to suspend entry of Cuban nationals as immigrants into the United States, subject to certain exceptions. *See* Suspension of Cuban Immigration, 1986 WL 796773 (Aug. 22, 1986). In 1996, President Clinton (through Presidential Proclamation 6958) invoked section 1182(f) to suspend entry, subject to certain exceptions, of members of the

*also* 8 U.S.C. § 1185(a)(1) (delegating authority to issue "rules, regulations, and orders, governing departure from and entry into the United States"); 1201(i) (authorizing the Secretary of State to, in his discretion, revoke visas).[2]

Congress likewise has expressly drawn immigration distinctions based on nationality. For example, in 2015, Congress amended the INA to exclude certain individuals from the visa waiver program (VWP) on the basis of nationality.[3] *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2990 (2015) (codified at 8 U.S.C. § 1187(a)(12)). As of February 2016, the exclusion applied to dual nationals of Iraq and Syria (pursuant to the statute's plain text), nationals of countries designated as state sponsors of international terrorism (currently Iran, Sudan, and Syria), as well as individuals who traveled to Libya, Somalia, or Yemen on or after March 1, 2011 (pursuant to Executive Branch designations under the statutory scheme). *See* Dep't of Homeland Sec., DHS Announces Further Travel Restrictions for the Visa Waiver Program (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program. These seven countries designated for purposes of the

---

Government of Sudan, officials of that Government, and members of the Sudanese armed forces as immigrants or nonimmigrants into the United States. *See* Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Are Members or Officials of the Sudanese Government or Armed Forces, 1996 WL 33673860 (Nov. 22, 1996). Other Presidents have done similarly. *See, e.g.*, Exec. Order No. 12,324 (President Reagan); Exec. Order No. 12,807 (President George H.W. Bush); Presidential Proclamation 8342 (President George W. Bush); Presidential Proclamation 8693 and Executive Orders Nos. 13,694 and 13,726 (President Obama).

[2] *See also* 6 U.S.C. § 236(b)(1) (conferring on Secretary of Homeland Security complementary authority "to refuse visas in accordance with law"), (c)(1) ("[T]he Secretary of State may direct a consular officer to refuse a visa to an alien if the Secretary of State deems such refusal necessary or advisable in the foreign policy or security interests of the United States."), (c)(2)(H), (d)(2) (reserving Secretary of State's delegated authorities under 8 U.S.C. § 1182(f)).

[3] Congress expressly excluded aliens who were dual nationals of a VWP country (e.g., France, Germany) and of Iraq and Syria from the VWP, *see* 8 U.S.C. §§ 1187(a)(12)(A)(i)(I), (ii)(I), excluded nationals of countries designated as state sponsors of terrorism under other laws, *see id.* §§ 1187(a)(12)(A)(i)(II), (ii)(II), and created a process by which the Secretary of Homeland Security could designate additional "[c]ountries or areas of concern" for purposes of the VWP travel restrictions, *see id.* § 1187(a)(12)(A)(i)(II), (ii)(III), (D).

VWP travel restrictions—including three also designated for nonimmigrant visa issuance restrictions, *see* 8 U.S.C. § 1735—are the same seven countries covered by Section 3 of the President's January 27, 2017 Order. *See* § 3(c) (incorporating by reference "countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12)").[4]

## II.   Presidential Authority Over Foreign Affairs and National Security

As a constitutional baseline, Congress and the Executive share concurrent authority over immigration matters. *Jean v. Nelson*, 727 F.2d 957, 964 (11th Cir. 1984) (en banc). Although "normally Congress supplies the conditions of the privilege of entry into the United States," "because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power" without raising delegation concerns. *Knauff*, 338 U.S. at 543. These delegations of authority to deny entry to certain classes of aliens, as outlined above, and based on the President's findings regarding the national interest, fall in the heartland of (and are bolstered by) the President's broad authority under Article II relating to foreign affairs and national security. *See* U.S. Const., art. II, § 2 ("Commander in Chief" power, and authority to "make treaties" and "appoint ambassadors"), § 3 (power to "receive ambassadors"). As the Supreme Court has repeatedly held, Article II confers upon the President expansive authority over foreign affairs, national

---

[4] That Congress itself, or through delegation, can establish laws that pick and choose among aliens based on nationality should be obvious, as the INA is replete with examples of explicit distinctions premised on nationality. *See Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008). To name but a few examples, in addition to the Visa Waiver Program described above, the President may grant Temporary Protected Status to specific nationalities, without granting it to others, *see* 8 U.S.C. § 1254a, and may pick and choose among nationalities deciding who and how many refugees to permit to enter the country, *see* 8 U.S.C. § 1157(a)(2), and Congress may also favor particular nationalities in admission and residency procedures for policy reasons, *see, e.g.*, Syrian Adjustment Act, Pub. L. No. 106-378, 114 Stat. 1442; Nicaraguan Adjustment and Central American Relief Act (Pub. L. No. 105-100, 111 Stat. 2160); Haitian Refugee Immigration Fairness Act of 1998, Pub.L. No. 105-277, §§ 901-904, 112 Stat. 2681-538 codified as amended at 8 U.S.C. § 1255 note (2006)); Cuban Adjustment Act of 1966, Pub. L. No. 89-732, §1, 80 Stat. 1161 (codified as amended at 8 U.S.C. § 1255).

security, and immigration. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952) (recognizing that control over immigration is an integral part of Article II authorities "in regard to the conduct of foreign relations [and] the war power"); *Knauff*, 338 U.S. at 542; *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (discussing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress"). Thus, where, as here, "the President acts pursuant to an express or implied authorization of Congress," *i.e.* 8 U.S.C. § 1182(f), coupled with the President's own Article II powers over foreign affairs and national security, "*his authority is at its maximum*, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (emphasis added); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015) (similar).

### III.   The President's Executive Order of January 27, 2017

Invoking these constitutional and statutory authorities, on January 27, 2017, the President issued Executive Order 13,769 titled: "Protecting the Nation from Foreign Terrorist Entry into the United States." The Order is intended "to protect the American people from terrorist attacks by foreign nationals admitted to the United States." Order § 2. To accomplish this purpose, the Order directs a number of actions. *See id.* §§ 2-11. First, Section 3 of the Order directs the Secretary of Homeland Security (in consultation with other Executive Branch officials) to immediately conduct a review to identify the "information needed from any country . . . to determine that [an] individual seeking [an immigration-related] benefit is who the individual claims to be and is not a security or public-safety threat." *Id.* § 3(a). The Secretary must, within 30 days of the Executive Order, "submit to the President a report on the results of the review," as well as "a list of countries that do not provide adequate information[.]" *Id.* § 3(b). During the

next 60 days, the Order directs a process for requesting necessary information from foreign governments that do not supply such information, and consequences for countries not providing the information. *See id.* § 3(d)-(f). While this review is ongoing, the Order, pursuant to section 1182(f), suspends entry for 90 days of aliens from countries covered by 8 U.S.C. § 1187(a)(12). *Id.* § 3(c). During this period, exceptions may be made (on a case-by-case basis) by the Secretaries of State or Homeland Security. *Id.* § 3(g). The suspension of entry in Section 3(c) does not apply to lawful permanent residents of the United States.[5] *See* Feb. 1, 2017 Memorandum, ECF 34-1; *see also* 8 U.S.C. §§ 1101(a)(13)(A), (C), (a)(20).

