IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| TAREQ AQEL MOHAMMED AZIZ, *et al.*, | |
| *Plaintiffs*, | |
| COMMONWEALTH OF VIRGINIA, | |
| *Intervenor-Plaintiff*, | Civil Action No. 1:17-cv-116 |
| v. | |
| DONALD TRUMP, President of the United States, *et al.*, | |
| *Defendants*. | |

**BRIEF OF *AMICI CURIAE* AMERICANS UNITED FOR SEPARATION OF
CHURCH AND STATE AND THE SOUTHERN POVERTY LAW CENTER
IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

KRISTI L. GRAUNKE
MICHELLE R. LAPOINTE
GILLIAN GILLERS
*Southern Poverty Law Center*
  *1989 College Avenue NE*
  *Atlanta, GA 30317*
  *(404) 521-6700*

RICHARD B. KATSKEE
ERIC ROTHSCHILD*
ANDREW L. NELLIS**
BRADLEY GIRARD
KELLY M. PERCIVAL***
CARMEN N. GREEN
  *Americans United for*
    *Separation of Church and*
    *State*
  *1310 L Street, NW*
  *Washington, DC 20005*
  *(202) 466-3234*

*Counsel for* Amici Curiae

* Admitted in Pennsylvania only. Supervised by Richard B. Katskee, a member of the D.C. bar.
** Admitted in New York only. Supervised by Richard B. Katskee, a member of the D.C. bar.
*** Admitted in California only. Supervised by Richard B. Katskee, a member of the D.C. bar.

**TABLE OF CONTENTS**

Introduction ...........................................................................................................................................1
Argument ..............................................................................................................................................1
A.  Virginia Is Likely To Succeed On The Merits Of Its Claims. ................................................2
    1.  The Executive Order violates the Establishment Clause. .............................................2
        a.  The Executive Order fails the *Larson* Test. ............................................2
        b.  The Executive Order fails the Endorsement Test. ...................................5
        c.  The Executive Order fails the *Lemon* Test. ............................................9
    2.  The Executive Order violates the Religious Freedom Restoration Act.......................11
B.  The Balance Of Harms And The Public Interest Favor Granting A Preliminary
    Injunction. ................................................................................................................................12
Conclusion ..........................................................................................................................................13

## INTRODUCTION

President Trump has spent more than a year promising to ban Muslims from entering the United States. During that time, he has repeatedly disparaged and attacked an entire religion and all its adherents because he says that it is "hard to separate . . . who is who" between Muslims and terrorists. Transcripts, *Anderson Cooper 360 Degrees*, CNN (Mar. 9, 2016), http://cnn.it/2jJmaEC. He has insisted that "hundreds of thousands of refugees from the Middle East" would attempt to "take over" and radicalize "our children." *Donald Trump Remarks in Manchester, New Hampshire*, C-SPAN 20:05 (June 13, 2016), http://cs.pn/2k7bHGq. He has warned that Syrian refugees would "be a better, bigger, more horrible version than the legendary Trojan Horse." *Id.* And when he has "talked about the Muslims," he has explained: "we have to have a ban . . . it's gotta be a ban." *Presidential Candidate Donald Trump Town Hall Meeting in Londonderry, New Hampshire*, C-SPAN 28:16 (Feb. 8, 2016), http://cs.pn/2kY4f1T.

Now, however, when called to task over his unconstitutional discrimination on the basis of religion, President Trump insists that the instrument for imposing that ban, Executive Order 13,769, avoids illegality because it is aimed at certain countries, not explicitly at Muslims. But he telegraphed this very strategy as a candidate: When challenged over the illegality of banning an entire religion and its adherents, then-candidate Trump responded "[s]o you call it territories. OK? We're gonna do territories." 60 Minutes, *The Republican Ticket: Trump and Pence*, CBS NEWS (July 17, 2016), http://cbsn.ws/29NrLqj.

A Muslim ban by any other name is still a ban on Muslims. It violates the fundamental constitutional guarantees of religious freedom, harming the Commonwealth of Virginia, its institutions, and its citizens. The ban is indefensible as a matter of law. A preliminary injunction is warranted.

## ARGUMENT

"[T]he First Amendment mandates governmental neutrality between religion and religion," forbidding official discrimination. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *accord, e.g.*, *McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); *Larson v. Valente*, 456 U.S.

