No. 17-cv-116 (LMB) (TCB)

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

TAREQ AQEL MOHAMMED AZIZ, et al.,

Petitioners,

v.

DONALD TRUMP, President of the United States, et al.,

Respondents.

BRIEF FOR THE STATES OF ILLINOIS AND NEW YORK AND THE COMMONWEALTHS OF MASSACHUSETTS AND PENNSYLVANIA, TOGETHER WITH THE STATES OF CALIFORNIA, CONNECTICUT, DELAWARE, IOWA, MAINE, MARYLAND, NEW MEXICO, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS

LISA MADIGAN
 *Attorney General*
 *State of Illinois*
100 W. Randolph St., 12th Fl.
Chicago, IL 60601

ERIC T. SCHNEIDERMAN
 *Attorney General*
 *State of New York*
120 Broadway, 25th Fl.
New York, NY 10271

JOSH SHAPIRO
 *Attorney General*
 *Commonwealth of*
  *Pennsylvania*
Strawberry Square, 15th Fl.
Harrisburg, PA 17120

MAURA HEALEY
 *Attorney General*
 *Commonwealth of*
  *Massachusetts*
One Ashburton Place
Boston, MA 02108

*\*List of States continues on signature pages*

Dated: February 8, 2017

# TABLE OF CONTENTS

Page

INTERESTS OF AMICI.........................................................................................................1

ARGUMENT .......................................................................................................................2

I.   The Requirements For A Preliminary Injunction Have Been Satisfied....................................2

    A.   The Executive Order Is Causing Irreparable Harm........................................................2

        1.   The Executive Order Is Disrupting The Work Of State Colleges
             And Universities In Multiple Ways. ...........................................................3

        2.   The Executive Order Is Disrupting Staffing And Research At State Medical
             Institutions..............................................................................................8

        3.   The Executive Order Is Irreparably Harming States' Economies And Tax
             Revenues..................................................................................................9

        4.   The Executive Order Inflicts Per Se Irreparable Harm By Violating the
             Establishment Clause. ...............................................................................12

    B.   Virginia's Challenge To The Executive Order Is Likely To Succeed On The Merits......12

        1.   The Executive Order Violates The Equal Protection Guarantee Of The Fifth
             Amendment...............................................................................................12

        2.   The Executive Order Violates The Establishment Clause........................................15

        3.   The Executive Order Violates The Due Process Clause...........................................18

    C.   The Balance of Hardships Weighs Heavily In Favor Of Granting Virginia's Requested
         Preliminary Injunction, Which Is In The Public Interest.

        1.   The Executive Order Is Gravely Harming People In Our States. ...........................21

        2.   The Executive Order Is Injuring States' Sovereign and Quasi-Sovereign Interests....24

        3.   Virginia's Requested Preliminary Injunction Is In The Public Interest...................26

II.  A Nationwide Preliminary Injunction Is Necessary To Provide Complete Relief. .................26

CONCLUSION ....................................................................................................................28

## INTERESTS OF *AMICI*

The States of Illinois and New York and the Commonwealths of Massachusetts and Pennsylvania, together with the States of California, Connecticut, Delaware, Iowa, Maine, Maryland, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia, submit this brief as *amici curiae* in support of the Commonwealth of Virginia's motion for a preliminary injunction enjoining the enforcement of certain provisions of an Executive Order that bars nationals of seven majority-Muslim countries from entering the United States.  The excluded individuals include those with valid U.S. visas that otherwise would entitle them to work, study, and travel within the *amici* States.  The Executive Order thus inhibits the free exchange of information, ideas, and talent between the seven designated countries and the *amici* States, damaging the financial stability and intellectual vitality of state educational and research institutions and disrupting large and small businesses throughout the States.  The sectors experiencing particular disruptions include the life sciences, technology, health care, and finance.

While the *amici* States have distinct economies, depend on differing industries for their economic vibrancy, and contain different types of medical and educational institutions, all of us welcome and benefit from immigration, tourism, and international student travel—and all of us face concrete, immediate, and irreparable harms caused by the Executive Order.  Indeed, several *amici* have filed or intervened or sought to intervene in parallel lawsuits raising similar claims.[1] Those lawsuits may well be affected by the decision in this case.

---

[1] *See, e.g.*, *Darweesh v. Trump*, No. 17-cv-480, ECF Nos. 38, 39 (E.D.N.Y. Feb. 2, 2017); *Louhghalam v. Trump*, No. 17-cv-10154-NMG, Dkt. No. 44 (D. Mass. Feb. 2, 2017).

**ARGUMENT**

**I.     The Requirements For A Preliminary Injunction Have Been Satisfied.**

To obtain a preliminary injunction, movants "must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Whether to grant such relief lies in the sound discretion of the court, *see Winter*, 555 U.S. at 24, and will not be disturbed absent an abuse of discretion, *see League of Women Voters of N.C.*, 769 F.3d at 235.

**A.     The Executive Order Is Causing Irreparable Harm.**

Though it was issued just twelve days ago, the Executive Order is already causing irreparable harm to the *amici* States and will continue to inflict that harm absent the entry of a nationwide preliminary injunction.  The injuries outlined below are representative of the harms being suffered by States throughout the country, including Virginia.  These injuries include specific disruptions to staffing and intellectual exchange at our colleges and universities and our medical institutions, ongoing harm to our economies and tax revenues, and *a per se* irreparable injury to our interests in ensuring that the Constitution is upheld within our jurisdictions—harms that cannot be compensated through money damages.  Moreover, because many of these harms are caused directly by the Executive Order's effect on nonimmigrant visa-holders, including those on student and work visas, these injuries are not ameliorated by the federal government's later-announced position that lawful permanent residents are unaffected by the Executive Order, notwithstanding the plain language of Section 3(c) of the Order.

2

### 1.   The Executive Order Is Disrupting The Work Of State Colleges And Universities In Multiple Ways.

The Executive Order has irreparably injured—and continues to injure—state colleges and universities across the country, including in the *amici* States, which rely on faculty and students from across the world.

