IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TAREQ AQEL MOHAMMED AZIZ, et al.,    )
                                     )
        Plaintiffs/Petitioners       )
                                     )
v.                                   )        1:17-cv-116 (LMB/TCB)
                                     )
DONALD TRUMP, President of the United )
   States, et al.,                    )
                                     )
        Defendants/Respondents.      )

## MEMORANDUM OPINION

In this civil action, the Commonwealth of Virginia ("Commonwealth") alleges that

Executive Order 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the

United States" ("the EO"), violates the First and Fifth Amendments to the United States

Constitution, as well as the Immigration and Nationality Act and Religious Freedom Restoration

Act. Before the Court is the Commonwealth's Motion for a Preliminary Injunction, to which

defendants have responded and on which oral argument has been held. Attached to the

Commonwealth's motion were multiple exhibits and declarations. The defendants have

responded with no evidence other than the EO, which they have defended primarily with

arguments attacking the Commonwealth's standing to oppose the EO and emphasizing the

authority of the president to issue such an EO. For the reasons that follow, the Commonwealth's

Motion for a Preliminary Injunction will be granted.

## I.    FINDINGS OF FACT

### A. The Executive Order

On January 20, 2017, Donald Trump ("Trump") was inaugurated as the 45th President of

the United States. On January 27, 2017, he signed the EO. Section 3 of the EO "proclaim[ed]

that the immigrant and nonimmigrant entry into the United States of aliens from" Syria, Iraq,

Iran, Libya, Sudan, Yemen, and Somalia "would be detrimental to the interests of the United

States" and "suspend[ed] entry into the United States, as immigrants and nonimmigrants, of such

persons for 90 days from the date of this order." [Dkt. 7-1] § 3(c). Although the EO specifically

excludes "foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization

visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas"[1] from the

ban on entry, it does not list lawful permanent residents ("LPRs") among those excluded. Id.

Section 5 of the EO suspends the United States Refugee Assistance Program ("USRAP") for

persons from all countries for 120 days. Id. at § 5(a). Once the suspension has ended, the EO

directs the Secretaries of State and Homeland Security "to the extent permitted by law, to

prioritize refugee claims made by individuals on the basis of religious-based persecution,

provided that the religion of the individual is a minority religion in the individual's country of

nationality." Id. at § 5(b).

Section 1 describes the stated purpose for the EO as follows:

> Numerous foreign-born individuals have been convicted or implicated in
> terrorism-related crimes since September 11, 2001, including foreign nationals
> who entered the United States after receiving visitor, student, or employment
> visas, or who entered through the United States refugee resettlement program.
> Deteriorating conditions in certain countries due to war, strife, disaster, and civil
> unrest increase the likelihood that terrorists will use any means possible to enter
> the United States. The United States must be vigilant during the visa-issuance
> process to ensure that those approved for admission do not intend to harm
> Americans and that they have no ties to terrorism.

[Dkt. 31-1] § 1. Section 2 goes on to declare it to be "the policy of the United States to protect

its citizens from foreign nationals who intend to commit terrorist attacks in the United States;

---

[1] The "G" series of visas are available to qualifying representatives of foreign governments and
international organizations.

2

and to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes." Id. § 2.

The EO was initially applied to LPRs, and the defendants have since conceded that Customs and Border Patrol ("CBP") initially stopped several LPRs at the border in the 24 to 48 hours after the EO was signed, although they represent that all such persons have since been permitted to enter the United States. After initial confusion within the executive branch, [Dkt. 61-17], Homeland Security Secretary John Kelly released a statement on Sunday, January 29, announcing that he "deem[ed] the entry of lawful permanent residents to be in the national interest" and that "lawful permanent resident status will be a dispositive factor in our case-by-case determinations," [Dkt. 61-1].

The next day, White House Counsel Donald F. McGahn II issued a memorandum stating that "there has been reasonable uncertainty about whether [Section 3 of the EO] appl[ies] to lawful permanent residents of the United States. Accordingly, to remove any confusion, I now clarify that Section 3(c) . . . do[es] not apply to such individuals." [Dkt. 34-1]. Defendants have argued that in light of this memorandum, the EO cannot be interpreted to apply to LPRs; however, a voluntary change of policy cannot be taken as binding unless it is "absolutely clear" that the government will not revert to its original position. Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 189 (2000). As the Ninth Circuit observed in related litigation, defendants have "offered no authority establishing that the White House counsel is empowered to issue an amended order superseding the Executive Order signed by the president . . . and that proposition seems unlikely," nor have they "established that the White House counsel's interpretation of the Executive Order is binding on all executive branch officials responsible for enforcing" it. Washington v. Trump, __ F.3d __, 2017 WL 526497, at *8 (9th

Cir. 2017). Accordingly, the Court finds that the EO presents an ongoing risk to the status of

LPRs from the seven countries covered by the EO.