## IV.    Recent Events

The original Plaintiffs filed this Complaint on January 28, 2017. That same day, this Court issued a temporary restraining order, directing Defendants to provide lawful permanent residents (LPRs) detained at Dulles International Airport access to counsel and forbidding Defendants from removing LPRs from Dulles pursuant to the Order for a period of seven days. ECF 3. On January 31, 2017, Virginia sought to intervene and asked the Court to issue an order to show cause why Defendants should not be held in contempt of Court. ECF 14, 18. Virginia also filed a motion for preliminary injunction. ECF 23. Meanwhile, the named parties executed a settlement agreement and asked the Court to hold the named Plaintiffs' claims in abeyance. ECF 25. On February 3, 2017, the Court granted the motions to intervene and to hold in abeyance, denied the motion to show cause, and ordered production of certain information to Virginia by

---

[5] The Order also suspends the U.S. Refugee Admissions Program for 120 days, while the Secretary of State (in conjunction with other Executive Branch officials), among other things, reviews "the USRAP application and adjudication process to determine what additional procedures should be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States," and then "implement[s] such additional procedures." Order § 5(a).

February 9, 2017.[6] ECF 37, 38. All individual Plaintiffs, the Azizes and Ms. Fadul, have dismissed their claims after lawfully reentering the United States, as have the Doe Plaintiffs.

Meanwhile, on February 1, 2017, White House Counsel issued a Memorandum clarifying that suspension of entry pursuant to section 3(c) does *not* apply to LPRs (i.e., an immigrant admitted with the privilege of residing permanently in the United States, 8 U.S.C. § 1101(a)(20)). More recently, on February 3, 2017, the District Court for the District of Massachusetts (Gorton, J.) issued a thorough, 21-page decision finding it unlikely that plaintiffs in that case would succeed on their claim that the Order is not a lawful exercise of the political branches' plenary control over the admission of aliens into the United States. *See Louhgalam*, 2017 WL 479779 at *6-7. That same day, the District Court for the Western District of Washington (Robart, J.), without explicitly analyzing the factors required to enter a temporary restraining order, issued a nationwide injunction barring enforcement of sections 3(c), 5(a)-(c), and 5(e) of the Order. Thereafter, Edward J. Ramotowski, Deputy Assistant Secretary, Bureau of Consular Affairs, Department of State, issued a letter reversing the provisional revocation of all visas provisionally revoked by his letter of January 27, 2017, which implemented section 3(c) of the Order. ECF 44. DHS separately issued guidance ordering its officers to suspend all actions implementing the affected section of the Order.[7] The Government filed an emergency appeal of Judge Robart's decision and requested a stay of the injunction. Oral argument on the stay request was held on February 7, 2017, but no decision has yet issued.

## STANDARD OF REVIEW

---

[6] The Court also indicated it would be inappropriate to order the Government to permit counsel into secondary inspection at Dulles. Tr. 38:18-24; *see* Tr. 43-44 (government counsel). The Government renews its objection to Virginia's declaration that LPRs in secondary are entitled to counsel as a matter of statute or due process, particularly where citizens are not even entitled to such counsel absent a custodial interrogation or criminal investigation. *See* 8 U.S.C § 1362; 8 C.F.R. § 292.5(b); *cf. United States v. Galloway*, 316 F.3d 624, 629 (6th Cir. 2003).

[7] *See* https://www.cbp.gov/border-security/protecting-nation-foreign-terrorist-entry-united-states.

A preliminary injunction is "an extraordinary and drastic remedy[.]" *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Notably, injunctive relief that would "deeply intrude[] into the core concerns of the executive branch"—such as foreign affairs and national security—may be awarded only where the plaintiff "make[s] an extraordinarily strong showing," *Adams*, 570 F.2d at 954-55, as to each element, as such requests ask courts "to approach the outer limit of its constitutional authority." *Palestine Info. Ofc v. Shultz*, 674 F. Supp. 910, 917 (D.D.C. 1987). Moreover, Virginia raises only facial challenges to the Order, which are "the most difficult challenge[s] to mount successfully," *United States v. Salerno,* 481 U.S. 739, 745 (1987), and require showing more than that the Order "might operate unconstitutionally under some conceivable set of circumstances" as to some sub-set of its residents whose interests it purports to invoke. *Id*. Instead, Virginia bears the "heavy burden" of "establish[ing] that no set of circumstances exist under which the [Order] would be valid." *Id*.; *United States v. Comstock*, 627 F.3d 513, 518 (4th Cir. 2010) ("facial challenge cannot succeed if a statute has a plainly legitimate sweep").

## ARGUMENT

## I.    Virginia Lacks Standing

At the outset, its bears noting that: because this case is now at the preliminary injunction stage, the burden of demonstrating standing is higher than at the pleading stage, *see, e.g.*, *Action NC v. Strach*, --- F. Supp. 3d ---, 15-CV-1063, 2016 WL 6304731, *18 (M.D.N.C. Oct. 27, 2016); the claims of the individual plaintiffs and intervenors have been dismissed; and Virginia is the only party with claims left in the litigation. Therefore, as the Court itself noted, it must

determine if Virginia has standing at this stage of the litigation.[8] ECF 42 at 11 n.11. Virginia does not meet its burden to establish standing here, and its motion for a preliminary injunction must be denied on this basis. *E.g.*, *Peterson v. Nat'l Telecommunications & Info. Admin.*, 505 F. Supp. 2d 313, 320 (E.D. Va. 2006), *aff'd*, 478 F.3d 626 (4th Cir. 2007).

Virginia asserts that the Order "has had a direct and substantial impact on Virginia and its public universities, faculty, and students who are foreign-born." ECF 39, ¶ 33. Specifically, Virginia asserts that the Order (1) "poses a significant chilling effect on other out-of-country students who fear traveling abroad due to the possibility that they will be denied reentry," (2) "directly harms Virginia universities who will not be able to attract academic talent that enriches their campuses and advances their educational mission"; (3) "financially harms Virginia universities who depend on tuition dollars from out-of-state and out-of-country students," (4) "jeopardizes grants and contracts that fund research at Virginia's universities," and (5) also "impairs Virginia's economy by restricting the travel of foreign students and foreign workers to Virginia, and impairing their ability to reside in Virginia, depriving [Virginia] of their talents and contributions as residents and taxpayers, and withholding their labor from Virginia's businesses." *Id.*, ¶¶ 42, 43, 47, 50, 52. To cure these alleged injuries, Virginia seeks to enjoin section 3(c) of the Order nationwide. *Id.* at 11. These allegations, however, are insufficient for Article III standing. To properly assert an injury-in-fact, a plaintiff must establish a "concrete and particularized" invasion of a "legally protectable interest" that is "actual or imminent, not conjectural or hypothetical." *Virginia ex rel. Cuccinelli*, 656 F.3d 253, 268 (4th Cir. 2011). Virginia appears to assert two types of interests: *parens patriae* and economic injury, neither of which qualifies as "legally protectable" as applied to the facts of this case. *Id.*

---

[8] *Shaw v. Hunt*, 154 F.3d 161, 165 (4th Cir. 1998) ("[W]ithout standing [the intervenors] could not have continued their intervenor status 'in the absence of the party [plaintiffs] on whose side intervention was permitted.'").