1

228, 246 (1982). Ignoring this clear constitutional command, the government has singled out one religious group—Muslims—for official disfavor and maltreatment. By instituting a wide-ranging, punishing ban on Muslim immigrants, the government runs roughshod over core First Amendment and statutory protections. Hence, Virginia is likely to succeed on the merits of its claims. And because the Executive Order violates fundamental First Amendment rights and the injuries that it inflicts are irreparable, the balance of the equities and the public interest weigh dispositively against allowing enforcement of the Muslim ban while this case is proceeding. A preliminary injunction should issue.

**A.    Virginia Is Likely To Succeed On The Merits Of Its Claims.**

   **1.    The Executive Order violates the Establishment Clause.**

At least three tests apply in determining whether governmental action like the challenged Executive Order violates the Establishment Clause. First, when the government confers a denominational preference (i.e., when it acts to favor or disfavor one faith or denomination over others), its conduct is subject to strict scrutiny and presumptively does not stand. *Larson*, 456 U.S. at 246. Second, the action is reviewed to determine whether the government is endorsing religion or certain religious beliefs. *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000). And third, the challenged conduct is evaluated under the test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to determine whether the government acted with a religious purpose and whether the effect of the government's action is to favor or disfavor religion or a particular faith. It is customary to apply all the tests pertinent to the particular facts. *See, e.g.*, *Mellen v. Bunting*, 327 F.3d 355, 371 (4th Cir. 2003); *see also Hernandez v. Comm'r*, 490 U.S. 680, 695 (1989) (courts should apply *Larson* when relevant before proceeding to *Lemon*). Failure to satisfy any of the tests—or even any part of the *Lemon* test—invalidates the challenged action. The Executive Order fails them all.

   **a.    The Executive Order fails the *Larson* Test.**

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244; *accord McCreary*, 545 U.S. at 875 ("the government may not favor one religion over another, or religion over irreligion,

religious choice being the prerogative of individuals"). Thus, when the government designates one denomination for different treatment—favorable or unfavorable—its action is subject to strict scrutiny under *Larson v. Valente*, *supra*. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1128 (10th Cir. 2012) (applying strict scrutiny to and invalidating state law disfavoring Islam).

    1. The Executive Order singles out countries that are almost entirely Muslim and subjects those who were born in or come from those countries—i.e., Muslims—to harsh legal disabilities and punishments, including exclusion, detention, and expulsion. Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017). The disfavored status is not limited to people outside the United States; many in Virginia have already been harmed. For example, students from these seven countries who are lawfully residing in Virginia have had their legal status within the United States revoked or denied. Compl. in Intervention ¶¶ 33–52. Notably, on January 27, the State Department revoked "all valid nonimmigrant and immigrant visas of nationals" of the seven countries, regardless of where the individuals currently reside. See Letter of Edward J. Ramotowski, Deputy Assistant Sec'y, Dep't of State (Jan. 27, 2017) (*available at* http://bit.ly/2ksbtL2). And while the government has now scaled back its attack on lawful permanent residents (Siddiqui Decl. Ex. 1), the legal status of many other Muslims within and outside the United States is still being rescinded, denied, or threatened.

    2. The government demurs that the Executive Order must apply so broadly because the seven identified countries are a source of threat to the United States. But the government's discrimination is laid bare by, among other things, the Executive Order's favoring of refugees who are "religious minorit[ies]" in their home countries—including the seven countries. *See* Exec. Order No. 13,769 § 5(b), (e). Although Virginia challenges only Section 3 of the Executive Order, the canons of construction require that all the sections must be read *in pari materia*. *See United States v. Morison*, 844 F.2d 1057, 1064 (4th Cir. 1988) ("[T]he starting point for ascertaining legislative intent is to look to other sections of the Act *in pari materia* with the statute under review."); *Yellowfish v. City of Stillwater*, 691 F.2d 926, 931 (10th Cir. 1982) (applying *in pari*

*materia* to executive orders as well as to congressional statutes). Hence, Section 5 illuminates the discriminatory meaning, purpose, intent, and effect of Section 3 and the entire Executive Order.