*First*, the Executive Order has disrupted these institutions' ability to meet their staffing needs.  It is already preventing and dissuading scholars from coming to our institutions—including scholars who had already committed to filling positions.  The harm is deep and widespread: the University of Massachusetts has more than 160 employees who are affected by the Executive Order; the University of Illinois has about 30 such employees; the City University of New York employs 46 such individuals; and the University of Maryland, College Park, includes about 350 such members in its community.[2]

While there is no absolute right to the maintenance or continuation of a visa, our state educational institutions rely on predictability in the visa system.  Moreover, foreign-born faculty who are here on visas typically have specialized expertise that cannot easily be replaced. Colleges and universities already are forming task forces and making contingency plans to fill these particular voids in their faculty rosters, but there is no guarantee that they will be able to

---

[2] *See, e.g.*, Decl. of Marcellette G. Williams, Ph. D., *Loughghalam v. Trump*, No. 17-cv-10154-NMG, (D. Mass. Feb. 2, 2017) ECF No. 52-9, at 3 ¶ 4 (describing impact on the University of Massachusetts); Wallace D. Loh, *Executive Actions and Staying True to Our Values*, https://www.president.umd.edu/executive-actions-and-staying-true-our-values (last visited February 8, 2017).

meet their urgent staffing needs.  These suddenly necessary efforts represent a considerable expenditure of scarce resources.

The above-described costs—compelled by the Executive Order—are neither elective nor speculative.  On the contrary, the *amici* States are aware of many staffing-related harms to specific programs in our States.  For example, foreign scholars from the designated countries who hold duly issued, otherwise-valid J-1 visas have abandoned their plans to come to the United States and teach because of the Executive Order.  In some such cases, the scholars were expected to teach during the spring semester of 2017, leaving holes in faculty rosters that our institutions must immediately fill.

Additional immediate disruption has occurred in the context of medical residency staffing.  This endangers our public health and places our communities at risk.  State medical schools participate in the "match" program to assign residents to university hospital programs.  These medical residents perform crucial services, including providing medical care to underserved residents.  The process has already begun, with rankings of future residents due on February 22; the computerized "match" scheduled for March 17; and matched residents expected to begin work on July 1.  Many programs regularly match medical residents from the seven designated countries and, prior to the Executive Order, medical schools like the University of Massachusetts Medical School already were actively considering and had interviewed specific applicants from the designated countries.  These programs must forgo ranking applicants from

the designated countries or risk having insufficient medical residents to meet staffing needs when their top choices are banned from entry despite, in some cases, having student or work visas.[3]

*Second*, the Executive Order creates uncertainty and imposes additional costs related to nonimmigrant faculty and other employees already present in the United States.  Because of the freeze of at least 90 days on processing visa applications under section 3(c) of the Executive Order, state institutions must pay an additional $1,225 fee per visa for "Premium Processing Service" to expedite the approval of certain eligible visas and still are unsure if visas will be issued.[4]

*Third*, the Executive Order has disrupted the admissions process for students, causing the loss of millions of tuition dollars that cannot be fully recovered.  Our state colleges and universities enroll thousands of students from the designated countries.  The California State University System has more than 1,300 affected students with immigrant status and more than 250 affected students on student visas.[5]  The City University of New York has more than 800 affected undergraduate students;[6] the University of California system's ten campuses have

---

[3] If a program "matches" with an applicant who is then unable to come into the country, the program is left with an open slot.  The only way to fill the slot is to seek a waiver from the National Resident Matching Program.  Such a waiver puts a medical school in the difficult position of trying to hire a resident from the pool of applicants who did not match anywhere else, and the school may be unable to find a resident at all.  These problems are described in detail in the Declaration of Michael F. Collins, MD, *Loughhalam v. Trump*, No. 17-cv-10154-NMG (D. Mass. Feb. 2, 2017), ECF No. 52-2, at ¶¶ 5-8.

[4] Information regarding U.S. Citizenship and Immigration Services' expediting service, including the fee, is available at https://www.uscis.gov/i-907 (last visited February 8, 2017).

[5] This figure is based on information provided by the Assistant Vice Chancellor of International and Off-Campus programs at the California State University System.

[6] This figure was provided by the Policy Advisor Office of New York City's Deputy Mayor for Strategic Policy Initiatives.

almost 500 affected graduate students and 40 affected undergraduates;[7] the State University of

New York has 320 affected undergraduates;[8] the University of Massachusetts has 300 affected

graduate and undergraduate students;[9] and the University of Illinois has over 300 affected

students.[10]  At the University of Washington, more than 95 students are immigrants from Iran,

Iraq, Syria, Somalia, Sudan, Libya, and Yemen.[11]  The number at Washington State University is

over 135.[12]  Other public institutions such as the Pennsylvania State University, Texas A&M

University, the University of Central Florida, the University of Houston System, the University

of Texas at Arlington, and Arizona State University each have hundreds of affected students.[13]

The Executive Order not only interferes with the matriculation of future students from the

seven designated countries but also severely harms those who are already enrolled at our state

institutions—thereby jeopardizing their continued enrollment—by preventing them from

travelling for research, conferences, family visits, and other irreplaceable activities that cannot be

---

[7] *See* Teresa Watanabe and Rosanna Xia, *Trump Order Banning Entry from Seven Muslim-Majority Countries Roils California Campuses*, Los Angeles Times (January 30, 2017), http://www.latimes.com/local/california/la-me-trump-universities-20170130-story.html (last visited February 8, 2017).

[8] This figure was provided to the New York Attorney General's Office by the State University of New York's General Counsel.

[9] *See* Decl. of Marcellette G. Williams, Ph. D., *supra* n.2, ¶ 3.

[10] This figure was provided to the Office of the Illinois Attorney General by the general counsel of the University of Illinois.

[11] *See* Decl. of Jeffrey Riedinger, *Washington v. Trump*, No. 2:17-cv-00141-JLR (W.D. Wash. Jan. 30, 2017), ECF No. 9, at 2 ¶ 5.

[12] *See* Decl. of Asif Chaudhry, *Washington v. Trump*, No. 2:17-cv-00141-JLR (W.D. Wash. Jan. 30, 2017), ECF No. 5, at 2 ¶ 5.