### B. Injuries to the Commonwealth and its Residents

The Commonwealth has produced evidence of the EO being disruptive to the operation

of its public colleges and universities. As the declaration of W. Taylor Reveley III ("Reveley"),

who is president of the College of William & Mary and the chair of the Council of Presidents, a

group consisting of the presidents and chancellors of Virginia's 14 public universities and

colleges and 23 community colleges, [Dkt. 32] at ¶¶ 1–2, explains, the EO affects international

travel of at least 350 students attending Virginia Commonwealth University, Virginia Tech,

George Mason University, the University of Virginia, and William & Mary combined.[2] [Dkt.

32] at ¶ 5. That number includes at least two students who were abroad when the EO was issued

and were denied reentry to the United States on its authority. Id. at ¶ 6.[3] At one university,

Iranian-born faculty and students "have had to cancel their plans to present their work at an

international conference on engineering" because they believe they are likely to be denied

reentry to the United States. Id. at ¶ 7. The EO is also disrupting the process by which medical

students "match" with academic hospitals for their residency, which takes place this month. Id.

at ¶ 8. At least two Virginia universities have already had to cancel appearances by foreign

scholars as a result of the EO. Id. at ¶ 9. Students have also begun withdrawing applications to

attend Virginia schools as a result of the travel ban, and at least two students who had already

announced an intention to enroll in Virginia schools have now abandoned those plans. Id. at

---

[2] At oral argument, the Commonwealth represented that across all of its schools its estimate of
affected persons has grown to 1,000 students and 66 faculty and staff members.

[3] One of these students, Najwa Elyazgi, has since entered the United States, but only as a result
of the District of Washington's order staying enforcement of the EO. [Dkt. 54] ¶ 11.

¶ 11.  The affected students and faculty "must refrain from leaving the United States for fear of not being able to return," id. at ¶ 7, and "are unsure whether they should take the trips they had planned to visit family and fulfill research obligations, whether future trips should be planned, and whether members of their family or research partners will be able to visit the United States," id. at ¶ 14.  The defendants provided no evidence to counter these representations.

The Commonwealth has also presented evidence that enforcement of § 3(c) of the EO will have a financial impact on its colleges and universities.  Most concretely, the EO will result in reduced revenue from tuition money from students who cannot return to continue their studies or who are unable to enroll.  [Dkt. 32] at ¶ 11.  Department of Homeland Security data from 2015, the most recent year available, shows that 465 student visa holders from the affected countries were enrolled in Virginia schools.  [Dkt. 61-15] at 4.  College Factual, a company that specializes in higher education analytics, estimates that this could result in up to $20.8 million in lost tuition and fees.  Id.; [Dkt. 61-16] at 1.  Although the Commonwealth has not identified any specific grants or contracts that are in immediate jeopardy, it also argues that the EO may inhibit the ability of research universities to fulfill the terms of various grants and contracts.  [Dkt. 32] at ¶ 12.

Reveley also avers that university personnel are experiencing "anxiety, confusion, and distress" because of the uncertainty introduced by the EO, such that some universities "have experienced an uptick in students, employees, and faculty using their counseling services."  Id. at ¶ 14.  Finally, Reveley and other administrators are concerned that the EO could imperil Virginia students who are studying abroad, by inflaming "anti-American sentiment[.]"  Id. at ¶ 15.  Again, defendants have not tendered any evidence to refute these concerns.