First, regarding the asserted quasi-sovereign *parens patriae* interest in the alleged chilling effect on foreign-born students who fear traveling abroad, "more must be alleged than injury to an identifiable group of individual residents." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Although a State may have a *parens patriae* interest in protecting its residents from discrimination in the job market on the basis of their state residency, *id.* at 609, *Alfred* did not hold -- and could not have held -- such an interest arises from the incidental effects of the *federal* government's treatment of foreign nationals on the basis of alienage.[9] *See Cuccinelli*, 656 F.3d at 268; *cf. Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012). Here, Virginia's asserted interests concern the effect of the Order on a small subset of foreign born residents and students. ECF 31 ¶ 5. While "the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population," *Snapp*, 458 U.S. at 593, Virginia has done no more than engage in speculation about the potential economic effects of the itself-speculative "chilling effect" of the Order on travel by foreign students and others. Virginia attaches little more than hearsay evidence of a handful of J-1 visa recipients having cancelled their plans to visit and study at a Virginia University during the upcoming semester,[10] ECF 32, ¶ 9, and conjecture about future effects of the Order. *Id.* ¶ 8. The Supreme Court routinely rejects as insufficient such "some day" claims of injury based on affidavits of similar indefiniteness. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 556 (1992). Thus, Virginia fails to establish *parens patriae* standing sufficient to succeed on its preliminary injunction motion.

---

[9] Virginia lacks standing to assert a procedural due process claim on behalf of the Virginia residents it claims will be affected by the Order. *E.g.*, *Connecticut ex rel. Blumenthal v. United States*, 369 F. Supp. 2d 237, 247 (D. Conn. 2005) ("The right to due process is an individual right that cannot be adequately represented by means of *parens patriae* authority.").

[10] The Reveley declaration identifies approximately 350 such students and faculty at Virginia universities and colleges, ECF 31, ¶ 5, that number appears to encompass LPRs, who are not subject to the Order. ECF 34-1, Memorandum (Feb. 1, 2017).

Regarding claims of economic harm, which the Court viewed as proprietary standing arguments, Virginia fails to establish this interest as well. For one, their allegations of economic harm beyond the speculative harm that may be suffered by their colleges and universities are completely unsupported, which cannot suffice at the preliminary injunction stage. *Action NC*, 2016 WL 6304731 at *18. Moreover, their asserted economic injuries are not cognizable. Virginia's contentions regarding its tax base and public funds cannot support standing. See Florida v. Mellon, 273 U.S. 12, 17-18 (1927) (finding no standing based on Florida's allegation that challenged law would diminish tax base); *see also, e.g., Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985). Virginia relies on *United States v. Texas*, 809 F.3d 134, 152–53 (5th Cir. 2015), *affirmed by an equally divided court*, 136 S. Ct. 2271 (2016), where the Fifth Circuit found that Texas had standing to raise an APA claim for the purposes of a motion for a preliminary injunction to challenge an immigration policy's effects on the State, that decision is distinguishable, not least because the Fifth Circuit "stress[ed]" that its decision was explicitly "limited to the[] facts" there. *Id.* at 154. The policy at issue -- the Secretary of Homeland Security's Deferred Action for Parents of Americans program -- was challenged, in pertinent part, for not being issued pursuant to APA notice and comment procedures before its enactment, a *procedural* right Texas was entitled to in the Court's view. *Id.* at 150. Here, however, at issue is an Executive Order, which is plainly not subject to the same requirements. *See Texas v. United States*, 86 F. Supp. 3d 591, 607 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015) (explicitly noting at the outset that no executive orders or presidential proclamations were at issue there).

Second, the Fifth Circuit accepted Texas's argument that it had standing because as a consequence of the program, and as exacerbated by federal preemption of how the State classified foreign-born individuals, *see* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13; *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014), Texas had to either incur

significant costs by issuing driver's licenses to DAPA beneficiaries or to change its sovereign laws. 809 F.3d at 157; 86 F. Supp. 3d at 616-622. Here however, the Order compels no such thing, as Virginia does not incur significant *costs* directly attributable to the Order or otherwise place into jeopardy its "sovereign interest in the power to create and enforce a legal code." *Id.* at 156. Nor does it suffer an injury exacerbated by existing *federal* law. Rather, Virginia's asserted economic harm is sheer speculation about indirect losses in state revenue or impacts to state contracts as a result of less foreign travel or fewer foreign residents in Virginia, *see* ECF 32 ¶¶ 11–14, which are merely generalized, ancillary, and non-justiciable effects of the federal government exercising its authority over immigration. *See Raines v. Byrd*, 521 U.S. 811, 819 (1997); *cf. FAIR v. Reno*, 93 F.3d 897, 901 (D.C. Cir. 1996) (such injuries are "common to the entire population" and "well-suited for redress in the political rather than the judicial sphere"); *Texas*, 86 F. Supp. 3d at 619-20 (distinguishing the alleged injuries before it from cases in which States alleged "general harm to state revenue or state spending"). Any asserted harm to Virginia's educational reputation or ability to attract students is also insufficiently concrete, *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), particularly where Virginia is free to mitigate any as of yet speculative harm by recruiting faculty or students from countries not subject to the President's exercise of his authority under section 1182(f).[11] *Cf. Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976). At bottom, Virginia's injury theory proves too much, as it would permit *any* sovereign, corporate, or individual entity displeased with *any* federal policy to challenge that policy based on incidental and speculative financial effects, a boundless theory of standing the Supreme Court has rejected that would effectively permit the states to halt any federal program they disagreed with. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

---

[11] Even assuming injuries, they are not redressable, as the Court cannot order the United States to grant visas or admit aliens. *See Kiyemba v. Obama*, 555 F.3d 1022, 1028 (D.C. Cir. 2009).