To be sure, affording refugee status to victims of religious persecution would be constitutionally permissible. But being "a minority religion in the individual's country of nationality" (Exec. Order No. 13,769 § 5(b)) does not mean that one is a victim of persecution. So affording preferred status solely on that basis is "precisely the sort of official denominational preference that the Framers of the First Amendment forbade" (*Larson*, 456 U.S. at 255). And because most refugees worldwide currently come from Muslim countries (*Figures at a Glance*, UNHCR, http://bit.ly/2cmTBiF (last visited Feb. 2, 2017)), the preference will primarily benefit non-Muslims, to the detriment of a disfavored minority faith in *this* country.

In short, the Executive Order disadvantages Muslims from the seven countries regardless of where they live now or whether they have already been thoroughly vetted for entry into the United States; and it prefers religious minorities, i.e., non-Muslims. Such straightforward religious favoritism is "suspect" and calls for "strict scrutiny in adjudging its constitutionality." *Larson*, 456 U.S. at 246.

3. The government counters by asserting an interest in "stop[ping] attacks by foreign nationals . . . admitted to the United States." Exec. Order No. 13,769 § 1. Yes, preventing terrorism is a compelling interest. But the Executive Order must be "closely fitted to further the interest." *Larson*, 456 U.S. at 248. It isn't.

A policy of suddenly, flatly, and universally excluding Muslims, many of whom have already been vetted and been approved by the government for entry—indeed, many of whom have lived here lawfully and peaceably for years—is not the least restrictive means to fight terrorism. People from the seven countries listed in the Executive Order have, collectively, killed *zero* people in terrorist attacks in the United States since 1975. Alex Nowrasteh, *Where Do Terrorists Come From? Not the Nations Named in Trump Ban*, NEWSWEEK (Jan. 31, 2017), http://bit.ly/2kWoddx. None of the top five countries of origin for foreign-born perpetrators of terrorism in the United

4

States are listed in or covered by the Executive Order. *See id.* And homegrown terrorism—by non-Muslims—is a far greater threat and causes significantly more deaths, yet it is left entirely unaddressed by the Executive Order. *See, e.g.*, Ellen Nakashima, *Domestic Extremists Have Killed More Americans than Jihadists Since 9/11. How the Government Is Responding*, WASH. POST (Oct. 15, 2015), http://wapo.st/1Qh8Kft. Hence, the policy's fit with the government's asserted interest is not merely loose; it is nonexistent.

      **b.**   **The Executive Order fails the Endorsement Test.**

  Not only is government forbidden to "discriminate among persons on the basis of their religious beliefs and practices," but the Establishment Clause "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny v. ACLU*, 492 U.S. 573, 590, 594 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)). "[T]he government may not favor one religion over another" by endorsing the one or condemning the other. *McCreary*, 545 U.S. at 875. Yet the Executive Order does exactly that.

  1. The question under the Endorsement Test is "'whether an objective observer . . . would perceive" the government to have placed its stamp of approval or disapproval on religion or on a particular faith. *Santa Fe*, 530 U.S. at 308 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 76 (1985) (O'Connor, J., concurring in the judgment)). This hypothetical "'objective observer' is presumed to know far more than most actual members of a given community." *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 n.16 (10th Cir. 2008). Most notably, the objective observer is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *McCreary*, 545 U.S. at 866. Hence, as a matter of law, the public's view and understanding of the challenged policy here and the entire history of publicly available information about its genesis and evolution must be considered in determining whether the Executive Order is an unconstitutional religious endorsement. *See id.*; *Green v. Haskell Cty. Bd. of Comm'rs*, 568 F.3d 784, 801 (10th Cir. 2009); *Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 734

(M.D. Pa. 2005). What is more, even officially repudiated past acts are not "dead and buried" but remain in the reasonable observer's memory, affecting how the final governmental action is viewed. *McCreary*, 545 U.S. at 870. Finally, the Establishment Clause is violated by "both perceived and actual endorsement of religion." *Santa Fe*, 530 U.S. at 305. Thus, if a reasonable observer considering the full history and context of the challenged policy would perceive governmental endorsement, even if the government did not intend it, the policy cannot stand. *Mellen*, 327 F.3d at 374.