[13] Abby Jackson, *The 10 U.S. Colleges That Stand to Lose the Most from Trump's Immigration Ban*, Business Insider (Feb. 1, 2017), https://amp.businessinsider.com/colleges-potentially-most-affected-trump-immigration-ban-2017-2.

compensated through money damages.[14]  The *amici* States' colleges and universities have already offered admission to students from the affected countries who now appear unable to attend, and they anticipate that—but for the Executive Order—they would admit many more over the coming months.  Already, the *amici* States are aware of students from the seven countries who have had to abandon plans to enroll in their programs due to the Executive Order, and students who have withdrawn applications entirely.  As a result, these public institutions must now alter their admissions processes to account for these students who can no longer accept or attend.  While public colleges and universities are always subject to federal immigration law and policy, the Executive Order has injured them unexpectedly, by upending with no advance notice the established framework around which these institutions have designed their enrollment processes.

Finally, the *amici* States are aware of specific instances where the Executive Order has caused harm to our institutions' core missions of education and scholarship.  Graduate and undergraduate students who traveled to see families abroad over winter break have been trapped outside the United States; admitted students and recent faculty hires have been unable to reach the United States; and faculty and doctoral students who are in the United States cannot travel abroad for fieldwork or conferences because they will not be able to reenter.  In some cases, such travel is necessary to complete a dissertation or remain on the tenure track.

---

[14] *See, e.g.*, Decl. of Marcellette G. Williams, Ph. D., *supra* n.2, at 4-5.

### 2.      The Executive Order Is Disrupting Staffing And Research
At State Medical Institutions.

Besides disrupting the matching process described above by which our state medical schools acquire medical residents to staff their hospitals, the Executive Order also disrupts the continued training of affected medical residents who are already here and serving our patient populations.  Where such residents are unable to renew or extend their nonimmigrant visas, state medical schools will be unable to continue to employ them; the schools will be left with unfilled positions in their multi-year programs for training physicians; and staffing gaps will open up at hospitals.  The health and well-being of the populaces in the *amici* States inevitably will suffer.  The primary care program at the University of Massachusetts Medical School, for example, currently has six medical residents from the designated countries under employment contracts at a time when primary care physicians are in short supply in many areas across the country.[15]

Public medical institutions also employ individuals from the designated countries in many other positions, including as fully trained physicians, research faculty, and post-doctoral researchers.  For example, 307 licensed healthcare professionals in Pennsylvania have trained in one of the designated countries.  The *amici* States are aware of employment offers from public entities that have already been extended to and accepted by individuals from the designated countries, who are now waiting for visas to be approved and uncertain if and when they will be able to begin their employment.  In addition, the *amici* States have current employees, located in the United States, who, for the time being, cannot renew or extend their visas or statuses.  Because patients at our medical facilities must be cared for, our facilities must immediately adapt to these changed circumstances and spend precious time and resources to do so.

---

[15] *Louhghalam v. Trump*, No. 17-cv-10154-NMG, Dkt. No. 25-1, at 12 (D. Mass. Jan. 31, 2017).

### 3. The Executive Order Is Irreparably Harming States' Economies And Tax Revenues.

The Executive Order gravely harms business interests in the *amici* States, which depend on remaining internationally competitive and attractive destinations for companies in the life sciences, technology, finance, health care, and other industries, and for tourists and entrepreneurs.  In Illinois alone, for example, 22.1% of entrepreneurs are foreign-born, and immigrant- and refugee-owned businesses employ more than 281,000 people.[16]  Immigrants in Illinois represent 37.7% of the State's software developers.[17]  And a recent study found that if even half of the more than 3,900 foreign-born graduates of Illinois universities in so-called STEM fields (science, technology, engineering, and mathematics) stayed in the United States, it could result in the creation of more than 5,100 new jobs for U.S.-born workers by 2021.[18]

Similarly, in the State of Washington, immigrant and refugee-owned businesses employ 140,000 people.[19]  In addition, Washington's technology industry relies heavily on the H-1B visa program, with Redmond-headquartered Microsoft alone employing nearly 5,000 people through that program.[20]  Other Washington companies, including Amazon, Expedia, and Starbucks,

---

[16] *See The Contributions of New Americans in Illinois* at 2, New American Economy (Aug. 2016), http://bit.ly/2kRVaro (last visited February 8, 2017).

[17] *Id.* at 10.

[18] *Id.* at 13.

[19] *See* Mot. for Temporary Restraining Order, *Washington v. Trump*, No. 2:17-cv-00141-JLR (W.D. Wash. Jan. 30, 2017), ECF No. 3, at 22.

[20] *Id.*

likewise employ thousands of H-1B visa holders.[21]  Loss of highly skilled workers puts these companies—and others across the *amici* States—at a disadvantage with global competitors.[22]

From the moment of its implementation, the Executive Order has also caused the *amici* States to lose both direct and indirect tax revenues: economic damage that cannot be undone. Every foreign student, tourist, and business visitor to the *amici* States contributes to our respective economies.  They do so not only by direct payments, including tuition, room, and board payments to state schools, but also through the tax receipts that the students' presence generates.  The Executive Order abruptly blocked thousands of travelers—potential consumers all—from entering the amici States, thereby halting their tax contributions as well.  When the Executive Order went into effect, "tens of thousands of visas" for U.S.-bound travelers immediately were revoked, with the State Department later confirming that roughly 60,000 individuals' visas were provisionally revoked.[23]

Absent the entry of the nationwide preliminary injunction that Virginia seeks, the *amici* States will lose weeks or even months of otherwise available tax revenues, even if Virginia ultimately prevails.  The collective amounts at issue are immense, even just with respect to the contribution of foreign students to our economies, which potentially total in the tens of millions of dollars.  Six of the top ten U.S. institutions hosting international students are located in the *amici* States, including the University of Illinois Champaign-Urbana, New York University, and

---

[21] *Id.*

[22] *See* Br. for Technology Companies and Other Businesses as *Amici Curiae* In Support of Appellees at 8-21, *Washington v. Trump*, No. 17-35105, Dkt. No. 19-2 (9th Cir. Feb. 5, 2017).