5

### C. The Government's Asserted Rationale for the EO

Defendants have maintained that the EO is necessary to protect the United States from terrorist attacks to be carried out by nationals of the seven affected countries [Dkts. 31-1, 80]; however, they have not offered any evidence to identify the national security concerns that allegedly prompted this EO, or even described the process by which the president concluded that this action was necessary.[4]

And contrary to the national security concerns recited in the EO, the only evidence in the record on this subject is a declaration of 10 national security professionals who have served at the highest levels of the Department of State, the Department of Homeland Security, the Central Intelligence Agency, and the National Security Council through both Republican and Democratic administrations,  [Dkt. 57], and at least four of whom "were current on active intelligence regarding all credible terrorist threat streams directed against the [United States] as recently as one week before the issuance of the" EO.  Id. at ¶ 2.  They write

> We all agree that the United States faces real threats from terrorist networks and must take all prudent and effective steps to combat them, including the appropriate vetting of travelers to the United States.  We all are nevertheless unaware of any specific threat that would justify the travel ban established by the Executive Order issued on January 27, 2017.  We view the Order as one that ultimately undermines the national security of the United States, rather than making us safer.  In our professional opinion, this Order cannot be justified on national security or foreign policy grounds.

Id. at ¶ 3.  They also observe that since September 11, 2011, "not a single terrorist attack in the United States has been perpetrated by aliens from the countries named in the Order."  Id. at ¶ 4.

---

[4] To the extent that such evidence might be classified, "the Government may provide a court with classified information.  Courts regularly receive classified information under seal and maintain its confidentiality.  Regulations and rules have long been in place for that." Washington, 2017 WL 526497, at *10 n.8.

### D. The President's Public Comments

The Commonwealth's evidence also contains several statements by the president and his senior advisors on the subject of immigration to the United States by Muslims. Although defendants dispute the relevance of these statements, as discussed below, they have not contested their accuracy.

On December 7, 2015, then-candidate Trump issued a press released titled "Donald J. Trump's Statement on Preventing Muslim Immigration." [Dkt. 61-12]. In the statement, he called "for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on." Id.

The latter statement is consistent with views that the president has expressed on various occasions over the last six years. A representative example[5] can be found in a 2011 interview with Fox News's Bill O'Reilly ("O'Reilly"). A portion of that interview reads:

> O'Reilly: Is there a Muslim problem in the world?
> Trump: Absolutely. Absolutely. I don't notice Swedish people knocking down the World Trade Center.
> . . .
> O'Reilly: But you do believe overall there is a Muslim problem in the world.
> Trump: Well, there is a Muslim problem. Absolutely. You just have to turn on your television set.
> O'Reilly: And do you think it encompasses all Muslims?
> Trump: No. And that's the sad part about life. Because you have fabulous Muslims. I know many Muslims and they're fabulous people. They're smart. They're industrious. They're great. Unfortunately, at this moment in time, there is a Muslim problem in the world. And by the way, and you know it and I [sic] and I know it and some people don't like saying it because they think it's not politically correct.

[Dkt. 61-19] at 5.

---

[5] The attachments to the Declaration of Mona Siddiqui [Dkt. 61] collect several other examples, although the Court does not consider every document in the Siddiqui declaration to be relevant.

As the campaign proceeded, there were fewer references to an outright ban on Muslim immigration, with the focus switched to a ban on persons from territories that have a Muslim majority. Mr. Trump and then-vice-presidential candidate Mike Pence ("Pence") were asked about this evolution in an interview with Lesley Stahl ("Stahl") on July 17, 2016. The relevant portion reads:

> Stahl: [I]n December, you [i.e., Pence] tweeted, and I quote you, "Calls to ban Muslims from entering the U.S. are offensive and unconstitutional."
> Trump: So you call it territories. OK? We're gonna do territories. We're not gonna let people come in from Syria that nobody knows who they are.
> . . .
> Stahl: [S]o you're changing . . . your position.
> Trump: --No, I—call it whatever you want. We'll call it territories, OK?
> Stahl: So not Muslims?
> Trump: You know—the Constitution—there's nothing like it. But it doesn't necessarily give us the right to commit suicide, as a country, OK? And I'll tell you this. Call it whatever you want, change territories [sic], but there are territories and terror states and terror nations that we're not gonna allow the people to come into our country.

[Dkt. 61-22] at 9–10.

On the morning of Friday, January 27, 2017, the president gave an interview with the Christian Broadcasting Network's David Brody ("Brody"):

> Brody: Persecuted Christians, we've talked about this, the refugees overseas. The refugee program, or the refugee changes you're looking to make. As it relates to persecuted Christians, do you see them as kind of a priority here?
> Trump: Yes.
> Brody: You do?
> Trump: They've been horribly treated. Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair [sic], everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them.