**II.    This Court Cannot, and Need Not, Review the President's National Security Determinations Underlying the Executive Order**

In addition to Article III standing, Virginia's claims must fail at the threshold because the President's invocation of section 1182(f) through the Order, and the Order's implementation through revocation of previously issued visas and denial of entry at the border are both not subject to judicial review under any meaningful standard of review. *See* 8 U.S.C. § 1201(i)

A.    Courts lack jurisdiction to review the Executive Branch's decisions concerning visa revocation and entry

By its terms, 8 U.S.C. § 1182(f) vests discretion in the President to determine whether "the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," to suspend entry or impose such conditions of entry as the President "may deem appropriate" for such period as "he shall deem necessary." Exercise of this discretion "is not limited to circumstances defined in the statute," which "provides no discernable standards" for reviewing his determination. *Haitian Refugee Ctr., Inc. v. Baker*, 789 F. Supp. 1552, 1575-76 (S.D. Fla. 1991); *see Webster v. Doe*, 486 U.S. 592, 594, 600-01 (1988).

Judicial second-guessing of the President's determination that a temporary suspension of entry of certain classes of aliens was necessary at this time to protect national security would constitute an impermissible intrusion on the political branches' plenary constitutional authority over foreign affairs, national security, and immigration. *See Knauff*, 338 U.S. at 543 ("not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien"); *see also INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999); *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988). Indeed, courts are particularly ill-equipped to second-guess the President's prospective judgment about risks to national security, as decisions about how best to "confront evolving threats" are "an area where information can be difficult to obtain and the impact of certain conduct difficult to assess."

14

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). Unlike the President, lack access to classified information about the threat posed by terrorist organizations operating in particular nations or the efforts of those organizations to infiltrate the United States. *See, e.g.*, *Al Haramain Islamic Found., Inc. v. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012). Virginia's assertion, clearly made without the benefit of such information, that there is a "near-absence of terror attacks" perpetrated by nationals of the countries subject to the Order, rings hollow.

Any argument that the judiciary may probe behind the President's exercise of his discretionary authority under section 1182(f) with respect to *aliens* is wrong. Indeed, under *Kleindienst*, 408 U.S. at 770, even when the putative rights of *citizens* are impacted by Executive action, which is not at issue in this case, "when the Executive exercises" immigration authority "on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion[.]" *Cf. Kerry v. Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring) (noting *Kleindeinst*'s "reasoning has particular force in the area of national security"). But such limited review is explicitly premised on the fact that the claims are brought "by United States citizens rather than by aliens."[12] *Saavedra v. Albright*, 197 F.3d 1153, 1163 (D.C. Cir. 1999); *see Macena v. USCIS*, 2015 U.S. Dist. LEXIS 148395, * 11 (D. Md. Nov. 2, 2015) ("In one limited circumstance, when a visa is denied in a manner that burdens a *citizen's* constitutional rights, courts may review the decision to see if it was made on the basis of a facially legitimate and bona fide reason"). The more searching inquiry envisioned by Virginia is not only foreclosed by these authorities, but would create substantial separation-of-powers

---

[12] And even where such review is available, it applies to the decisions of the *consular* officer abroad, and *not* to the President. *See, e.g. Macena,* 2015 U.S. Dist. LEXIS 148395 at *11 ("Though erroneous this Court is without jurisdiction to order an *American consular official* to issue a visa to any alien whether excludable or not.") (emphasis added); *Romero v. Consulate of the United States, Barranquilla, Columbia*, 860 F. Supp. 319, 322 (E.D. Va. 1994) (explaining "Plaintiffs' status as offshore aliens precludes their reliance on *Kleindienst*"). No party cites any authority for the proposition that such review may be extended to the President.

problems by permitting probing of the President's subjective motive in issuing the Order, *cf. United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) (a "hazardous matter"), and here even more so by seeking an injunction against the *President, see Mississippi v. Johnson*, 71 U.S. 475, 501 (1867), rather than consular official.[13]

> B.   Virginia lacks any cause of action under the INA or to enforce the alleged rights of third party aliens

Virginia's argument that the Government is "violating the [INA]" by an alleged failure to carry out *discretionary* duties under the INA, specifically 8 U.S.C. §§ 1151 (governing the worldwide level of immigration), 1201 (governing the issuance and revocation of visas), and 1225 (governing the inspection of aliens by immigration officers and asylum), ECF 39, ¶¶ 74-75, fails at the threshold. It is true that Congress has enacted the Administrative Procedure Act (APA), which provides that a "*person* suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review," 5 U.S.C. § 702 (emphasis added), and then sets forth the procedures for such review, *see id.* §§ 704, 706. But Virginia is not asserting a claim under the APA, and even if it was, the President is not an "agency" under the APA nor subject to its requirements, *see Franklin*, 505 U.S. at 800-1, such its claim would be foreclosed.[14] *See Louhgalam*, 2017 WL 479779 at *6-7; *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016); *accord Mississippi*, 71 U.S. at 501; *cf. Texas*, 86 F. Supp. 3d at 607 (differentiating cases where

---

[13] Assuming *arguendo* the standard might apply, as another district court has recognized, the Order undeniably states a facially legitimate and bona fide reason—ensuring "the "proper review and maximum utilization of available resources for the screening of foreign nationals" and "that adequate standards are established to prevent infiltration by foreign terrorists." Order, §§ 3(c), 5(a), (c); *see Loughhalam*, 2017 WL 479779 at *8. The Order does so in part by incorporating a list of seven countries that were identified by Congress—and by the Executive in 2016—as raising terrorism-related concerns. *Louhghalam*, 2017 WL 479779 at *6-7.

[14] The same result obtains under traditional zone of interests principles, as Virginia cannot and does not demonstrate any interest that Congress intended to protect through the INA. *See Am. Fed'n of Gov't Emp., AFL-CIO v. Rumsfeld*, 321 F.3d 139, 144-45 (D.C. Cir. 2003).

agency action rather than "executive orders or other presidential proclamations" at issue).

But more importantly, the INA creates no private cause of action for a state to sue the federal government under the INA, let alone assert any liberty or proprietary interest a state resident might have regarding their rights vis-à-vis the federal government. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *cf. Cuccinelli*, 656 F.3d at 269 ("a state possesses no legitimate interest in protecting its citizens from the government of the United States").[15] For example, Virginia cannot obtain a visa under 8 U.S.C. § 1201 or seek asylum under 8 U.S.C. § 1225. Virginia thus lacks any "legally protected interest*," Arizona Christian Sch. Tuition Org. v. Win*n, 563 U.S. 125, 134 (2011), in the grant or denial of entry to an alien outside the United States. Rather, under the INA's carefully reticulated scheme*,* judicial review is available only at the behest of an *individual* alien adversely affected, and even then only if the alien is subject to removal or expedited removal proceedings, *see* 8 U.S.C. §§ 1201(i), 1225(b), 1252. Moreover, under longstanding principles discussed above, an *alien* abroad cannot obtain judicial review of the denial of a visa (or his failure to be admitted as a refugee), or, separately, of any determination made during proceedings under section 1225. *See Castro v. United States Dep't of Homeland Sec.*, 835 F.3d 422, 434–49 (3d Cir. 2016), *pet. for cert. pending,* No. 16-812. It follows that a third party, like Virginia, has no "judicially cognizable interest," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), in such a denial, and no statutory cause of action under the INA to enforce such rights on behalf of third parties, let alone itself. *See Alexander*, 532 U.S. at 286 ("private rights of action to enforce federal law must be created by Congress").[16]