      2. Disapproval of Islam and approval of other faiths is apparent from the bare text of the Executive Order. Section 3 singles out for exclusion persons from seven overwhelmingly Muslim nations: Iran (99.5% Muslim), Iraq (99.0% Muslim), Libya (96.6% Muslim), Somalia (99.8% Muslim), Sudan (90.7% Muslim), Syria (92.8% Muslim), and Yemen (99.1% Muslim). Exec. Order No. 13,769 § 3(c); PEW RES. CTR., THE GLOBAL RELIGIOUS LANDSCAPE 45–50 (2012), http://bit.ly/2k4Us8B.

      The Executive Order's treatment of refugees in Section 5 is pertinent here also, because the reasonable observer would view Section 3 in light of the entire Executive Order, its history, and its embodiment and communication of the government's aims and objectives. The Executive Order blocks entry of all refugees temporarily and of Syrian refugees indefinitely (Exec. Order No. 13,769 § 5(a), (c)), disproportionately affecting Muslims. As noted, Syria is overwhelmingly Muslim; and Muslims made up a plurality of *all* refugees resettled in the United States last year, the number of Muslim refugees having increased almost every year over the past decade. Jens Manuel Krogstad & Jynnah Radford, *Key Facts About Refugees to the U.S.*, PEW RES. CTR. (Jan. 30, 2017), http://pewrsr.ch/2kk7ro8. And the disfavor of Islam is further compounded by the Executive Order's favoritism toward refugees who belong to minority religions (*see* Exec. Order No. 13,769 § 5(b), (e)), as most refugees worldwide today come from Muslim-majority countries (*Figures at a Glance*, *supra*). The intention to disfavor Muslims, and only Muslims, is pellucid.

3. Though these features of the Executive Order alone suffice to communicate official preference for non-Muslims, as a matter of law the objective observer knows much more. First, the precursor to the Executive Order was then-candidate Trump's public and repeated promises of a "total and complete shutdown of Muslims entering the United States." Siddiqui Decl. Ex. 8. Second, candidate Trump renamed and repackaged his Muslim ban only after public outcry over its illegality, candidly explaining that he would now be "talking territory instead of Muslim." *Meet the Press*, NBC NEWS (July 24, 2016) http://nbcnews.to/29TqPnp. Third, he publicly described this change not as "a pull-back" but as "an *expansion*" of his Muslim ban. *Id.* (emphasis added). Fourth, after the election, President-elect Trump asked Rudy Giuliani (then a vice chair of the President-elect's transition team and under consideration for Secretary of State) how the "Muslim ban" could be implemented "legally." Siddiqui Decl. Ex. 4. Fifth, in an interview with the Christian Broadcasting Network on January 27, 2017, the very day he issued the Executive Order, President Trump declared that his administration would be acting to give priority to Christian refugees going forward. Siddiqui Decl. Ex. 6.[1] Sixth, the government has exempted from the ban persons from the seven identified countries who hold an Israeli passport (i.e., individuals who are likely to be Jewish). *See Message from U.S. Embassy Tel Aviv Consular Section*, U.S. EMBASSY IN ISRAEL, http://bit.ly/2l0KWB8 (last visited Feb. 2, 2017).

The objective observer is aware of these and many other public statements by President Trump and his advisers, surrogates, and members of his administration who developed the Muslim ban and the resulting Executive Order, as well as the broader "social context" in which the Executive Order and the policy that it embodies arose. *See, e.g.*, *Kitzmiller*, 400 F. Supp. 2d at 734. The message, and magnitude, of the government's disfavor toward Islam is made vivid to the

---

[1] Invoking stereotypical images of violence by Muslims against Christians, President Trump made clear his view that the claims of Muslim refugees were to take a backseat to those of Christians: "Do you know if you were a Christian in Syria it was impossible, at least very tough, to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair." *Id.*