[23] *See* Rachel Revesz, *Donald Trump Immigration Ban: 60,000 Visas Revoked After Travel Restrictions Imposed on Seven Muslim-Majority Countries*, The Independent (Feb. 3, 2017), available at http://ind.pn/2l0eovf (last visited February 8, 2017).

the University of Southern California.[24]  In 2015, New York hosted nearly 1,000 nationals from

the designated countries who were studying on temporary visas.[25]  They collectively contributed

$30.4 million to the State's economy, including direct payments for tuition, fees, and living

expenses.[26]  In Illinois, the figure is $30.3 million.[27]  And these amounts do not include indirect

economic benefits, such as the contributions of international students and scholars to innovation

in academic and medical research.  These States, of course, are not the only ones affected.  The

seven countries singled out by the Executive Order account for more than 16,000 students who

attended institutions of higher education nationally in the 2014-15 academic year.[28]  During that

period, Iran alone sent 11,338 students to colleges and universities across the United States,

yielding an estimated economic impact of $323 million.[29]  California universities and colleges

host the largest number of students from the seven designated countries.  The overwhelming

majority of them are from Iran, which sent 1,286 student visa-holders to California institutions in

2015.[30]

---

[24] *See* http://bit.ly/2jZHg6y (last visited February 8, 2017).

[25] *See* http://www.iie.org/Research-and-Publications/Open-Doors/Data/Economic-Impact-of-
International-Students (last visited February 8, 2017).

[26] *See id*.

[27] *See id*.

[28] *See* Institute of International Education, *Open Doors Data, International Students: All Places
of Origin*, http://bit.ly/1ObpkM2 (last visited February 8, 2017).

[29] *See* Institute of International Education, Open Doors Data, Fact Sheets for Iran: 2015,
http://bit.ly/2lmPhjg (last visited February 8, 2017).

[30] *See* Watanabe & Xia, *Trump Order Banning Entry from Seven Muslim-Majority Countries
Roils California Campuses*, *supra* n.7.

### 4. The Executive Order Inflicts *Per Se* Irreparable Harm By Violating the Establishment Clause.

The *amici* States also have suffered irreparable harm because the Executive Order

violates the Establishment Clause of the First Amendment, as discussed in Part I.B.2 below.

When a party seeking injunctive relief "alleges a violation of the Establishment Clause, this is

sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary

injunction determination." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303

(D.C. Cir. 2006); *see also ACLU of Ill. v. City of St. Charles*, 794 F.2d 265, 275 (7th Cir. 1986);

*cf. ACLU of Ky. v. McCreary Cty*, 354 F.3d 438, 445 (6th Cir. 2003) (presuming irreparable

harm where plaintiffs were likely to succeed on the merits of their Establishment Clause claim);

*Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986) (same).

### B. Virginia's Challenge To The Executive Order Is Likely To Succeed On The Merits.

### 1. The Executive Order Violates The Equal Protection Guarantee Of The Fifth Amendment.

The Supreme Court has made clear that the Due Process Clause of the Fifth Amendment

prohibits the federal government from denying to any person, including a noncitizen, the equal

protection of the laws. *See*, *e.g.*, *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976). Under well-

established equal protection doctrine, classifications based on religion are inherently suspect and

subject to strict scrutiny. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). The

Executive Order, whose clear purpose and effect are to operate as a "Muslim ban," contravenes

these fundamental equal protection principles.

That the Executive Order was motivated by an intent to discriminate against Muslims is

clear from the public statements of officials in the Trump Administration, including the president

himself.  As a candidate for president, Donald Trump repeatedly promised that he would ban

Muslims from entering the United States.[31]  Shortly after the Executive Order was promulgated,

an advisor to President Trump revealed that the President had asked him to craft a Muslim ban

that would withstand judicial scrutiny.[32]  And at a January 31 press conference on the Executive

Order, the Secretary of the Department of Homeland Security explained that "[t]his whole

approach was part of what then-candidate Trump talked about for a year or two."  *See generally*

Va. PI Br. at 18-19.

The Executive Order cannot withstand strict scrutiny.  Its ban on entry into the United

States by all nationals of the seven affected nations—immigrants and nonimmigrants alike, from

infants to the elderly—is the antithesis of narrow tailoring.[33]  This is especially so given the

"near-absence of terror attacks" committed in the United States by lawful permanent residents or

visa holders from those countries,[34] and the extensive screening that the United States has

applied to these persons before granting them permission to live, work, and study in the United

States.

---

[31] Donald J. Trump Statement on Preventing Muslim Immigration (Dec. 7, 2015),
https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration (last visited February 8, 2017) (statement "calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on.").

[32] *Trump asked for a 'Muslim ban,' Giuliani says – and ordered a commission to do it 'legally'*,
The Wash. Post (Jan. 29, 2017) ("'So when [Trump] first announced it, he said, 'Muslim ban.'
He called me up.  He said, 'Put a commission together.  Show me the right way to do it
legally.'"), https://goo.gl/VL155w (last visited February 8, 2017).

[33] Draft State Dep't Dissent Channel Memo at 2, https://goo.gl/JCAUdL (last visited February 8, 2017).

[34] *Id.*

13

Visa applicants are always required to undergo rigorous screening, often by multiple agencies of the U.S. government, before a visa can be approved.  For example, the Petition in another suit challenging the Executive Order describes the procedures required by the Iraqi Special Immigrant Visa (SIV) program, and the extensive screening applied to the petitioner in that case between his application for an SIV on or about October 1, 2014 and the visa issuance on January 20, 2017.  To apply for an SIV, the petitioner in that suit was required to obtain Chief of Mission Approval from the United States Embassy in Iraq; file a Form I-360 petition with U.S. Citizenship and Immigration Services; and then submit a DS-260 visa application to the National Visa Center.  After that paperwork was processed, he was required to go through an interview at a U.S. consulate or embassy; a medical examination; and substantial security background checks performed by the U.S. government.  Only after all of this screening, designed to prevent entry by individuals who may pose a security risk, did he receive from the U.S. government a visa for travel to the United States.[35]   A blanket ban on entry to the United States of nationals of seven majority-Muslim countries who have already been extensively vetted for visa eligibility is not narrowly tailored.[36]

Even under a more deferential approach, though, the Executive Order cannot pass constitutional muster.  Evidence from President Trump himself establishes that Virginia is likely to succeed in showing that the Executive Order was motivated by anti-Muslim animus.  And as

---

[35] *See Darweesh v. Trump*, No. 17-cv-480, Dkt. No. 1, at ¶¶ 23-30 (E.D.N.Y. Jan. 28, 2017).