[Dkt. 61-6] at 2. That evening, the EO was signed.

8

On Sunday, January 29, 2017, two days after the EO was signed, former Mayor of New York City Rudolph Giuliani ("Giuliani") said in an interview on Fox News, "'I'll tell you the whole history of it[.]' . . . 'So when [Trump] first announced it, he said 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.' . . . 'And what we did was, we focused on, instead of religion, danger—the areas of the world that create danger for us[.]' . . . 'Which is a factual basis, not a religious basis. Perfectly legal, perfectly sensible. And that's what the ban is based on. It's not based on religion. It's based on places where there are [sic] substantial evidence that people are sending terrorists into our country.'" [Dkt. 61-4] at 1–2 (emphasis in original).

The president and his advisors deny that the EO represents the Muslim ban that the president spoke about during his campaign. Secretary Kelly said in an interview on Tuesday, January 31, 2017, "'This is not, I repeat not, a ban on Muslims.' . . . 'We cannot gamble with American lives. I will not gamble with American lives. These orders are a matter of national security, and it is my sworn responsibility as secretary of homeland security to protect and defend the American people.'" [Dkt. 61-17] at 3.

## II.   CONCLUSIONS OF LAW

### A. Justiciability

As a threshold matter, defendants argue that courts "lack jurisdiction to review the Executive Branch's decisions concerning visa revocation and entry," at least in part because those decisions involve national security judgments. [Dkt. 80] at 14.

The word "jurisdiction" was once a "word of many, too many, meanings." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 90 (1998) (internal citation and quotation marks omitted). Accordingly, the Supreme Court "has endeavored in recent years to 'bring some

discipline' to the use of the term 'jurisdictional.'" Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012)

(quoting Henderson v. Shinseki, 562 U.S. 428, 435 (2011)).  Because the modern concept

addresses "a court's adjudicatory capacity," it refers to either "subject matter jurisdiction" or

"personal jurisdiction." Henderson, 562 U.S. at 435.

Defendants have argued that exercising jurisdiction in this case would be "an

impermissible intrusion on the political branches' plenary constitutional authority over foreign

affairs, national security, and immigration." [Dkt. 80] at 14.  By advancing this argument,

defendants appear to be invoking the political question doctrine, under which a court lacks

subject matter jurisdiction over "a controversy . . . where there is a textually demonstrable

constitutional commitment of the issue to a coordinate political department; or a lack of

judicially discoverable and manageable standards for resolving it[.]" Zivotofsky v. Clinton, 566

U.S. 189, 195 (2012) (internal quotation marks and citations omitted).

The issues in this case are not textually committed to another department by the

Constitution.  To the contrary, the Commonwealth argues that the EO is in violation of

constitutional and statutory law, and that resolving these claims requires interpreting the EO, the

Immigration and Nationality Act, and the Constitution.  "This is a familiar judicial exercise."

Zivotofsky, 566 U.S. at 196.  "At least since Marbury v. Madison, [the Supreme Court has]

recognized that when" government action "is alleged to conflict with the Constitution, 'it is

emphatically the province and duty of the judicial department to say what the law is.'" Id.

(quoting Marbury, 1 Cranch 137, 177 (1803)).  "That duty will sometimes involve the

'[r]esolution of litigation challenging the constitutional authority of one of the three branches,'

but courts cannot avoid their responsibility merely 'because the issues have political

implications.'" Id. (quoting INS v. Chadha, 462 U.S. 919, 943 (1983)).

At oral argument, defendants suggested that their justiciability arguments were limited to the context of 8 U.S.C. § 1182(f), which is the statutory authority that the president invokes for the EO. Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants[.]" Defendants urge that this statutory grant of authority places the president at the zenith of his power, citing the framework first articulated by Justice Jackson in his concurrence in <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579 (1952). Under <u>Youngstown Sheet & Tube</u>, "[w]hen the President acts pursuant to an express . . . authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." 343 U.S. at 635.