---

[15] Once an individual is admitted by the Federal Government the individual is free to move to any state. *See Trauz v. Raich*, 239 U.S. 33, 42 (1915). Thus, the connection, here, between Virginia and the aliens it wishes to sue on behalf is even more attenuated than in *Cuccinelli.*

[16] *Texas Health and Human Services Commission v. USA*, ---F. Supp. 3d ---, 2016 WL 6677886 at *3-4 (N.D. Tex. June 15, 2016) ("where Congress creates a comprehensive statutory scheme with express provision for private enforcement in certain circumstances, it is highly improbable

III.    **Virginia Fails to Demonstrate It Is Likely to Prevail on the Merits**

Even assuming justiciability, Virginia falls far short of carrying its "heavy burden" to demonstrate that it is likely to prevail on the merits of its facial challenge by "establish[ing] that no set of circumstances exist under which the [Executive Order] would be valid." *Salerno*, 481 U.S. at 745. To the contrary, the Order fits within the express delegation of authority in 8 U.S.C. § 1182(f). The State's constitutional and statutory claims also fail as to their individual elements.

A.    The Order is a Valid Exercise of Congress's Broad Delegation of Authority to the President and His Own Constitutional Powers

As noted, the Order was issued pursuant to Congress's broad delegation of authority to the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate" whenever the President determines their entry would be detrimental to the interests of the United States. 8 U.S.C. § 1182(f). This express delegation, coupled with the President's own Article II powers over foreign affairs and national security, mean that the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.'"[17] *Zivotofsky*, 135 S. Ct. at 2083-84 (quoting *Youngstown*, 343 U.S. at 635 (Jackson,

---

that Congress absentmindedly forgot to mention an intended private action"). *Texas* is directly on point, finding that States *lack* ay cause of action under the INA to challenge the placement of refugees by the Federal Government in their territory. *See Alabama v. U.S.*, 2016 WL 4070146, *4 (N.D. Ala. Aug 31, 2016) (same).

[17] Justice Black's majority opinion in *Youngstown* held that President Truman had usurped Congressional authority over *domestic* affairs by issuing an Executive Order permitting the seizure of steel mills during the height of the Korean War. 343 U.S. at 588-89. Critical to that holding was the conclusion that Congress held exclusive Article I authority over such action and had not delegated *any* of that authority to the Executive. *Id.* But that is far removed from the situation here, where Congress *has* explicitly delegated sweeping authority to the President, including through section 1182(f), and where the President himself has inherent authority under Article II that was not present in *Youngstown*, a scenario decidedly *not* anywhere close to the constitutional line suggested by Justice Jackson. 343 U.S. at 637 ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional

J., concurring)); *see Dames & Moore v. Regan*, 453 U.S. 554, 674 (1982) (upholding decision to

nullify non-Iranian interests in Iranian assets because Congress delegated broad authority to the

President under the International Emergency Economic Powers Act, such that decision was

"supported by the strongest presumption and the widest latitude of judicial interpretation"). Thus,

the Order falls squarely within Congress's delegation in 8 U.S.C. § 1182(f) of the "power to

prevent the entry of any alien or groups of aliens into this country as well as * * * to grant entry

to such person or persons with any restriction on their entry as he may deem to be appropriate."

*Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980); *accord Haitian Refugee*

*Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992). "Pursuant to, and without exceeding,

that grant of discretionary authority, the President * * * suspended entry of aliens from the seven

subject countries." *Louhghalam*, 2017 WL 479779 at *6-7. As noted above (n. 2), prior

Presidents have repeatedly invoked this authority to suspend entry of certain classes of aliens,

including on the basis of nationality. *Cf. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187

(1993) (it is "perfectly clear that 8 U.S.C. § 1182(f) * * * grants the President ample power to

establish [by Executive Order] a naval blockade that would simply deny illegal Haitian migrants

the ability to disembark on our shores.").

Additionally, in the immigration context specifically, the Supreme Court has "long

recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised

by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*,

430 U.S. 787, 792 (1977)); *see Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) ("in the exercise of

its broad power over naturalization and immigration, Congress regularly makes rules that would

be unacceptable if applied to citizens"). In this Circuit, "[t]he reasons that preclude judicial

---

powers of Congress over the matter."); *cf. Zivotofsky*, 135 S. Ct. at 2084 (analyzing whether
Congress may require the President to recognize a foreign sovereign under the "lowest ebb"
framework, inapplicable here).

review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization," so the "constraints of rationality imposed by the constitutional requirement of substantive due process and of nondiscrimination exacted by the equal protection component of the due process clause do not limit the federal government's power to regulate either immigration or naturalization." *Appiah v. INS*, 202 F.3d 704, 710 (4th Cir. 2000). Indeed, courts here and elsewhere have repeatedly affirmed that "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979); *see also, e.g., Jean*, 727 F.2d at 978 n.3; *Rajah*, 544 F.3d at 435; *cf. Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981). There can be little doubt, therefore, based on binding and persuasive precedent, that 8 U.S.C. § 1182(f) authorizes the President to suspend the entry of classes of immigrants on the basis of nationality where, as here, the President has determined that their entry would be "detrimental to the interests of the United States." And it is thus untenable for Virginia to contend that, for countries with populations that the President has determined present a national-security risk to the United States—as supported by prior assessments by Congress, the State Department, or the Department of Homeland Security—the President lacks the authority to pause the entry of aliens from those countries.

Virginia does not allege that Congress's delegation through section 1182(f) is otherwise limited by other provisions of the INA, and so has waived this argument. Parties in other litigation have cited 8 U.S.C. § 1152(a)(1)(A), which provides, with certain exceptions, that "no person shall receive any preference or priority or be discriminated against in the issuance of an *immigrant visa* because of the person's race, sex, nationality, place of birth, or place of residence." But this restriction does not address the President's authority under § 1182(f) to suspend the *entry* of aliens, an entirely different act under the immigration laws. Indeed, issuance

20

of an immigrant visa does not entitle an alien to admission to the United States because visas may be revoked, and even if an alien is issued a valid visa, he may be denied admission to this country when he arrives at the border. *See, e.g.*, *Saavedra*, 197 F.3d at 1163. There is thus no inconsistency between § 1152(a)(1)(A) and the President's Order under § 1182(f). *Cf. Encuentro Del Canto Popular v. Christopher*, 930 F. Supp. 1360, 1365-66 (N.D. Cal. 1996).