7

objective observer by the government's initial attempt, through the Executive Order, to ban even lawful permanent residents—people whom the government had already thoroughly vetted and who in most cases know no home other than the United States—before it disavowed that position in the face of compelling legal challenges. *See* Siddiqui Decl. Ex. 1. And the religious animus is further underscored by the government's mass revocation of "*all* valid nonimmigrant and immigrant visas," with few exceptions, from the seven Muslim countries. Letter of Edward J. Ramotowski, Deputy Assistant Sec'y, Dept. of State (Jan. 27, 2017) (*available at* http://bit.ly/2ksbtL2) (emphasis added)). The objective observer will also be aware that, notwithstanding the President's insistence that the measure is necessary to ensure national security, the Executive Order was crafted not by national-security experts but by political advisors, who themselves have a public record of hostility toward Muslims. *See, e.g.*, Evan Perez et al., *Inside the Confusion of the Trump Executive Order and Travel Ban*, CNN (Jan. 30, 2017), http://cnn.it/2kGdcZy; Andrew Kaczynski, *Steve Bannon in 2010: 'Islam Is Not a Religion of Peace. Islam Is a Religion of Submission*,*'* CNN (Jan. 31, 2017), http://cnn.it/2knpxSE.

    4. Taking all of that into account, an objective observer could hardly help but perceive a strong message of governmental condemnation of Islam and an accompanying message of official preference for other faiths—the latter most obviously through President Trump's express declaration that his administration would favor Christians over other refugees. The objective observer would thus conclude that Muslims are "outsiders, not full members of the political community" and that persons of other faiths are "insiders, favored members of the political community." *Santa Fe*, 530 U.S. at 309–10 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)).

    Nor may the government waive away the President's statements and other publicly available information about the history of the Executive Order as improper consideration of the "subjective motive in issuing the order." Emergency Motion at 17, *Washington v. Trump*, 17-35105 (9th Cir. Feb. 4, 2017). As explained, the Endorsement Test *requires* that this information

be considered, not for subjective intent, but as an objective test of how the objective observer in the public would view the Executive Order.

5. Simply put, the Executive Order communicates loudly and clearly that Muslims are a disfavored caste. That is not a message that the government can or should convey: "When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship." *McCreary*, 545 U.S. at 883 (O'Connor, J., concurring). The violation of the Establishment Clause here is forthright and flagrant.

        **c.**        **The Executive Order fails the *Lemon* Test.**

The Executive Order also fails the *Lemon* Test, under which governmental action must have a preeminently secular purpose (*McCreary*, 545 U.S. at 864) and must also have a "principal or primary effect . . . that neither advances nor inhibits religion" (*Lemon*, 403 U.S. at 612). Failure to satisfy either requirement constitutes an Establishment Clause violation. *See id.* at 612–13.

1. The secular-purpose requirement is violated if the "government's actual purpose is to endorse or disapprove of religion." *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)). It is not enough merely to articulate a secular purpose; "the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. As with the Endorsement Test, "[t]he eyes that look to purpose belong to an 'objective observer.'" *Id.* at 862 (internal quotation marks omitted) (quoting *Santa Fe*, 530 U.S. at 308). In other words, the test for purpose is an objective inquiry, not a subjective one. And because "reasonable observers have reasonable memories," the court must not "turn a blind eye to the context" but must "look to the record of evidence showing the progression leading up to" the challenged action. *Id.* at 866, 868.

President Trump's clear, unambiguous statements of purpose both before and after the election and inauguration (only a few of which are detailed above), and the rest of the substantial and very public history leading up to the Executive Order, all bespeak the purpose to disfavor Islam, a religious minority in this country, and to favor the majority faith. The President and his

9

campaign surrogates and policy advisers promised a "complete and total shutdown of Muslims entering the United States" and favoritism toward Christian refugees. *See* Siddiqui Decl. Ex. 12; Siddiqui Decl. Ex. 6; Siddiqui Decl. Ex. 5. They have now acted to deliver on those promises. *See* Exec. Order No. 13,769 §§ 3, 5. The incantation of 'national security' simply does not explain the actions actually taken. So the government's proffered justification for the Executive Order must be deemed either a "sham" or merely "secondary" to an impermissible purpose (*McCreary*, 545 U.S. at 864) to disfavor, vilify, and shun Muslims.

2. The Executive Order also fails *Lemon*'s principal-effect requirement by inhibiting Islam and advancing other faiths. *See Lemon*, 403 U.S. at 612. That is for the reasons already explained under the Endorsement Test: The effect requirement is violated when, "irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion].'" *Mellen*, 327 F.3d at 374 (4th Cir. 2003) (alteration in original) (quoting *Wallace*, 472 U.S. at 56 n. 42).[2]

\*   \*   \*

Rather than undertaking a careful examination of existing federal immigration policy to determine what may be needed to ensure national security, the President did what he has been promising for over a year: He banned Muslims. Because the Executive Order is grounded in nothing more than religious animus, strict scrutiny cannot be satisfied. The government's constitutionally and morally indefensible policy cannot stand.