[36] Although it is true that the seven affected countries had been among those previously identified as a risk by Congress and a previous administration, the implications of that previous identification were far more limited, relating primarily to the eligibility of nationals of those countries to visit the United States under the Visa Waiver Program, *i.e.*, *without* a visa.  *See* 8 U.S.C. § 1187(a)(12); 81 Fed. Reg. 39680-02 (June 17, 2016).

the Supreme Court has held, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (citation and alteration omitted).

### 2.    The Executive Order Violates The Establishment Clause.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Official action that distributes benefits or burdens according to religion is subject to strict scrutiny. *Id.* at 246.  The law at issue in *Larson*, which imposed burdensome regulations only on religious organizations that solicited more than half their funds from nonmembers, did not explicitly mention any religious denomination, *id.* at 231-32, but the Court nevertheless applied strict scrutiny because the law in effect favored some religions over others, *id.* at 246-47.

The Executive Order violates *Larson*'s clear command.  The Order's refugee provisions explicitly rely on religion as a basis for classification by ordering federal officials to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."  Order, § 5(b).  President Trump has left no doubt that the purpose of this provision is to favor Christian refugees over Muslim refugees.[37]  In addition, the Order's travel ban singles out nationals of

---

[37] *See David Brody, Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority as Refugees*, CBN News (Jan. 27, 2017), http://bit.ly/2kypiFy ("[Interviewer:] The refugee program, or the refugee changes you're looking to make. As it relates to persecuted Christians, do you see them as kind of a priority here?"  President Trump: "Yes. …. Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible . . . . And I thought it was very, very unfair. So we are going to help them.").

seven overwhelmingly Muslim countries: Iran (99.5% Muslim), Iraq (99.0% Muslim), Libya

(96.6% Muslim), Somalia (99.8% Muslim), Sudan (90.7% Muslim), Syria (92.8% Muslim), and

Yemen (99.1% Muslim).  Order, § 3(c).[38]  That the Order stops short—for now—of imposing a

ban on nationals of other predominantly Muslim states does not prevent it from being recognized

as exactly what the President promised to deliver: an anti-Muslim religious classification.  The

Order thus violates the "principle at the heart of the Establishment Clause, that government

should not prefer one religion to another."  *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,

512 U.S. 687, 703 (1994).

    In addition to this fundamental prohibition on religious preferences, Establishment

Clause case law requires the government to act with a secular purpose, and holds that the

"principal or primary effect" of the government's action "must be one that neither advances nor

inhibits religion."  *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971).  Courts do not blindly defer to

the government's judgment about whether a sufficient secular purpose is present.  "When a

governmental entity professes a secular purpose for an arguably religious policy, the

government's characterization is, of course, entitled to some deference.  But it is nonetheless the

duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one.'"  *Santa Fe Indep.*

*Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (quoting *Wallace v. Jaffree*, 472 U.S. 38, 75 (1985))

(O'Connor, J., concurring in the judgment).  *See also Mellen v. Bunting*, 327 F.3d 355, 372-73

(4th Cir. 2003) (same).  In fulfilling this duty, courts must examine all "probative evidence,"

exercise "common sense," and refuse "to turn a blind eye to the context in which [the] policy

[38] Pew Research Center, *The Global Religious Landscape* 45-50 (2012), http://bit.ly/2k4Us8B
(last visited February 8, 2017).

16

arose." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005) (alteration in original). In particular, the "historical context" of the government's action and "the specific sequence of events leading to [its] passage" must be taken into account. *Id.* (alteration in original).

The Executive Order violates both the secular purpose prong and the effects prong of the *Lemon* test. The many statements made by the President and his advisors concerning the Executive Order establish that its primary purpose is to make good on the "Muslim ban" that Trump promised during the 2016 election campaign.[39] In this regard, even the across-the-board pause in the U.S. Refugee Admissions Program, Order § 5(a), is suspect, for during the period from October 1, 2016, through January 31, 2017, the majority of refugees coming into the United States arrived from majority-Muslim nations.[40] As for the effects prong, the Supreme Court has held that it is violated when the government's action "would cause a reasonable observer to fairly understand it in its particular setting as impermissibly advancing or endorsing religion." *Lambeth v. Bd. Of Commrs Of Davidson Cty., N.C.*, 407 F.3d 266, 271 (4th Cir. 2005) (citing *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 598-600 (1989)). Again, in light of the evidence described above, the Trump Administration has left little doubt as to the desired effect of the Order.

---

[39] *Donald Trump proposes "total and complete shutdown of Muslims entering the United States*," http://www.vox.com/2015/12/7/9867900/donald-trump-muslims (last visited February 8, 2017).

[40] Department of State, Bureau of Population, Refugees, and Migration, Office of Admissions - Refugee Processing Center, *Refugee Arrivals by Nationality*, https://static1.squarespace.com/static/580e4274e58c624696efadc6/t/58989ff63e00be25e12d46d3/1486397432465/Arrivals+by+Nationality+-+Map2.6.17.pdf (last visited February 8, 2017).

17

### 3.    The Executive Order Violates The Due Process Clause.

The Executive Order also denies due process of law to individuals within the *amici*

States.  Individuals arriving at a port of entry in the United States are entitled to certain rights

and procedures specified by the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 *et seq.*

For example, Congress has provided that lawful permanent residents and persons to whom the

United States has granted refugee or asylee status cannot be summarily excluded from the United

States, regardless of their country of origin.[41]  Under Section 1252 of the INA, such persons are

entitled to judicial review of any administrative determination seeking to subject them to

expedited removal.  *See id.* § 1252(e)(2).[42]

These "statutory rights granted by Congress" confer an entitlement to treatment that

creates a property interest under the Due Process Clause of the United States Constitution

because some "[m]inimum due process rights attach to statutory rights."  *Dia v. Ashcroft*, 353

---

[41] Indeed, as to lawful permanent residents, the Supreme Court has held that "an 'innocent, casual, and brief excursion' . . . outside this country's borders would not subject" such a person "to the consequences of an 'entry' on his return." *Landon v. Plasencia*, 459 U.S. 21, 29 (1982) (quoting *Rosenberg v. Fleuti*, 374 U.S. 449, 462 (1963)).