Maximum power does not mean absolute power. Every presidential action must still comply with the limits set by Congress' delegation of power and the constraints of the Constitution, including the Bill of Rights.[6] It is a bedrock principle of this nation's legal system that "the Constitution ought to be the standard of construction for the laws, and that wherever there is evident opposition, the laws ought to give place to the Constitution." The Federalist No. 81, at 481 (Alexander Hamilton) (Clinton Rossiter ed., 1999). Defendants have cited no authority for the proposition that Congress can delegate to the president the power to violate the

---

[6] <u>Youngstown Sheet & Tube</u> is better known as the <u>Steel Seizure Case</u>. In that case, President Truman ordered the Secretary of Commerce to seize control of most of the country's steel mills because he felt that an impending strike would jeopardize the military's ability to wage the Korean War. The Supreme Court struck the order, holding that although "[t]he power of Congress to . . . authorize the taking of private property for public use" was beyond question, the president did not have power to do so without Congress' approval, even in wartime. <u>Id.</u> at 588.

Constitution and its amendments and the Supreme Court has made it clear that even in the

context of immigration law, congressional and executive power "is subject to important

constitutional limitations." Zadvydas v. Davis, 533 U.S. 678, 695 (2001).

Indeed, the Supreme Court has refused to hold that the president is exempt from

compliance with the Due Process Clause even when he is exercising a pure Article II power,

such as the detention of persons deemed "enemy combatants." In Hamdi v. Rumsfeld, 542 U.S.

507, 509 (2004), for example, the Supreme Court was confronted with the constitutional claims

of an "enemy combatant." The Court recognized the government's "critical . . . interest in

detaining those who actually pose an immediate threat to the national security of the United

States during ongoing international conflict," id., but still held that the president must comply

with the Fifth Amendment, id. at 524. If the president's actions can be subject to judicial review

when he is exercising his core Article II powers, as in Hamdi, it follows that his actions are also

subject to such review when he exercises Article I powers delegated to him by Congress. As the

Ninth Circuit has explained, "the Supreme Court has repeatedly and explicitly rejected the notion

that the political branches . . . are not subject to the Constitution when policymaking in [the

immigration] context." Washington, 2017 WL 526497, at *5.

The defendants also continue to dispute the Commonwealth's Article III standing to

challenge the EO. The Court has already held that the Commonwealth has pleaded facts

sufficient to establish standing under both a parens patriae theory and proprietary theory. See

Mem. Op., [Dkt. 42] at 11. Because the pending motion is for a preliminary injunction, the

Commonwealth may no longer rest on its pleadings but must "set forth by affidavit or other

evidence specific facts, which for purposes of the [preliminary injunction] will be taken to be

true." Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks and

citations omitted). As discussed above, the Commonwealth has submitted sufficient evidence in the form of Reveley's declaration to establish at this early point in the litigation standing under the standards articulated in this Court's memorandum opinion dated February 3, 2017. See Mem. Op., [Dkt. 42] at 11.

### B. Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they 'need not show a certainty of success." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) (internal quotation marks and citation omitted).

### C. Likelihood of Success on the Merits

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.[7] "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244 (1982). The Supreme Court has articulated various tests for determining whether that command has been violated. The first such test is that the law "must have a secular . . . purpose." Lemon v. Kurtzman, 403 U.S. 602, 612 (1971).

---

[7] Although the First Amendment only addresses Congress by its terms, it has long been held to apply to executive action as well. See, e.g., New York Times Co. v. United States, 403 U.S. 713, 714 (1971).

"In the past, [this] test has not been fatal very often, presumably because government does not generally act unconstitutionally, with the predominant purpose of advancing" one religion over another. McCreary County v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 863 (2005). The secular purpose requirement "'nevertheless serves an important function,'" id. at 859 (quoting Wallace v. Jaffree, 472 U.S. 38, 75 (1985) (O'Connor, J., concurring in the judgment)), because "[b]y showing a purpose to favor religion, the government sends the . . . message to . . . nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members," id. at 860 (internal citations and quotation marks omitted). This message of exclusion from the political community is all the more conspicuous when the government acts with a specific purpose to disfavor a particular religion.

Defendants have argued that the Court may not go beyond the text of the EO in assessing its purpose, or look behind its proffered national security rationale,[8] but the Supreme Court has rejected that position. Although courts "often . . . accept governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims, . . . in those unusual cases where the claim was an apparent sham, or the secular purpose secondary, the unsurprising results have been findings of no adequate secular object." McCreary, 545 U.S. at 865. When determining what purpose motivates governmental action, "an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." McCreary, 545 U.S. at 862. In other words, what matters is what an "objective observer" would draw from the text of the policy, enlightened by historical context and "the

---

[8] The District of Massachusetts apparently agreed in Louhghalam v. Trump, as it referred only to the text of the EO, but the court did not explain why it did not consider any other evidence. See ___ F. Supp. 3d ___, 2017 WL 479779, at *4–*5 (D. Mass 2017).

specific sequence of events leading to" its adoption. Id. (internal citations and quotation marks omitted). This historical context can include statements by relevant policymakers. Id. at 870 (considering resolutions authorizing a Ten Commandments display by county boards); see also Washington, 2017 WL 526497 at *10 (sanctioning the consideration of "statements by decisionmakers").