But even if there were thought to be some potential inconsistency between § 1152(a)(1)(A) and § 1182(f), 8 U.S.C. § 1152(a)(1)(B) makes clear that the statute does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications * * *." The Order is thus not covered by the restrictions of subsection (A), because the Order directs a review and revision of *procedures for processing* of visa applications and adopts procedures for a temporary suspension and then resumption of processing of certain visa applications following that review. *See, e.g.*, Order §§ 3(a), 5(a). Furthermore, while the review is pending, the Secretaries of State and Homeland Security have discretion to grant visas on a case-by-case basis. And, crucially for each of Virginia's claims with respect to nonimmigrants – i.e. all non-LPRs at issue in Virginia's complaint – section 1152 has no application at all to aliens who hold or seek *nonimmigrant visas*, such as student visas or work visas. And § 1152(a)(1)(B) permits, as here, a temporary suspension of entry pending completion of a review and revision of procedures for processing visa applications, which is not subject to any judicial review.[18] *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of*

_____

[18] Even if it applied, § 1152(a)(1)(A) would not restrict § 1182(f)'s broad grant of discretionary authority. The "courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective," *Dorsey v. U.S.*, 567 U.S. 260, 276 (2016), and should interpret "the specific [to] govern[] the general." *RadLAX Gateway Hotel v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012). Here, § 1152(a)(1)(A) establishes a *general* rule governing the issuance of immigrant visas, whereas § 1182(f) governs the *specific* instance when the President determines that entry of a "class of aliens" would be

*State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997).

    B.  Virginia's constitutional challenges are without merit

       a.  Fifth Amendment—Due Process

    Virginia first argues that the Order "violates the due process rights of . . . Virginia residents who are [LPRs] and visa holders[.]" Mem. at 6. There are three problems with this argument: (1) it erroneously reads the Order to extend to LPRs; (2) conflates LPRs with aliens issued valid visas; and (3) conflates aliens issued valid visas within the country and those without. Regarding Virginia's first misunderstanding, the Order simply does not affect *any* LPR. *See Vartelas v. Holder*, 132 S. Ct. 1479, 1484 (2010). And if there were any doubt, the White House counsel has issued guidance clarifying that § 3(c) does not apply to LPRs. ECF 34-1; *see also* 8 U.S.C. §§ 1101(a)(13), (20). Simply put, Virginia's claims regarding LPRs are no longer justiciable. *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010).

    Virginia's second misunderstanding ignores how nonresident aliens (even aliens issued valid holders) have no constitutional rights to entry or a visa, and the decision whether to admit them into the United States rests exclusively with the federal political branches. *See Landon*, 459 U.S. at 32.  Even at ports of entry, non-resident aliens who have not entered the country have no due process rights with respect to their request for admission beyond what Congress has affirmatively provided. *See Plasencia*, 459 U.S. at 32; *Mezei*, 345 U.S. at 213. And even for visa holders *within* the United States, due process "attaches only when the federal government seeks to deny a liberty or property interest." *Knoetze v. United States*, 634 F.2d 207, 211 (5th Cir. 1981) ("the revocation of an entry visa issued to an alien already within our country has no effect

---

"detrimental to the interests of the United States." The assertion that § 1152(a)(1)(A) limits that authority would mean that the President would be statutorily disabled from barring the entry of nationals of a country with which we are at war—a result that would raise serious constitutional questions, itself a sufficient reason to reject the Virginia's reading. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

upon the alien's liberty or property interests"); *see* 8 U.S.C. 1201(i).

Knowing this, Virginia cites cases discussing the visa *application* process to analogize aliens issued visas to LPRs, Mem. at 8, but neglects to acknowledge that there is no constitutional right to a visa. *See Kleindienst*, 408 U.S. at 762; *Ramirez v. Clinton*, 2013 WL 227732, at *4 n.2 (E.D. N.C. Jan. 22, 2013); *see also Knoetze*, 634 F.2d at 212 ("revocation of an alien's visa jeopardizes no liberty or property interest entitled to constitutional protection"); *cf.. Dekoladenu v. Gonzales*, 459 F.3d 500, 508 (4th Cir. 2006), *abrogated on other grounds by Dada v. Mukasey*, 554 U.S. 1 (2008) (concluding that where a benefit's grant or revocation is entirely discretionary, the alien has neither a liberty nor property interest in the relief sought.). Simply put, there is no constitutionally protected interest in either obtaining or continuing to possess a visa, *e.g.*, *Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990) (non-citizen has no "inherent property right in an immigrant visa."),[19] and nothing Virginia argues can avoid the fact that it is "beyond peradventure" that "unadmitted and nonresident aliens" have no right to be freely admitted to the United States.[20] *Adams v. Baker*, 909 F.2d 643, 647 (1st Cir. 1990).

The same is true for Virginia's argument regarding aliens issued visas alleged "right[s] to

---

[19] *See Vietnamese Asylum Seekers*, 104 F.3d at 1354 (aliens "may not assert a Fifth Amendment right in challenging the procedures for granting immigrant visas"); *De Avilia v. Civiletti*, 643 F.2d 471, 477 (7th Cir. 1981) ("no vested right in the issuance of a visa"); *Knoetze*, 634 F.2d 207 (revocation of alien's visa, without notice, does not infringe a liberty or property interest entitled to constitutional protection); *Louhghalam*, 2017 WL 479779, at *5 ("There is no constitutionally protected interest in either obtaining or continuing to possess a visa.").

[20] Indeed, non-admitted aliens at the border or abroad have no constitutional rights with respect to challenging the decision of the Executive to deny them entry. *See Castro*, 835 F.3d at 439–44 (collecting cases). As both the Third and Ninth Circuits have held, that is even true for aliens who have in fact *entered* the country and are apprehended shortly thereafter. *See id.*; *United States v. Peralta-Sanchez*, — F.3d —, 2017 U.S. App. LEXIS 2165 (9th Cir. Feb. 7, 2017) (concluding that alien crossing apprehended after illegal entry entitled to no more process than aliens apprehended at the border). *A priori*, if even aliens physically on U.S. soil "cannot invoke the Constitution . . . in an effort to force judicial review [of their exclusion] beyond what Congress has already granted them," *id.* at 446, aliens abroad wishing to enter certainly cannot. *E.g. Mezei*, 345 U.S. at 212; *cf. Verdugo*, 494 U.S. at 271.

travel . . . to pursue an occupation, and . . . to acquire knowledge." Mem. at 11. None of these substantive due process rights is implicated where, as here, Virginia is essentially arguing that the only way for non-citizens to exercise these rights is if they are able to freely enter and exit the United States. *See, e.g.*, *Regan v. Wald,* 468 U.S. 222 (1984) (rejecting plaintiffs' argument that President Reagan's restrictions on transactions with Cuba violated their right to international travel); *Haig v. Agee*, 453 U.S. 280, 306 (1981) ("The Court has made it plain that the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States."); *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (upholding travel ban to Cuba and noting how "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow"); *United States v. Lindh*, 212 F. Supp. 2d 541, 570 & n.73 (E.D. Va. 2002) ("restrictions on dealings with hostile foreign nations—designed to deprive such regimes of resources— [do not] violate [constitutional] rights.").