---

[2] Section 5 compounds the impermissible effect of the Executive Order by demonstrably targeting Muslims for unfavorable treatment. Muslim refugees desperate to escape the charnel house of Syria and reunite with family members in Virginia or elsewhere in the United States are now forced to renounce or disguise their faith to qualify for the Executive Order's exception affording preferred status to "religious minorit[ies]." Exec. Order No. 13,769 § 5(e). When remaining in Syria may be tantamount to a death sentence, this scenario is hardly implausible. *Cf., e.g.*, *The Marranos*, JEWISHHISTORY.ORG, http://www.jewishhistory.org/the-marranos/ (last visited Feb. 2, 2017) (describing "[t]he forced conversion of a quarter-million Jews in Spain" during the Inquisition). It is difficult to imagine a policy that would more greatly inhibit the practice of one's faith than to make religious conversion a life-or-death matter.

## 2. The Executive Order violates the Religious Freedom Restoration Act.

The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, provides that governmental action cannot substantially burden religious exercise unless it is the least restrictive means of furthering a compelling interest—that is, unless the action survives strict scrutiny. *See Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015). Once again, the Executive Order cannot meet that "exceptionally demanding" test (*see id.* at 864).

To take an obvious example, Muslim residents of Virginia (and other States) who hold visas and are legally present in the United States cannot make a pilgrimage to Mecca—one of the five pillars of Islam and a mandatory religious obligation to be fulfilled at least once in a practicing Muslim's lifetime (Diaa Hadid, *What Muslims Do on Hajj, and Why*, N.Y. Times (Sept. 8, 2016), http://nyti.ms/2kYGovS). For if they leave the United States and then try to come back, they will be detained and deported. Coercion "to act contrary to [one's] religious beliefs by the threat of civil or criminal sanctions" is a substantial burden on religious exercise under RFRA. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008). No one could seriously dispute that detention and subsequent deportation meet that threshold.

The Executive Order must therefore be "the least restrictive means of furthering [a] compelling governmental interest" (§ 2000bb-1(b)), which, as explained above (*see supra* Section A.1.a), it is not. A blanket ban on all immigration and visitation from seven overwhelmingly Muslim nations with little to no history of sending terrorists to the United States, and the revocation of visas and the inevitable detention and deportation of people lawfully in the United States and accused of no crime, much less terrorism, are not only far more restrictive than necessary to fight terrorism, but they may not further the government's asserted interest at all. *See* David Morgan, *Former Intel Official: Trump Immigration Ban Makes Americans Less Safe*, CBS NEWS (Jan. 30, 2017), http://cbsn.ws/2jKLkpK. The Executive Order is thus unlawful under RFRA.

More generally, RFRA was enacted "to provide greater protection for religious exercise than is available under the First Amendment." *Holt*, 135 S. Ct. at 859–60. Thus, whatever else it may cover, RFRA certainly encompasses violations of the Free Exercise Clause's core mandate

that the government must not single out a particular denomination for punishment based on religious exercise. In that regard, because "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt," the singling out of a religious group for punishment is suspect even if done artfully and by subterfuge without making direct, explicit reference to the group or its faith. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Here, the subterfuge is artless. The "religious gerrymander" violates the Free Exercise Clause—and thus also RFRA (*cf. Fernandez v. Mukasey*, 520 F.3d 965, 966 n.1 (9th Cir. 2008))—unless the government can demonstrate that it is the least restrictive means to serve a compelling interest (*Lukumi*, 508 U.S at 534, 546), which it cannot.