[42] 8 U.S.C. § 1252(e)(2) states in full:

> Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of—
>
> **(A)** whether the petitioner is an alien,
> **(B)** whether the petitioner was ordered removed under such section, and
> **(C)** whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

8 U.S.C. § 1225(b)(1)(A)(i), in turn, sets forth statutory procedures for expedited removal.

F.3d 228, 239 (3d Cir. 2003) (alteration in original, quotation marks omitted); *see also Meachum v. Fano*, 427 U.S. 215, 226 (1976); *Selgeka v. Carroll*, 184 F.3d 337, 342 (4th Cir. 1999).

Moreover, where lawful permanent residents are concerned, the Supreme Court has repeatedly recognized that the Due Process Clause's "constitutional protection of an alien's person and property is particularly strong." *Demore v. Kim*, 538 U.S. 510, 543-44 (2003). "Once they are admitted to permanent residence, [lawful permanent residents] share in the economic freedom enjoyed by citizens: they may compete for most jobs in the private and public sectors without obtaining job-specific authorization, and apart from the franchise, jury duty," and the ability to receive "certain forms of public assistance, their lives are generally indistinguishable from those of United States citizens." *Id.* at 544.

Thus, even apart from the statutory entitlements conferred by the INA, lawful permanent residents who seek to return to the United States after a short stay abroad are "entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude [them]." *Landon v. Plasencia*, 459 U.S. 21, 33 (1982) (referencing illustrative cases). Although the government has represented that lawful permanent residents are no longer barred from entry by section 3(c) of the Order, they remain covered by its plain language, and the government's purported voluntary cessation of that aspect of the travel ban does not moot Virginia's claims on their behalf. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (describing voluntary cessation exception to mootness).

Holders of multiple-entry visas for work and study in the United States, who are returning to the United States from short visits abroad, are likewise entitled to at least minimal due process protections by virtue of their connection to our country, the magnitude of what they have at stake, and the lack of any substantial government interest in excluding otherwise

19

admissible persons whom United States consular authorities have already extensively screened and approved for entry and re-entry.  *See*, *e.g., Plasencia*, 459 U.S. at 34 (applying to the immigration context the Supreme Court's test for determining the specific dictates of "due process" set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  Removal of a person who is otherwise authorized to enter the United States for purposes of temporary residence "visits a great hardship on the individual and deprives him or her of the right to stay and live and work in this land of freedom." *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (brackets omitted); *see also Plasencia*, 459 U.S. at 34; *Jordan v. De George,* 341 U.S. 223, 231 (1951).  This is especially true for visa-holders who have exercised their rights to bring their spouses and families to the United States.[43]  When the government excludes such persons, it causes them to "lose the right to rejoin [their] immediate family, a right that ranks high among the interests of the individual." *Plasencia*, 459 U.S. at 34.

### C.     The Balance of Hardships Weighs Heavily In Favor Of Granting Virginia's Requested Preliminary Injunction, Which Is In The Public Interest.

In addition to the irreparable injuries that the Executive Order is inflicting on States' proprietary interests, the Executive Order also harms the welfare of the people of our States.

---

[43] *See, e.g.*, 8 U.S.C. § 1101(a)(15)(F)(ii) (defining spouse and minor children of certain student visa holders to be non-immigrants); 8 C.F.R. § 214.2(f)(3) (describing admissibility and visa eligibility requirements for spouse & minor children of student-visa holder); 8 U.S.C. § 1101(a)(15)(H) (defining certain temporary workers to be nonimmigrants); 8 C.F.R. § 214.1(a)(1)(iii) (creating new nonimmigrant category for spouses and minor children of temporary workers with visas pursuant to § 1101(a)(15(H)); 8 C.F.R. § 214.2(h)(9)(iv) (describing admissibility and visa eligibility of spouse & minor children of these temporary workers); 8 U.S.C. § 1101(a)(15)(J) (defining spouse and minor children of certain medical researchers, scholars, and professors to be nonimmigrants); 8 C.F.R. § 214.2(j)(1) (describing admissibility and visa eligibility requirements for spouse & minor children of J-visa researchers, scholars and professors).

Protecting the public against such harms is not only at the core of the balance-of-harms and public-interest prongs of the preliminary injunction standard as applied here, but also relates directly to the States' well-established sovereign and quasi-sovereign interests. *See, e.g., Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 601-08 (1982) (describing those interests).

### 1.   The Executive Order Is Gravely Harming People In Our States.

The Executive Order presumptively bars entry into the United States for all nationals of the seven affected countries, even if they are otherwise lawfully authorized to enter or re-enter this country on the basis of immigration documents previously issued by U.S. authorities. Residents of the *amici* States have been prevented from traveling home, and their family members have been prevented from visiting them.  Indeed, after the Order was issued, many such persons were even detained for days at airports at airports throughout the United States— often without access to counsel—when they attempted to enter the country.[44]  Numerous long-term and temporary residents of the *amici* States were victims of the resulting turmoil, which also broadly disrupted travel at all major United States airports, many of which are located in the

---

[44] Michael D. Shear et al., *Judge Blocks Trump Order on Refugees Amid Chaos and Outcry Worldwide*, N.Y. Times (Jan. 28, 2017), https://goo.gl/OrUJEr (last visited February 8, 2017); Amanda Whiting, *Despite Court Order, US Officials Won't Allow Lawyers at Dulles to See Detainees*, Washingtonian (Jan. 29, 2017), https://www.washingtonian.com/2017/01/29/customs-and-border-protection-still-not-allowing-lawyers-to-see-detainees/ (last visited February 8, 2017).