Defendants argue that an elected official's statements before he took the oath of office are irrelevant, but that position also runs counter to McCreary. 545 U.S. at 866. Just as the Supreme Court has held that "the world is not made brand new every morning[,]" id., a person is not made brand new simply by taking the oath of office. Limiting the temporal scope of the purpose inquiry "bucks common sense: reasonable observers have reasonable memories, and [Supreme Court] precedents sensibly forbid an observer 'to turn a blind eye to the context in which [the] policy arose.'" Id. (quoting Santa Fe Ind. Sch. Dist. v. Doe, 530 U.S. 290, 315 (2000)). For example, in McCreary, the American Civil Liberties Union ("ACLU") sought to enjoin a display including the Ten Commandments in two counties' courthouses. Id. at 855. The Supreme Court examined the history of interactions between county executives, the ACLU, and the federal district court for a one-year period before the challenged display was erected, id. at 851–57, and determined from that history that "the [c]ounties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody religious neutrality," id. at 873. Further, in Santa Fe, the Court examined over a year's worth of events leading up to a school district's adoption of the challenged "Prayer at Football Games" policy to conclude that it "unquestionably ha[d] the purpose and create[d] the perception of encouraging the delivery of prayer at a series of important school events." Santa Fe, 530 U.S. at 294–98, 317.

15

This Court is similarly not free to "ignore perfectly probative evidence" from statements made by the president before he took office. See McCreary, 545 U.S. at 866.

Defendants have repeatedly cited Kleindienst v. Mandel, 408 U.S. 753 (1972), arguing that when facing constitutional scrutiny in an immigration context, the government must only supply a "facially legitimate and bona fide reason" for its action, but Mandel is inapplicable to this litigation. By its terms, Mandel does not apply to the persons who have already been granted visas because it involved an as-applied challenge to executive action by a person who had not been granted a visa. Id. at 758–60. Here, by contrast, the allegations involve persons who have passed through extensive vetting requirements and been granted visas. Accordingly, the limitation Mandel imposes on constitutional review of executive action does not apply to the class of persons relevant to this action. Moreover, even if Mandel did apply, it requires that the proffered executive reason be "bona fide." Id. at 770. As the Second and Ninth Circuits have persuasively held, if the proffered "facially legitimate" reason has been given in "bad faith," it is not "bona fide." Am. Academy of Religion v. Napolitano, 573 F.3d 115, 126 (2d Cir. 2009); Bustamente v. Mukasey, 531 F.3d 1059, 1062 (9th Cir. 2008). That leaves the Court in the same position as in an ordinary secular purpose case: determining whether the proffered reason for the EO is the real reason.

Defendants argue that permitting a court to "look behind" the president's national security judgments will result in a trial de novo of the president's national security determinations.[9] No party has asked the Court to engage in such an exercise, nor would

---

[9] Similar concerns were raised in one of the wartime detention cases, Boumediene v. Bush, 553 U.S. 723, 831 (2008) (Scalia, J., dissenting), but lower courts have proven capable of conducting the required due process analysis without supplanting the executive branch, see e.g., Bensayah v. Obama, 610 F.3d 718, 723–27 (D.C. Cir. 2010).

precedent permit it to do so.  As in the Ninth Circuit, this court's "jurisprudence has long counseled deference to the political branches on matters of immigration and national security[.]" Washington, 2017 WL 526497, at *5.  The Establishment Clause concerns discussed above do not involve an assessment of the merits of the president's national security judgment.  Instead, the question is whether the EO was animated by national security concerns at all, as opposed to the impermissible motive of, in the context of entry, disfavoring one religious group and, in the area of refugees, favoring another religious group.