   b.   Establishment Clause and Equal Protection

Virginia also alleges that the Order violates the Establishment Clause because it was "motived [sic] by animus towards Muslims." Mem. at 16. This claim is meritless for multiple reasons. First, non-resident aliens have no rights under the Establishment Clause with respect to their attempt to gain entry into the United States for the same reasons (previously discussed) that they are not protected by the Due Process Clause, such that Virginia lacks any cognizable claim on their behalf. Second, the order is neutral with respect to religion. The only sections of the Order addressing religion are Sections 5(b) and (e), discussing the admission of refugees who face persecution because of their membership in a minority religion. Virginia does not seek to enjoin that provision and in any event has no standing to make such an argument as *nothing* in its Complaint relates to refugees seeking admission to the United States. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, *Inc.*, 454 U.S. 464, 485–86 (1982);

*Louhghalam*, 2017 WL 479779, at *4-5 (plaintiffs are not "refugees seeking admission to the United States and consequently, any future implementation of Section 5[] would not personally affect them."). Finally, Sections 5(b) and (e) provide accommodations for refugees from *all* countries in the refugee program, not just the seven countries specified in Sections 3(a). Their provisions do not favor any particular religious sect or affiliation. *Louhghalam*, 2017 WL 479779, at *4-5 ("Nothing in Section 5 compels a finding that Christians are preferred."). Nor does it violate the Establishment Clause to recognize that religious minorities are more likely to face persecution than members of a religious majority. *Cf. Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987) (Brennan, J.); *see also* 8 U.S.C. § 1187, Note 2. Any claim that the Order operates as a "Muslim ban" is thus baseless.[21]

For similar reasons, Virginia's allegations that the Order violates equal protection ignores how nonresident aliens have no rights under the Due Process Clause with respect to their request for entry into the United States. Indeed, as noted, where an equal protection claim is made against a federal immigration law (as opposed to a State law based on alienage), only rational basis review applies. *See, e.g., Mathews*, 426 U.S. at 83 (considering whether a law that made distinctions based on alienage was "wholly irrational"); *United States v. Carpio-Leon*, 701 F.3d 974, 979, 982–83 (4th Cir. 2012) ("Carpio-Leon cannot show that there is no rational relationship between prohibiting illegal aliens from bearing firearms and the legitimate government goal of public safety."). And quite apart from the cases cited by Virginia,[22] "[i]t is settled law that rational basis review is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996). Instead, the

---

[21] Virginia's reference to information extrinsic to the plain language of the Order would not be permitted under the deferential review they ask this Court to undertake, and in any event violates tenets of statutory construction. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1999).
[22] *E.g., United States v. Windsor*, 133 S. Ct. 2675 (2013); *Romer v. Evans*, 517 U.S. 620 (1996)

issue is "whether the legislative classification is *rationally related to a legitimate governmental interest.*" *Id.* (emphasis added). Indeed, challenged laws are entitled to "a strong presumption of validity," *Heller v. Doe*, 509 U.S. 312, 318–19 (1993), and must be sustained if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *id.* at 319–20 (internal quotations omitted). "To sustain the validity of its policy, *the government is not required to provide empirical evidence*," *Thomasson*, 80 F.3d at 928 (emphasis added); "a legislative choice is not subject to courtroom factfinding[,]" *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); and, "'[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Heller,* 509 U.S. at 320. The Order easily satisfies this relevant standard. *Cf. Haig*, 453 U.S. at 307 ("[i]t is obvious and unarguable that no governmental interest is more compelling than the security of the Nation").

As the Order is does not discriminate on the basis of religion generally or even discussing Islam specifically, Virginia's arguments on this score amount to nothing more than a policy disagreement with these alienage classifications based on national security concerns. Mem. at 18–21. But, as noted, the Constitution permits the political branches to differentiate on the basis of nationality—especially when there are national security concerns at issue. *See, e.g.*, *Jean*, 727 F.2d at 978; *Narenji*, 617 F.2d at 748. Nor is there anything invidious about the Order's reliance on 8 U.S.C. § 1187(a)(12) even though it references seven countries with majority Muslim populations. After all, there are obviously legitimate national security reasons to temporarily pause entry of nationals of these countries, pending a review and strengthening of the vetting process for visa applicants. These seven countries were *already* identified pursuant to § 1187(a)(12) by February 2016, and it is not the courts' "role . . . to second-guess the[se political] judgment[s] . . . . Rather, the question is whether the [law] is supported by a rational basis." *Johnson v. Whitehead*, 647 F.3d 120, 127 (4th Cir 2011) (noting this "context is a special one"

because Congress has "plenary power over immigration and naturalization"). Where, as here, those decisions are supported by an Act of Congress and the determination of the Executive that the countries in question present heightened terrorism-related risks, that alone satisfies any scrutiny warranted under Supreme Court and Fourth Circuit precedents. *See Fiallo*, 430 U.S. at 794; *Whitehead*, 647 F.3d at 127.

      C.      State Sovereigns Lack a Cause of Action under the RFRA

      Virginia claims that section 3 of the Order violates the Religious Freedom Restoration Act of 1993 (RFRA) by "restricting [aliens'] ability to engage in religious travel abroad and, in the case of residents traveling abroad, to return freely to the United States to attend services in their own faith communities." ECF 39 at ¶ 38. RFRA, by its own terms, provides that "Government shall not substantially burden a *person*'s exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. §2000bb-1(a) (emphasis added). "RFRA's use of 'person' should be interpreted consistently with the Supreme Court's interpretation of 'person' in the Fifth Amendment." *Rasul v. Myers*, 563 F.3d 527, 533 (D.C. Cir. 2009). And as the Supreme Court long ago explained, "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot . . . be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court." *S.C. v. Katzenbach*, 383 U.S. 301, 323-24 (1966); *see also Premo v. Martin*, 119 F.3d 764, 771 (9th Cir. 1997); *cf. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2769 (2014). Indeed, it would be absurd to conceive of Virginia as having a burdened religious exercise, and Virginia thus may not invoke RFRA as a basis to challenge Federal decisions concerning aliens.

## IV.    Virginia Fails to Demonstrate Irreparable Harm

      Virginia must make a "clear showing" of irreparable harm, *Winter*, 555 U.S. at 22, *i.e.* that harm is "'actual' and 'immediate.'" *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d

802, 812 (4th Cir. 1991). Here, again, Virginia relies on the Reveley Declaration, which fails to

establish a clear showing of irreparable harm and instead states generally that some unidentified

students and scholars may be prevented from traveling. ECF 32, ¶¶ 7, 14. However, Virginia

must demonstrate irreparable harm to *itself. See, e.g.*, *Adams v. Freedom Forge Corp.*, 204 F.3d

475, 487 (3d Cir. 2000). Because Virginia has identified no such injury—much less a likely,

immediate, and irreparable one—it has not met its burden. Further, these injuries are unspecified

and speculative; the declaration provides few, if any details, for example about whether the

Virginia residents specifically mentioned in the declaration, are LPRs and, thus, not subject to

the Order, *id.* ¶¶ 6, 7, or have any concrete, immediate plans to travel. *See Lujan*, 504 U.S. at

556.