**B.     The Balance Of Harms And The Public Interest Favor Granting A Preliminary Injunction.**

A preliminary injunction is appropriate to protect against imminent and unconstitutional official discrimination against Muslims. The issuance of a temporary restraining order by the United States District Court for the Western District of Washington (*see Washington v. Trump*, No. 17-0141, 2017 WL 462040, at *3 (W.D. Wash. Feb. 3, 2017)) has already resulted in reinstatement of some 60,000 visas for people whom the government had previously screened and approved for entry. Michael Edison Hayden & Maia Davis, *World's Airlines Are Told It's Back to Business as Usual for US-bound Travelers in Wake of Judge's Order*, ABC NEWS (Feb. 4, 2017), http://abcn.ws/2l8PYvy. If that TRO, now on appeal (though it is an unappealable order) were for any reason lifted, allowed to expire, or limited jurisdictionally to the Western District of Washington or the Ninth Circuit, there can be little doubt that the government would immediately reinstate the mass revocations in Virginia and elsewhere. For those whose visas are in jeopardy, and who might be detained and deported, there would then be no adequate remedy for the harms.

What is more, "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *accord Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Because the Executive Order violates First Amendment rights, the injuries that it inflicts are irreparable as a matter of law. *Elrod v. Burns*,

427 U.S. 347, 373 (1976). And, of course, "[t]he public has no interest in enforcing an unconstitutional" law. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272–73 (11th Cir. 2006); *accord Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011). Quite the contrary.

On the other side of the equation, the government has in the pending proceedings in the Ninth Circuit asserted unfettered discretion to exclude an entire "class of aliens" whenever it makes "the predictive judgment" that the class threatens national security, arguing that judicial review of those decisions offends the public interest (Emergency Mot., *supra*, at 21–22). We anticipate that it will take the same position here. But the government has no legitimate interest, much less a compelling one, in enforcing unconstitutional policies. *See Newsom*, 354 F.3d at 261; *Carandola*, 303 F.3d at 521. It has no legitimate interest in discriminating on the basis of religion. It has made no showing that there is any serious risk from the people whom it has already vetted and granted the right to be in the United States. And it cannot show that judicial review of unconstitutional conduct undermines governmental authority. Rather, judicial review is the principled constitutional bulwark against naked abuse of political power that confers legitimacy on all governmental action. The harms to Virginia and the public from the Executive Order are imminent and extreme; the purported harms to the government are not legally cognizable. All factors favor the entry of a preliminary injunction.

## CONCLUSION

The Executive Order is what President Trump promised all along: a "Muslim ban." No amount of rebranding can change that. People are excluded, detained, and deported for no reason other than their deity and preferred holy book. The Executive Order is an insult to the fundamental principles of religious freedom enshrined in our Constitution. It cannot stand—even for a day. The preliminary injunction should be granted.

Respectfully submitted,

/s/ *Carmen N. Green*

| | |
|---|---|
| KRISTI L. GRAUNKE<br>    *pro hac vice* motion forthcoming<br>MICHELLE R. LAPOINTE<br>    *pro hac vice* motion forthcoming<br>GILLIAN GILLERS<br>    *pro hac vice* motion forthcoming<br>*Southern Poverty Law Center*<br>*1989 College Avenue NE*<br>*Atlanta, GA 30317*<br>*Tel.: (404) 521-6700*<br>*Fax: (404) 221-5857*<br>*Email:  Kristi.Graunke@splcenter.org*<br>*            Michelle.Lapointe@splcenter.org*<br>*            Gillian.Gillers@splcenter.org* | RICHARD B. KATSKEE, *pro hac vice* pending<br>ERIC ROTHSCHILD,* *pro hac vice* pending<br>ANDREW L. NELLIS,** *pro hac vice* pending<br>BRADLEY GIRARD, *pro hac vice* pending<br>KELLY M. PERCIVAL,*** *pro hac vice* pending<br>CARMEN N. GREEN<br>    *Americans United for Separation of Church*<br>    *and State*<br>    *1310 L Street, NW*<br>    *Washington, DC 20005*<br>    *Tel.: (202) 466-3234*<br>    *Fax: (202) 466-3353*<br>    *Email:  katskee@au.org / rothschild@au.org*<br>                *nellis@au.org / girard@au.org*<br>                *percival@au.org / green@au.org* |

*Counsel for* Amici Curiae

Date:       February 8, 2017

---

\* Admitted in Pennsylvania only. Supervised by Richard B. Katskee, a member of the D.C. bar.
\*\* Admitted in New York only. Supervised by Richard B. Katskee, a member of the D.C. bar.
\*\*\* Admitted in California only. Supervised by Richard B. Katskee, a member of the D.C. bar.

**CERTIFICATE OF SERVICE**

I certify that on February 8, 2017, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ *Carmen N. Green*