*amici* States.  *See, e.g.*, *Alfred L. Snapp & Son*, 458 U.S. at 602 (noting States' independent interest "in the well-being of [their] populace").

These harms have been exacerbated by the government's shifting and inconsistent implementation of the Executive Order, which "unleashed global chaos" almost as soon as it was issued on January 27.[45]  Customs and border control officials arrived at airports on January 28 without instructions on how to implement it.[46]  The lack of advance warning led to "homeland security officials 'flying by the seat of their pants[]' to try to put policies in place."[47]  Officials at different airports applied different policies.[48]  This uncertainty was compounded by the actions of officials at the highest levels of the federal government, who vacillated over how to interpret and apply the Executive Order.  For example, the federal government changed its mind multiple times about whether the Executive Order applies to lawful permanent residents.[49]  On February 1, the White House Counsel acknowledged "that there has been reasonable uncertainty about

---

[45] Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017), https://www.nytimes.com/2017/01/29/us/politics/donald-trump-rush-immigration-order-chaos.html?_r=0 (last visited February 8, 2017)

[46] *Id.*

[47] *Id.*

[48] *See, e.g.*, Jonathan Allen & Brendan O'Brien, *How Trump's Abrupt Immigration Ban Sowed Confusion at Airports, Agencies*, Reuters (Jan. 29, 2017), www.reuters.com/article/us-usa-trump-immigration-confusion-idUSKBN15D07S (last visited February 8, 2017) (while many visa-holders reported being "allowed into the country without a problem," some lawful permanent residents were "turned away").

[49] *See, e.g.*, Evan Perez et al., *Inside the Confusion of the Trump Executive Order and Travel Ban* (Jan. 30, 2017), http://www.cnn.com/2017/01/28/politics/donald-trump-travel-ban/index.html (last visited February 8, 2017); Press Release, U.S. Department of Homeland Security, *Statement By Secretary John Kelly On The Entry Of Lawful Permanent Residents Into The United States* (Jan. 29, 2017), https://goo.gl/6krafi (last visited February 8, 2017).

whether" the travel ban applies to lawful permanent residents of the United States, and purported to "clarify that Sections 3(c) and 3(e) [of the Order] do not apply to such individuals."[50]

Without judicial action staying the implementation of the Executive Order across the country, our States will see a return of the chaos experienced in our airports beginning on the weekend of January 28 and 29, and continued serious harms to the individuals who live, work, and study in our States; the institutions that employ and educate such persons; and the families they are part of and the communities in which they reside.  Our universities will continue to face uncertainty about whether affected students will be allowed to resume their studies;[51] our businesses will not know if and when affected employees will be allowed to return to their

---

[50] *See* Memorandum to the Acting Secretary of State, the Acting Attorney General, and the Secretary of Homeland Security from Donald F. McGahn II (Feb. 1, 2017), www.politico.com/f/?id=00000159-fb28-da98-a77d-fb7dba170001 (last visited February 8, 2017).

[51] *See* Class Action Compl. For Declaratory and Injunctive Relief ¶¶ 45-48, *Al-Mowafak v. Trump*, No. 17-cv-557 (N.D. Cal. Feb. 2, 2017), ECF No. 1 (describing case of Wasim Ghaleb, a Yemeni national currently studying business administration at Grossmont College in San Diego on a valid F-1 visa, who traveled to Saudi Arabia for a family trip on January 15, 2017 and who is being prevented from returning to the United States because of the Executive Order); *see also* First Am. Pet. for Writ of Habeas Corpus and Class Compl. for Declaratory and Injunctive Relief ¶¶ 18, 52-54, 71, *Aziz v. Trump*, No. 17-cv-116 (E.D. Va. Feb. 3, 2017), ECF No. 7 39 (detailing additional instances of individuals traveling abroad who are unable to return because of the Executive Order).

offices; [52] and a broad swath of our residents will be unable to visit with overseas family

members or return home if they do.[53]

**2.      The Executive Order Is Injuring States' Sovereign and Quasi-Sovereign Interests.**

States have a legally cognizable interest in exercising "sovereign power over individuals

and entities within . . . [their] jurisdiction" through creation and enforcement of "a legal code,

both civil and criminal." *Alfred L. Snapp & Son,* 458 U.S. at 601.  States also possess a quasi-

sovereign interest in protecting the civil rights of all residents within their jurisdiction.  *Id.* at

608-09.  The Executive Order harms these sovereign and quasi-sovereign interests by preventing

States from enforcing regimes of non-discrimination created by their state constitutions and laws.

Residents and businesses in many of the *amici* States—and indeed many of the *amici* States

themselves—are *prohibited by state law* from taking national origin and religion into account in

determining to whom they can extend employment and other opportunities.[54]  Although the

---

[52] *See* Decl. of Ayesha Blackwell-Hawkins, Esq., *Washington v. Trump*, No. 17-cv-141 (W.D. Wash., Jan. 30, 2017), ECF No. 6(declaration from Amazon employee stating that company's employees may not be able to travel and that company has instructed one of its lawyers not to make a business trip to the United States for fear that she may be detained); *see also* Jack Nicas, *Google Criticizes Impact on Staff of Trump Immigration Order*, Wall St. J. (Jan 28., 2017), *available at* https://www.wsj.com/articles/google-criticizes-impact-on-staff-of-trump-immigration-order-1485596067 (last visited Feb. 5, 2017) (reporting on e-mail from Google's CEO that expressed concern that its employees will not be able to return from abroad).

[53] Jared Maslin, *"It's Tearing Families Apart." 6 Stories of Lives on Hold Due to Trump's Visa Ban*, Time (Feb. 2, 2017), *available at* http://time.com/4649876/donald-trump-visa-ban-executive-order-lives/ (last visited Feb. 5, 2017) (Iraqi-born U.S. citizen returned to Iraq to help his wife apply for a visa; and although wife procured a visa, officials will not let her enter the United States because of Executive Order; the couple remains in Iraq).