The Commonwealth has produced unrebutted evidence supporting its position that it is likely to succeed on an Establishment Clause claim.  The "Muslim ban" was a centerpiece of the president's campaign for months, and the press release calling for it was still available on his website as of the day this Memorandum Opinion is being entered.  See [Dkt. 61-12].  The president connected that policy to this EO when, asked last July if he had abandoned his plan for a Muslim ban, he responded "Call it whatever you want.  We'll call it territories, OK?"  [Dkt. 61-22] at 10.  Giuliani said two days after the EO was signed that Trump's desire for a Muslim ban was the impetus for this policy.  [Dkt. 61-4] at 1.  And on the same day that the president signed the EO, he lamented that under the old policy, "If you were a Muslim you could come in, but if you were a Christian, it was almost impossible," and said his administration was "going to help" make persecuted Christians a priority.  [Dkt. 61-6] at 2.  Defendants have not denied any of these statements or produced any evidence, beyond the text of the EO itself, to support their contention that the EO was primarily motivated by national security concerns.[10]

---

[10] The Court gives little weight to the post hoc statements by Secretary Kelly and other administration officials that this is not a Muslim ban.  See [Dkt. 61-17] at 3.  Such rationalizations, coming after the litigation had already been challenged on First Amendment and other legal grounds, are typically afforded little weight in an intent inquiry.  See Peacock v. Duval, 694 F.2d 644, 646 (9th Cir. 1982).

The "specific sequence of events" leading to the adoption of the EO bolsters the Commonwealth's argument that the EO was not motivated by rational national security concerns. As the declaration from the national security experts states, ordinarily an executive order prioritizing national security is based "on cleared views from expert agencies with broad experience on the matters presented to [the president]." [Dkt. 57] at ¶ 7. But here there is no evidence that such a deliberative process took place. Id. To the contrary, there is evidence that the president's senior national security officials were taken by surprise. See [Dkt. 61-17]. Although Giuliani suggested that the EO was formulated by a "whole group of very expert lawyers" and at least two members of Congress, this process appears to have taken place during the campaign and there is no evidence that this commission was privy to any national security information when developing the policy. See [Dkt. 61-4]. Once again, defendants have offered no evidence to the contrary.

Defendants argue that the list of countries affected by the EO was singled out by Congress and the previous administration for special scrutiny and therefore cannot reflect religious prejudice. Giuliani advanced a similar argument in his interview after the EO was signed—that as long as the policy was given an outwardly legal form, it is constitutional. [Dkt. 61-4] at 1–2. Once again, McCreary is to the contrary:

> One consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage. This presents no incongruity, however, because purpose matters.

545 U.S. at 866 n.14. Absent the direct evidence of animus presented by the Commonwealth, singling out these countries for additional scrutiny might not raise Establishment Clause concerns; however, with that direct evidence, a different picture emerges. In Giuliani's own account, the origin of this EO was a statement by the president that he wanted a legal way to

18

impose a ban on Muslims entering the United States. [Dkt. 61-4] at 1.  The president himself

acknowledged the conceptual link between a Muslim ban and the EO when, asked if he had

changed his position, he said "Call it whatever you want. We'll call it territories, OK?" [Dkt. 61-

22] at 10.  That the same list might have been created by constitutionally legitimate concerns

does not alter the legal analysis under McCreary.

The argument has also been made that the Court cannot infer an anti-Muslim animus

because the EO does not affect all, or even most, Muslims.  The major premise of that

argument—that one can only demonstrate animus toward a group of people by targeting all of

them at once—is flawed.  For example, it is highly unlikely that the Supreme Court considered

the displays of the Ten Commandments erected by the Kentucky counties in McCreary, which

had a localized impact, to be targeted at all persons outside the Judeo-Christian traditions.  See

545 U.S. at 851.  Moreover, the Supreme Court has never reduced its Establishment Clause

jurisprudence to a mathematical exercise.  It is a discriminatory purpose that matters, no matter

how inefficient the execution.  See id. at 860.