Virginia's argument that its coffers may decrease as an indirect result of the Order, *id.* ¶¶

11–13, is purely speculative; Virginia presents no evidence of its revenues being negatively

impacted by the Order or that this economic harm cannot be corrected by a judgment in the

normal course of litigation. *Sampson v. Murray*, 415 U.S. 61, 90, 94 (1974) ("The key word in

this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and

energy necessarily expended in the absence of a stay, are not enough."); *Hughes Network Sys.,*

*Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (requiring "extraordinary

circumstances" for irreparable monetary harm to exist). To the extent Virginia asserts

reputational injury, ECF 32, ¶ 10, such injury is similarly monetary, and highly speculative.

*Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 120 (4th Cir. 1993).[23]

---

[23] To the extent Virginia may assert that the Order's immediate implementation and continued
effect will cause its universities and colleges to create new admissions guidelines with little
advance notice, this argument is, at bottom, yet again an assertion of economic harm, and
Virginia cannot establish that a limited and temporary pause of visas issued to applicants from
seven countries, with a case-by-case waiver process, would lead to an actual, immediate, and
drastic restructuring of Virginia's higher education admissions procedures that would rise to a

**V.      The Balance of Equities and Public Interest Tip Sharply in the Government's Favor**

Virginia has not demonstrated that any harm to it outweighs the harm that an injunction

would cause Defendants, or that "an injunction is in the public interest." *Winter*, 555 U.S. at 20.

These two factors merge where, as here, the Federal Government is the opposing party. *Nken v.*

*Holder*, 556 U.S. 418, 435 (2009). Courts have accorded "great weight" to considerations of

foreign policy and national security when balancing the interests and equities of the parties. *Nat'l*

*Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997); *Comm. for Nuclear*

*Responsibility, Inc. v. Seaborg*, 463 F.2d 796, 798 (D.C. Cir. 1971) (given "assertions of

potential harm to national security and foreign policy—assertions which [the court] obviously

can not appraise—and given the meager state of the record before us, we are constrained to

refuse an injunction"). Moreover, in assessing the public interest, a court must heed "the

judgment of Congress, deliberately expressed in legislation," and "the balance that Congress has

struck." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001).

These factors weigh heavily in Defendants' favor. Virginia asks the Court to enjoin an

Executive Order well-within the President's constitutional and statutory authority to issue.

Virginia disagrees with the President's determination and believes the Order will harm the

interests of residents in that state. The Constitution, however, commits "decision-making in the

fields of foreign policy and national security . . . to the political branches of government,"

*Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005), not to the States. And Congress has

expressly authorized the President to do what he has done here based upon a finding, which the

President has made here, that "the entry . . . of any class of aliens into the United States would be

detrimental to the interests of the United States." It would be contrary to the public interest to

---

clear showing of irreparable harm. *Direx.*, 952 F.2d at 812. To the extent Virginia asserts an
Establishment Clause claim, because it is unlikely to succeed on that claim, it cannot show
irreparable harm on this basis. *Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190 (4th Cir. 2013).

ignore Congress's judgment that the President should make such determinations, to second-guess the President's determination, or to override the President's determination based on purported interests of a single state. *See Adams*, 570 F.2d at 954.

## VI.     Any Relief Must be Limited in Scope to Virginia and to Specific Harm Found

Even were the Court to conclude that Virginia satisfies the requirements for an injunction with respect to some of its claims, the Court should not enter the injunction Virginia seeks. *See* ECF 31-1 at 2; Complaint, ECF 39 at 11 (seeking order enjoining enforcement of the section 3(c) of Order). Entry of an injunction is reversible error if it is "broader in scope than that necessary to provide complete relief to the plaintiff" or if it does "not carefully address only the circumstances of the case." *Kentuckians for Commonwealth v. Rivenburgh,* 317 F.3d 425, 436 (4th Cir. 2003). This is especially so, where, as here, other courts have upheld the Order against the very challenges raised by Virginia, decisions to which this court should accord comity. *See Georgia-Pacific Consumer Prods. LP v. Von Drehle Corp.*, 781 F.3d 710, 715 (4th Cir. 2015). Thus, where, as here, any injury is limited to narrow class of actual Virginia *residents* with ties or presence to the Commonwealth, if any, a broad, nationwide injunction barring *all* applications of section 3(c) to *all* aliens in the world, would be far too expansive. *See Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993). Indeed, the vast majority of aliens Virginia's proposed injunction would reach have never previously visited this country, and have not yet begun the process of obtaining a visa, let alone developing any plausible claim to constitutional rights with respect to their legal status or right to contest entry. At most, an injunction should be limited to the individuals on whom Virginia's claims rest—previously lawfully admitted aliens temporarily abroad or who wish to travel and return to the United States in the future.

## CONCLUSION

For the reasons set forth above, the Court should deny Virginia's motion.

Dated: February 8, 2017     Respectfully submitted

           DANA J. BOENTE
           UNITED STATES ATTORNEY

           CHAD A. READLER
           Acting Assistant Attorney General

           WILLIAM C. PEACHEY
           Director

By:      /s/
           DENNIS C. BARGHAAN, JR.
           Assistant U.S. Attorney
           2100 Jamieson Avenue
           Alexandria, Virginia 22314
           Telephone: (703) 299-3891
           Fax:  (703) 299-3983
           Email:  dennis.barghaan@usdoj.gov

           EREZ REUVENI
           Senior Litigation Counsel
           Civil Division, Office of Immigration Litigation
           P.O. Box 868
           Ben Franklin Station
           Washington, D.C. 20044
           Telephone:  (202) 307-4293
           Fax:  (202) 616-8962
           Email:  erez.r.reuveni@usdoj.gov

DATE: February 8, 2017     ATTORNEYS FOR RESPONDENTS

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a true and correct copy of the same to the following:

Simon Sandoval Moshenburg
Legal Aid Justice Center
6066 Leesburg Pike, Suite 520
Falls Church, Virginia  22041
Email: Simon@justice4all.org

Counsel for Petitioners


Stuart Alan Raphael
Office of the Attorney General (Richmond)
202 North 9th Street
Richmond, VA 23219
804-786-7240
Fax: 804-371-0200
Email: sraphael@oag.state.va.us

Trevor Stephen Cox
Office of the Attorney General (Richmond)
202 North 9th Street
Richmond, VA 23219
(804) 786-7704
Fax: (804) 371-0200
Email: tcox@oag.state.va.us

Counsel for the Commonwealth of Virginia

Timothy J. Heaphy
Hunton & Williams LLP (DC-Pennsylvania Ave)
2200 Pennsylvania Ave NW
Washington, DC 20037
202-955-1500
Fax: 202-778-2201
Email: theaphy@hunton.com


Counsel for Osman Nasreldin and Sahar Kamal Ahmed Fadul

Date: February 8, 2017

_____/s/_____
DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:        (703) 299-3983
Email:  dennis.barghaan@usdoj.gov

ATTORNEYS FOR RESPONDENTS