[54] *See, e.g.*, Cal. Const. art. I, §§ 7-8; Cal. Gov't Code §§ 11135-11137, 12900 *et seq.*;; Conn. Gen. Stat. § 46a-60; Ill. Const. art. I, § 3; Ill. Const. art. I, § 17; 740 ILCS 23/5 (a)(1); 775 ILCS 5/1-102 (A); 775 ILCS 5/10-104 (A)(1); 5 Maine Rev. Stat. Ann. §§ 784, 4551-4634 (2013); Mass. Gen. L. ch. 151B, §§ 1, 4; Mass. Gen. L. ch. 93, § 102; Md. Code Ann., State

24

States, state residents and state businesses are always constrained in their employment decisions by validly-enacted federal immigration law, the Executive Order represents an act of unconstitutional discrimination.  Indeed, the statements of the President and his senior advisers and the rushed process by which the Executive Order was rolled out without thoroughly consulting federal agencies responsible for national security suggest that this particular Order was not driven by national security, but by unlawful animus.  See Part I.B.1 & n. 31 above.

---

Gov't § 20-606; N.Y. Exec. Law §§ 291 (1)-(2); 296(1)a-e; 296(1-a) a-d; 296(2); 296(2-a); 296(3-b); 296(4); 296(5)(a)1-3,(b)1-2, (c)1-2,(d); 296(10)a; 296(13);296-c (2)a-c; 43 P.S. § 952(a); 43 P.S. § 952(b); 43 P.S. § 953; 43 P.S. § 955; Pa. Const. Art. I, § 1; Pa. Const. Art. I, § 3; Pa. Const. Art. I, § 26; R.I. Gen. Laws 28-5-7(1)(i).

### 3.      Virginia's Requested Preliminary Injunction Is In The Public Interest.

All of the facts described above—the chaos unleashed by the Executive Order and the harms it is inflicting on our States, our people, businesses, airports, hospitals, universities, families and communities—demonstrate why Virginia's requested preliminary injunction is in the public interest.  In addition, as the Fourth Circuit has noted, "upholding constitutional rights surely serves the public interest." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)).

## II.      A Nationwide Preliminary Injunction Is Necessary To Provide Complete Relief.

A nationwide injunction is necessary to maintain the status quo prior to the issuance of the Executive Order and to provide complete relief to Virginia and prevent the irreparable harms described above.  The "scope of injunctive relief is dictated by the extent of the violation established," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and "[i]t is well established … that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992) (citations omitted).  As the Fourth Circuit has noted, "[w]hen required by the circumstances of the case, district courts have issued injunctions which apply to conduct by the Attorney General of litigation in other federal courts." *Id.*; *see also id.* at 1309 (nationwide injunction was "appropriately tailored to prevent irreparable injury"); *Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide injunction in light of the constitutional requirement of a "*uniform* Rule of Naturalization," the need for a "comprehensive and *unified* system" of immigration policy, and the likelihood that a narrower injunction would be ineffective in the

immigration context) (emphases in original), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).

The interconnections among this country's economic, transportation, and educational systems frustrate any attempt to provide effective interim relief on less than a nationwide basis. An injunction limited to the geographical boundaries of Virginia would not sufficiently protect firms and institutions that conduct business in multiple states or those noncitizens who must arrive through entry points outside of Virginia. And an injunction limited to visa holders, lawful permanent residents, or both, who reside, or intend to reside, in Virginia, would be utterly unworkable, as the federal government has made no showing that it would be able to devise and implement an effective system for distinguishing any such subgroup. Only a nationwide injunction will provide complete relief.

## CONCLUSION

For the foregoing reasons, this Court should grant the Commonwealth of Virginia's

motion and enter a preliminary injunction enjoining the operation of the Executive Order on a

nationwide basis.

Dated: February 8, 2017

Respectfully submitted,

ERIC T. SCHNEIDERMAN
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
120 Broadway, 25th Floor
New York, NY 10271

LISA MADIGAN
  *Attorney General*
  *State of Illinois*
DAVID FRANKLIN
  *Solicitor General*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of Pennsylvania*
JONATHAN SCOTT GOLDMAN
  *Executive Deputy Attorney General*
Civil Law Division
Strawberry Square, 15th Floor
Harrisburg, PA 17120

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
ELIZABETH N. DEWAR
GENEVIEVE C. NADEAU
JONATHAN B. MILLER
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108

KARL A. RACINE
  *Attorney General*
  *District of Columbia*

  _/s/  Michael A. Tilghman_
MICHAEL A. TILGHMAN II [VSB No. 77397]
  *Assistant Attorney General*
Suite 630 South
441 Fourth Street, N.W.
Washington, D.C. 20001
(202) 727-6247
(202) 741-8676 (fax)
michael.tilghman@dc.gov

28

XAVIER BECERRA
 *Attorney General*
 *State of California*
Suite 11000
455 Golden Gate Avenue
San Francisco, CA  94102

GEORGE JEPSEN
 *Attorney General*
 *State of Connecticut*
55 Elm Street
Hartford, CT 06106

MATTHEW P. DENN
 *Attorney General*
 *State of Delaware*
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801

THOMAS J. MILLER
 *Attorney General*
 *State of Iowa*
1305 E. Walnut Street
Des Moines, IA 50319

JANET T. MILLS
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
 *Attorney General*
 *State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

HECTOR BALDERAS
 *Attorney General*
 *State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

JOSH STEIN
 *Attorney General*
 *State of North Carolina*
9001 Mail Service Center
Raleigh, NC 27699

ELLEN F. ROSENBLUM
 *Attorney General*
 *State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. KILMARTIN
 *Attorney General*
 *State of Rhode Island*
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
 *Attorney General*
 *State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
 *Attorney General*
 *State of Washington*
1125 Washington Street SE
PO Box 40100
Olympia, WA   98504-0100

29

**CERTIFICATE OF SERVICE**

I certify that on the 9th day of February, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to all ECF participants.

*/s/ Michael A. Tilghman II*
MICHAEL A. TILGHMAN II [VSB No. 77397]
Assistant Attorney General
Suite 630 South
441 Fourth Street, N.W.
Washington, D.C. 20001
(202) 727-6247
(202) 741-8676 (fax)
michael.tilghman@dc.gov