Finally, defendants argue that the evidence on which the Commonwealth relies proves

too much, because it would render every policy that the president makes related to Muslim-

majority countries open to challenge.  This fear is exaggerated.  The Court's conclusion rests on

the highly particular "sequence of events" leading to this specific EO and the dearth of evidence

indicating a national security purpose.  See McCreary, 545 U.S. at 862.  The evidence in this

record focuses on the president's statements about a "Muslim ban" and the link Giuliani

established between those statements and the EO.  Based on that evidence, at this preliminary

of the litigation, the Court finds that the Commonwealth has established a likelihood of success on the merits.[11]

### D. Irreparable Harm

As a matter of law, the threat of an Establishment Clause violation in and of itself constitutes irreparable harm. Newsom v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)). But it is not the only irreparable harm that the Commonwealth is experiencing. As discussed above, the travel ban applies to hundreds of students at the Commonwealth's universities, and is already preventing the exchange of faculty on which such universities thrive, by significantly straining freedom of movement. Moreover, Virginia's schools have begun to lose students, and have credibly stated that they expect to continue losing students and medical residents in the coming months if the travel ban is not lifted. Students are not fungible, thus these losses cannot be compensated by money damages, even if money damages were available in this civil action, which they are not. In light of the likelihood of an Establishment Clause violation and the restraint on liberty imposed by the travel ban, the Commonwealth has established irreparable harm.

### E. Balance of the Equities

As the Fourth Circuit has held, "a state is in no way harmed by the issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional[.]" Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks and citation omitted). Moreover, in contrast to the evidence of irreparable harm to the Commonwealth from the EO, the defendants have failed to present any

---

[11] Because the Commonwealth has established a likelihood of success on its Establishment Clause claim, the Court does not need to address its equal protection, due process, or statutory claims at this stage.

evidence of harm they or the nation will suffer if enforcement of § 3(c) of the EO is preliminarily enjoined beyond bare assertions that the EO is necessary for national security. Although there is no interest more weighty than a bona fide national security concern, the defendants have presented no evidence to support their contention that the EO is necessary to national security. And as the Ninth Circuit observed, there is no evidence that the procedures in place before the EO was signed were inadequate, as the government has not pointed to any attacks perpetrated by nationals of the affected countries since September 11, 2001. Washington, 2017 WL 526497 at *10. Ironically, the only evidence in this record concerning national security indicates that the EO may actually make the country less safe. As the former national security officials have stated: "[The EO] ultimately undermines the national security of the United States, rather than mak[ing] us safer. In our professional opinion, this Order cannot be justified on national security or foreign policy grounds." [Dkt. 57] at ¶ 3. The Commonwealth therefore prevails on the balance of the equities.

### F. Public Interest

The Fourth Circuit has held that "upholding constitutional rights surely serves the public interest." Giovani Carandola, 303 F.3d at 521 (internal quotation marks and citation omitted). The Court therefore finds that enjoining an action that is likely a violation of the Establishment Clause serves the public interest, particularly in the absence of evidence to support the government's asserted national security interest as discussed above.

### G. Scope of Relief

The Commonwealth originally sought an order enjoining enforcement of § 3(c) of the EO at any port of entry against Virginia residents who lawfully held either LPR status, a valid student visa, or a valid work visa at the time that the EO was signed. At oral argument, it

21

amended its request to include a request for a nationwide injunction applying to all persons, not just Virginia residents. Although "[n]ationwide injunctions are appropriate if necessary to afford relief to the prevailing party," Va. Soc'y for Human Life v. Fed. Election Comm'n, 263 F.3d 379, 393 (2001), injunctive relief must be no broader than necessary to avoid encroaching "on the ability of other circuits to consider the" questions raised. Id. The relief originally requested by the Commonwealth is appropriately tailored to the basis for the Commonwealth's standing and its claims relating to its residents, colleges, and universities. Moreover, the nationwide temporary restraining order entered in the District of Washington provides the broader protection sought by the Commonwealth. To avoid any claim that the preliminary injunction to be entered in this litigation is defective because of overbreadth, this Court declines the Commonwealth's invitation to impose broader relief.

### III.   CONCLUSION

For the reasons discussed in this Memorandum Opinion, the Court holds that the unrefuted evidence presented by the Commonwealth establishes that there is a likelihood the Commonwealth will prevail on the merits of its Establishment Clause claim; that it will suffer irreparable injury if the enforcement of § 3(c) of the EO is not enjoined as it relates to Virginia residents, Virginia institutions, and persons connected to those persons and institutions; that the defendants will not suffer any harm from imposing the injunction; and that enjoining unconstitutional action by the Executive Branch is always in the public's interest. Accordingly, the Court will enter a separate order granting a modified version of the injunction sought by the Commonwealth.

Entered this 13 day of February, 2017.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

22